# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life ）
Term Parole Consideration ）    CDC Number D-60489
Hearing of: ）
                           ）
HAROLD HAWKS            ）
_____）


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 27, 2006


PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

HAROLD HAWKS, Inmate
STEVE DEFILIPPIS, Attorney for Inmate
LINDA DUNN, Deputy District Attorney
MARK DWYER, Victim's Next of Kin
HOLLY BELL, Victim's Next of Kin
MICHELLE MCELYEA, Victim's Next of Kin
BRETT COLEMAN, Victim's Next of Kin Support
STEVE BELL, Victim's Next of Kin Support
JOHN BARNES, Victims' Services
DAN PHERIGO, Public Information Officer/CTF
PRESS (2), Unidentified
RACHELLE HARVEY, Observer/Via Videoconference
RICHARD DE ATLEY, Observer/Via Videoconference
EMILY WEBB, Observer/Via Videoconference
MARILYN BALDWIN, Observer/Via Videoconference
STEPHANIE BRADLEY, Observer/Via Videoconference
STEPHANIE GARTHWAITE, Technical Support


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No        See Review of Hearing
_____    Yes       Transcript Memorandum


**Sandra Triplett, Peters Shorthand Reporting**

ii

INDEX

                                                           Page

Proceedings.......................................... 1

Case Factors........................................ 30

Pre-Commitment Factors.............................. 43

Post-Commitment Factors............................. 54

Parole Plans........................................ 70

Closing Statements................................. 109

Recess............................................. 148

Decision........................................... 149

Adjournment........................................ 154

Transcriber Certification.......................... 155

--oOo--

1

1         **P R O C E E D I N G S**

2         **DEPUTY COMMISSIONER SMITH:** And we're on

3    the record.

4         **PRESIDING COMMISSIONER DAVIS:** All right,

5    Mr. Defilippis. This is in the matter of

6    Mr. Harold Hawks, CDC number D-60489. And you

7    have an issue that you wanted to discuss before

8    we brought in -- Well, it's actually my choice

9    not to do -- not to bring anybody else into the

10   room. But you wanted to discuss the presence of

11   the press.

12        **ATTORNEY DEFILIPPIS:** That's correct.

13   Thank you, Mr. Davis. What I'm asking is that

14   the press be excluded from this proceeding. I

15   did not get prior notice of there being anyone

16   requesting to attend the proceeding. My

17   understanding of the protocol with the -- with

18   the Board is that if someone wants to come in as

19   an observer, they need to obtain written

20   permission from the Board in advance. I have

21   not been provided with notification that there

22   has been any written permission granted to

23   anyone to attend. And I believe that the

24   presence of the press here is going to simply

25   result in a prejudicial impact on my client.

26   This is a parole suitability hearing. This is

27   not something I think is appropriate to be

1    having the press come in and have the press

2    present to exert influence.  That's been one of

3    the problems in this case is that there have

4    been in the past, attempts to unlawfully assert

5    influence.  The Corona Police Department,

6    Lieutenant Mike Anderson, who on October 22,

7    2003, at 10:05 a.m., sent an e-mail out in which

8    he was soliciting opposition letters from

9    individuals, I think, connected with the --

10        **PRESIDING COMMISSIONER DAVIS:**  Okay,

11    Mr. Defilippis, if we could stay on the press

12    issue.

13        **ATTORNEY DEFILIPPIS:**  Well, this is part

14    of the press issue and part of the -- and one of

15    the issues is attempts to unlawfully influence

16    the Board.  And there has -- there has already

17    been efforts in that regard by the Police

18    Department where Mike Anderson has actually

19    acknowledged in an e-mail that he has been told

20    by the -- Quote, "We have been told by the Board

21    that Hawks is doing everything right and may be

22    paroled in the near future."  Quote, "We have

23    been told that these letters in past years have

24    been the only thing that has kept him in

25    custody."  End of quote.  I have been Mr. Hawks'

26    representative during the relevant time.  I was

27    his Counsel in 2002, 2003, 2005 and today's

3

1  hearing.  The Board never said any of those

2  things in my presence.  Those were apparently

3  some members of the Board.  We don't know who

4  has had some ex-parte communications with

5  Lieutenant Anderson.  It appears that, you know,

6  this proceeding was somehow brought to the

7  attention of the press.  I'm not sure how.  I

8  don't know how that occurred, because I didn't

9  get notice in advance of the fact that the press

10  was going to be here, and so I was not apprised

11  of how this was going to be proceeding.

12  Mr. Anderson also on January 25, 2005, stated,

13  quote, "Last year, I attended the proceedings

14  and could not believe at the end of the hearing,

15  the family and I were told Hawks would probably

16  be paroled soon."  End of quote.  Again, I was

17  present at the November 2003 hearing that he's

18  referring to and I was not told that.  So again,

19  this was another communication that appears to

20  be outside of my presence.  There appears to be

21  clearly attempts to influence the Board in this

22  matter, to put pressure on the Board, political

23  pressure, as a result of the status of the

24  victim in this case.  And I believe that what's

25  going on at this point is that there's an

26  attempt to get the press involved, so that

27  further pressure is put on the Board not to

4

1    parole Mr. Hawks.  It was somebody that has an

2    absolutely incredible, perfect programming here

3    in prison.  And as a result, I think that these

4    statements are true.  It has been the pressure

5    of the Police Department, the letters in

6    opposition, they've grown.  Everything has

7    grown.  The efforts to oppose Mr. Hawks' parole

8    have grown from two letters in 1997 to, you

9    know, with the petition with over 100

10   signatures.  The first three hearings, there

11   were -- I think two, two and three opposition

12   letters.  And then since the time that

13   Mr. Anderson has gotten involved in this,

14   they've suddenly grown to 30 plus letters in

15   each of the hearings.  Now with the petition

16   with over 100 signatures and now with the press

17   showing up, and for the first time in 21 years,

18   taking an interest in this case.  And I believe

19   that this is prejudicial to Mr. Hawks.  I

20   believe it would result in an unfair hearing to

21   him.  And as a result, I'm opposing the

22   allowance of the press in as observers, since

23   this was not approved in advance.

24       **PRESIDING COMMISSIONER DAVIS:**  Ms. Dunn,

25   do you have any comments you'd like to make?

26       **DEPUTY DISTRICT ATTORNEY DUNN:**  My only

27   comment is that it's my understanding the press

1    got clearance from CDCR, and our office is

2    confident that there will be a fair and

3    impartial decision rendered today that would be

4    uninfluenced by anyone.  That's my only comment.

5        **PRESIDING COMMISSIONER DAVIS:**  The press

6    did gain clearance from our CDCR, and actually,

7    we were just notified of this yesterday.

8        **DEPUTY COMMISSIONER SMITH:**  Late yesterday

9    afternoon.

10       **PRESIDING COMMISSIONER DAVIS:**  Late

11   yesterday afternoon, the press would be here,

12   ourselves.

13       **ATTORNEY DEFILIPPIS:**  No one called my

14   office to advise me that they had been notified

15   of this.  And the protocol is that the Board

16   makes the decision as to whether observers come

17   in or don't come in.

18       **PRESIDING COMMISSIONER DAVIS:**  Well, I

19   think it's also been cleared by -- It has been

20   cleared by the Board as well.  I got a call last

21   night from John Monday, and it had been cleared.

22       **ATTORNEY DEFILIPPIS:**  Again, Mr. Monday

23   did not call my office.  And I am known to be

24   the representative of Mr. Hawks in this case.

25   I've had this issue before, where the Board has

26   precluded individuals favorable to parole from

27   the hearing process in the case of Rick

6

1    Schoenfeld down at CMC.  They've attempted to
2    get the trial judge or not the trial judge, but
3    the Appellate Justice who supported parole into
4    the hearing as well as the prosecutor of
5    Mr. Schoenfeld.  That was denied by the Board.
6    And we're required to go through a full process
7    to obtain clearance for an observer.  And that
8    has not been done here.

9         **PRESIDING COMMISSIONER DAVIS:**  No, they
10    have been cleared to be here, so the clearance
11    is not an issue.  The -- I have not been
12    contacted by anyone, and I'm sure --
13    Commissioner Smith, have you been contacted by
14    anyone trying to sway you one way or the other
15    about this case?

16        **DEPUTY COMMISSIONER SMITH:**  Not at all.
17    No.

18        **PRESIDING COMMISSIONER DAVIS:**  Nor have I.
19    I haven't -- In fact, I frankly didn't even know
20    who Mr. Hawks was until I read the file, and
21    have had no prior contact.  The press is an
22    independent third party that obtained clearance.
23    They're not someone either for or against.
24    They're simply here to report and report.  So I
25    am going to overrule your objection.  I will --
26    I want to make it clear for the record now, and
27    just so you know -- and I'm sure you know

1    already.  I am a retired police chief, but I am
2    -- I don't know the people involved in this.  I
3    don't know, as I said, don't know Mr. Hawks,
4    don't know the officers, have never been
5    contacted, have not been contacted by anyone
6    with regard to this case.  So I'll just lay that
7    out for you now just in case you want to ponder
8    that.  But I'm sure you already knew that,
9    but --

10        **ATTORNEY DEFILIPPIS:**  I did already know
11    that.

12        **PRESIDING COMMISSIONER DAVIS:**  -- to make
13    it clear for the record that I feel perfectly
14    capable of rendering a fair and appropriate
15    decision regardless of the presence of the
16    press.  Commissioner Smith?

17        **DEPUTY COMMISSIONER SMITH:**  Additionally,
18    I'm a retired Deputy Commissioner.  I have been
19    retired for about three and a half years and
20    working as a --

21        **ATTORNEY DEFILIPPIS:**  I see you an awful
22    lot for someone who is retired.

23        **DEPUTY COMMISSIONER SMITH:**  I don't -- I'm
24    not totally doing the retirement thing just
25    right, I guess.

26        **ATTORNEY DEFILIPPIS:**  That's true.

27        **DEPUTY COMMISSIONER SMITH:**  But the point

8

1    being was that, you know, even if the Board were

2    to try and exercise any influence whatsoever,

3    which is not -- absolutely not the case, in this

4    situation or in any other situation, here's my

5    status as a retired Member of the Board.  I'm

6    absolutely capable of weighing facts and

7    rendering what, in my opinion, is a fair and

8    proper decision, and I certainly make that

9    commitment to both you, Mr. Hawks, when he comes

10   in and to the Riverside County District

11   Attorney's Office without any prejudice or

12   pressure whatsoever.

13       **ATTORNEY DEFILIPPIS:**  And just so that I'm

14   clear for the record, you know, I've appeared in

15   front of both of you previously, and I'm

16   certainly not suggesting that I believe there

17   was any actual attempts to influence either of

18   you, and I certainly have no evidence of that.

19   And I have no reason to believe that anything

20   you say is not correct.  But and there is

21   another issue that I'm going to raise as a

22   result of what Mr. Anderson has done.  Because

23   what it does is it creates the appearance of

24   impropriety.  Whether or not there's actual

25   efforts to bias the two decision makers that are

26   actually present in this case, there is now an

27   appearance by us as a result of the unlawful and

1  illegal conduct of Mr. Anderson in this case.

2  And as a result of that, it's my position that

3  the Board is no longer in a position that -- the

4  Board as an entity, not you two specifically,

5  but the Board as an entity is now not in a

6  position to hear this case.

7  **PRESIDING COMMISSIONER DAVIS:** All right.

8  Is that all you want to put on the record under

9  objections?

10  **ATTORNEY DEFILIPPIS:** Wherever you want to

11  deal with that, I just was bringing it up

12  because I don't want to, you know, suddenly hit

13  you with that at some point. We can take care

14  of it now. We can address it in the objections

15  during the course of the proceedings. However

16  you want to do it.

17  **PRESIDING COMMISSIONER DAVIS:** All right.

18  We can -- Why don't we go ahead and take care of

19  it now so we --

20  **ATTORNEY DEFILIPPIS:** Okay.

21  **PRESIDING COMMISSIONER DAVIS:**  -- can be

22  done.

23  **ATTORNEY DEFILIPPIS:** Well, I essentially

24  stated it just now. The quotes that I've read

25  to you from Mr. Anderson's October 22, 2003

26  e-mail as well as the January 25, 2005 letter

27  that he submitted, I think outlined the

1   acknowledgments that he's made of having ex-

2   parte communications with the Board.  I can

3   represent to you that if I were sworn as a

4   witness, I would testify that I was present at

5   the November 19th, 2003 hearing and there was no

6   statements that were made at that hearing to

7   Lieutenant Anderson or to anyone else or the

8   family or the District Attorney in my presence

9   regarding Mr. Hawks as doing everything right

10  and possibly being paroled in the near future or

11  that the opposition letters have been the only

12  thing that kept him in custody nor was there any

13  statement made that at the end of the hearing,

14  that the family was told that Mr. Hawks would

15  probably be paroled soon.  I note that the

16  October 27th, 2003 e-mail predates the 2003

17  hearing.  The 2003 hearing was November 19, so

18  Mr. Anderson is referring to ex-parte

19  communications that occurred prior to that date.

20  And in his January 25, 2005 letter, he's

21  referring to the proceedings the year prior to

22  that, which would be the November 19, 2003

23  hearing.  So he's indicating that on more than

24  one occasion, there have been ex-parte

25  communications by perhaps prior Commissioners

26  and/or Deputy Commissioners.  I'm not sure who

27  was involved, because he doesn't identify who it

11

1    is with him.  I believe that creates, at this

2    point, clearly the appearance of impropriety and

3    results in the inability of the Board as an

4    entity to sit in judgment of Mr. Hawks' parole

5    application.

6    **PRESIDING COMMISSIONER DAVIS:**  All right.

7    Are you making that in the form of an objection

8    for this hearing?

9    **ATTORNEY DEFILIPPIS:**  Yes, I'm objecting

10    to the Board conducting this hearing.  I believe

11    that, in my estimation, the matter would have to

12    be essentially dealt with by an appointment of

13    an independent body or reference to the -- to

14    the courts to have the issue of his parole

15    suitability decided.

16    **PRESIDING COMMISSIONER DAVIS:**  Do you

17    have anything you'd like to add to this?

18    **ATTORNEY DEFILIPPIS:**  Well, I can

19    appreciate you asking the District Attorney for

20    her input, however --

21    **DEPUTY DISTRICT ATTORNEY DUNN:**  I was

22    going to say no, Mr. Defilippis.  Thank you very

23    much, Sir.

24    **PRESIDING COMMISSIONER DAVIS:**  And as

25    always, this is not an issue of getting

26    (indiscernible) simply adding their information

27    to the mix.  And then what I will do is tell you

12

1   that we simply don't have enough information to
2   act on your particular objection, so I'm going
3   to overrule that.  I'm sure you'll take it up to
4   the next appropriate step where the information
5   can be properly weighed.

6        **ATTORNEY DEFILIPPIS:**  Certainly.  And just
7   for the record, I -- those -- the letters and
8   e-mails are a matter of record in this -- in
9   this matter.  They have been submitted and are
10  attached to the set of exhibits that I provided
11  in advance for the hearing.

12       **PRESIDING COMMISSIONER DAVIS:**  All right.
13  Anything else?

14       **ATTORNEY DEFILIPPIS:**  Not at this time.
15  Everything else can be addressed during the
16  course of the hearing.

17       **PRESIDING COMMISSIONER DAVIS:**  All right.
18  And we will go off record now and we'll bring
19  everybody in and get started.

20                 [Off the record]

21       **DEPUTY COMMISSIONER SMITH:**  We're on the
22  record.  This is a Subsequent Parole
23  Consideration Hearing for Harold Hawks, CDC
24  number D-60489. Today's date is July 27th, 2006.
25  We're located at the Correctional Training
26  Facility in Soledad.  The inmate was received on
27  July 2nd, 1987, from Riverside County.  The life

13

1    term began on November 29th, 1987, with a

2    Minimum Eligible Parole Date of November 28th,

3    1997.  Controlling offense for which the inmate

4    has been committed is murder second with a

5    firearm.  Case number CR26084.  Count one, Penal

6    Code Section 187/12022.5.  The inmate received a

7    term of 15 years to life plus two.  This hearing

8    is being tape-recorded.  For the purposes of

9    voice identification, we'll each state our first

10    and last name.  When it reaches you, Mr. Hawks,

11    if you'd also give us your CDC number, please.

12    I'll start and move to my left.  I'm James

13    Davis, D-A-V-I-S, Commissioner.

14        **DEPUTY COMMISSIONER SMITH:**  My name is

15    Dennis Smith, S-M-I-T-H.  I'm a Deputy

16    Commissioner.

17        **CORRECTIONAL COUNSELOR BARNES:**  John

18    Barnes, B-A-R-N-E-S, Correctional Counselor,

19    Victims' Services Coordinator at CTF.

20        **MR. DWYER:**  Mark Dwyer, D-W-Y-E-R, son of

21    the victim.

22        **MR. COLEMAN:**  Brett Coleman, C-O-L-E-M-A-N,

23    family support.

24        **MS. BELL:**  Holly Bell, B-E-L-L, daughter

25    of victim.

26        **DEPUTY DISTRICT ATTORNEY DUNN:**  Linda

27    Dunn, D-U-N-N, Riverside County District

14

1    Attorney's Office.

2         **MS. MCELYEA:**  Michelle McElyea,

3    M-C-E-L-Y-E-A, daughter of the victim.

4         **MR. BELL:**  Steve Bell, B-E-L-L, family

5    support.

6         **DEPUTY COMMISSIONER SMITH:**

7    Mr. Defilippis?

8         **MR. PHERIGO:**  Dan Pherigo, Public

9    Information Officer and Administrative Assistant

10   with the Correctional Training Facility.  That's

11   spelled P-H-E-R-I-G-O.

12        **PRESIDING COMMISSIONER DAVIS:**

13   Mr. Defilippis, that's you.

14        **ATTORNEY DEFILIPPIS:**  Steve Defilippis,

15   D-E-F-I-L-I-P-P-I-S.  I'm the Attorney for

16   Mr. Hawks.

17        **INMATE HAWKS:**  I'm Harold Hawks,

18   H-A-W-K-S, D-60489.

19        **PRESIDING COMMISSIONER DAVIS:**  And we also

20   have some people joining us by

21   videoconferencing.  Would you introduce

22   yourselves as well, please?

23        **MS. HARVEY:**  Rachelle Harvey, H-A-R-V-E-Y,

24   observer.

25        **MR. DE ATLEY:**  Richard De Atley,

26   D-E, space, A-T-L-E-Y, observer.

27        **MS. WEBB:**  Emily Webb, W-E-B-B, observer.

15

1          **MS. BALDWIN:**  Marilyn Baldwin,

2     B-A-L-D-W-I-N, observer.

3          **MS. BRADLEY:**  Stephanie Bradley,

4     B-R-A-D-L-E-Y, observer.

5          **MS. GARTHWAITE:**  I'm Stephanie Garthwaite,

6     G-A-R-T-H-W-A-I-T-E, for technical support.

7          **PRESIDING COMMISSIONER DAVIS:**  All right.

8     We also have two members of the press with us

9     today, who will not be actively participating in

10    this hearing as well as two correctional

11    officers who are here for security purposes, who

12    will also not be actively participating in this

13    hearing.  Before we begin, Mr. Hawks, in front

14    of you, in that laminated piece of paper

15    underneath your documents is the Americans with

16    Disabilities Act Statement.  Could you please

17    read that aloud?

18         **ATTORNEY DEFILIPPIS:**  Mr. Davis, before we

19    get into that, I was advised that several of the

20    individuals appearing by videoconferencing are

21    connected with the press in some fashion.

22    However, none of the individuals, as I

23    understood it, identified themselves as being

24    press related.

25         **PRESIDING COMMISSIONER DAVIS:**  Are there

26    press members at your end?

27         **MR. DE ATLEY:**  There are.  I was

16

1    instructed to say observer, but I -- Richard De

2    Atley, reporter with the Press Enterprise.

3         **PRESIDING COMMISSIONER DAVIS:**  All right.

4         **MS. GARTHWAITE:**  I apologize.  That was my

5    fault.

6         **PRESIDING COMMISSIONER DAVIS:**  All right.

7    Mr. Hawks?

8         **INMATE HAWKS:**  Okay.

9              "The Americans with Disabilities

10             Act, ADA, is a law to help people

11             with disabilities.  Disabilities

12             are problems that make it harder

13             for some people to see, hear,

14             breathe, talk, walk, learn, think,

15             work or take care of themselves

16             than it is for others.  Nobody can

17             be kept out of public places or

18             activities because of a

19             disability.  If you have a

20             disability, you have a right to

21             ask for help to get ready for your

22             BPT hearing, get to the hearing,

23             talk, read forms and papers and

24             understand the hearing process.

25             BPT will look at what you asked

26             for to make sure that you have a

27             disability that is covered by the

17

1            ADA, and that you have asked for

2            the right kind of help.  If you do

3            not get help or if you do not

4            think you got the kind of help

5            you need, ask for a BPT 1074

6            Grievance Form.  You can also get

7            help to fill it out."

8        **PRESIDING COMMISSIONER DAVIS:**  All right.

9    Thank you.  And according to our records

10   together with staff in the institution, on

11   January 6th, 2006, you reviewed and signed a

12   Form 1073, indicating that you do not have any

13   disabilities that would qualify under the

14   Americans with Disabilities Act.  Is that

15   correct, sir?

16       **INMATE HAWKS:**  That is accurate.

17       **PRESIDING COMMISSIONER DAVIS:**  All right.

18   Anything changed since that time?

19       **INMATE HAWKS:**  No.

20       **PRESIDING COMMISSIONER DAVIS:**  All right.

21   And you're wearing glasses today.  Do you need

22   those to read?

23       **INMATE HAWKS:**  Yes, I do.

24       **PRESIDING COMMISSIONER DAVIS:**  All right.

25   And they work all right for you?

26       **INMATE HAWKS:**  No problem.

27       **PRESIDING COMMISSIONER DAVIS:**  And you can

18

1   hear me?

2        **INMATE HAWKS:**  Certainly.

3        **PRESIDING COMMISSIONER DAVIS:**  All right.

4   Very well.  And you walked here today under your

5   own steam?

6        **INMATE HAWKS:**  Indeed I did.

7        **PRESIDING COMMISSIONER DAVIS:**  All right.

8   Very well.  Is there anything that you can think

9   of that would preclude you from actively

10   participating in this hearing today?

11       **INMATE HAWKS:**  No.

12       **PRESIDING COMMISSIONER DAVIS:**  And,

13   Counsel, are you satisfied of that as well?

14       **ATTORNEY DEFILIPPIS:**  Yes.

15       **PRESIDING COMMISSIONER DAVIS:**  All right.

16   This hearing is being conducted pursuant to

17   Penal Code Sections 3041 and 3042 and the rules

18   and regulations of the Board of Prison Terms

19   governing Parole Consideration Hearings for life

20   inmates.  The purpose of today's hearing is to

21   once again consider the number and nature of the

22   crimes for which you were committed, your prior

23   criminal and social history and your behavior

24   and programming since your commitment.  We've

25   had the opportunity to review your Central File

26   and your prior transcripts, and you'll be given

27   an opportunity to correct or clarify the record

19

1    as we proceed.  Now we will reach a decision

2    today and inform you whether or not we find you

3    suitable for parole and the reasons for that

4    decision.  If you are found suitable for parole,

5    the length of your confinement will be explained

6    to you.  Nothing that happens in today's hearing

7    will change the findings of the court.  The

8    Panel is not here to retry the case.  We're here

9    for the sole purpose of determining your

10   suitability for parole.  Is that -- Do you

11   understand this?

12           **INMATE HAWKS:**  I do.

13           **PRESIDING COMMISSIONER DAVIS:**  The hearing

14   will be conducted in basically two phases.

15   First I will discuss with you the crime for

16   which you were committed as well as your prior

17   criminal and social history.  Commissioner Smith

18   will go over your progress since your

19   commitment, your counselor's report, your

20   psychological evaluation and your parole plans

21   as well as any letters of support or opposition

22   as they may exist.  Once that is concluded, the

23   Commissioners, the District Attorney and then

24   your attorney will have an opportunity to ask

25   questions.  The questions that come from the

26   District Attorney will be asked through the

27   Chair, and then you will respond back to the

20

1    Panel with your answers. Next, the District

2    Attorney and then your attorney will be given an

3    opportunity to make a final closing statement,

4    and then you will follow that with your closing

5    statement, which should focus on your

6    suitability for parole. Following that, they'll

7    be two statements from the victim's next of kin.

8    The California Code of Regulations states that

9    regardless of time served, the inmate shall be

10   found unsuitable for and denied parole, if in

11   the judgment of the Panel, the inmate would pose

12   an unreasonable risk of danger to society if

13   released from prison. Now you have certain

14   rights. Those rights include the right to a

15   timely notice of this hearing, the right to

16   review your Central File and the right to

17   present relevant documents. Counsel, are you

18   satisfied your client's rights have been met

19   today?

20        **ATTORNEY DEFILIPPIS:** Those rights have

21   been met.

22        **PRESIDING COMMISSIONER DAVIS:** Thank you.

23   You have an additional right. And that's the

24   right to be heard by an impartial Panel. Now

25   you've heard Commissioner Smith and I introduce

26   ourselves today. Do you have any reason to

27   believe that we would not be impartial?

21

1     **INMATE HAWKS:**  I defer that question to my

2    attorney.

3     **PRESIDING COMMISSIONER DAVIS:**

4    Mr. Defilippis?

5     **ATTORNEY DEFILIPPIS:**  I've addressed that

6    issue previously in the earlier phase of this

7    hearing, and I'll stand with it.

8     **PRESIDING COMMISSIONER DAVIS:**  All right.

9    Thank you.  You will receive a written copy of

10    our tentative decision today.  That decision

11    becomes effective within 120 days.  A copy of

12    the decision and a copy -- a copy of the

13    transcript will be sent to you.  The Board has

14    eliminated its appeal process.  If you disagree

15    with anything in today's hearing, you have the

16    right to go directly to the court with your

17    complaint.  You are not required to admit your

18    offense or discuss your offense.  However, once

19    again, the Panel does accept the findings of the

20    court to be -- to be correct and true.  Do you

21    understand that, sir?

22     **INMATE HAWKS:**  Yes, I do.

23     **PRESIDING COMMISSIONER DAVIS:**  All right.

24    Commissioner Smith, are we going to be dealing

25    with anything from a confidential file today?

26     **DEPUTY COMMISSIONER SMITH:**  We will not.

27     **PRESIDING COMMISSIONER DAVIS:**  All right.

22

1    I want to pass a checklist of documents to both

2    Counsels to take a look at this, make sure we're

3    all operating off the same list of documents.

4         **ATTORNEY DEFILIPPIS:**  The box for official

5    letters is not checked.  I was provided a letter

6    from the Deputy District Attorney.  There also

7    are opposition letters.  That box is not

8    checked.

9         **PRESIDING COMMISSIONER DAVIS:**  You're

10   talking about the trail that has come in since

11   the time this Board packet was prepared?

12        **ATTORNEY DEFILIPPIS:**  Apparently so.

13        **PRESIDING COMMISSIONER DAVIS:**  Okay.

14        **ATTORNEY DEFILIPPIS:**  Letters of

15   employment, there are letters verifying

16   employment.  But the -- that is not checked.

17        **PRESIDING COMMISSIONER DAVIS:**  It is also

18   in the additional information that was provided?

19        **ATTORNEY DEFILIPPIS:**  It may be.  I think

20   a number of those were actually sent directly to

21   the Board.

22        **PRESIDING COMMISSIONER DAVIS:**  We have --

23   We have a rather extensive package of additional

24   information.

25        **ATTORNEY DEFILIPPIS:**  Right.

26        **PRESIDING COMMISSIONER DAVIS:**  So if

27   you're referring to the package that both you

23

1    and the District Attorney and the Board

2    received, then we have those.

3        **ATTORNEY DEFILIPPIS:**  There also are

4    arrest reports selected.  Arrest reports, I

5    would note, and autopsy that were provided by

6    the District Attorney's Office with their

7    packet, that is not checked.  Although it is not

8    checked, the boxes for disciplinary reports or

9    counseling chronos, that information --

10   obviously, the absence of those is noted in the

11   file.  The box for other non-specific but

12   pertinent information developed since date of

13   last hearing, I don't know what that is, but it

14   is checked.  I haven't received any such

15   documents.

16       **PRESIDING COMMISSIONER DAVIS:**  I guess

17   referring to the package that all of us have

18   here.

19       **ATTORNEY DEFILIPPIS:**  If that's all it's

20   referring to, then I do have the -- obviously,

21   the package I sent to (indiscernible) the

22   package the District Attorney sent.

23       **PRESIDING COMMISSIONER DAVIS:**  Okay.  If

24   you'll pass that to the District Attorney as

25   well, please.

26       **DEPUTY DISTRICT ATTORNEY DUNN:**  Yes, I've

27   seen everything and I just want to clarify, the

1    psych report that I have, the most recent one is

2    January of '05.

3        **PRESIDING COMMISSIONER DAVIS:**  Yeah, that

4    is the one that we have in our package,

5    Mr. Defilippis.

6        **DEPUTY DISTRICT ATTORNEY DUNN:**  Thank you.

7        **PRESIDING COMMISSIONER DAVIS:**  Is that the

8    one you have as well?

9        **ATTORNEY DEFILIPPIS:**  The same one I have.

10       **PRESIDING COMMISSIONER DAVIS:**  All right.

11   All right.  That will be marked Exhibit One

12   then.  Any additional documents, Counsel?

13       **ATTORNEY DEFILIPPIS:**  Not at this time.

14       **PRESIDING COMMISSIONER DAVIS:**  Any

15   preliminary objections, Mr. Defilippis, other

16   than those that you've already offered prior to

17   everyone coming into the room?

18       **ATTORNEY DEFILIPPIS:**  Yes.  I do note that

19   with the number of observers that we have, I

20   have been previously advised that the Board's

21   rules restrict numbers of observers to two.

22   That rule has been violated here.  The -- There

23   is a limitation of next of kin to two next of

24   kin.  And, again, that rule is apparently

25   violated here.  I was not provided advance

26   notice of any of the observers that are present

27   today.

25

1   **PRESIDING COMMISSIONER DAVIS:**  Actually,
2   there is -- I know of no such rule restricting
3   the number of observers.  And in terms of next
4   of kin, I don't believe that that rule has been
5   -- There will be two speakers and their support
6   persons are here, and I believe that that is
7   consistent with the prior Board policy.  Was
8   there any objection that you had other than
9   those two?

10   **ATTORNEY DEFILIPPIS:**  The rule was
11   actually stated to me by the Board's legal
12   counsel in the case of Richard Schoenfeld.  I
13   was directly advised by the Board's legal
14   counsel that there is a limitation to two.

15   **PRESIDING COMMISSIONER DAVIS:**  Well,
16   that's not my understanding, and so I'm going to
17   overrule your objection.  Was there another
18   objection besides those two?

19   **ATTORNEY DEFILIPPIS:**  Yes.  I'm objecting
20   to the package of materials provided by the
21   District Attorney's Office.  It is inaccurate,
22   misleading.  It contains information that
23   obviously, as you indicated, Mr. Commissioner,
24   the job here is not to retry the case.  It
25   appears that's what the District Attorney's
26   Office is attempting to do.  There are
27   photographs in here that are not part of the

26

1    record of the trial proceedings.   There are

2    newspaper articles, which are not part of the

3    record of the trial proceedings.   There are

4    police reports, selected police reports that

5    ultimately much of what was said in the police

6    reports turned out to be inaccurate at the time

7    of trial and by what came out in the testimony

8    at the trial.   There's also a preliminary

9    hearing transcript that's contained within these

10   materials.   The preliminary hearing was

11   superseded by the trial proceedings in this

12   case.   The testimony that was given was

13   testimony that was at the trial, not testimony

14   at the preliminary hearing.   There was actually

15   quite a bit of contradiction between what was

16   said by the prosecution witnesses at the trial

17   versus what was said at the time of the

18   preliminary hearing.   So I would object to those

19   materials being utilized in this case.   This

20   does not follow the standard protocol, which is

21   that should the District Attorney's Office wish

22   to provide information to the Board of Prison

23   Terms for future hearings, it's their obligation

24   to follow the statutory procedure that is

25   utilized following the conviction in the case.

26   They're entitled to be able to submit a

27   statement to the court.   That statement is then

27

1    reviewed by the court. It's accuracy is

2    determined. And then once that has been

3    finalized, it's submitted by the court at the

4    time of the transmission of the inmate to the

5    facility. It's submitted to CDC with the

6    probation report. That procedure was not

7    followed here. There's also a procedure to

8    allow certain limited documents to be submitted

9    by the District Attorney's Office regarding

10   Appellate proceedings. Again, that's not what's

11   being provided here. These are materials that

12   would not have been utilized at the trial and

13   are materials that should not be considered by

14   the Board here. The case has been decided.

15   It's already been adjudicated.

16        **PRESIDING COMMISSIONER DAVIS:** Any

17   information the District Attorney would like to

18   provide?

19        **DEPUTY DISTRICT ATTORNEY DUNN:** I just --

20   I'm glad to see that Mr. Defilippis did, in

21   fact, receive our package of information and

22   that he has adequate notice of all of the

23   materials, and I hope that the Board received

24   the same packet of information. All of it is

25   relevant to the case, and therefore, relevant to

26   the issues today.

27        **PRESIDING COMMISSIONER DAVIS:** All right.

28

1    Thank you.

2        **DEPUTY DISTRICT ATTORNEY DUNN:** That's it.

3        **PRESIDING COMMISSIONER DAVIS:** Certainly

4    the Board considers a lot of different

5    information; anything that is pertinent. And we

6    weigh it, based on its -- the value for the

7    individual situation based on, again, reviewing

8    the case itself. The instant offense itself is

9    certainly one of the areas for suitability. And

10   so based on that and the fact that, again, we

11   review the information for its own value, I'm

12   going to overrule that motion as well. Anything

13   else, sir?

14       **ATTORNEY DEFILIPPIS:** Nothing else at this

15   time.

16       **PRESIDING COMMISSIONER DAVIS:** All right.

17   Will your client be speaking with us today?

18       **ATTORNEY DEFILIPPIS:** Yes, he will. He

19   will testify on all issues with the exception of

20   the commitment offense. We will submit that on

21   the five prior hearings. I think there's been

22   about five counselor's reports where he has

23   discussed the offense; four psychological

24   reports as well as with the probation officer at

25   the time of the sentencing and his testimony at

26   the trial of this matter.

27       **PRESIDING COMMISSIONER DAVIS:** All right.

29

1    For all other matters, would you raise your

2    right hand, sir, and we'll go ahead and swear

3    you in.  Do you solemnly swear or affirm the

4    testimony you give at this hearing will be the

5    truth and nothing but the truth?

6            **INMATE HAWKS:**  I do.

7            **PRESIDING COMMISSIONER DAVIS:**  For a

8    summary of this particular case, I'm going to

9    refer to the probation officer's report,

10   starting on page two.

11           **ATTORNEY DEFILIPPIS:**  I guess I do have

12   one further objection then.  There was an

13   Appellate proceeding in this case.  I think the

14   Appellate proceeding is the appropriate

15   rendition of the facts.  One of the problems

16   with the probation report is it's often

17   prepared, and I believe may even state so at the

18   beginning of it, that it's prepared by reference

19   to police reports.  And as I've indicated

20   previously, much of what was said in the police

21   reports turned out to be factually inaccurate by

22   the testimony in trial.

23           **PRESIDING COMMISSIONER DAVIS:**  What I plan

24   to do is I will also include the Court of

25   Appeals Opinion, which is very, very short and

26   really doesn't go into some of the detail.  And

27   if there are -- And I also note that Mr. Hawks,

1    in his most recent discussion with the

2    counselors, wanted to correct the record from

3    the previous 2004 Board report, I believe it

4    was.  So I'll be also -- I'll be referring to

5    that as well, and that will give your side of it

6    as well.  All right?  So, effectively, what I'm

7    saying is I'm going to overrule your motion,

8    because I am going to read this report.  I will

9    also include the Court of Appeals Opinion.  All

10   right.

11               "During the evening of August 22nd,

12        1986, Harold Hawks had driven to

13        Mission Viejo to the home of his

14        wife's parents, where she and his

15        son had been staying because of

16        marital problems they'd been

17        having.  Upon his arrival at the

18        in-laws' home, he was told that

19        his wife had taken his son to San

20        Diego on a train for an outing.

21        This caused him to have a delay in

22        his departure from that location

23        for a protracted period of time.

24        During the course of the evening,

25        Mr. Hawks consumed approximately

26        six beers.  He was at his in-laws'

27        home, and while waiting for the

31

1        train station after Mrs. Hawks

2        arrived and prior to Mr. Hawks

3        departing Mission Viejo, available

4        information indicates that they

5        quarreled.  On the same evening,

6        Mr. Michael Dwyer, D-W-Y-E-R, his

7        wife, Patricia and two family

8        members or two family friends had

9        been at the Orange County

10       fairgrounds, where the Dwyer's

11       son, Mark, had been in a

12       motorcycle competition.  During

13       the course of that evening, Mark

14       became involved in an accident on

15       the track and was offered medical

16       assistance, which he declined.

17       However, as the evening wore on,

18       Mark began to experience

19       increasing discomfort from

20       injuries, which were not readily

21       observable.  Based on these

22       considerations, the Dwyers elected

23       to return to Riverside and have

24       their son checked by a physician

25       at the Riverside Community

26       Hospital.  Proceeding on their

27       individual courses, chances and

32

1        circumstance was to bring the

2        Dwyers and their family and their

3        friends in contact with Mr. Hawks

4        with violent and fatal results.

5        While proceeding northbound on the

6        91 Freeway in the fast lane,

7        Mr. Hawks overtook Mr. Dwyer, who

8        was driving his van in the number

9        one (fast) lane.  Mr. Hawks passed

10       Dwyer's vehicle in the number two

11       lane, where after the lane changed

12       into the number one lane and

13       slowed down.  This caused

14       Mr. Dwyer to have to rapidly

15       decelerate the speed of his

16       vehicle.  Pushing to get his son

17       to the hospital as quickly as

18       possible, Mr. Dwyer requested

19       Mr. Hawks to move back over to the

20       number two lane, thus allowing him

21       to pass by flipping his high beams

22       and the headlights off and on.

23       Mr. Hawks did not comply with the

24       request, and continued to slow the

25       pace of his vehicle, and

26       additionally, made an obscene

27       gesture with his hand at

33

1          Mr. Dwyer.  When Mr. Dwyer

2          attempted to pass Mr. Hawks, by

3          shifting his vehicle into the

4          number two lane, Hawks sped up and

5          refused to allow the passing

6          movement.  However, Dwyer finally

7          succeeded in overtaking and

8          passing Hawks' vehicle, where

9          after he changed back into the

10         number one lane.  Hawks continued

11         to follow Dwyer until they reached

12         the area of Corona city limits

13         where after Mr. Hawks pulled his

14         car adjacent to Dwyer's van and

15         motioned at Dwyer to follow him

16         off the freeway, while gradually

17         changing across the freeway until

18         reaching the number four lane.

19         Mr. Dwyer did not acknowledge the

20         invitation, but continued a course

21         down the 91 Freeway.  Almost

22         immediately thereafter, the report

23         of the gunshot could be heard.

24         Mr. Dwyer also seeing the muzzle

25         flash from the weapon emanate from

26         Mr. Hawks' vehicle.  At that

27         point, Hawks [sic] noticed that

34

```
 1          his mother had been wounded.
 2          Excuse me.  At that point, Mark
 3          noticed his mother had been
 4          wounded and was bleeding
 5          profusely.  Mr. Dwyer informed of
 6          this and immediately left the
 7          freeway, taking his wife to Corona
 8          Community Hospital.  There,
 9          Patricia Dwyer was pronounced dead
10          on arrival, having sustained a
11          gunshot wound to her chest with
12          the projectile severing her aorta,
13          where after it exited her body,
14          striking Wendy Varga, V-A-R-G-A, a
15          passenger in the Dwyer van in the
16          throat, critically wounding her
17          also.  Corona Police officers
18          commenced their investigation to
19          homicide, and after crimes -- and
20          other crimes stemming from
21          Mr. Hawks' acts at that point.
22          After the vehicle witness -- After
23          the victims' witnesses in the
24          Dwyer's van were interviewed and
25          physical evidence was gathered,
26          however, for a period of days, the
27          identity of Mrs. Dwyer and
```

35

1        Ms. Vega's assailant could not be

2        determined.  On August 26th, 1986,

3        the Corona Police Department

4        received information from the San

5        Bernardino County Sheriff Sergeant

6        that his daughter-in-law had

7        information concerning their

8        investigation into this case.

9        Shortly before noon on that date,

10       telephonic contact was established

11       with this female subject, who had

12       advised the detectives that she

13       was the cousin of Harold Harvey

14       Hawks.  She said that Hawks had

15       stopped by her home on the evening

16       of August 22nd, 1986, with his son

17       on their way up to their cabin --

18       up to a cabin their family owned

19       in the San Bernardino Mountains.

20       She advised detectives that while

21       Hawks was at her home, he told her

22       of the incident he had been

23       involved in with a -- with a van

24       on the 91 Freeway that evening.

25       She further told investigators

26       that Hawks had been or had told

27       her of the confrontation, which

| 1  | had occurred on the freeway, and |
|----|----------------------------------|
| 2  | that this incident had culminated |
| 3  | in Hawks firing one shot from the |
| 4  | shotgun at the van before it |
| 5  | proceeded down the freeway. |
| 6  | Because the accounts in the |
| 7  | newspaper regarding the shooting, |
| 8  | which was being investigated, bore |
| 9  | such resemblance to the account |
| 10 | her cousin had given her about the |
| 11 | -- about what had occurred on the |
| 12 | freeway on the evening of August |
| 13 | 22nd, Mr. Hawks' cousin decided it |
| 14 | was best to advise law enforcement |
| 15 | officials of her concerns. |
| 16 | Subsequent investigation in this |
| 17 | case resulted in Mr. Hawks being |
| 18 | taken into custody without |
| 19 | incident in the early evening of |
| 20 | August 26th, 1986.  Mr. Hawks' |
| 21 | shotgun was recovered from his |
| 22 | parents' home in Pomona later on |
| 23 | that -- in that evening.  After |
| 24 | being Mirandized, Mr. Hawks told |
| 25 | investigating police officers that |
| 26 | he needed to talk to them and that |
| 27 | he had, quote, "a terrible burden |

37

```
 1          on his mind."  Closed quote.
 2          During questioning, Mr. Hawks
 3          admitted that he had fired his
 4          shotgun in order to frighten the
 5          driver of the van in return for
 6          his having nearly driven Hawks off
 7          the road into the median divider.
 8          As the van passed him and he --
 9          and cut him off while changing
10          lanes in front of him, Mr. Hawks
11          further stated he did not by any
12          means intend to hurt or kill
13          anyone by his actions."
14     Subsequently, defendant was trans -- Well, they
15     talk about transferring and the county jail
16     process.  The Court of Appeals Opinion, starting
17     on page two, indicates that,
18          "On the night of August 26th, 1986,
19          the murder victim and her friend
20          were riding in a van driven by the
21          (indiscernible) husband.  They
22          were on their way to Riverside on
23          Highway 91 to take the couple's
24          son, who had been injured earlier,
25          to a hospital.  Hawks, who was
26          upset after a disagreement with
27          his estranged wife, was driving on
```

```
 1          the same freeway with his two-year
 2          old son.  A, quote, 'tragic [sic]
 3          dispute', closed quotes, arose
 4          between the driver of the van and
 5          Hawks, and the latter became very
 6          upset when, as he claimed, the van
 7          cut him off, forcing him into the
 8          median and one of his occupants
 9          threw an empty soda can at his
10          car.  Hawks then reached into his
11          backseat and retrieved a shotgun,
12          which he loaded with a slug, then
13          fired once.  The slug pierced the
14          side of the van, hit the victim's
15          chest killing her (indiscernible)
16          her body and lodged into the
17          throat of her companion."
```

18    **ATTORNEY DEFILIPPIS:**  Mr. Davis, just a
19    minor correction.  I think on the sixth line of
20    the Court of Appeal Opinion, you said tragic
21    dispute.  That's actually traffic dispute.

22    **PRESIDING COMMISSIONER DAVIS:**  You're
23    absolutely right.  Thank you.  Traffic dispute.
24    Going back to the Board reports, as I said, we
25    marked the 2006 Board report on page one of the
26    prisoner's version, and it indicates,

27          "Hawks stated in an interview with

39

```
1           this author on 1/6/06, that in his
2           version, it's stated in the
3           November 2004 BPT report, there
4           existed a few discrepancies, which
5           are now being clarified."
6   So I'm assuming this is the version,
7   Mr. Defilippis, as you would prefer that we
8   refer to for your client's version of this.
9       ATTORNEY DEFILIPPIS:  Yes, there's
10  actually some factual inaccuracies in the
11  probation report that are clearly refuted by the
12  testimony at the trial.  As you'll note at the
13  top of the probation report, it states that
14  (indiscernible) came from the Corona Police
15  Department reports and not from the actual trial
16  proceedings.  But, yes, this is the -- this is
17  the version that Mr. Hawks has given.
18      PRESIDING COMMISSIONER DAVIS:  All right.
19  Beginning again in the same report, it says,
20          "Hawks stated that on the night of
21          August 22nd, 1986, he was scheduled
22          to pick up his son from his in-
23          laws' house at approximately 6:00
24          p.m.  Upon arriving at the
25          residence, no one was home.  He
26          waited until 7:00 p.m., when Tom
27          Fleming, F-L-E-M-I-N-G, his
```

40

| | |
|---|---|
| 1 | father-in-law, arrived home at |
| 2 | 7:30 p.m. Shirley Fleming, his |
| 3 | mother-in-law, had arrived and |
| 4 | stated that Roxanne, his wife, had |
| 5 | taken their son to San Diego by |
| 6 | train and would not be back until |
| 7 | approximately 9:10 p.m. Hawks |
| 8 | stated he drank a few beers with |
| 9 | Tom Fleming, and then he went to |
| 10 | the train station to meet his |
| 11 | wife. As Hawks waited for the |
| 12 | train to arrive, he had two more |
| 13 | beers. When the train arrived |
| 14 | late, he had an argument with his |
| 15 | wife about picking up their son. |
| 16 | They talked in the parking lot of |
| 17 | the train station for about a half |
| 18 | an hour, and he then followed his |
| 19 | wife back to his parents' house. |
| 20 | At his parents' house, they had |
| 21 | another argument. Hawks then |
| 22 | left, taking only his son. He |
| 23 | planned to go to his parents' |
| 24 | house in Lake Arrowhead and or in |
| 25 | the Lake Arrowhead area for the |
| 26 | weekend. Hawks stated that while |
| 27 | driving on Freeway 91 in the |

41

```
1              number one lane, he was suddenly

2              approached by a set of bright

3              lights, which he thought was a

4              Highway Patrol car.  As the lights

5              continued to get closer and were

6              extremely bright, he realized that

7              it was not a police car.  The car

8              stayed on his tail.  Hawks said he

9              flipped off the driver of the

10             vehicle and waved him around.  It

11             was then he noticed that the

12             vehicle was just a van and as it

13             passed in front of his car, the

14             driver threw something metallic at

15             the front of Hawks' car.  Hawks

16             stated the van deliberately cut in

17             front of him, causing him to brake

18             and swerve into the center median

19             of -- on the -- on the left.  At

20             this time, Hawks was very scared

21             and his two-year old son was

22             screaming at the top of his lungs,

23             having been dislodged from his car

24             seat.  Hawks stated that he was

25             mad, and then reached into the

26             backseat of his car for his

27             clothes back.  From inside the
```

42

```
 1          bag, he pulled out a shotgun and
 2          put it in his lap.  He then
 3          grabbed a round from inside the
 4          bag and he chambered it into the
 5          shotgun.  The van was about one or
 6          two car lengths ahead of four --
 7          of four freeway lanes on -- I'm
 8          sorry.  Four free lane -- freeway
 9          lanes over to the left of Hawks'
10          car when Hawks fired a shot above
11          and behind the van to scare the
12          person in the van, stating, quote,
13          'It was only a warning shot.'
14          Closed quotes.  Hawks stated he
15          had no intention of hitting anyone
16          nor did it appear to him that he
17          had hit the van.  The van
18          continued along the freeway and
19          then Hawks exited the freeway.
20          Hawks then went to a 24-hour gas
21          station, purchased some gas and
22          beer and got back on the Freeway
23          91.  He then took out the spent
24          shell from his shotgun and threw
25          it out the car window onto the
26          freeway between Corona and
27          Riverside.  Hawks then went to his
```

43

| | |
|---|---|
| 1 | cousin's house and stayed there |
| 2 | for a couple of days.  On Sunday |
| 3 | morning, Hawks decided to go to |
| 4 | Pomona, and that afternoon, |
| 5 | returned his son to his in-laws' |
| 6 | house.  Hawks then left his in- |
| 7 | laws' house and went home.  On |
| 8 | Tuesday, Hawks went to work and |
| 9 | returned home.  He went to a |
| 10 | friend (Greg)'s house to help fix |
| 11 | an air conditioning unit.  While |
| 12 | at the house, the Pomona Police |
| 13 | Department arrested him for one |
| 14 | charge of murder." |
| 15 | And, Counsel, as always, if at some point |
| 16 | Mr. Hawks should choose to speak to us about the |
| 17 | instant offense, he's certainly welcome to do |
| 18 | that.  However, we understand and appreciate the |
| 19 | fact he has -- he has an absolute right not to |
| 20 | do so.  Now, Mr. Hawks, we're going to get into |
| 21 | the -- your background portion. And it's at this |
| 22 | portion, if you have some -- if I misstate |
| 23 | something or if you have something that you want |
| 24 | to add, please feel free to do that.  In terms |
| 25 | of a social history, you were born in 1959, the |
| 26 | youngest of five children.  Are your parents |
| 27 | still -- |

44

1        **INMATE HAWKS:**  No.

2        **PRESIDING COMMISSIONER DAVIS:**  No.  And

3    you lived with your parents just prior to the

4    instant offense.

5        **INMATE HAWKS:**  I had lived with them on

6    and off.  Yes.  I was going through a divorce,

7    and so I needed a place to stay.

8        **PRESIDING COMMISSIONER DAVIS:**  Okay.  At

9    the time this report -- And I'm reading from the

10   probation officer's report.  At the time this

11   was done, you were married, but you have since

12   divorced.

13       **INMATE HAWKS:**  That's correct.

14       **PRESIDING COMMISSIONER DAVIS:**  And you

15   have one -- You still have your son?

16       **INMATE HAWKS:**  Yes.

17       **PRESIDING COMMISSIONER DAVIS:**  Is with

18   your ex-wife.

19       **INMATE HAWKS:**  That's right.

20       **PRESIDING COMMISSIONER DAVIS:**  And you

21   have a step-daughter.  Is that correct?

22       **INMATE HAWKS:**  That's right.

23       **PRESIDING COMMISSIONER DAVIS:**  Your formal

24   education consisted of graduating from Pomona

25   High School in 1978, and you took a variety of

26   vocational courses, including plumbing, sheet

27   metal layout, air conditioning and heating

45

1   installing.

2       **INMATE HAWKS:**  Excuse me.  I actually

3   worked in those fields.  I didn't take

4   vocational training in those fields.  I worked

5   in those -- in those construction areas.

6       **PRESIDING COMMISSIONER DAVIS:**  All right.

7   At the time of the arrest, you were employed as

8   an installer, a fabrication foreman for

9   California Air Conditioning in Upland.

10      **INMATE HAWKS:**  That's correct.

11      **PRESIDING COMMISSIONER DAVIS:**  And a

12  previous employment included a trouble -- a

13  troubleshooter for a solar company.  You've

14  never served in the Military.  In terms of

15  substance abuse, you acknowledge consuming four

16  to five six-packs of beer a week prior to the

17  instant offense.  But there, that's not exactly

18  correct.  Is it?  There was some discussion in

19  reading that there was a --

20      **INMATE HAWKS:**  Probably.  Sometimes I

21  drank more beer than that during the --

22      **PRESIDING COMMISSIONER DAVIS:**  A little

23  more, a little less?

24      **INMATE HAWKS:**  Or a little less.  Yeah.

25      **PRESIDING COMMISSIONER DAVIS:**  And --

26      **INMATE HAWKS:**  At the time of the offense.

27      **PRESIDING COMMISSIONER DAVIS:**  -- now in

46

1    the probation officer's report, you acknowledge

2    experimenting with marijuana.  But I read in any

3    other areas where you were also using cocaine.

4         **INMATE HAWKS:**  I used marijuana, but I

5    didn't just experiment with it.  That's another

6    factual thing that's incorrect off of the

7    probation officer's report.  I used marijuana

8    and I've used cocaine before.  Yeah.

9         **PRESIDING COMMISSIONER DAVIS:**  And to what

10   extent were you using?  Well, let me back up.

11   What was your drug of choice?  Alcohol or was it

12   marijuana?

13        **INMATE HAWKS:**  I would say that that would

14   be alcohol would be my gateway drug that would

15   lower my inhibitions and then I'd smoke weed.

16   But at the time of the offense, I wasn't really

17   smoking very much weed at that -- at that time.

18   I was really relying on alcohol.  So my drug of

19   choice would be alcohol.

20        **PRESIDING COMMISSIONER DAVIS:**  And you had

21   indicated prior in other reports that I reviewed

22   that both your mother and father and your

23   brother were alcoholics.

24        **INMATE HAWKS:**  Yes.

25        **PRESIDING COMMISSIONER DAVIS:**  When did

26   you start using drugs and alcohol?  I include

27   alcohol in the drug category.

47

1      INMATE HAWKS:  Well, of course, I was --
2   you know, drank beer since I was exposed to them
3   as a youth.  I really didn't start drinking
4   alcohol heavily until I was probably 19 or 20,
5   when I was ending my skateboarding career.  And
6   I smoked marijuana through, you know, on and off
7   through high school through my skateboarding
8   years and used cocaine at parties occasionally.
9      PRESIDING COMMISSIONER DAVIS:  How did you
10  get started?
11     INMATE HAWKS:  How did I get started?
12     PRESIDING COMMISSIONER DAVIS:  Using
13  alcohol and drugs.
14     INMATE HAWKS:  You know, I don't know.
15     PRESIDING COMMISSIONER DAVIS:  Do you
16  think it was the family influence or do you --
17     INMATE HAWKS:  I think it was probably
18  peer pressure and the culture at the time as
19  well.  And I think that definitely I was exposed
20  to alcohol as a problem-solving tool.  In
21  particular, my mother's form of alcoholism.  And
22  so, I think that's probably how I got started in
23  terms of drinking alcohol as seeing it as a tool
24  to solve problems maybe.
25     PRESIDING COMMISSIONER DAVIS:  Did that
26  work for you?
27     INMATE HAWKS:  Of course not.

48

1          **PRESIDING COMMISSIONER DAVIS:**  Yeah.

2          **INMATE HAWKS:**  Of course not.  It's coping

3    strategy not a problem solving tool.

4          **PRESIDING COMMISSIONER DAVIS:**  And how

5    much of a problem was that for you, do you

6    think?  I mean obviously it was clearly a

7    problem here in the instant offense.  But prior

8    to that, did that affect your life in other

9    ways?

10         **INMATE HAWKS:**  Well, I think it got worse

11   and worse up until a point -- up until the time

12   of the commitment offense.  There's no doubt

13   about that.  And, yeah, I went down the wrong

14   road with my -- with my life, mainly because of

15   my alcoholism, I would say.

16         **PRESIDING COMMISSIONER DAVIS:**  Do you --

17   Did you spend a lot of time, you think, under

18   the influence of alcohol?

19         **INMATE HAWKS:**  Well, I didn't -- You know,

20   I worked.  I was functional in terms of that I

21   worked and I basically was -- I drank after

22   work.

23         **PRESIDING COMMISSIONER DAVIS:**

24   (Indiscernible) you drank during work?

25         **INMATE HAWKS:**  Oh, no.

26         **PRESIDING COMMISSIONER DAVIS:**  Okay.

27         **INMATE HAWKS:**  No.  I wasn't a, you know,

1  stumbling drunk 24/7.  I was -- I guess the best

2  way to explain it is a functioning alcoholic in

3  terms that I was able to work and live my life.

4  But in the evenings though, my -- I started

5  drinking.  And this is back -- exactly the same

6  type of alcoholism that my mother and my brother

7  fell into is the best way to describe it.

8      PRESIDING COMMISSIONER DAVIS:  Now your --

9  is your brother still living?

10      INMATE HAWKS:  Yes.

11      PRESIDING COMMISSIONER DAVIS:  And does he

12  -- does he have any problems with alcohol still

13  or --

14      INMATE HAWKS:  They still like to get

15  drunk.  Yeah.  But he, you know, he stays in his

16  own place, so to speak, after work and doesn't

17  leave the house.

18      PRESIDING COMMISSIONER DAVIS:  Any other

19  siblings have a problem with alcohol or drugs?

20      INMATE HAWKS:  I don't think my sister has

21  had much of a problem with alcohol and drugs.

22  Of course, it was within their lives, but no, I

23  wouldn't say -- I wouldn't call them alcoholics

24  or drug addicts or anything of that nature.

25      PRESIDING COMMISSIONER DAVIS:  Now you had

26  no prior arrests.  You had no contact with law

27  enforcement other than the police coming to your

50

1    home once for a domestic violence call.

2        **INMATE HAWKS:**  No prior arrests.  Yeah,

3    the domestic violence call in Whittier, I

4    believe it was.

5        **PRESIDING COMMISSIONER DAVIS:**  Yeah, there

6    was apparently no record of that or no arrest

7    made.

8        **INMATE HAWKS:**  There was no arrest made.

9    I took the -- I'm the one that called the police

10   in that particular incident, and I'm the one

11   that --

12       **PRESIDING COMMISSIONER DAVIS:**  I think

13   that you brought that to the attention of the

14   Panel at a prior Board hearing as well.

15       **INMATE HAWKS:**  Right.  Right.  I have a

16   copy of my arrest record if you'd like to see

17   it.

18       **PRESIDING COMMISSIONER DAVIS:**  No, I do

19   too.  No, I'm just -- So did you ever seek any

20   help for your alcoholism?

21       **INMATE HAWKS:**  My wife got a DUI, and I

22   went to Alcoholics Anonymous with her, I think

23   to 10 sessions for part of the DUI treatment

24   thing.  And no, I didn't.  I think that at the

25   time that the commitment offense occurred, I had

26   been thinking about getting help extensively at

27   that time.  And I just didn't get it in time.

1    Tragically, I didn't get it in time.  Maybe

2    another month or so or maybe two months.  Maybe

3    even a week, and I might have turned the corner

4    and sought for it, because I knew my life was in

5    shambles as a result of it.

6        **PRESIDING COMMISSIONER DAVIS:**  So you

7    recognized you had a problem?

8        **INMATE HAWKS:**  I did recognize that I had

9    a problem.  That's right.

10       **PRESIDING COMMISSIONER DAVIS:**  What was --

11   When did you recognize that?

12       **INMATE HAWKS:**  I think actually I

13   recognized I had a problem with alcohol much

14   when I started (indiscernible) probably when I

15   was about 19 or 20 I realized it.  But I -- my

16   mistake.  I didn't act on it.  Tragically, it

17   ended with this.

18       **PRESIDING COMMISSIONER DAVIS:**  So you

19   couldn't think of anyone that you could talk to

20   or turn to and say look, I've got a problem.

21   What do you think I should do.

22       **INMATE HAWKS:**  I -- You know, I didn't

23   seek it is probably the best way that I can

24   describe it.  I didn't -- I didn't seek it out.

25   And I realize that was a terrible mistake on my

26   behalf.

27       **PRESIDING COMMISSIONER DAVIS:**  When you

52

1    went to the AA meetings with your wife, did you

2    actually participate or did you just kind of sit

3    in the back of the room and wait for her to

4    finish?

5·        **INMATE HAWKS:**  No, I think I actually may

6    have participated more than she did in the

7    meetings, but it didn't grab me at that time.

8    And, of course, I didn't even start alcoholism

9    or Alcoholics Anonymous in here until I'd been

10   in prison for three or four years.  That's when

11   it became available to me.  And I realized that

12   when I got clean and sober as a result of being

13   arrested, and realizing that I had killed a good

14   person and hurt so many people, I determined on

15   my own to stop drinking.  And then I -- Once I

16   got into Alcoholics Anonymous years later, I

17   realized that it was a good tool for helping not

18   just myself, but other people to get off alcohol

19   and change their lives.  It's avail -- It's

20   widely available tool.  I mean psychotherapy is

21   probably the best one, but so I didn't really

22   realize that or participate in Alcoholics

23   Anonymous until I got into the program after

24·  being clean and sober and finding value in it.

25        **PRESIDING COMMISSIONER DAVIS:**  You just --

26   I think in prior hearings you described your

27   family life as fairly normal.

53

1       **INMATE HAWKS:**  I'd say it was fairly
2   normal.  Yeah.

3       **PRESIDING COMMISSIONER DAVIS:**  So your mom
4   and dad's alcoholism didn't totally -- There
5   wasn't any violence or anything associated with
6   that?

7       **INMATE HAWKS:**  No, my father didn't drink
8   every night.  He didn't come home and drink
9   every night or anything of that nature.  He did
10  -- He was, you know, a mild alcoholic, I would
11  say would be the best way to describe that.  My
12  mother started drinking after 5:00 type of a
13  thing and after dinner was prepared and all that
14  type of stuff.  And she would go off into her
15  own room and start drinking.  So but other than
16  that, I'd say I had a pretty good upbringing.

17      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Is
18  there anything about your background prior to
19  the instant offense?  You have no -- I think
20  we've already covered your arrest record and so
21  forth, that it doesn't exist.  You don't have
22  one.  Anything about you prior to coming to the
23  institution that we haven't talked about that
24  you feel is important for the Panel to
25  understand?

26      **INMATE HAWKS:**  Not that I can think of at
27  this time.

54

1    **PRESIDING COMMISSIONER DAVIS:**  If you
2    think of something that comes to mind as we go
3    through this process, and you want to let us
4    know about it, please feel free.

5    **INMATE HAWKS:**  Do you have a specific
6    question?

7    **PRESIDING COMMISSIONER DAVIS:**  Oh, no.
8    No, I --

9    **INMATE HAWKS:**  Any more specific
10   questions?

11   **PRESIDING COMMISSIONER DAVIS:**  No, I've
12   asked the questions that I have.  Okay.
13   Commissioner, do you have any questions?

14   **DEPUTY COMMISSIONER SMITH:**  No, I don't
15   have any questions at this time.

16   **PRESIDING COMMISSIONER DAVIS:**  All right.
17   I'll ask you to turn your attention, please, to
18   Commissioner Smith.

19   **DEPUTY COMMISSIONER SMITH:**  Mr. Hawks,
20   according to the C-File, you were received by
21   the Department of Corrections on July 2nd, 1987.
22   Received here at CTF on September 13th, 1989.
23   You have a Classification Score of 19, which is
24   the lowest classification score that a life
25   inmate can attain.  Your last hearing was held
26   on March 2nd, 2005.  That was your Fourth
27   Subsequent Hearing and you received a one-year

55

1    denial at that time.  Since you've been

2    incarcerated, you've established an outstanding

3    disciplinary history.  That being you've

4    received no 115s or 128s.  And you're to be

5    complimented for that achievement.  This Panel

6    realizes and recognizes how difficult it is to

7    be disciplinary in an institutional setting.

8    And so for you to have established that record,

9    you're to be commended.  And both Commissioner

10   Davis and I do, in fact, commend you for that

11   record.  You have been involved in a number of

12   programs.  As I go through the programs as I was

13   best able to capture them, should there be

14   anything I overlook or anything that you'd like

15   to expand on, I'll certainly give you that

16   opportunity.  And I'm going to focus on those

17   activities that primarily took place from the

18   date of your prior hearing to today's date.  And

19   with that being said, certainly, if there are

20   other activities, other achievements that

21   occurred prior to your last hearing that I

22   haven't addressed, again, I will give you and

23   Counsel that opportunity.  There's a chrono that

24   indicates that in August of '05, you completed a

25   three-week Anger Management Cage Your Rage

26   Workshop.

27        **INMATE HAWKS:**  That's correct.

56

1        **DEPUTY COMMISSIONER SMITH:**  You've been an

2    active participant in therapy with Staff

3    Psychologist Howlin, H-O-W-L-I-N, since August

4    of 2004.  That chrono indicates that you're

5    involved with Doctor Howlin to, quote, unquote,

6    "Gain deeper personal insight."  Are you still

7    participating with Doctor Howlin?

8        **INMATE HAWKS:**  Yes, I am.

9        **DEPUTY COMMISSIONER SMITH:**  All right.

10   How often do you meet with Doctor Howlin?

11       **INMATE HAWKS:**  I meet with him about once

12   a month.  It varies a little bit.  And then, of

13   course, I'm tasked with keeping a dream log and

14   also other task specific (indiscernible)

15   processing as well as self-processing.  And

16   right now, I'm reading a book he asked me to

17   read as well.  So it's daily participation on my

18   own, but once a month basically with him.

19       **DEPUTY COMMISSIONER SMITH:**  And it's a

20   one-on-one?

21       **INMATE HAWKS:**  Yeah.

22       **DEPUTY COMMISSIONER SMITH:**  Okay.  You've

23   received numerous laudatory chronos.  Actually,

24   before we go to the laudatory chronos, you also

25   received a certificate of completion for Anger

26   Management.  You actually received two of those.

27   One, December of '05, and the other February of

1   '06.  You received a number of laudatory
2   chronos.  These aren't going to be in
3   chronological order.  One dated June 2006, for
4   your volunteering to assist in the repair of the
5   institution's soccer and football field.  May
6   30th of 2006, that is really a general chrono
7   more than a laudatory chrono in that that chrono
8   compliments you for your proficiency in
9   professional qualities regarding your graphic
10  arts assignment.  Very positive chrono.  Another
11  one dated April 2006, for your participation as
12  a member of the We Care; a juvenile deterrent
13  program.  And you've been involved in that
14  program for the last two years.  You also have
15  five laudatory chronos regarding your
16  participation and your membership in the Twelve
17  Step Program, which you've been involved in
18  since July of 1990.  That's an Alcoholics
19  Anonymous Program.

20      **INMATE HAWKS:**  Right.  It's AA.  The
21  principles of AA and NA actually.

22      **DEPUTY COMMISSIONER SMITH:**  And the dates
23  of those chronos are April of '05, June '05,
24  October '05, December '05, and the most recent,
25  April of '06.  If you were to receive a parole
26  date and be returned to the community, would you
27  continue to participate in AA and Twelve Step

58

1    programs?

2        INMATE HAWKS: Certainly. I have a

3    meeting set up in Pomona just four or five

4    blocks from where I would be paroled to.

5        DEPUTY COMMISSIONER SMITH: And why would

6    you take that step?

7        INMATE HAWKS: Well, the psychological

8    report, which we'll get to, they talk about

9    that. He says I don't need to take it anymore.

10   But you know what, it's a way to give back, if

11   nothing else. It's a way to give back to people

12   that are struggling. And maybe I can get

13   through to somebody that was in my situation

14   years ago and get through them -- get through to

15   them and get them clean and sober or help them

16   to get themselves clean and sober, so that they

17   don't make tragic mistakes in their lives as

18   well. So I think it's a -- it's a lifelong

19   commitment to giving. I actually have a job

20   offer also to work in a clean and sober living

21   home in Los Angeles County. But it's not my

22   primary job offer, but it's something I would

23   definitely consider doing.

24       DEPUTY COMMISSIONER SMITH: Okay, thank

25   you. And you have a laudatory chrono dated

26   February 2006, for your completion of the

27   Healing the Angry Heart video series. You have

59

1    two additional chronos, December of 2005,

2    January of 2006, for your involvement in the

3    group, Fathers Behind Bars.  And December 2005,

4    you and other members of that group hosted a

5    children's holiday festival.  You raised over

6    $10,000, and you provided that money to the Boys

7    and Girls Club of Monterey County.  The Fathers

8    Behind Bars group, is that unique to this

9    institution?

10        **INMATE HAWKS:**  It's at Central and North

11    and South Facility here at this institution.  Do

12    you know of it in another institution?  I don't

13    -- I don't know of it in other institutions.

14    I'll be more than happy to find out for you, but

15    I believe it's unique here to this institution

16    at this point in time.

17        **DEPUTY COMMISSIONER SMITH:**  All right.

18    Okay.

19        **ATTORNEY DEFILIPPIS:**  Yeah, I personally

20    haven't heard of it in any of the other

21    institutions.

22        **DEPUTY COMMISSIONER SMITH:**  Okay.  And

23    I've not heard of it before either, which is why

24    I asked that question.  Is that something that

25    existed that you joined or did you have some

26    involvement in the development and the creation

27    of that organization?

60

1          **INMATE HAWKS:**  I did not have a -- I did
2     -- I wasn't one of the initial people to get
3     involved in that, but I was able to get involved
4     with it through my work in graphic arts and
5     making -- for the last couple years, making
6     Christmas decorations and stuff like that.  And
7     then they liked my work, so they brought me in
8     as a group artist basically.  And so I
9     participate as much as I can and I believe it's
10    a good program for the children of incarcerated
11    fathers, and it allows the guys to give their
12    kids something and a little Christmas gift and
13    to have a nice Christmas celebration.  We call
14    it holiday celebration, actually.  And it's --
15    And then, of course, we're able to give back to
16    the community as well through our work, so
17    that's good.  It's a good thing.

18         **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank
19    you.  A laudatory chrono dated December 2005,
20    regarding completion of a 12-week Anger
21    Management Program.  There are two laudatory
22    chronos or they're identified as laudatory
23    chronos.  They're both dated June 2005.  They're
24    from two correctional officers.  They should
25    really be general chronos, not laudatory
26    chronos, since they're -- they make
27    recommendations rather than to basically

61

1    recognize an achievement you've made.  But that

2    being said, both of those chronos are very

3    positive in that they strongly recommend that

4    you be granted parole.  You've been assigned to

5    vocational printing.  You were assigned as a

6    student until November 2005, when you became a

7    print tool attendant.  Is that your current

8    assignment?

9        **INMATE HAWKS:**  That is.

10       **DEPUTY COMMISSIONER SMITH:**  Okay.  And in

11   March of 2005, you completed 20 competency units

12   in graphic arts in addition to the prior

13   completion of competency units.  And in June of

14   2005, you completed another 13 competency units

15   in graphic arts as well.  Further, you received

16   a diploma as a legal assistant in Paralegal from

17   the Blackstone Career Institute.  And that's

18   dated April 2006.  Before I go over the

19   psychological evaluation, which is dated January

20   2005, prepared by Doctor Sexton, S-E-X-T-O-N,

21   are there any other activities that you've been

22   involved in?  Any other chronos that we should

23   be aware of that I haven't addressed?

24       **INMATE HAWKS:**  Well, you've got the

25   Blackstone certificate -- completion diploma and

26   my -- that was my fourth vocational trade that

27   I've finished with the print shop.  There was a

 1    couple of other chronos that you did not get.
 2    One of them was from Jack Bauers dated 4/26/05,
 3    for art participation in Arts in Corrections.
 4    Do you have that particular chrono?
 5         **DEPUTY COMMISSIONER SMITH:**  Yes.  Yeah,
 6    actually I do.
 7         **INMATE HAWKS:**  All right.
 8         **ATTORNEY DEFILIPPIS:**  If you have the
 9    packet that I submitted to the -- to the Board
10    if you go to Exhibit C, it has all of the
11    chronos and certificates including the
12    vocational graphic arts completion that
13    Mr. Hawks just mentioned was in there.  And then
14    following some of those are the chronos that we
15    talked about.
16         **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank
17    you, Counsel.
18         **INMATE HAWKS:**  You mentioned Cage Your
19    Rage and all of the different participations.
20    There was a -- No, I'd say that that pretty much
21    gets it.  That pretty much covers it.
22         **DEPUTY COMMISSIONER SMITH:**  Okay.
23    Certainly, if anything else comes to mind prior
24    to us going into research -- into recess, let me
25    know so that we can get those on the record,
26    because we want to capture, you know, all of the
27    positive activities you've been involved in.

63

1    Counsel?

2        **ATTORNEY DEFILIPPIS:**  He also -- He also

3    participated in the Legal Services for Prisoners

4    with Children seminar June 15th, 2005.  I don't

5    believe that was mentioned.  And I think that's

6    the last of the chronos.

7        **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank

8    you, both.  Referring to the psychological

9    evaluation, as I indicated, it's dated January

10   14th of '05, it would have been used at your

11   prior Parole Consideration Hearing.  And as

12   such, I'm going to address just a few sections

13   that I think are most pertinent, since the

14   report has been addressed at the prior hearing.

15   But certainly, if there are any other sections

16   or any comments that you or Counsel would like

17   to have addressed or read for the record, I'll

18   certainly give you that opportunity.  Moving to

19   page two, under diagnostic impressions, it

20   indicates that under Axis I and Axis II, there

21   are No Clinical or Personality Disorders.  Under

22   Axis III, that there's a History of

23   Tuberculosis, but it's not a -- currently an

24   active disease.  Under Axis IV, there's Life

25   Tern Incarceration.  That's a diagnostic

26   impression of stress, and that's a standard

27   diagnostic impression that's applied to all life

64

 1    inmates.  Under Axis V, there's a current Global
 2    Assessment Functioning Score of 85, which is
 3    relatively high.  And that's based on a scale of
 4    zero to 100.  Moving to page three, the Doctor
 5    addresses a few specific questions that the
 6    Board had apparently raised in the past with
 7    recommendations.  The first question had to do
 8    with your current mental health.  And on the
 9    prior page, the Doctor notes that based on the
10    above diagnostic impressions, there is no
11    psychiatric reason that you should not be
12    paroled.  The Doctor goes on and writes that the
13    second question has to do with your violence
14    potential in the community.  And then the Doctor
15    writes that his findings are completely
16    consistent with the prior reports.  That due to
17    your exemplary performance while incarcerated,
18    your lack of mental illness and resolved
19    substance abuse issues that you're viewed as
20    having a no greater violence potential than the
21    average non-offender population in the
22    community, and you're viewed as being below
23    average for the typical parolee.  Regarding the
24    third question that's attributed to the Board
25    has to do with the significance of alcohol or
26    drugs as it relates to the commitment offense.
27    The Doctor notes that as has been stated in

65

1    previous reports, alcohol abuse was a

2    significant contributor to the instant offense.

3    However, since your incarceration, you've

4    remained substance free for 19 years and not due

5    to an institutional remission, but rather, an

6    individual commitment. And that that

7    commitment, in the Doctor's opinion, will

8    sustain you when you are released from the

9    institution. The Doctor goes on to note that at

10   present, there's no alcohol dependent problem

11   and that further treatment in AA would not be

12   recommended. You've indicated that you attend

13   AA now mostly to help others or for social

14   interaction, and that is a benefit to society

15   and to the institution. Your continued level of

16   participation would be encouraged. When I was

17   asking you about AA, you didn't mention anything

18   about the social interaction. Is that -- Is

19   that part of your --

20        **INMATE HAWKS:** Of course. There are a

21   number of prisoners like myself that have been

22   clean and sober for a decade or two, and we have

23   a lot to common -- a lot in common. And you

24   know, our discussions are basically based around

25   how ludicrous it would be to go back to drinking

26   at this point in time. You know, what a

27   collapse that would be. So there's a support

66

1    system there to some extent.  But yeah, that
2    covers it.

3        **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank
4    you, Mr. Hawks.  Going on with the report, it
5    indicates that, again, apparently the Board had
6    requested the Doctor to determine to what extent
7    you've explored your commitment offense.  And
8    the Doctor notes that as it's well known to the
9    Board, you've attended approximately 14
10   different self-help groups or programs.  And
11   although they weren't necessarily all
12   recommended by various clinicians, you attended
13   them or many of them through your own volition
14   is how I read this conclusion.  The Doctor also
15   notes that you've attended one-on-one therapy
16   with Doctor Bakeman, Doctor Howlin and Doctor
17   Fishbach, and that one-on-one therapy as we
18   discussed earlier is ongoing with Doctor Howlin.
19   And that the Doctor notes -- Doctor Sexton notes
20   that all of the clinicians have written very
21   positive chronos regarding your participation in
22   the one-on-one therapy, and that Doctor Howlin
23   concluded his August 2004 chrono by stating that
24   in his opinion, you should have a very low risk
25   of re-offending.  The final question that the
26   Board is -- apparently asked was your need for
27   any further therapy.  And the Doctor writes, it

67

1    should be obvious in the lack of recommendations

2    for further therapy from all previous

3    clinicians.  And your completing 14 self-help

4    programs and one-on-one therapy with three

5    different clinicians, that there is no further

6    therapy programs while incarcerated or no need,

7    no indicated.  Any comments or any other

8    sections of that evaluation that either you or

9    Counsel would like to have addressed for the

10   record?

11       **ATTORNEY DEFILIPPIS:**  Yes, if I could just

12   address a couple points.  The reference to 14

13   different self-help groups is actually now 19,

14   since the report is a little over a year and a

15   half old.  The -- Just historically, what had

16   happened is that the 2003 Panel had issued a

17   list of questions that the Doctor is actually

18   addressing in here.  And in talking about the --

19   his exemplary performance while incarcerated,

20   lack of mental illness, resolved substance abuse

21   issues as being a background that tells him that

22   Mr. Hawks has no greater violence potential than

23   the average non-offender, he goes on to talk

24   about the importance of the Shram chrono in the

25   file.  And although it wasn't noted earlier, the

26   chrono by Lieutenant Shram -- Lieutenant Shram

27   actually has, I think it was seven or eight

68

1    years of parole agent experience prior to

2    working in the institution.  And when he -- when

3    he wrote this chrono -- Excuse me, when the

4    Doctor referenced the chrono, the Doctor also

5    referenced the fact that the Doctor himself has

6    extensive parole agent experience, and was

7    offering his opinions with that background as

8    well.  Also, in reference to the exploration of

9    his causative factors of the -- of the offense,

10   the Doctor discusses at length the -- on the

11   last page of the report, the letters of apology

12   that have been written to the victims' family as

13   well as to the City of Corona, the letter to the

14   Chief of Police Corona, again apologizing for

15   the -- for the offense.  The -- Also what was

16   referenced and it's contained within the

17   materials that I have submitted to the Board as

18   Exhibit F is the Concrete Wave article that was

19   written regarding Mr. Hawks.  He references that

20   magazine article, and suggests to the Board that

21   that article should be read in its entirety by

22   the Board to give a better understanding of the

23   inmate's complete understanding of the crime he

24   committed, the pain that it caused to other

25   people and how it has motivated his personal

26   growth.  And when you talked about the different

27   self-help groups that were participated in, I

1   think you said that many of them were not
2   recommended by clinicians.  But the Doctor's
3   actual wording was even though they were not
4   recommended by any of the previous clinicians
5   who saw him.  And if you note in the -- in the
6   reports, there was actually no recommendations
7   for any type of treatment throughout the time
8   that Mr. Hawks has been in the institution, yet
9   he has consistently obtained not only one-on-one
10  therapy, which is at this point, almost unheard
11  of, that general population inmates are
12  receiving one-on-one therapy.  This is something
13  he's actively sought out.  And the self-help
14  groups that he has sought out are, again,
15  without the recommendation of anyone.  He's
16  doing this, again, on his own.  Other than that,
17  I would -- I have no other comments regarding
18  the psychological reports that can't be
19  addressed in closing.
20      **DEPUTY COMMISSIONER SMITH:**  All right.
21  Thank you, Counsel.  Before I go on to the
22  parole plans, I'm going to turn the tapes over,
23  so I don't end up interrupting myself.
24      [Thereupon, the tape was turned over.]
25      **DEPUTY COMMISSIONER SMITH:**  After a short
26  recess, everyone previously identified is back
27  in the hearing room as well as the people that

```
 1    are participating in the hearing or observing
 2    the hearing by video as well.  I'm going to
 3    refer to the Board packet dated March 2006,
 4    regarding your parole plans.  It indicates that
 5    your plan is to reside with a Mr. Dennis Hill in
 6    Pomona, California.  And as an alternative,
 7    you'd reside with a Breck and Heidi Spencer,
 8    S-P-E-N-C-E-R.  And I have letters which I'll
 9    address to that effect.  It also indicates that
10    you plan to make your career as an installer
11    with Capitol Drywall in Los Angeles.
12         INMATE HAWKS:  Working for Scott Baumann.
13    Yes.
14         DEPUTY COMMISSIONER SMITH:  Okay.  And
15    that's with Spencer Roofing or is it --
16         INMATE HAWKS:  No, that's --
17         DEPUTY COMMISSIONER SMITH:  -- or that's a
18    different --
19         INMATE HAWKS:  That's an alternative job
20    offer.
21         DEPUTY COMMISSIONER SMITH:  An alternate.
22         INMATE HAWKS:  In San Bernardino County.
23         DEPUTY COMMISSIONER SMITH:  All right.  As
24    I go through them, we have a number of letters
25    to go through.  I'll look for that letter of
26    employment from Mr. Baumann.
27         ATTORNEY DEFILIPPIS:  Exhibit D actually
```

1    has a good summary of the parole plans that --

2    if you need that for reference.  It lays out the

3    Los Angeles County and the San Bernardino County

4    plans.

5        **DEPUTY COMMISSIONER SMITH:**  Counsel, had

6    the copy of the packet received that you

7    submitted, if it had still been broken down with

8    Exhibit sections, I could refer -- it would be

9    easier to refer to that.  But it did not come in

10   that direction and --

11   **ATTORNEY DEFILIPPIS:**  You're welcome

12   during deliberations to (indiscernible) mine.

13   Well, actually, I could share with

14   (indiscernible).

15       **DEPUTY COMMISSIONER SMITH:**  That's

16   (indiscernible) I see.  No, why don't you both

17   hold on to those.

18       **ATTORNEY DEFILIPPIS:**  Okay.

19       **DEPUTY COMMISSIONER SMITH:**  As I go

20   through the letters too, I'm going to ask you to

21   the best that you can, both of you for that

22   matter, to follow along to make sure that I

23   haven't overlooked any.

24       **ATTORNEY DEFILIPPIS:**  Sure.

25       **DEPUTY COMMISSIONER SMITH:**  And certainly

26   when we -- when we get to that letter, you know,

27   I want to make sure that that employment letter

72

1   is highlighted.

2       **ATTORNEY DEFILIPPIS:**  Very well.

3       , **DEPUTY COMMISSIONER SMITH:**  All right.

4   Indicates also that you intend to work with

5   Small Business Enterprise of the field of

6   computer repair and graphic arts.

7       **INMATE HAWKS:**  I would like to do that

8   eventually.  Yes.

9       **DEPUTY COMMISSIONER SMITH:**  Okay.  But

10  that's not an immediate plan?

11      **INMATE HAWKS:**  More of a long-term plan.

12  Sure.

13      **DEPUTY COMMISSIONER SMITH:**  Okay.  Well,

14  because of this -- the number of letters that we

15  have, I'm going to, you know, provide a very

16  brief summary.  That brief summary is in no way

17  intended to minimize the value of these support

18  letters.  And if there's, you know, anything in

19  these letters that you would like me to

20  specifically address, please let me know.  All

21  right.  The first letter dated April 2006, is

22  from Dennis Hill.  A very positive letter

23  supporting the granting of parole.  And he

24  writes that you're his uncle.

25      **INMATE HAWKS:**  That's correct.

26      **DEPUTY COMMISSIONER SMITH:**  And that upon

27  release, you could reside with he and his family

73

1    in their residence in Los Angeles County, and

2    that he would assist you with any means

3    necessary to ensure your successful parole.

4    Another letter from Heidi Hill-Spencer.  You are

5    her uncle.

6         **INMATE HAWKS:**  That's correct.

7         **DEPUTY COMMISSIONER SMITH:**  Right.  She

8    writes a strong letter of support indicating

9    that family, friends and acquaintances have all

10   offered assistance to you upon your release,

11   including employment, housing and general

12   support.  That you're welcome to join her family

13   in Lake Arrowhead and that she and her husband

14   would gladly house and employ you.  Another

15   letter from Breck Spencer, the husband.

16   Indicates that he's been very active in the

17   family.  He's married to your niece, Heidi, and

18   has been for seven years.  He owns a roofing

19   business and a home in Lake Arrow wood -- Lake

20   Arrowhead, and that you're welcome to be an

21   employee at Spencer Roofing and as a resident in

22   his home upon release, and that you could work

23   for him on a roof doing field estimates or in

24   the office.  All of which he feels that you're

25   competent to do.  There are two letters.  One

26   dated May 8th, 2006.  Another one dated June

27   29th, 2006, from Margo Clinkenbeard.  I

74

 1   apologize if I'm mispronouncing that.

 2       **INMATE HAWKS:**  That's correct actually.

 3       **DEPUTY COMMISSIONER SMITH:**  Then no

 4   apology necessary.  Her last name is spelled

 5   C-L-I-N-K-E-N-B-E-A-R-D.  And in both of these

 6   letters, very positive.  Indicates that she's

 7   known you for over 20 years.  No relationship,

 8   but a friend.  Correct?

 9       **INMATE HAWKS:**  That's correct.

10       **DEPUTY COMMISSIONER SMITH:**  All right.

11   And that, you know, she's willing to help you

12   while you're on parole in any way possible,

13   including housing, clothing, automobile or

14   financial support.  And both of those letters

15   are similar in that regard.  A letter from your

16   son, Harold William Hawks.  It's dated April

17   17th, 2006.  Obviously, writes a very supportive

18   letter and requests that you be granted a parole

19   date.  A letter from Roxanne Fleming, F-E -- or

20   I'm sorry.  F-L-E-M-I-N-G.  It's dated April

21   2006.  Indicates that she's your ex-wife.

22       **INMATE HAWKS:**  That's correct.

23       **DEPUTY COMMISSIONER SMITH:**  She writes a

24   positive letter with regard to you being granted

25   parole.  However, also indicates in that letter

26   that, you know, she may have her own reasons for

27   wanting to see you granted parole, and that she

75

1   writes that you still owe her a ton of money and
2   that if you were out on parole, you could
3   somehow get her that funding and that would help
4   her and her family out.

5       **INMATE HAWKS:**  I'd be more than happy to
6   help my ex-wife out for as long as I'm alive.
7   She raised my son on her own and stepdaughter as
8   well, and not a problem at all.

9       **DEPUTY COMMISSIONER SMITH:**  Okay.  A
10  letter from John Hawks, II, dated May 2006; your
11  brother.

12      **INMATE HAWKS:**  That's correct.

13      **DEPUTY COMMISSIONER SMITH:**  He writes that
14  the door to his home in San Bernardino County is
15  always open to you as well as your son, and that
16  he'd be happy to help and support you with
17  whatever you choose to do.  That he works in
18  selling satellite dishes and other video systems
19  and he believes that you could go to work for
20  him if you wanted to in Los Angeles County.  A
21  letter dated June 26th of '06, from Pearl and
22  William Budde, B-U-D-D-E.  Are they family
23  friends?

24      **INMATE HAWKS:**  No, these are lifelong
25  friends, basically, for my family and myself.

26      **DEPUTY COMMISSIONER SMITH:**  Okay.  Because
27  it indicates that they've known you for many

76

1    years as apparently you and their son kind of

2    grew up together.

3         INMATE HAWKS:  Yeah, we went to high

4    school together or I grew -- I went to high

5    school with their five children.

6         DEPUTY COMMISSIONER SMITH:  And it's a

7    very supportive letter for you being granted

8    parole.  A letter from Ruth and Richard Spencer,

9    dated May 2006, indicating that they've known

10   you and your family or particularly, your family

11   for over 41 years.  That they believe that

12   you've matured and that you've served time for

13   your poor judgment and that you should be given

14   a chance to live a normal life with your son and

15   family.  And they believe that you're no longer

16   a threat to society.  A letter from Travis Hill,

17   May 2006.  He's a nephew.

18        INMATE HAWKS:  That's correct.  Kind of a

19   grand-nephew, I guess would be the way to state

20   it.  My niece's son.

21        DEPUTY COMMISSIONER SMITH:  In the letter

22   he writes, he indicates that he's writing on

23   behalf of his uncle.

24        INMATE HAWKS:  That's right.

25        DEPUTY COMMISSIONER SMITH:  A very

26   supportive letter for the granting of parole.

27   Indicates that you have many job and housing

1    offers and more support than you'll need to get

2    your life restarted.  And he's willing to do

3    whatever he can to help to get you reorganized

4    and established into society.  A handwritten

5    letter dated May 2006, from an Alex and Connie

6    -- and I'll need some help with the last name.

7         **INMATE HAWKS:**  Bulong.

8         **DEPUTY COMMISSIONER SMITH:**  B-U-L-O-N-G.

9         **INMATE HAWKS:**  That's correct.

10        **DEPUTY COMMISSIONER SMITH:**  Okay.

11   Apparently they have known your family for more

12   than 30 years, and you know, believes that, you

13   know, based on your time in the institution,

14   that you've been rehabilitated and that you

15   should be granted parole.  A letter from Georgia

16   Hill dated May 2006, your sister.

17        **INMATE HAWKS:**  She's my late sister.

18        **DEPUTY COMMISSIONER SMITH:**  Oh, she's

19   passed away?                        .

20        **INMATE HAWKS:**  She's been passed away the

21   last month.

22        **DEPUTY COMMISSIONER SMITH:**  Our

23   sympathies.

24        **INMATE HAWKS:**  Thank you.

25        **DEPUTY COMMISSIONER SMITH:**  Sorry to hear

26   that.  You know, a very, very warm and

27   supportive letter from her.  A letter from Susan

78

1    Roseberry, R-O-S-E-B-E-R-R-Y; another sister.

2        **INMATE HAWKS:**  That's correct.

3        **DEPUTY COMMISSIONER SMITH:**  All right.

4    You know, she again writes a very positive

5    letter.  Unfortunately, she does reference your

6    deceased sister and the battle that she had with

7    cancer.  But she indicates that in her opinion,

8    you've served your time and you're ready for a

9    successful parole.  And a letter from Jamie

10   Roseberry, same date.  Indicates that you're his

11   uncle.

12       **INMATE HAWKS:**  Her uncle.  Yes.

13       **DEPUTY COMMISSIONER SMITH:**  Her uncle.

14       **INMATE HAWKS:**  Yes.

15       **DEPUTY COMMISSIONER SMITH:**  Okay.

16   Describes you as a premiere candidate for a

17   successful parole, and that it's senseless to

18   continue to deny you year after year.  And that

19   the family has set aside resources that will

20   assist you in being successful on parole.  A

21   letter dated the same date from Charles

22   Roseberry.  Also describes you as an uncle.  But

23   I'm guessing that's in the same family

24   relationship.

25       **INMATE HAWKS:**  That's right.

26       **DEPUTY COMMISSIONER SMITH:**  Writes a

27   positive letter regarding you being granted

79

1    parole.  And indicates that, again, that family

2    will provide you with whatever resources are

3    necessary for you to become successful on

4    parole.  A letter from Charlene Wagoner,

5    W-A-G-O-N-E-R, dated May 2006, indicating that

6    she's known you for over 25 years.  You've

7    always been one of her son's best friends.

8    You'd be welcome in her home upon release.  And

9    she knows that you have many friends and

10   relatives who will support you with a place to

11   live and job offers as will she.  A letter from

12   Alexis Guerrier, G-U-E-R-R-I-E-R.  It's dated

13   May 2006.  It's a letter of support for you.

14   You're described as a family friend that they've

15   known for approximately 30 years.  And they

16   would hope that you would be granted a parole

17   date.  A fairly extensive letter from a Peter

18   Camann, C-A-M-A-N-N, who is with the BCP Tri-

19   Fitness Corporation in New Hampshire.  Indicates

20   that he is a dear and longtime friend of yours.

21   Writes a very detailed letter, the onus of which

22   is to strongly recommend that you be granted

23   parole at this time.  A letter from Scott

24   Baumann, B-A-U-M-A-N-N, the vice president of

25   sales for Capitol Drywall in San Dimas,

26   California.  It's dated April 2006.  Indicating

27   that he will provide you with employment as an

1    estimator at Capitol Drywall.  And that your
2    primary job location would be in Los Angeles
3    County.  And that he would expect that you'd
4    have a long and profitable career.  Your
5    starting wage would be $20 an hour with the
6    possibility of overtime.  And that he is
7    committed to helping you with your successful
8    transition back into the community.  A letter
9    from a Steven Vargas, V-A-R-G-A-S, dated May
10   2006, indicates that he's a property manager in
11   Hermosa Beach.  That he met you back in the
12   '70's.  That he's confident that with the
13   support of family and friends, your work skills
14   and your education, that you'd be able to be
15   successful on parole.  He's considering opening
16   a sober living home in his home in Hermosa Beach
17   and you'd have a -- you'd be an excellent choice
18   to be the coordinator of that home.  A letter
19   from Enrique -- Is it Nila?

20          **INMATE HAWKS:**  That's correct.

21          **DEPUTY COMMISSIONER SMITH:**  N-I-L-A, dated
22   April ·2006.  Indicates that she's a childhood
23   friend of yours and would like to see you being
24   granted parole.  Another letter dated April
25   2006, by Thomas Clark.  Indicates that he knows
26   that you have family and friends that would
27   support your release in the community, and would

81

1    hope that you would be granted a date.

2          **INMATE HAWKS:**  Excuse me.

3          **DEPUTY COMMISSIONER SMITH:**  Yes?

4          **INMATE HAWKS:**  Mr. Clark is a retired fire

5    marshal in Pomona.  He kind of considers me as a

6    -- as a second son.  When we were teenagers, his

7    -- When I was a teenager, his son, which was a

8    few years older than I, self-committed suicide.

9    And so he kind of adopted me as a second father

10   in a lot of respects.  So that's a -- I feel

11   that's important for the Board to understand.

12         **DEPUTY COMMISSIONER SMITH:**  Okay.  I

13   appreciate you adding that.  A letter from

14   Shirley Jochem.

15         **INMATE HAWKS:**  Jochem.

16         **DEPUTY COMMISSIONER SMITH:**  Jochem.  I

17   knew I wasn't going to get them all.

18   J-O-C-H-E-M.  It's dated April 2006.  Indicates

19   that she's known you for over 38 years.  That

20   you've been a close friend of her children as

21   well as her husband.  That you'll continue to be

22   a close friend who will always be welcome in her

23   home.  And they'll provide you with whatever

24   support they're able to.  Two letters from R.M.

25   Crocker.  One dated March 2006.  The other one

26   dated July 2006.  They are both similar letters

27   indicating that they have known the Hawks family

1    since 1951, and that they'll do everything

2    within their ability to assist and support you

3    on parole.  A letter dated April 2006, from

4    Leanne Marie Fleming.  Indicates that your son

5    is her brother.

6            **INMATE HAWKS:**  That's correct.

7            **DEPUTY COMMISSIONER SMITH:**  Okay.  And

8    that she views you as a step dad and she would

9    help you in every way she possibly could.  A

10   letter from a Richard -- a Richard Wenrich,

11   W-E-N-R-I-C-H, indicating that he believes that

12   you've turned your life around.  That you paid

13   for your crime and that you should be allowed

14   back into society.  A letter from -- Two letters

15   actually from, I believe it would be his wife.

16           **INMATE HAWKS:**  That's correct.

17           **DEPUTY COMMISSIONER SMITH:**  Sandra

18   Wenrich, dated March 2005 and March 2006.  Like

19   some of the other duplicate letters, they're

.20  both very supportive.  She indicates that she

21   and her husband live in Oregon, and that they

22   would be happy to support you in any way

23   possible once released to the community.

24   Another letter dated June 2006, from Jennifer

25   Klanas, K-L-A-N-A-S.  Indicates that you're her

26   uncle and that she requests that the Board grant

27   you a parole date at this time.  And that her

1   family would provide you with any resources that

2   you might need to be successful on parole.

3   There's also a second letter from Pearl and

4   William Budd.   That was dated March 2006.   And,

5   again, that's a similar letter to the letter

6   that I've already addressed for the record.

7        **INMATE HAWKS:** Commissioner, I believe

8   that some of the duplicate letters that you

9   received that were -- or actually were the

10  second letters were sent to the Riverside

11  District Attorney directly, but somehow they got

12  mixed up in the files.   I'm not sure exactly

13  why.

14       **DEPUTY COMMISSIONER SMITH:** Okay.   And I

15  -- And I didn't see those or I didn't refer to

16  those as being duplicate letters, because they

17  had different dates.   And although the

18  information was generally the same, certainly

19  two letters with different dates would not be

20  considered as duplicate.

21       **INMATE HAWKS:** I appreciate that.   There

22  were also a couple of other letters that you

23  missed.   The primary ones being from Dennis

24  Williams and Linda Benson.   Linda Benson is

25  another one of my sisters.

26       **DEPUTY COMMISSIONER SMITH:** Do you have --

27  Do you have that letter handy?

84

1      INMATE HAWKS:  I do have it.

2      DEPUTY COMMISSIONER SMITH:  Would you

3   provide that to the officer and I'll

4   (indiscernible) the officer bring that over to

5   me.

6      INMATE HAWKS:  (Indiscernible) in there

7   detailing her desire to function as my parole

8   release coordinator should I get out to smooth

9   over any transitional problems that may arise

10   with the Board, the Board's parole unit, etc.

11   And also, she's -- she worked in law enforcement

12   as a civilian employee for a number of years.

13   She has very insightful information in her

14   letter that you may want to consider.

15      DEPUTY COMMISSIONER SMITH:  The letter is

16   by -- from Linda Benson, B-E-N-S-O-N.  It's

17   dated June 19th, 2006.  As you indicated, she is

18   a sister residing in San Diego.  She goes

19   through extensive detail with regard to housing,

20   (indiscernible) assistance, domestic needs,

21   employment, support and does address her serving

22   as a release coordinator.  And because of the

23   extent of the letter, I'm not going to go to

24   into all of the details on the record.  When we

25   go into recess, if you'll leave this letter in

26   the room, we'll review it at that time.

27      INMATE HAWKS:  Very well.

85

1       **ATTORNEY DEFILIPPIS:**  What I can do,
2    Mr. Smith, is I can just leave my whole packet,
3    so you'll have it with the tabs broken down.
4       **INMATE HAWKS:**  Or you can just hang on to
5    that one.  That's fine.
6       **DEPUTY COMMISSIONER SMITH:**  But whichever
7    works best for the two of you.
8       **INMATE HAWKS:**  Go ahead and hang on to
9    that if you want.
10      **PRESIDING COMMISSIONER DAVIS:**  Was there
11   another letter that you wanted to refer to here,
12   before we hand it back?
13      **INMATE HAWKS:**  Yeah, there was a --
14      **DEPUTY COMMISSIONER SMITH:**  Well, let me
15   give your packet back until we also go
16   (indiscernible).
17      **ATTORNEY DEFILIPPIS:**  Actually, you're
18   going to need the -- there's two other -- two
19   other letters that were missed.  Marty Yavon and
20   Dennis Williams, which should be towards the end
21   of Exhibit E.
22      **INMATE HAWKS:**  I think Marty Williams.
23      **DEPUTY COMMISSIONER SMITH:**  There's a
24   letter that --
25      **ATTORNEY DEFILIPPIS:**  And Dennis Williams
26   is right before Linda Benson's letter.
27      **DEPUTY COMMISSIONER SMITH:**  Yeah, all

1    right.  It's a letter that's dated June 20th,

2    2006.  Signed by Dennis Williams, who resides in

3    San Diego.  Again, writes a very detailed

4    letter.  You know, addressing his disagreement

5    with prior Board decisions.  And again, goes

6    into housing, domestic needs, employment, time

7    and support that he will provide to Mr. Hawks

8    based on his being granted a parole date.  And

9    again, as with the other letters, since there's

10   a lot of detail in this one, we'll review this

11   at the recess as well.  And was there another

12   letter?

13        **ATTORNEY DEFILIPPIS:**  Yes, the one right

14   before that.  Marty Yavon.

15        **DEPUTY COMMISSIONER SMITH:**  A letter from

16   Marty Yavon.

17        **INMATE HAWKS:**  Yavon.

18        **DEPUTY COMMISSIONER SMITH:**  Yavon,

19   Y-A-V-O-N, Yavon Productions in Ohio.  Indicates

20   that he began corresponding with you in March

21   2004.  Has offered you a residence in his home

22   when you're paroled.  And, of course, since he

23   lives in Ohio, that's unlikely.  But that

24   doesn't negate the positive letter of support.

25   Counsel, Mr. Hawks, anything else?

26        **ATTORNEY DEFILIPPIS:**  Yeah, one last one

27   is Thomas Fleming.  It's the 10th letter back.

1    I'll show where it's in -- Thomas W. Fleming,

2    April 26th, 2006.

3        **DEPUTY COMMISSIONER SMITH:**    There's a

4    Roxanne Fleming?

5        **ATTORNEY DEFILIPPIS:**    After -- Three or

6    four letters after that.    Thomas.

7        **DEPUTY COMMISSIONER SMITH:**    Right.    A

8    letter that's dated April 26th, 2006, signed by

9    Thomas Fleming.    Indicates that he's written

10    several letters in the past supporting your

11    being granted parole and has touched upon

12    support in terms of financial, spiritual and

13    other areas.    And would like to see you being

14    granted a parole at this time.

15        **ATTORNEY DEFILIPPIS:**    I think that's all

16    the letters.

17        **DEPUTY COMMISSIONER SMITH:**    All right.

18    Certainly, if any others come to mind, please

19    let me know.

20        **INMATE HAWKS:**    Thank you.

21        **DEPUTY COMMISSIONER SMITH:**    Now we

22    received from the Riverside County District

23    Attorney's Office, some 17 pages of petitions

24    containing various number of signatures from 11

25    to 30 signatures, all opposing parole at this

26    time for Mr. Hawks.    And we had also received --

27    although the index indicates that there should

88

1    be five letters in this package, I only found

2    one.  If I've overlooked them, Counsel, I'd be

3    happy to address them.  And that letter is from

4    a Daniel Dunnigan, D-U-N-N-I-G-A-N, who writes a

5    personal letter of opposition.  We sent out what

6    are known as 3043 notices.  Those are letters

7    that go out to the various criminal justice

8    agencies that were involved in your commitment

9    offense.  We did not receive any letters in

10   response to the 3042 notices.  However, we do

11   have a letter from the Riverside County District

12   Attorney's Office that's signed by Senior Deputy

13   District Attorney Linda Dunn.  Since she's

14   present, rather than me reading the letter in

15   any detail at all, suffice it to say that her

16   conclusion in the letter is that the Riverside

17   County District Attorney's Office respectfully

18   requests that the Board find Mr. Hawks not

19   suitable for parole at this time.  And since

20   she's present and will be participating in the

21   hearing in just a few moments, I'll give her the

22   opportunity to go into any detail with that

23   letter that she would like to.  Is that

24   acceptable to you?

25        **DEPUTY DISTRICT ATTORNEY DUNN:**  Yes, thank

26   you.

27        **DEPUTY COMMISSIONER SMITH:**  All right.

89

1    Before I return to Commissioner Davis, is there

2    anything else that we should be aware of or any

3    other comments that you'd like to make with

4    regard to your parole plans?

5        **INMATE HAWKS:**  Just that I do have

6    extensive support for parole as required in Los

7    Angeles County with housing offer and multiple

8    job offers.  But the Board -- prior Boards, I

9    made it clear then, that I'm willing to parole

10   anywhere in the state that the Board wants to

11   parole me to.  I've made plans for that.  My

12   sister, Linda Benson, is willing to provide me

13   with rental assistance anywhere to get

14   established.  And that would be for the benefit

15   of the victims' family members if they want to

16   parole me to Northern California or what have

17   you.  You know, I have no problem with that.

18       **DEPUTY COMMISSIONER SMITH:**  Thank you.

19   Counsel?

20       **ATTORNEY DEFILIPPIS:**  Yeah, I would just

21   note that the actual parole plans that Mr. Hawks

22   had submitted to his counselor note Georgia Hill

23   as the release coordinator.  Since she's

24   deceased, Linda Benson will be stepping into

25   that role, as per her letter.

26       **DEPUTY COMMISSIONER SMITH:**  All right.

27   Thank you.  Commissioner Davis.

90

1    **PRESIDING COMMISSIONER DAVIS:**  Thank you.
2    You've done a lot of work in AA and NA.  What
3    parts of that do you find most helpful for you?
4        **INMATE HAWKS:**  For the AA and NA?
5        **PRESIDING COMMISSIONER DAVIS:**  Uh-hmm.
6        **INMATE HAWKS:**  Well, I think that group --
7    self-help groups in general.  Not just AA, but
8    in general, have helped me to think about my
9    mistakes in the past and learn extensively from
10   those.  And also, realize that, you know, the
11   folly of my ways, I dealt with my life on coping
12   strategy before.  And I solved my problems just
13   by simply drinking.  And the way I think, it is
14   kind of a little simplistic way to explain it.
15   So I've learned to develop problem solving
16   skills in here, particularly when it comes to
17   stressful situations as a -- as a result of that
18   reflection.  And I -- you know, I back away from
19   stressful situations at this point in time and
20   use problem solving skills to find peaceful
21   resolution rather than going to drink.  I've
22   also delved deeply into the crime and understand
23   the utter horror and tragedy that I caused to so
24   many people as well as a result of my drinking,
25   my primary problem.
26       **PRESIDING COMMISSIONER DAVIS:**  Is that a
27   result of the therapy or self-help programs or a

91

1   combination?

2       INMATE HAWKS:  Well, the drinking, being

3   one of the primary causes that I pulled the

4   trigger that night.  But, of course, the self-

5   help and therapy have helped me to delve into

6   that and understand the tragic consequences that

7   I've caused to so many people.

8       PRESIDING COMMISSIONER DAVIS:  Now you

9   mentioned that one of your reports indicate that

10  you don't need to continue with AA if you were

11  on the outside.  How do you feel about that?

12      INMATE HAWKS:  Oh, I think that it's a

13  lifelong commitment for me.

14      PRESIDING COMMISSIONER DAVIS:  And

15  understand, I'm not promoting AA or NA or any of

16  the other (indiscernible).  We also talked about

17  your other self-help.

18      INMATE HAWKS:  Certainly.

19      PRESIDING COMMISSIONER DAVIS:  But I'm

20  talking about self-help in general.

21      INMATE HAWKS:  There are -- Certainly.

22  There's a -- There's lots of ways to give back

23  to the community.  Getting involved in youth

24  prevention programs, such as We Care.  Bringing

25  something like that to the streets.  Fathers

26  Behind Bars as well.  But in terms of AA, I

27  think it's the most immediate and effective way

92

1    that I can begin giving back to the community.

2    And, you know, it's not just giving back.  Even

3    though I've been into AA for a long time, I

4    still learn stuff from people's stories when

5    they tell me different stuff, and I can -- I can

6    relate with them.  So it's not just a one-way

7    street.  I still get something from it.  But I

8    feel that I'm able to give back a significant

9    amount, and I'll continue on with that.

10         **PRESIDING COMMISSIONER DAVIS:**  So you

11   consider yourself an alcoholic?

12         **INMATE HAWKS:**  I've -- The AA preaches

13   that once an alcoholic, always an alcoholic.  So

14   I consider myself --

15         **PRESIDING COMMISSIONER DAVIS:**  Is that

16   something that you believe?

17         **INMATE HAWKS:**  I consider myself to be an

18   alcoholic.  That's correct.  I'll be dry for

19   nearly 20 years now, and I intend to stay that

20   way.  It's brought some severe clarity into my

21   life, and I will not go back to drinking.

22         **PRESIDING COMMISSIONER DAVIS:**  And that is

23   something that you believe is a lifelong

24   commitment?

25         **INMATE HAWKS:**  I do.  Whether I'm giving

26   or receiving from the -- from the program out

27   there, I'm going to stick with it.

93

1      **PRESIDING COMMISSIONER DAVIS:**  So what is

2  the first week, two weeks, three weeks, four

3  weeks on the outside look like for you?

4      **INMATE HAWKS:**  Well, that will be an

5  adjustment period.  I'll be able to have a

6  residence immediately.  My family will help me

7  getting clothes, transportation.  I have a job

8  waiting for me that I will start immediately.

9  And, of course, in terms of AA, I have a --

10  right -- four or five blocks from where I will

11  be paroling to in Pomona, there is a meeting

12  residence there on Gary Avenue. And I'm familiar

13  with that actually.  I used to go by there as a

14  kid all the time.  My elementary school was very

15  near there.  And so I'll be heading right on

16  over there to see what I can do and get involved

17  in meetings and see what I can do with that.

18      **PRESIDING COMMISSIONER DAVIS:**  Any

19  problems that you perceive?

20      **INMATE HAWKS:**  Problems, do I perceive?

21      **PRESIDING COMMISSIONER DAVIS:**  Yes.

22      **INMATE HAWKS:**  Well, it would be quite a

23  transition from living in prison for the last

24  two decades.  I -- You know, but I don't think

25  that I'm going to have any serious problems in

26  terms of making an adjustment.  I get along well

27  with people in here and I believe I'll get along

94

1   well with people out there as well.  I don't
2   think that I will have any significant problems
3   for readjustment other than just getting back
4   going, working a regular job is a little
5   different than the jobs that we are -- have in
6   here.  And so once I get adjusted, acclimated to
7   being in society again, I think I'll be all
8   right.  Probably one of the biggest hurdles
9   though, that I will have will be getting a
10  driver's license, because I haven't been
11  involved in that in a long time; driving a
12  vehicle.  But I do have access to
13  transportation.  I do have access to public
14  transportation as well.  My job that I'll be
15  going to is actually an estimator, so I don't
16  need to go into the field or anything.  I can
17  take the bus or ride a bike there if I needed
18  to.  So those are things that I can handle.  I
19  can -- I can solve any problem that I do have
20  that way.

21          **PRESIDING COMMISSIONER DAVIS:**  Okay.  And
22  the book that you're reading now is what?

23          **INMATE HAWKS:**  It's called The Symbolic
24  Quest.  And it is a book that deals with a
25  (indiscernible) approach to psychology, dream
26  therapy, symbolic interpretation.

27          **PRESIDING COMMISSIONER DAVIS:**  Without

1   commenting on your instant offense, what -- in
2   all the work that you've done, can you talk
3   about the insight that you have into the crime,
4   the victims generally?

5       **INMATE HAWKS:**  Yeah, I believe I can.  I
6   think that, you know -- Excuse me.  I'm kind of
7   drying out here a little bit.  I've -- I
8   understand the harm that I've caused everybody.
9   I do the best that I can to try to empathize
10  with the harm that I've caused.  I've lost
11  family members too; close family members.  So I
12  do understand that not as severely or tragically
13  as the victims' family members have suffered.
14  Both of the family members have suffered and the
15  community as well.  I listened to everything
16  that the victims' family members have to see.  I
17  read these opposition letters that have come in
18  in the past.  And I -- You know, I feel -- I
19  feel terrible that I shot and killed Patricia
20  Dwyer and I severely wounded Wendy Varga.  I
21  feel terrible for the pain that I've caused to
22  the community, Corona and California citizens at
23  large.  I feel terrible for the pain that I've
24  caused to her college and the Corona Police
25  Department.  This is a nightmare.  The fact of
26  the matter is that I will always feel terrible
27  about what happened.  And the record is clear

96

1     though, that I turned the corner when I first
2     came in.  I understood that I had a duty and
3     responsibility to change my life and I
4     understood that that was the only way to serve
5     this time respectfully to everybody that I have
6     harmed.  So I try to live with this tragedy
7     every day, just like everybody else does, in the
8     most positive manner that I can.  Try to keep a
9     positive light on my life as a result of this.

10          **PRESIDING COMMISSIONER DAVIS:**  The letters
11    that you mentioned that you had written
12    previously to the police department and so forth
13    or that were mentioned in testimony that you had
14    written, was that a result of your AA work?

15          **INMATE HAWKS:**  I did reflect deeply on
16    Step Nine as a -- before doing that.  I also
17    talked to the psychologist and everybody else.
18    But it was a -- It was a result -- It was a
19    result of receiving the opposition material that
20    started coming in after 2003.  And it was a
21    result of Mark Dwyer writing and saying he never
22    had anything in writing from me.  So I knew that
23    I needed to do something, so I found the
24    procedure to do that, reflected on it deeply and
25    wrote them trying to express my remorse and
26    bring them some closure.  If it helps, then it
27    helps them.  I hope it did.

97

1          **PRESIDING COMMISSIONER DAVIS:**  So was that

2    a mechanical thing that you did because you just

3    thought it needed to be done or is it something

4    you sincerely believe that you wanted to do?

5          **INMATE HAWKS:**  No, I'd wanted to do it for

6    a long time.  The thing is, though, how do you

7    approach something like that.  I felt that I had

8    to wait until the door -- a door was open before

9    I could do that.  And so I thought about it over

10   the years a lot and I think the longer that I

11   waited, the better actual, you know, letter that

12   I could write.  Early on, I probably not --

13   would not have been able to apologize as

14   thoroughly as I felt I did anyways.  And that

15   would be reflected upon my apology at trial.  I

16   was out of it, having just been convicted of

17   murder and so my apology was very -- It was

18   sincere, but it wasn't as, you know, thought out

19   as it -- as I could have been.

20         **PRESIDING COMMISSIONER DAVIS:**  All right.

21   Commissioner, any questions?

22         **DEPUTY COMMISSIONER SMITH:**  No, I don't

23   have any questions.

24         **PRESIDING COMMISSIONER DAVIS:**  Ms. Dunn?

25         **DEPUTY DISTRICT ATTORNEY DUNN:**  Yes, thank

26   you, Commissioner.  We'd like to ask the inmate

27   in the February 1986 police incident in

98

1    Whittier, where the police were called about

2    domestic violence, when the police took away the

3    inmate's shotgun, I'd like to know how he got it

4    back after that.

5         **INMATE HAWKS:**  Okay.  First of all, I'm

6    the one that called the police at that incident.

7    I took the shotgun away from my wife.  I put it

8    on the roof of our duplex that we were living at

9    that point in time.  And I got the shotgun back

10   -- I think it was three days later.  I went down

11   to the Whittier police report [sic], gave them

12   the receipt, got the shotgun back.  And then

13   afterwards, I went to a D.A. follow-up with my

14   wife and I both went to the D.A. follow-up and

15   talked about the incident, etc.

16        **DEPUTY DISTRICT ATTORNEY DUNN:**  I'd like

17   to ask --

18        **INMATE HAWKS:**  But given back to me by the

19   Whittier Police Department.

20        **DEPUTY DISTRICT ATTORNEY DUNN:**  Then I'd

21   like to ask the inmate, when was the first year

22   that he possessed and owned any weapon.

23        **INMATE HAWKS:**  Possessed and owned any

24   weapon?  Probably would have been like a .22

25   caliber rifle when I was like 18 maybe.  I'm

26   guessing, but I'd say around there probably.

27        **DEPUTY DISTRICT ATTORNEY DUNN:**  On page

99

1    seven of the probation report, it states that

2    the inmate told the probation officer his

3    hobbies were trap shooting and hunting. Can he

4    please explain how long he had been engaged in

5    those hobbies prior to the life crime.

6        **INMATE HAWKS:** Gladly. In terms of

7    shotguns, I had not had much access until about

8    maybe a year and a half before the crime

9    occurred. And I was getting into trap shooting.

10   I was -- I wanted to go quail hunting, and so

11   that's where that -- And in Imperial County,

12   that would have opened up a couple weeks after

13   this crime occurred. And that is when -- is why

14   I had the shotgun. I was going to go trap

15   shooting on that -- on that weekend. And so I'd

16   experimented with a shotgun over that period of

17   time maybe once a month for about a year, a year

18   and a half, somewhere on there. Again, I'm just

19   going off the top.

20       **DEPUTY DISTRICT ATTORNEY DUNN:** And was

21   the inmate also familiar, not just with the

22   weapons, but with ammunition for the various

23   weapons, including the shotgun?

24       **INMATE HAWKS:** I had tried different types

25   of ammunitions in the shotguns. Correct.

26       **DEPUTY DISTRICT ATTORNEY DUNN:** The inmate

27   said that he attended AA meetings with his ex-

100

1    wife.  Can he please explain to us the month and

2    year of those meetings?

3         **INMATE HAWKS:**  I believe that would have

4    been in 1986, and around the -- around the

5    summer of 1986.  I'm sorry, 1983.  It would have

6    been around the summer of 1983.  I believe

7    that's when she got that DUI.

8         **DEPUTY DISTRICT ATTORNEY DUNN:**  And

9    other --

10        **INMATE HAWKS:**  The summer to fall of 1983.

11   Somewhere around there.

12        **DEPUTY DISTRICT ATTORNEY DUNN:**  Thank you.

13   Other than the AA meetings that he attended at

14   that time, did the inmate ever participate in

15   any substance abuse activity or treatment prior

16   to the life crime?

17        **INMATE HAWKS:**  No.

18        **DEPUTY DISTRICT ATTORNEY DUNN:**  And what

19   is the name and city, if he can give us, of his

20   AA sponsor out in the community?

21        **INMATE HAWKS:**  I don't have a sponsor, per

22   se, other than a man by the name of Steve

23   Vargas.  You read his letter.  It's in there and

24   he's willing to be with me in AA.  I don't think

25   he really mentions it as a sponsor, but that

26   will be my primary contact other than just going

27   straight over to Gary Avenue meeting house and

101

1   getting involved in the hearings there or excuse

2   me, the meetings there. I'll be in contact with

3   my friend, Steve, as well. And I think that I

4   can develop being a sponsor for people actually.

5   **DEPUTY DISTRICT ATTORNEY DUNN:** And the

6   inmate said that he has attended Anger

7   Management and other classes while incarcerated.

8   I'd like to ask him if he ever attended any such

9   anger management, parenting, psychotherapy or

10   any classes while he was in the community prior

11   to the life crime?

12   **INMATE HAWKS:** No, I didn't. I just --

13   These have been very enlightening and educating

14   experiences for me since I've been in prison.

15   No, I -- nothing like that on the streets.

16   **DEPUTY DISTRICT ATTORNEY DUNN:** Can the

17   inmate tell us why he did not do that?

18   **INMATE HAWKS:** No, I can't. I can't give

19   an answer that will satisfy you. And all I can

20   say is that I failed to do so. But I've since

21   done everything I can to try and remedy for that

22   failure of tragic -- the consequences, as they

23   may be.

24   **DEPUTY DISTRICT ATTORNEY DUNN:** And can

25   the inmate tell us whether or not he's --

26   believes his conviction for the second degree

27   murder was fair or unfair?

102

1       **INMATE HAWKS:**  I will just say that I
2    accept the punishment and the conviction that
3    was handed down to me and I have taken the
4    degradation and punishment of incarceration and
5    turned it into a positive life-changing
6    experience.  So, yes, I do accept the jury's
7    verdict in my case.
8       **DEPUTY DISTRICT ATTORNEY DUNN:**  My other
9    questions would relate to the life crime,
10   Commissioner, so if that is not to be allowed, I
11   have no further questions.
12      **PRESIDING COMMISSIONER DAVIS:**  All right.
13   Thank you.  Mr. Defilippis.
14      **ATTORNEY DEFILIPPIS:**  Thank you.
15   Mr. Hawks, it sounds like as you -- after you
16   were arrested in this case and you came to
17   prison, there was a change in how you began to
18   approach your life.  Is that correct?
19      **INMATE HAWKS:**  That is seriously,
20   definitely the case.
21      **ATTORNEY DEFILIPPIS:**  And why did you
22   initiate that change in your life?
23      **INMATE HAWKS:**  Well, first of all, I
24   killed an outstanding member of the community.
25   This was a horrifying thing for me as well as I
26   know it was for everybody else involved.  And I
27   injured another person very severely, horribly,

103

1    and I understand that.  And so I knew right then

2    and there that it was time to change.  I had to

3    change my life.  And I was in the county jail,

4    and the county jails are kind of a wild

5    situation. And I looked around at the people

6    that were in there with me, and I -- and I

7    dawned on the fact that most of these guys, they

8    just didn't get why they were here.  Their

9    behaviors had become so bad that they had been

10   thrown in jail and most of them went to prison

11   anyway.  It's society had to lock them up.  So I

12   understood that this incarceration -- I knew I

13   was going to go to prison because I wasn't

14   saying that I didn't pull the trigger that

15   night.  And so I understood right off the bat

16   that this was the chance, an opportunity to

17   change.  So I kind of got it right after that

18   with this, that I have a duty and responsibility

19   to change my life.  And so I think it clicked

20   for me.

21       **ATTORNEY DEFILIPPIS:**  Now when you got

22   into AA, that was the first point at which your

23   custody level was reduced down far enough that

24   you were able to go to the program.  Is that

25   correct?

26       **INMATE HAWKS:**  That's correct.  I was at

27   Folsom Prison.  They did have AA, but I couldn't

104

1   get into it.  I tried to get into it.  They had

2   it on the weekends, and it was kind of like

3   well, you can take college classes or you can

4   take AA.  And so I tried to get into AA and I

5   wasn't able to do it, but I was able to get into

6   college, so -- and they were on the weekends.

7   So then when I came here, I got into AA a few

8   months after I got here, once I started meeting

9   guys in the groups.

10      **ATTORNEY DEFILIPPIS:**  And since 1990,

11  you've been consistently involved in AA.  Is

12  that correct?

13      **INMATE HAWKS:**  I have.

14      **ATTORNEY DEFILIPPIS:**  And in terms of

15  sobriety though, your sobriety goes back to the

16  date of your arrest?

17      **INMATE HAWKS:**  The moment of my arrest.

18  That's correct.  Yeah.

19      **ATTORNEY DEFILIPPIS:**  And you talked about

20  continuing with the program of AA once you get

21  out on the streets.  Would you continue in other

22  self-help endeavors?

23      **INMATE HAWKS:**  I would.  I would do that.

24  I would.  I would seek out opportunity for other

25  Anger Management groups.  I think that I can

26  learn a lot from them and I also may be able to

27  give back something into some of these groups.

105

1   I think I may get involved in self-help on the

2   -- you know, in a broader aspect.  And as well,

3   youth violence prevention is something that I

4   have -- that I'm interested.  I think that

5   that's an important way to give back to the

6   community, and I think I will try to actually

7   take a We Care type program to the streets.

8   That will some be -- have something that I have

9   to deal with the parole office with.

10       **ATTORNEY DEFILIPPIS:**  Now while you have

11   been in prison, you've obtained an AA Degree.

12   Is that correct?

13       **INMATE HAWKS:**  That's correct.

14       **ATTORNEY DEFILIPPIS:**  And a Bachelors

15   Degree.

16       **INMATE HAWKS:**  That's correct.

17       **ATTORNEY DEFILIPPIS:**  And a Masters

18   Degree.

19       **INMATE HAWKS:**  That's correct.

20       **ATTORNEY DEFILIPPIS:**  You've worked your

21   entire time that you've been in custody.  Is

22   that correct?

23       **INMATE HAWKS:**  When I'm able to work, yes.

24   That's correct.

25       **ATTORNEY DEFILIPPIS:**  And --

26       **INMATE HAWKS:**  Sometimes I've been in

27   vocations and sometimes yes.  But I've remained

106

1    consistently busy.

2        **ATTORNEY DEFILIPPIS:**  That's right.

3    Either in a vocational program or in a work

4    assignment.

5        **INMATE HAWKS:**  That's correct.

6        **ATTORNEY DEFILIPPIS:**  And you've always

7    received top grades in those work assignments.

8    Correct?

9        **INMATE HAWKS:**  Yes.

10        **ATTORNEY DEFILIPPIS:**  And top grades in

11    the vocational assignments?

12        **INMATE HAWKS:**  That's correct.

13        **ATTORNEY DEFILIPPIS:**  In terms of

14    vocations, you actually have completed four

15    different vocations, formal vocations here in

16    the prison system.

17        **INMATE HAWKS:**  That is correct.  All

18    computer -- in computer related technologies.

19        **ATTORNEY DEFILIPPIS:**  And my understanding

20    is, is generally, inmates are limited to two.

21    But you've been able to complete four.

22        **INMATE HAWKS:**  That's correct.

23        **ATTORNEY DEFILIPPIS:**  You've also gotten

24    the educational degrees and you went through the

25    Paralegal course.  Is that correct?

26        **INMATE HAWKS:**  I did, which would be

27    another vocation actually.

1          **ATTORNEY DEFILIPPIS:**  So you're actually

2    certified as a -- as a paralegal?

3          **INMATE HAWKS:**  I'm not certified.  I have

4    a paralegal diploma.

5          **ATTORNEY DEFILIPPIS:**  Okay.  From

6    Blackstone.

7          **INMATE HAWKS:**  From Blackstone.  Correct.

8          **ATTORNEY DEFILIPPIS:**  And you have -- you

9    have also, throughout that same period of time

10   that involved in AA as well as the 19 different

11   self-help groups that we've talked about.

12         **INMATE HAWKS:**  That's correct.

13         **ATTORNEY DEFILIPPIS:**  And you're also

14   active in sports at the institution.

15         **INMATE HAWKS:**  I am.  Sports, as also, I

16   play in volunteering sports; soccer, softball,

17   keeping the field maintained and also in Arts in

18   Corrections doing musical shows and things of

19   that nature as well.

20         **ATTORNEY DEFILIPPIS:**  And I was going to

21   get to that.  You've spent over the years, time

22   as a musician in the Arts in Corrections

23   program?

24         **INMATE HAWKS:**  That's correct.

25         **ATTORNEY DEFILIPPIS:**  And you've also been

26   involved in the hobby program?

27         **INMATE HAWKS:**  That's correct.

108

1    **ATTORNEY DEFILIPPIS:**  And because of your

2    graphic arts background, you've been involved in

3    doing a lot of paintings and artistic work.

4    **INMATE HAWKS:**  That's right.  Both digital

5    and audio.

6    **ATTORNEY DEFILIPPIS:**  And I noted that in

7    the chronos that talk about your participation

8    in those programs, the instructors seem to feel

9    that your participation doesn't just relate to

10   your own artistic work, but taking steps to

11   better those programs.

12   **INMATE HAWKS:**  That's correct.

13   **ATTORNEY DEFILIPPIS:**  Is that a focus that

14   you've had during the time that you've been

15   involved in each of the programs that you've

16   been in?

17   **INMATE HAWKS:**  Sure.  There's always room

18   for improvement, whether it be buying my own

19   books to donate to vocational courses or, you

20   know, giving my time as a recording technician

21   to help other people expand their artistic

22   endeavors.  I give whenever I can.  It's an

23   important thing.

24   **ATTORNEY DEFILIPPIS:**  And now in the last

25   two years, you've been involved in that We Care

26   program.  Is that correct?

27   **INMATE HAWKS:**  I think it's been a little

109

1    bit over two years.  But, yeah, the program

2    right now is kind of stalled.  But yeah, I am

3    involved in it.

4        **ATTORNEY DEFILIPPIS:**  So I -- Basically,

5    with everything I've seen you're doing, you've

6    got a -- you've got an active week every week

7    pretty much when you get up in the morning until

8    you go to bed at night.

9        **INMATE HAWKS:**  I'm as busy now as I ever

10   was on -- as a free person, if not busier.

11       **ATTORNEY DEFILIPPIS:**  I have nothing

12   further at this time.

13       **PRESIDING COMMISSIONER DAVIS:**  All right.

14   Thank you.  Ms. Dunn, closing.

15       **DEPUTY DISTRICT ATTORNEY DUNN:**  Thank you.

16   As set out more fully in our letter dated July

17   the 6th, 2006, the District Attorney's Office of

18   the County of Riverside is opposed to the parole

19   of this inmate, Harold Harvey Hawks.  He remains

20   unsuitable because he is still an unreasonable

21   risk to the community and to the people of the

22   State of California.  There are a number of

23   factors I would like to refer to.  And, of

24   course, we start with the life crime itself.  It

25   is one of the many factors that should be

26   considered by this Board, and I'm sure will be.

27   We oppose parole for this man, not only because

110

1  he killed a woman who was an off-duty police
2  officer. Let's make it very clear. We oppose
3  his parole because he killed a human being and
4  he killed a complete stranger who was in her
5  forties and the mother of three young people,
6  teenagers, 22 years old was her oldest. And she
7  was a wife, loved by her husband and missed by
8  him. This human being did not have any
9  connection to the inmate and he killed her in a
10 senseless and completely random act. We now
11 call it road rage. We didn't have that term
12 back in 1986. This man was a completely out of
13 control and angry individual. He was angry that
14 night, long before he ever left his home or his
15 in-laws' home, and he carried that anger with
16 him in his own vehicle. He was being careless
17 and reckless with his own child, who was two
18 years old, who was in a car with him and was
19 apparently, according to the inmate's own
20 admissions, not seat-belted in appropriately,
21 because the inmate said that his son was
22 dislodged from the car seat during this
23 incident. And this inmate was drinking with his
24 young child and had a weapon and ammunition
25 right next to his seat. So his recklessness
26 predated the actual crime itself, and it's
27 important to get a picture of what this man was

111

1    like.  When he came upon the Dwyer van,

2    Mr. Hawks became angry at what?  Someone who he

3    didn't like speeding, slowing down?  It doesn't

4    matter, because it's so trivial.  The motive for

5    this crime as to be almost it is inexplicable

6    why anyone because of a car in traffic would

7    become so angry that they would fire a shot at

8    an occupied vehicle.  And the problem today is

9    that we don't know what his insight into that

10   crime is.  We don't know what the reasons that

11   led him to that point really were.  We have no

12   opportunity to know that.  What we do know is

13   that he fired a slug and it's shown in this

14   photograph, it illustrates what happened.  This

15   is the van being pointed at by a member of the

16   Corona Police Department.  And it's easy to see

17   the size of this slug that he fired directly

18   into this van.  In prior versions of the crime,

19   the inmate has not been truthful about the

20   crime.  At the time of the sentencing, he

21   characterized what happened.  He said, quote,

22          "I have to live with this also

23          every day, not only by being

24          incarcerated, but by knowing I

25          took another human's life

26          accidentally.  I know in my heart

27          it was an accident.  I have been

112

1         totally cooperative and honest in

2         this matter.  I don't feel the

3         verdict of second degree murder is

4         fair or right.  It's unfortunate

5         that this tragic accident ever

6         happened."

7  End quote.  That is not much different than his

8  most recent version of the events, in which he

9  still maintains that this crime was an accident.

10  And he said to this Board that he made -- he

11  fired what he characterizes as a warning shot,

12  meant only to scare the person in the van.  And

13  told prison personnel in preparation for this

14  Board, that he had no intention of hitting

15  anyone.  That is not true.  That is a deliberate

16  inaccurate portrayal of the life crime on the

17  inmate's part, and we have to call it like it

18  is.  The inmate has not shown any insight,

19  because he is still characterizing this as an

20  accident.  And until he comes to grips with the

21  fact that it was an intentional shot and comes

22  to grips with the fact that we all know from the

23  minute we get our driver's license that cars and

24  vans and trucks carry human beings, and that

25  when we fire a gun at them, we're going to hurt

26  and even kill a human being.  It's not an

27  accident that this happened.  When you fire a

113

1     slug from a shotgun into an occupied vehicle,
2     that is the definition of implied malice,
3     reckless disregard for human life. And he has
4     not acknowledged that after 19 years in prison.
5     He needs to do that before we can be comfortable
6     in allowing this man to be free on the streets
7     of our state. He told his own cousin -- Her
8     name was Michelle, and it's in the police
9     reports, within half an hour after he committed
10    this crime --

11        **ATTORNEY DEFILIPPIS:** I'm going to object
12    to reading of statements from the police
13    reports. And this appears to be an effort to
14    get into retrying the crime. The crime is what
15    it is. We've read a summary of that crime. It
16    has not been challenged by Mr. Hawks, and I
17    think that the District Attorney needs to accept
18    the crime and the verdict that was rendered in
19    the court.

20        **PRESIDING COMMISSIONER DAVIS:** I think
21    what I've heard so far is the District
22    Attorney's attempt to talk about the severity of
23    the crime, so I'll allow it.

24        **ATTORNEY DEFILIPPIS:** Except that she's
25    now attempting to get into reading police
26    reports. And as I've indicated to you
27    previously, there we're getting into

114

1    inaccuracies and matters that were not under

2    oath, that were not subjected to cross-

3    examination at the trial, and are contrary to

4    much of what is in the trial.

5        PRESIDING COMMISSIONER DAVIS:  And I'll

6    certainly allow you to address that in your

7    closing as well.

8        ATTORNEY DEFILIPPIS:  Except that we're

9    now at a closing phase where I can't start to

10   introduce evidence.  She's attempting to

11   introduce evidence that is going to be

12   considered by the Board.  That's wholly

13   inappropriate to do.  This is not to be a

14   retrial of the case.

15       PRESIDING COMMISSIONER DAVIS:  And I agree

16   it's not to be a retrial, and I consider this to

17   be a statement.  If it gets into a retrial, I'll

18   stop it at that time.  I'm going to go and let

19   -- go ahead and allow her to read her statement.

20       DEPUTY DISTRICT ATTORNEY DUNN:  Reading

21   from page two of the District Attorney's letter

22   in opposition to parole,

23           "According to Ms. Wallace, the

24           cousin, the inmate said he

25           couldn't get the van to pull over,

26           so he, quote, 'decided to shoot a

27           hole in the side of the van.'  End

115

1    quote. And then repeatedly told
2    her about how he had shot a hole
3    in the side of the van.  And he
4    also told her that he used one arm
5    to brace the shotgun and hold it
6    steady while he aimed."
7  Now that is critical, because it completely --
8  it shows the inconsistency with the inmate's
9  current version which is I fired above and
10  behind the van.  It was an accident.  That's not
11  what he told his cousin and that's certainly not
12  what this evidence in this photograph shows.
13  And this is a man, who by his own admissions
14  just a few moments ago, was a man who was
15  familiar with weapons.  He had owned the shotgun
16  and fired it on a monthly basis in the year
17  prior to the life crime and was familiar with
18  the ammunition.  He knew what he was doing when
19  he pulled out a slug from the bottom of his
20  ammunition bag and loaded a shotgun, all the
21  while, by the way, with his child beside him and
22  under the influence of alcohol.  So this is an
23  extremely dangerous, reckless crime, which
24  exhibited a callous disregard for human
25  suffering and for life; the life of others.
26  And, in fact, multiple victims were attacked in
27  this crime.  We all know and we will no doubt

116

1     hear more about Patricia Dwyer losing her life

2     when she was shot in the aorta.  And it's

3     important to remember that she was not the only

4     victim.  That there was, in fact, another

5     victim, a woman whose name was Wendy Varga,

6     V-A-R-G-A.  And her statements at sentencing,

7     which I will refer to and were referred to at

8     the previous Board, are extremely touching.

9     This woman lived for six years after the crime.

10    And here is what Ms. Varga told the judge at the

11    sentencing.  She said,

12            "From August 22nd, 1986, I was

13            hospitalized for the most part of

14            eight months due to the

15            complications of a gunshot wound.

16            As a result of this accident, my

17            family was told if I lived through

18            the first 36 hours in intensive

19            care, I might -- may never talk

20            again or regain the use of my left

21            arm, which was paralyzed at the

22            time.  I was told that the shotgun

23            slug had lacerated the voice box,

24            the vocal cords, the trachea and

25            esophagus.  After the shotgun shot

26            ricocheted off of my fifth and

27            sixth vertebrae, it continued to

117

```
 1          pass through the seventh, eighth
 2          and ninth cranial nerves at the
 3          neck, causing permanent damage.
 4          It then passed through the
 5          brachial plexus and rotator cuff
 6          in the left shoulder, lodging just
 7          two layers below the skin.  After
 8          numerous operations and months of
 9          physical therapy, I have regained
10          the use of my left arm and am able
11          once again to talk.  There are
12          still more surgeries to come and I
13          also suffer from partial paralysis
14          on the left side of my face, which
15          in turn, has caused other
16          difficulties.  As a result of this
17          accident, I have suffered
18          immensely, and at this time, my
19          health is still undeterminable and
20          will take a very long time to
21          become normal again.  I have lost
22          not only the independence of a
23          normal human being, but also many
24          personal valuables due to this
25          tragedy, which I will be paying
26          for not only with physical and
27          mental being, but my financial as
```

118

```
 1          well.  Many top specialists at
 2          U.C. Irvine Medical Center have
 3          told me that it's a miracle that I
 4          survived, and an even greater
 5          miracle that my disabilities
 6          aren't more severe than they are.
 7          Although my external scars may
 8          fade away, the internal scars
 9          Mr. Hawks has placed upon myself
10          will be with me for the rest of my
11          life.  By a stronger will than my
12          own, I am able to speak here
13          today, and I do realize by asking
14          Judge Webster to impose the
15          maximum sentence on Mr. Hawks, it
16          will never ease my pain or
17          suffering, but it would make my --
18          it would ease my mind to know that
19          Mr. Hawks will have a very long
20          time to think about the suffering
21          that he has caused."
22  And as this Board is no doubt aware, that woman
23  lived for about six years and took her own life.
24  She is a second victim of this inmate's.  In
25  addition to the life crime, for the insight of
26  which we have really no idea what kind of
27  insight and what kind of thinking the inmate has
```

119

 1    about what led up to committing such a horrific
 2    act, we have also on the inmate's part of
 3    history and a pattern of unstable and tumultuous
 4    relationships.  It is very clear that he and his
 5    ex-wife, at least one time the police were
 6    called.  They were fighting.  A shotgun was
 7    taken.  It is very clear that on the night of
 8    the life crime, he was arguing with his -- with
 9    his wife about the child, and was apparently so
10    angry at her that he took the child and left
11    while he was under the influence.  This is a man
12    who had -- his life was completely chaotic and
13    out of control.  His life only came together
14    when he was forced for it to come together by
15    being incarcerated.  It's very interesting and
16    very important to note that Mr. Hawks never went
17    to AA while he was in the community, while he
18    had a significant alcohol problem.  He never did
19    any anger management.  He never sought any kind
20    of help at all until he had no choice but to do
21    that.  And that's important, because he has
22    taken advantage of the programs, and we are not
23    going to shy away from that fact.  That's good.
24    It's better than the other way.  However, why is
25    it that Mr. Hawks only took advantage when he
26    was forced by incarceration to do so?  Why
27    didn't he do it when he was on the street?  He

120

1    did not.  And it's also notable to us that

2    Mr. Hawks, when asked directly if he believes

3    his conviction for second degree murder was fair

4    or unfair, he was evasive in his response.  He

5    says yes, I accept it, but he didn't say that it

6    was fair, because he cannot bring himself to say

7    it, because he still apparently believes that it

8    was not fair that he was convicted of the murder

9    of Patricia  Dwyer.  And he has not fully

10    accepted his responsibility.  In addition to

11    that, we note from the letters of support,

12    there's some angry supporters of Mr. Hawks, and

13    they have alleged that this -- our office, the

14    District Attorney's Office does not care about

15    their positions.  We respect their position, of

16    course.  But we note that this member of our

17    community, who was a woman who protected and

18    served her community, a woman of character, was

19    killed and that this woman, whose name was

20    Patricia Dwyer, this woman left behind a

21    grieving family and grieving co-workers.  And

22    she was just the person who happened to die that

23    day because of this man's anger.  Our obligation

24    is to all the citizens; two million people in

25    Riverside County, 38 million plus in California.

26    All of the citizens who would be at risk.  It

27    could have been anybody on the road that day.

121

1    It could have been a homeless person.  It was

2    Patricia Dwyer.  It could have been any one of

3    us.  And I am sure that there will be some

4    discussion of the psychiatric report, so I will

5    just briefly touch on the fact that the

6    psychiatric report says that this person is no

7    more dangerous than the average citizen.  The

8    average citizen has not committed a murder.

9    There's only one person in the room today that

10   has committed a murder, and that is this inmate,

11   Mr. Hawks.  The best predictor of future

12   behavior is past behavior.  To suggest that the

13   average citizen is the same risk as Mr. Hawks is

14   illogical and it's offensive.  Mr. Hawks has not

15   served enough time for the horrendous crime that

16   he committed.  He has not come to grips with the

17   why.  He has continued to deny responsibility

18   and claim it was accidental.  All the programs

19   in the world aren't going to make up for that.

20   We would respectfully request that this Board

21   deny his bid for parole today and find him

22   unsuitable.  Thank you.

23         **PRESIDING COMMISSIONER DAVIS:**  Thank you.

24   Mr. Defilippis.

25         **DEPUTY COMMISSIONER SMITH:**

26   Mr. Defilippis, before we go to closing, let me

27   put in another tape.

122

1        **ATTORNEY DEFILIPPIS:**  Certainly.

2             [Thereupon, a new tape began.]

3        **DEPUTY COMMISSIONER SMITH:**  Go ahead, sir.

4        **ATTORNEY DEFILIPPIS:**  Thank you.  Eleanor

5    Roosevelt once said that justice can never be

6    one-sided.  It has to be from both sides.  When

7    Mr. Hawks received a sentence of 17 years to

8    life, justice was served.  He was tried.  He was

9    convicted and he came to prison.  And justice

10   was served, and that's what -- that's what our

11   society requires is that an individual who

12   commits a crime be tried, be convicted, be

13   subjected to the laws that our society has.  The

14   District Attorney's Office is the one that

15   prosecuted Mr. Hawks.  And when they prosecuted

16   Mr. Hawks, they prosecuted Mr. Hawks for first

17   degree murder.  They prosecuted him for an

18   intentional, deliberate attempted murder, based

19   on the shooting of the -- at the van.  Mr. Hawks

20   was acquitted of first degree murder.  He was

21   found guilty of second degree implied malice

22   murder.  There was never a finding by the jury

23   that there was intent to kill.  And that is what

24   has been talked about throughout this time in

25   terms of the accidental nature of this.  What

26   Mr. Hawks was attempting to do was precisely

27   what he said and what he's said since the

123

1    inception.  He was attempting to scare the
2    individual in the van.  He wasn't intending to
3    kill anyone.  That's what was accidental about
4    this.  Not it was accidental to shoot at a van.
5    That's not accidental and it's never been
6    contended to be accidental.  It's always been
7    contended that the accident was actually hitting
8    somebody.  The District Attorney's Office has
9    provided you photographs.  Take a look at those
10   photographs.  They show the van and they show
11   the fact that the van on the side is paneled.
12   They show that there's some windows in the back
13   that are way up high.  You can't see into the
14   van.  The windows are obscured.  You cannot see
15   through them, so there was no indication to him
16   at the time that there was anybody in that van.
17   Now if you go back to the discussion of the
18   crime, we talked about some of the problems that
19   you have from going on a rendition that comes
20   from police reports, because when they actually
21   testified at the -- at the trial, the testimony
22   came out significantly different.  In the -- In
23   the probation report, when it talks about the --
24   what happened, it talks about Mr. Hawks coming
25   up on the Dwyer van.  That didn't happen.  What
26   happened was that Mr. Hawks was in the front.
27   The Dwyer van came up behind him.  There was

124

1    testimony from James Ross Goldstein.

2    Mr. Goldstein was an independent witness; had

3    nothing to do with any of this.  He was driving

4    down the road and saw the events that occurred.

5    He talked about the fact that what caught his

6    attention was that there was a van that came up

7    on a -- on a vehicle suddenly, and that that van

8    not flicking its high beams, as was stated in

9    the police report, but had its high beams on.

10   And that's what drew his attention to it.  That

11   that van was following the car the distance of

12   10 to 15 feet, and that that continued for at

13   least a mile down the road.  Mr. Goldstein talks

14   about the fact that the van came around the

15   sedan.  The sedan was obviously the one that

16   Mr. Hawks was driving.  The van being the one

17   that Mr. Dwyer was driving.  That the -- That --

18   and this is at page 170 of the trial transcript.

19   This is the actual trial testimony that was

20   rendered.  What he -- What he talked about was

21   the van came around and cut off Mr. Hawks and

22   literally drove Mr. Hawks into the median area.

23   At page 170, it talks about the fact that

24   Mr. Hawks crossed the fog line and actually went

25   into the center median area.  That's what

26   Mr. Hawks has always talked about in terms of

27   being run into the center of the road.  And

125

1    that's where his son got dislodged from the --
2    from the seat during that time.  I don't bring
3    this up to excuse the behavior.  What I bring
4    this up for is because it puts everything into a
5    context and it puts it into a context so that
6    you know what happened, you know what he's done
7    since then to take the corrective actions that
8    he needs to take care of to ensure that this
9    type of thing never happens again.  Mr. Dwyer,
10   at the -- at the trial, actually conceded
11   several points that Mr. Hawks has always
12   contended.  One of those being that a can or
13   object of some type, a metal object of some type
14   was thrown at Mr. Hawks' vehicle by Mr. Dwyer.
15   He acknowledged that pages 92 to 93 of the
16   transcript, and also at page 81 of the trial
17   transcript that he, in fact, did -- as he
18   described it, he said he just flipped a Coke can
19   out the -- out the window.  Ms. Varga, in a suit
20   brought against Mr. Dwyer, talked about the fact
21   that Mr. Dwyer, a trained and experienced
22   firefighter, quote, "became extremely outraged
23   at the driver of another automobile on the
24   highway and proceeded on a course of driving,
25   utilizing his van as a weapon, directed at the
26   driver of the other automobile.  That Mr. Dwyer
27   violated at least 11 separate California Vehicle

126

1  Codes over a very short stretch of freeway.

2  This is what Mrs. Varga was saying about

3  Mr. Dwyer and his driving of the van.  These

4  violations included, but are not limited to

5  aggravated and despicable conduct, such as

6  throwing a missile at another automobile,

7  engaging in exhibition of speed contest and

8  running another motor vehicle off the freeway.

9  And then she goes on to say that she describes

10  Mr. Hawks as being someone who was not

11  predisposed to such action.  The driver of the

12  other automobile became so provoked that he

13  loaded and discharged a firearm in the direction

14  of defendant's van.  And that's what caused the

15  injuries.  Now the acquittal of first degree

16  murder and the acquittal of attempted murder

17  negates the issues of intent to kill.  It shows

18  that anything that was charged with an intent to

19  kill, premeditation, deliberation, anything of

20  that nature, there were acquittals for.

21  Mr. Hawks was convicted of what he should have

22  been convicted of.  He was convicted of causing

23  the death of another individual by shooting into

24  an occupied vehicle.  It's essentially a felony

25  murder that occurs for a violation of 246 of the

26  Penal Code, shooting into an occupied vehicle.

27  And by doing that, that supplied the malice

127

1    necessary for the jury to come to the verdict of

2    guilty.  That's how he was found guilty in this

3    particular case.  He has come here and he has

4    always acknowledged the underlying facts of

5    that, and always acknowledged that he was

6    responsible for causing her death.  But most

7    importantly, what he's done is he's taken that

8    situation and he's come to prison and he's

9    turned his life around.  As the Board is well

10    aware, I do a lot of these types of cases.  I

11    handle a variety of inmates that come before the

12    Board for parole.  I can't think of another

13    inmate that I've come across, that I've read

14    about in any reported decisions of this state,

15    that I have heard about, that has been talked

16    about to me, I can't think of any that equal

17    what Mr. Hawks has done.  What he has done since

18    he has come to prison is so far and above --

19    head and shoulders above anybody else that you

20    see on the basis of sitting as Commissioners on

21    this Board.  He comes to prison.  He immediately

22    stops drinking.  He immediately turns his life

23    around.  You'll see those statements repeatedly

24    throughout the file.  But what he did was he

25    looked at his life and he said my life is not

26    going in the right direction.  Look what I've

27    done.  I can't as an individual, go on acting in

128

1    the way that I was acting in the past.    That

2    would be -- essentially, I think he called it a

3    lack of respect for the victim that he killed,

4    for the individuals that he harmed as a result

5    of what he did.  And so what he did is he

6    actively took it upon himself to change his

7    life, and he's done everything that he can

8    possibly do since coming in here.  As soon as he

9    got to a point where he was able to get into AA,

10   he got into AA.  But he stayed away from the

11   drinking.  You can read it in Doctor Sexton's

12   report.  He says it there right at the

13   inception.  And this is not information that we

14   (indiscernible) to (indiscernible) the

15   (indiscernible) Panel Members here.  Drugs and

16   alcohol were available in the institutional

17   setting.  If you want drugs inside here, you can

18   get them.  They're there.  They're available.

19   If Mr. Hawks didn't have a dedication and a

20   desire to turn his life around, he'd be doing

21   the same things that he was doing before he came

22   to prison.  But he has.  He's changed.  He's

23   gotten involved in AA.  He's gotten into every

24   form of program that's available in this

25   institution.  There are no programs -- You can

26   go through every program in your mind that you

27   know of in this institution and ask did

129

1    Mr. Hawks avail himself with that.  Yes, he did.

2    He has availed himself of everything.  Not only

3    that, he has three times with -- I know I'm

4    going to miss it.  When was Doctor Bakeman

5    (indiscernible).  I believe he may have had a

6    second stint with Doctor Bakeman and

7    (indiscernible) now it's Doctor Howlin.  There

8    may be another one in between there as well.

9    But I know that he's had three separate periods

10   of time; distinct isolated periods of time where

11   he's gone through extended periods of one-on-one

12   therapy.  And as you know, one-on-one therapy

13   since the mid-nineties has not been available to

14   the general population inmates.  He's had to

15   really put himself out there to get this type of

16   treatment in the institutions.  He's completed

17   four vocations.  You don't see inmates in here

18   with four vocations.  The general rule in the

19   institutions is that once they've done two, that

20   that's it.  But he's doing these things in order

21   to better himself.  He looks for new ways that

22   he can -- that he can show himself to be

23   suitable for parole.  New ways that he can show

24   himself to be ready to go back out there into

25   society.  And that's why he's able to tell you

26   today that he doesn't perceive that there's

27   going to be any problems when I get out there.

130

1    He tells you that, because he's done the things
2    that he needs to do in order to make himself
3    ready for parole.  Parole is for the guilty, and
4    I think that's a point that we need to
5    acknowledge up front.  Counsel talks about why
6    didn't he do these things out on the streets.
7    Why didn't he get involved in AA.  Why didn't he
8    get involved in Anger Management.  If he had
9    gotten involved in AA, if he had gotten involved
10   in Anger Management, this tragedy would never
11   happened.  But you can say that in any case that
12   you have that appears in front of you.  If the
13   inmate had done the things to keep them from
14   committing this type of a crime, the crime
15   wouldn't have happened and we wouldn't be here
16   deciding an issue of parole suitability.  But as
17   I state, parole is for the guilty.  It's for the
18   individual who is guilty of the offense and has
19   done their time and has shown themselves not to
20   be an unreasonable risk of danger to society if
21   paroled.  Not once did Counsel talk about the
22   statutory and regulatory factors of suitability.
23   Because if you go through those statutory and
24   regulatory factors of suitability, there is
25   nothing to talk about in terms of Mr. Hawks.
26   There's nothing that shows Mr. Hawks is
27   currently a danger to society if he's released.

131

```
 1   The crime was 21 years -- almost 21 years ago.
 2   He has shown that he has changed as a person.
 3   That crime does not make him currently
 4   unreasonably dangerous.  And the reason the
 5   crime doesn't is because of all the steps that
 6   he's taken.  He's done everything to get rid of
 7   the issues that caused him to come to prison.
 8   If you look at Doctor Sexton's report, it goes
 9   through a very detailed analysis and it talks
10   about each of the factors, because back in
11   November of 2003, we had a Board hearing.  And
12   at that Board hearing, there were issues raised
13   and what the Commissioners at that hearing said
14   was we need these questions answered.  We need
15   to know how much has he delved into the
16   commitment offense.  What's his insight like.
17   It also talks about the lack of insight.
18   Insight has been so clearly established in this
19   case.  The Doctor talks about it and says you
20   know what, I've got these -- this list of
21   questions here from the Board, and they're
22   asking me to respond and to tell you, the Board,
23   what it is that we believe is the case of
24   Mr. Hawks, and they go through -- he goes
25   through a real complete analysis.  He talks
26   about the fact that Mr. Hawks demonstrates a,
27   quote, "general stability" and it's unlikely
```

132

1   that his mental status will be altered unless
2   one of the following should occur, pre-senile
3   dementia.  He talks about injury to the brain or
4   trauma causing injury -- medical condition
5   causing injury to the brain (indiscernible)
6   causing injury to the brain.  He goes on to say
7   the absence of these new developments which
8   would be obvious to the Board of Prison Terms,
9   that further psychological reports would be
10  redundant and of little clinical value.  So he's
11  telling you there is -- what you have -- what
12  you have in the four reports that have started
13  in 1990.  I believe it was 1997, the 2000 and
14  2005.  Those reports establish very clearly that
15  there is no psychological (indiscernible) to
16  parole.  That there is no diagnosis of a
17  psychological condition.  That there is no need
18  for treatment. And he says you want to talk
19  about a need for a treatment, you want to know
20  what my answer is to that, look back on the four
21  prior reports.  Look at all those reports and
22  see what the Doctor said.  And in each case, the
23  Doctor is saying there is no mental health
24  condition.  That there is no need for treatment.
25  So Mr. Hawks, over these years, what he has done
26  is he has availed himself of things, despite the
27  fact that the Doctors themselves say he doesn't

133

1    need those.  He's done things that you might
2    look at it and say well, you know, he's a bright
3    guy.  He, you know, has an aptitude of
4    (indiscernible) and, therefore, it's not really
5    that big of a deal that he gets an AA Degree and
6    (indiscernible) through correspondence courses
7    (indiscernible) to (indiscernible).  But look
8    back at his TABE scores and (indiscernible) TABE
9    scores that I saw are (indiscernible).   This
10   has not been something that is just something
11   that falls into place easily for him that he
12   just kind of walks through.  He's had to work
13   hard.  And look at those grades that he
14   received. He's on the honor roll almost every
15   semester.  He's -- He graduates with honors in
16   each of these programs that he's gone through.
17   Look at the grades on the Blackstone paralegal
18   courses that he took, 95's to 100's.  And he's
19   doing this while he's going through and getting
20   four (indiscernible) vocations completed.  He's
21   getting all these degrees.  He's working in the
22   institution.  He's volunteering his time.  He's
23   doing things like helping to take care of the
24   soccer field recently.  He's working in the Arts
25   in Corrections Program.  He's volunteering his
26   time to help out other inmates in that regard;
27   helping people who are less fortunate than him.

134

1    Working with juveniles recently, attempting to
2    give something back to society.  This is a man
3    who understands the magnitude of what he did.
4    Read that Concrete Wave article.  Read those
5    chronos from Shram and from Ramos, the
6    Correctional Officers that have written about
7    Mr. Hawks.  They talk about the fact that they
8    see him on a daily basis.  I think that one of
9    them knew him for 15 years.  They've had --
10   They've had contact on a daily basis with him.
11   What they see him as is an individual who was --
12   who was clearly suitable for parole.  The Shram
13   chrono from June of last year, "I have known
14   inmate Hawks since February of 1998."  So at
15   that time it was seven years.  "Interacted with
16   him on a daily basis as part of my duties as a
17   correctional officer.  I've written a laudatory
18   documentation on four prior occasions in support
19   of Mr. Hawks.  My analysis remains constant and
20   unwavering.  After 19 years in prison, Hawks is
21   a well-rounded individual and a deserving
22   candidate for parole.  His rehabilitative
23   efforts have been and remained sincere.  He has
24   proven himself on many levels, including
25   advanced academic accomplishments, in-depth
26   vocational studies in computer technologies,
27   consistent self-help and therapeutic

135

```
 1    participation, hobbies and arts.  Hawks
 2    continues to program as a model prisoner."
 3    You'll see that term model prisoner throughout
 4    his file and you will see it not from Mr. Hawks,
 5    not from people who have an interest in saying
 6    it, but from the people who guard him, the
 7    people who have been responsible for overseeing
 8    him during his time in custody.  They describe
 9    him as a model prisoner.  Shram goes on to say,
10    "Last year, I learned a great deal more about
11    Hawks through an article in a popular
12    skateboarding magazine."  Again, that's the
13    Concrete Wave article that I've referred you to.
14    This information enhanced my understanding of
15    his background and his determined efforts, which
16    I have witnessed firsthand, to put and keep his
17    life on a positive track.  It also strengthened
18    my understanding of the deep remorse that Hawks
19    feels towards his -- towards his offense and the
20    harm he caused so many people."  So he talks
21    about that deep remorse.  He talks about that
22    insight that the Counsel says isn't there.
23    People that know him, the people who have spent
24    the time with him over these last 20 years, know
25    him and understand the depth of his remorse, the
26    depth of his feelings.  You see that in the
27    letters.  When you go through those letters that
```

136

1    he's written to the families of the victims, to
2    the -- to the Chief of Police of the City of
3    Corona, to the press in Corona, asking them to
4    publish his apology to the City of Corona.
5    Those documents show you the depth of his
6    understanding of the harm that he caused, why it
7    happened and what he's done to turn his life
8    around.  This case happened because he had
9    issues of anger and he had issues of substance
10   abuse, meaning the alcohol, that were unresolved
11   at the time.  He's come to prison and he's taken
12   care of those points.  He's taken care of them
13   to the point of where the Doctors even say he
14   doesn't need anything further.  This is a man
15   who is going to go back out on the streets and
16   be as safe as the regular citizens.  And what
17   has often been described to me and you'll see
18   those reports of Doctors on a -- I wouldn't say
19   on a constant basis, you'll see them on an
20   occasional basis where they will rate certain
21   inmates who have shown their rehabilitation,
22   rate them as being consistent with the level of
23   danger of average ordinary citizens out on the
24   streets.  And there's a reason for that.  And
25   the psychologist will tell you that what it is,
26   is the individual has seen what can happen if
27   they let their life go awry.  And because of

137

1    that, they're so active in taking the steps to

2    prevent future issues, that they actually

3    overcompensate for those problems that they had

4    and become so far less of a risk of danger as a

5    result of their active participation in these

6    types of programs.  I can go on and talk to you

7    about Mr. Hawks for a long period of time.  But

8    I won't.  You see him.  You get an opportunity

9    to talk to him here today.  He's been in front

10    of five different Panels of the Board

11    previously.  Every time it happens, we come here

12    and the Board evaluates Mr. Hawks' case.  There

13    are recommendations that are made.  Earlier

14    Boards recommended that he get therapy, and

15    you'll see the chronos in the file where he went

16    into the mental health unit and he asked for

17    therapy.  He said can I get therapy.  The Board

18    has told me I need it.  The chronos in the file

19    document that, you know, he doesn't need

20    therapy.  But yet, eventually, he was able to

21    get into the therapy with Doctor Howlin again.

22    And so he's gotten back into that.  But each

23    time, the Board tells him to stay disciplinary

24    free.  He's done that.  Upgrade vocationally,

25    educationally.  That is so crystal clear that it

26    doesn't even deserve a comment.  He has done so

27    much in those two areas that there is absolutely

138

1    nothing more that he can do.  Earn positive

2    chronos.  He's done that.  He's probably got

3    close to a hundred laudatory chronos in his

4    file.  You've got a thick file there in front of

5    you, and that file is one that you can look

6    through and nowhere in that file, say for the

7    commitment offense, will you find a black mark

8    about Mr. Hawks.  Not one.  Nothing.  What he's

9    done since he's come to prison has been so

10   exemplary that he has shown you that he no

11   longer presents an unreasonable risk of danger

12   to society if paroled.  I urge you to set a

13   parole date in this case and to do as Eleanor

14   Roosevelt said, give justice to both sides in

15   this case.  There was justice on the

16   prosecution's side when there was a conviction

17   and there was a sentence and he was sent to

18   prison indeterminately, which meant that he

19   could spend up to his life in prison if he

20   didn't do anything to change himself.  And what

21   he's done is he's earned the right to have a

22   parole date set and have a date set consistently

23   with the matrix.  And I would urge you at this

24   time to find him suitable for parole and set a

25   date.

26          **DEPUTY COMMISSIONER SMITH:**  Thank you,

27   Counsel.

139

1       **PRESIDING COMMISSIONER DAVIS:**  Thank you.

2    We're going to take five minutes and to give

3    everybody a chance to take a break and cool off.

4                   [Off the record]

5       **DEPUTY COMMISSIONER SMITH:**  We're back on

6    the record.  Everyone previously identified is

7    back in the hearing room as well as those

8    previously identified, individuals who are

9    observing the course of the hearing through the

10   video process.

11      **PRESIDING COMMISSIONER DAVIS:**  All right.

12   Mr. Hawks, now it's your opportunity to address

13   the Panel directly and tell us why you believe

14   that you are suitable for parole.

15      **INMATE HAWKS:**  Thank you.  I do accept the

16   jury's verdict as being fair, and I do accept

17   responsibility for this crime.  I understand

18   that the District Attorney and the Corona

19   Police, the Dwyer family, the Varga family and

20   all who loved and knew Patricia Dwyer and Wendy

21   Varga will always oppose my parole.  I do not

22   believe that their sentiments will ever change.

23   I've apologized to them and the community in

24   every responsible opportunity in court and Board

25   hearings, through letters and through an

26   article.  And again, here today, I apologize

27   from the bottom of my heart to the Dwyers, the

140

1    Vargas, the citizens of the state at large for

2    the damage that I've caused to so many people,

3    for the grief and sorrow that my irresponsible

4    acts (indiscernible) struck into all of your

5    lives and for the pain that still lingers in

6    your hearts.  Obviously, no mere words or deeds

7    will ever cure the pain that I've caused to

8    everyone involved in this matter.  The past will

9    never change.  The only thing that I have in

10    control of are the changes and choices that I

11    make in my life as a result of this tragedy.

12    And so I, therefore, ask the Board not to judge

13    me for who I was 20 years ago, but that the

14    person that I've become now.  Twenty years of

15    dedicated sobriety has given me clarity in my

16    life that I just could not have dreamed of

17    before I came to prison, before all this tragedy

18    happened.  That clarity has allowed me to

19    educate myself extensively through vocational

20    and university studies, learn of myself through

21    self-help and therapy and give of myself through

22    volunteering in the arts, sports and activity

23    groups.  All the while maintaining and growing

24    family and social ties.  All of hits is

25    evidenced before the Board here today and there

26    can be little doubt that my institutional record

27    is exceedingly good.  But it's more than just

```
 1    that.  It is a direct reflection of the person

 2    that I am now and is a concrete indicator of my

 3    ability to succeed on parole.  It is a strong

 4    and current indicator of the fact that I have

 5    changed my life in the best possible way and am

 6    ready for parole.  And it would have been

 7    totally wrong and totally disrespectful of me to

 8    have done anything else but rehabilitate myself

 9    for the past two decades.  I made horrible

10    choices on the night of August 22nd, 1986.  And

11    those choices will haunt me forever, as they do

12    many people here in this room.  However, I since

13    made the right choices in my life.  I've become

14    a better person than I ever was or could have

15    been on the streets.  I strive towards continued

16    self-growth every day as well, and I realize

17    that and understand that it's my responsibility

18    that my actions have a positive benefit on the

19    people that I come into contact with .  And so I

20    do strive for that and I will strive for that

21    for the rest of my life.  There are also many

22    people who support my immediate release.

23    There's a huge network of people and

24    opportunities for success awaiting me on parole.

25    All these people see that I've responsibly

26    served my time and that support that is awaiting

27    me in the community from family and friends will
```

142

1   ensure my success on parole and far beyond.

2   While I can never repair the damage that I've

3   caused to everyone on both sides of this

4   tragedy, I can go forward with my life and be a

5   productive member of my family and society.  In

6   fact, I have a duty and responsibility to do

7   just that.  This is why I have worked so hard

8   over the past two decades to serve my prison

9   term responsibly and respectfully, to change my

10  life and prepare for parole with the skills and

11  social ties necessary for a law-abiding future.

12  Thank you.

13      **DEPUTY COMMISSIONER SMITH:**  Thank you,

14  sir.

15      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

16  All right.  Since it has been now some time

17  since the transcriber would have heard your

18  voice, if you, whoever is going to speak first,

19  to please introduce themselves and bring the

20  microphone over closer to you.

21      **MS. BELL:**  My name is Holly Bell.  I'm the

22  daughter of Patricia Dwyer.  Hi.  My brother and

23  sister and I appreciate the opportunity to be

24  here today and for my sister and I to say a few

25  words.  It's really hard for me to speak about

26  my mom and also about the -- that day, the worst

27  day of my life.  But I'll do my best.  My

143

1    brother told me that the last thing that my mom
2    said, she was standing up, looking outside out
3    of the passenger window, and she said we're
4    going to be okay now, he's getting off the
5    freeway.  And, you know, in all reality, that's
6    the exact opposite.  Nothing is okay and will
7    ever be okay.  And it's really, really, really
8    tough to deal with this.  I wasn't in the van
9    that night with them.  I was actually maybe five
10   minutes up the road with a boyfriend in his car.
11   I could have been in the van.  My brothers told
12   me what happened and I had my own little, in my
13   head, my vision of what happened that night. And
14   for the past 20 years, it just pops up in my
15   head, this vision, this awful vision of this
16   bullet coming through the van and killing my
17   mom. And I have to live with this all the time.
18   I, for instance, maybe two months ago, I'm with
19   my friends and my neighbors having a barbecue,
20   and we're talking and laughing and having a good
21   time, and I'm smiling.  And then all of a
22   sudden, it's like someone came from behind and
23   said boo.  It's like I was startled into this
24   picture of my mom getting shot.  And I don't
25   know why my brain does this to me.  It just
26   keeps happening over and over.  Just out of the
27   blue.  And there's time when I think maybe

144

 1    because I'm getting a little bit older.  I'm 38
 2    now.  When I start thinking about her and I
 3    start getting really upset and I can't get
 4    distracted and move on and do something else, I
 5    start getting chest pains.  It feels like a
 6    little lightening bolt going through my chest.
 7    I don't know if that's anxiety, and I seriously
 8    doubt if, you know, you can have a heart attack
 9    at age 39.  But it just tears me up.  It tears
10    me up and I will never, ever get over this.  I
11    wish I could.  There's that state -- There's a
12    saying, times heals all wounds.  That's not
13    true.  Not this one.  This one is way too much.
14    It's just way too much.  My son plays Little
15    League, and they have little events at Little
16    League.  And one time this police officer showed
17    up with his canine and did a little exhibition.
18    And at first, I was sitting there and I just
19    thought wow, this is really great.  And it
20    reminded me of my mom with her police dog.  And
21    at the very same time, it hurt so bad.  So it's
22    like both at the same time.  It's just awful.
23    This is the last thing.  I've been struggling
24    with my faith in God for the last 20 years,
25    because I can't understand why God would let
26    such a horrible thing happen to my mom.  And I
27    know that's a horrible thing, but it's the

145

1    truth.  I respectfully request on behalf of my

2    family that you deny parole for Mr. Hawks

3    because of the severity of the crime and the

4    continued suffering that myself and my family

5    have to deal with and will have to deal with for

6    the rest of our lives.  Thank you.

7         PRESIDING COMMISSIONER DAVIS:  Thank you.

8         DEPUTY COMMISSIONER SMITH:  Thank you.

9         MS. MCELYEA:  Do you want me to say my

10   name?

11        PRESIDING COMMISSIONER DAVIS:  Please.

12        MS. MCELYEA:  Michelle McElyea.

13        DEPUTY COMMISSIONER SMITH:  And would you

14   spell your last name, please?

15        MS. MCELYEA:  M-C-E-L-Y-E-A.

16        DEPUTY COMMISSIONER SMITH:  Thank you.

17        MS. MCELYEA:  I know the letters didn't

18   make it to you, but here's two; one from my

19   daughter and one from my best friend.  Either

20   will you let me read them or I could give them

21   to you, and you can read later?

22        DEPUTY COMMISSIONER SMITH:  Yeah, you can

23   give them to us and we'll read them during the

24   recess.

25        MS. MCELYEA:  Okay.  Because I don't think

26   I could get through it anyways.

27        DEPUTY COMMISSIONER SMITH:  Yes, just as

146

1   we will the other letters.

2       MS. MCELYEA:  You have them.

3       PRESIDING COMMISSIONER DAVIS:  Could we

4   just have the names of those, so I make sure I

5   have those.

6       MS. MCELYEA:  Jeanae McElyea.  Okay, and

7   Kelly Brandt.  Okay.

8       DEPUTY COMMISSIONER SMITH:  You can give

9   those to the officer, if you would.  He'll give

10  them to me after we --

11      MS. MCELYEA:  Okay.  Thank you.  We'll

12  start with, you know, my mom.  She was an

13  incredible woman and I've said it before many

14  times.  I'm sure you're sick of hearing about my

15  kids.  But like my son, he just graduated high

16  school.  Just graduated, you know.  He's going

17  into the cadet program.  My daughter, she's a

18  junior now, and she's going into the Fire

19  Explorers.  My kids did everything backwards

20  from their grandma and their grandpa.  They're

21  funny.  But and my daughter in her letter, she

22  was really -- you know, she's pretty angry about

23  it, you know.  My son, he wants to come.  I

24  won't let him, you know, because they didn't get

25  to know their grandma.  The same with little

26  Mark.  You know, they didn't get to know her.

27  People tell her all the time at Speedway, you

147

1    know, they tell my daughter about, you know,

2    this, that and the other thing, and it's

3    wonderful.  You know, and I'm going on.  Okay.

4    We don't come every year to be hateful nor

5    spiteful nor anything.  We come here for mom's

6    voice.  We tell you how we feel every year, how

7    much it hurts, what we're doing without her.

8    It's hard.  But we're not being hateful.  We're

9    not grudge full.  We do not hold a grudge.

10   We're just -- We're going to keep coming.  It's

11   just going to happen.  We're note hateful.  And

12   I know some people think that we're trying to be

13   hateful.  We're not.  I have tried through past

14   hearings to see something, to feel something.

15   I've even pointed out I'm not seeing anything at

16   all.  It's always referred to as an accident.  I

17   don't even -- You know, the plain fact is, mom

18   is gone.  The day I can have a cup of coffee

19   with her, then we can talk otherwise.  I just

20   don't know what else to say beyond it's just a

21   tragedy for the kids.  You know, my brother --

22   and I'm proud of my brother.  He is now racing

23   Speedway again.  He is throwing his leg back

24   over that Speedway back after 20 years.  We're

25   back at the track.  Everybody is stoked and

26   there are still a lot of riders there that rode

27   when, you know, we rode before.  You know, and

148

1    they're a big support to us and there's -- we're

2    having a great time.  And Mark did it, and I

3    think that's a big hurdle for poor Mark is

4    getting over the fact that it happened after

5    Speedway.  But now he's back on that bike. We're

6    all trying to mend.  Everybody is trying to

7    mend.  It's just not going to happen.  I don't

8    know.  I'm done.

9         **DEPUTY COMMISSIONER SMITH:**  Thank you.

10         **PRESIDING COMMISSIONER DAVIS:**  All right.

11   Thank you very much.  We'll now recess for our

12   deliberations.

13                    **R E C E S S**

14                      **--o0o--**

15

16

17

18

19

20

21

22

23

24

25

26

27

149

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                  **D E C I S I O N**

3      **DEPUTY COMMISSIONER SMITH:**  We're back on

4      the record.  Everyone previously identified is

5      back in the hearing room as well as those

6      individuals who are -- have been observing the

7      hearing from Riverside County through the video

8      hookup.  Commissioner.

9      **PRESIDING COMMISSIONER DAVIS:**  All right,

10     thank you.  This is in the matter of Harold

11     Hawks, CDC number D-64 -- 60489.  The Panel

12     reviewed all information received from the

13     public and relied on the following circumstances

14     in concluding that the prisoner is not suitable

15     for parole and would pose an unreasonable risk

16     of danger to society or a threat to public

17     safety if released from prison.  We come to this

18     conclusion based on the nature and circumstances

19     of the commitment offense.  The offense was

20     carried out in an especially callous manner.

21     There were multiple victims; one injured and one

22     killed in the same incident.  The offense was

23     carried out in a manner which demonstrates an

24     exceptionally callous disregard for human life.

25     And the motive for the crime is inexplicable in

26     relation to the offense.  These conclusions are

27     **HAROLD HAWKS   D-60489   DECISION PAGE 1   7/27/06**

150

1    drawn from the Statement of Facts, wherein for a

2    reason still best known to Mr. Hawks, he became

3    involved in what would be described today as a

4    road rage incident. He was already angry when

5    he chose to drive after drinking. Rather than

6    disengage from the incident, he chose to

7    retrieve a shotgun from a bag. He loaded the

8    shotgun with a slug, pointed the shotgun at the

9    van and fired. The slug pierced the side of the

10   van, killing Patricia Dwyer and seriously

11   injuring Wendy Varga. We note that you have no

12   previous criminal history. That your behavior

13   while being in the institution has been

14   exemplary. You have no 128(a) counseling

15   chronos and no serious 115s. And as

16   Commissioner Smith pointed out earlier, that is

17   a record to be truly proud of. That is

18   something that I know the institution -- the

19   people here at the institution appreciate.

20   Certainly the officers who work here appreciate

21   it and this Panel commends you for that. The

22   psychological report of January 5th or of

23   January 2005, by Doctor Sexton is supportive.

24   And your parole plans are appropriate. We note

25   that with regard to the 3042 notices, the

26   District Attorney from Riverside County is here

27   **HAROLD HAWKS  D-60489  DECISION PAGE 2  7/27/06**

151

```
 1   in person by representative and does oppose
 2   parole.  Nevertheless, we do want to commend you
 3   for a lot of different things, including --
 4   well, first and foremost, your no discipline --
 5   That is, again, a remarkable record and we
 6   commend you for that.  You have a number of
 7   chronos and have accomplished very -- a lot of
 8   different things, including Cage Your  Rage in
 9   2005, your individual one-on-one therapy since
10   2004 by Doctor Howlin or with Doctor Howlin and
11   other -- and two other doctors.  Your 2006
12   participation in repairing the football and
13   soccer fields.  Your 2006 general positive
14   chronos.  Your 2006 We Care juvenile program.
15   Your five laudatory chronos for your Twelve Step
16   AA Program.  Your 2006 Healing the Angry Heart
17   Program with and your video sessions.  The 2006
18   Fathers Behind Bars Children's Holiday Fest
19   where you assisted in making the gifts for the
20   program as well.  Your 12-week Anger Management
21   Program.  Your two laudatory chronos from
22   correctional officers.  A laudatory chrono from
23   Jack Powers, your graphic arts instructor.
24   Vocational printing -- too, your obtaining the
25   position of vocational printing tool attendant.
26   Your obtaining a certificate from Blackstone as
27   HAROLD HAWKS   D-60489   DECISION PAGE 3    7/27/06
```

152

1    a paralegal.  Your total of four vocations and

2    your additional 33 competency units in graphic

3    arts.  You -- As you said earlier, you have

4    truly kept busy.  This is a one-year denial.  In

5    terms of recommendations, the Panel recommends

6    that you remain disciplinary free.  That you

7    continue as available in your self-help

8    programs.  And clearly, you are -- you are doing

9    well in that.  And you are doing some

10    independent reading, which is something we often

11    suggest as well, but you are already doing that.

12    That you continue to earn positive chronos and

13    the Panel will also request a new psychological

14    evaluation for the next hearing, as this current

15    psychological had been used in two prior

16    hearings, although it is favorable.

17    Commissioner, do you have any anything you'd

18    like to add?

19    **DEPUTY COMMISSIONER SMITH:**  I certainly

20    concur with all of your comments, Commissioner.

21    Mr. Hawks, good luck.

22    **ATTORNEY DEFILIPPIS:**  Is there an issue

23    that you're looking to have clarified in a new

24    psych evaluation?  I'm wondering why, because

25    the psychologist had said further reports would

26    be redundant.

27    **HAROLD HAWKS  D-60489  DECISION PAGE 4    7/27/06**

153

1      **PRESIDING COMMISSIONER DAVIS:**  Well, the

2  last one -- the last one was positive.  We have

3  no reason to believe the next one would be

4  positive, except it would also reflect in his

5  case, maybe some additional growth.  So it may

6  be even more positive for him.

7      **ATTORNEY DEFILIPPIS:**  I'm just wondering

8  if there were --

9      **PRESIDING COMMISSIONER DAVIS:**  So I'm not

10  sure --

11      **ATTORNEY DEFILIPPIS:**   -- new issues

12  that --

13      **PRESIDING COMMISSIONER DAVIS:**  No, we're

14  not --  There are no issues that we're looking

15  to address.

16      **DEPUTY COMMISSIONER SMITH:**  Nothing

17  specific.  Just some --

18      **ATTORNEY DEFILIPPIS:**  Yeah.

19      **DEPUTY COMMISSIONER SMITH:**  We want to

20  make sure that --

21      **PRESIDING COMMISSIONER DAVIS:**  That

22  (indiscernible) be fair all around.

23      **DEPUTY COMMISSIONER SMITH:**  -- the next

24  time, all the documents that will be considered

25  by the Panel will be current.

26      **ATTORNEY DEFILIPPIS:**  Okay.

27  **HAROLD HAWKS   D-60489   DECISION PAGE 5    7/27/06**

154

1      **PRESIDING COMMISSIONER DAVIS:**  All right.

2    We are adjourned.

3      **INMATE HAWKS:**   Thank you.

4      **PRESIDING COMMISSIONER DAVIS:**  Good luck

5    to you, sir.

6      **DEPUTY COMMISSIONER SMITH:**  Counsel, thank

7    you for being here.

8      **DEPUTY DISTRICT ATTORNEY DUNN:**   Thank you.

9      **MS. MCELYEA:**   Thank you.

10      **DEPUTY COMMISSIONER SMITH:**  All of you,

11    appreciate you being here.  Thank you.

12                  --o0o--

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:November 24, 2006**

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED**

27    **HAROLD HAWKS   D-60489   DECISION PAGE 6   7/27/06**

155

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Sandra Triplett, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 154, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of HAROLD HAWKS, CDC No. D-60489 on JULY 27, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 9, 2006 at Sacramento County, California.

Sandra Triplett
Transcriber
**PETERS SHORTHAND REPORTING**