# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE

PROBATION OFFICER'S REPORT

THE PEOPLE OF THE STATE OF CALIFORNIA

VS.

HAROLD HARVEY HAWKS

| COURT NO. | DEPT. & JUDGE |
|---|---|
| CR-26084 | 8 -- Webster |
| ATTORNEY | HEARING DATE |
| Jack Murphy | 6/2/87; 8:30 a.m. |
| CUSTODY STATUS | TYPE OF REPORT |
| Jail | R&S |
| | PROB. NO. |
| | A- 168946 |

| DATE OF OFFENSE(S) | DATE INFO/XXXXXX FILED | DATE CONVICTED | HOW CONVICTED |
|---|---|---|---|
| August 22, 1986 | November 20, 1987 | May 4, 1987 | Jury Verdict |

CONVICTED OFFENSE(S):

COUNT I:  187 PC (Murder/Second Degree), a felony.
ALLEGATIONS - PC 12022.5 and PC 1192.7(c)(8) (Personal Use of a Firearm).
COUNTS III and V:  245(a)(2) PC (ADW/Firearm), felonies.
ALLEGATIONS - (As to Counts III and V) - PC 12022.5 and PC 1192.7(c)(8)
              (Personal Use of a Firearm).

COUNTS DISMISSED/PENDING:

COUNTS II and IV:  Attempt 187 PC (Attempt Murder), both felonies.
ALLEGATIONS -  (Counts II and IV) - PC 12022.5 and PC 1192.7(c)(8) (Personal
               Use of a Firearm).

SPECIFICATION OF PLEA:

N/A

RECOMMENDATION:

(1)  State Prison (As prescribed by law).

CIRCUMSTANCES OF THE OFFENSE:

Source:  Investigation reports, Corona Police Department.

During the evening of August 22, 1986, Harold Hawks had driven to Mission Viejo, to the home of his wife's parents, where she and his son had been staying because of marital problems they had been having.  Upon his arrival at his in-law's home, he was told that his wife had taken his son to San Diego on the train for an outing.  This caused him to have to delay his departure from that location for a protracted period of time.  During the course of the evening, Mr. Hawks consumed approximately six beers while he was at his in-law's home and while waiting at the train station.  After Mrs. Hawks arrived and prior to Mr. Hawks departing Mission Viejo, available information indicates that they quarreled.

On the same evening, Michael Dwyer, his wife Patricia, and two family friends had been at the Orange County Fair Grounds where the Dwyer's son, Mark, had been in a motorcycle competition.  During the course of the evening, Mark became involved in an accident on the track and was offered medical assistance, which he declined.  However, as the evening wore on, Mark began to experience increasing discomfort from injuries which were not readily observeable.  Based on these considerations, the Dwyers elected to return to Riverside and have their son checked by a physician at Riverside Community Hospital.

Proceeding  on their individual courses, chance and circumstance was to bring the Dwyers and their friends into contact with Mr. Hawks with violent and fatal results.  While proceeding northbound on the 91 Freeway in the fast lane, Mr. Hawks overtook Mr. Dwyer, who was driving his van in the number one (fast) lane.  Mr. Hawks passed Dwyer's vehicle in the number two lane, whereafter he lane changed into the number one lane and slowed down.  This caused Mr. Dwyer to have to rapidly decelerate the speed of his vehicle.  Wishing to get his son to the hospital as quickly as possible, Mr. Dwyer requested Mr. Hawks to move back over into the number  two  lane, thus allowing him to pass, by flicking

1 the high-beams of his headlights off and on. Mr. Hawks did not comply with
2 this request and continued to slow the pace of his vehicle and additionally,
3 made an obscene gesture with his hand at Mr. Dwyer.
4     When Mr. Dwyer attempted to pass Mr. Hawks by shifting his vehicle into
5 the number two lane, Hawks sped up and refused to allow the passing movement.
6 However, Dwyer finally suceeded in overtaking and passing Hawks's vehicle,
7 whereafter, he changed back into the number one lane. Hawks continued to
8 follow Dwyer until they reached the area of the Corona City limits, whereafter
9 Mr. Hawks pulled his car adjacent to Dwyer's van and motioned to Dwyer to follow
10 him off of the freeway, while gradually changing lanes across the freeway until
11 reaching the number four lane.
12     Mr. Dwyer did not acknowledge this invitation, but continued on his course
13 down the 91 Freeway. Almost immediately thereafter, the report of a gunshot
14 could be heard, Mark Dwyer also seeing the muzzle flash from the weapon emanate
15 from Mr. Hawks' vehicle. At that point, Mark noticed that his mother had
16 been wounded and was bleeding profusely. Mr. Dwyer was informed of this and
17 immediately left the freeway, taking his wife to the Corona Community Hospital.
18 There, Patricia Dwyer was pronounced dead on arrival, having sustained a gun-
19 shot wound to her chest, the projectile severing her aorta, whereafter it exited
20 her body striking Wendy Varga, a passenger in the Dwyer's van, in the throat,
21 critically wounding her also. Corona Police Department officers commenced
22 their investigation of the homicide and other crimes stemming from Mr. Hawks'
23 acts at that point. All of the victims/witnesses in the Dwyer's van were
24 interviewed and physical evidence was gathered. However, for a period of days,
25 the identity of Mrs. Dwyer's and Ms. Varga's assailant could not be determined.
26     On August 26, 1986, the Corona Police Department received information
27 from a San Bernardino County Sheriff's Sergeant that his daughter-in-law had
28 information concerning their investigation into this case. Shortly before noon

that date, telephonic contact was established with this female subject, who advised the detective that she was the cousin of Harold Harvey Hawks. She said that Hawks had stopped by her home on the evening of August 22, 1986, with his son, on their way up to a cabin their family owned in the San Bernardino mountains. She advised the detectives that while Hawks was at her home, he told her of an incident he had been involved in with a van on the 91 Freeway that evening. She further told investigators that Hawks had told her of the confrontation which had occurred on the freeway and that this incident had culminated in Hawks firing one shot from his shotgun at the van before it proceeded down the freeway.

Because the accounts in the newspaper regarding the shooting which was being investigated bore such a resemblance to the account her cousin had given her about what had occurred on the freeway on the evening of August 22, Mr. Hawks' cousin decided it was best to advise law enforcement officials of her concerns. Subsequent investigation in this case resulted in Mr. Hawks being taken into custody, without incident in the early evening of August 26, 1986. Mr. Hawks' shotgun was recovered from his parent's home in Pomona later on in the evening. After being Mirandized, Mr. Hawks told investigating police officers that he needed to talk to them in that he had "a terrible burden on my mind." During questioning, Mr. Hawks admitted he had fired his shotgun in order to frighten the driver of the van in return for his having nearly driven Hawks off of the roadway, into the median divider, after the van passed him and cut him off while changing lanes in front of him. Mr. Hawks further stated, he did not, by any means, intend to hurt or kill anyone by his actions. Subsequently, the defendant was transferred from the Corona Police Department to the Riverside County Jail, where he was booked pursuant to several criminal charges. He has remained incarcerated at Riverside County Jail, during the pendency of these proceedings.

CRIMINAL RECORD:

CBI: A08279704   FBI: 378497FA6   CDL: N6249563   SSN: 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

The sole entry on the defendant's criminal history transcript pertains to his arrest in the instant matter.

CDL:  None.

DEFENDANT'S STATEMENT:

(Personal interview on May 22, 1987)

Mr. Hawks stated that until Mr. Dwyer pulled his van up behind him and flashed his lights, he was not paying any particular attention to that particular vehicle. He stated, however, when the lights were flashed off and on at him, he thought that it was a police car behind him, which instinctively caused him to slow down.

When he finally got a good look at the vehicle behind him, he stated, he saw it was the Dwyers' van, at which time he adjusted his rear-view mirror to deflect the lights away from him, which was when he made the obscene gesture at the van's driver. When the van went around him, Mr. Hawks reported, and changed lanes right in front of him, nearly cutting him off, he was forced onto the median strip for approximately fifty yards, after which he regained control of his vehicle. The violent evasive action he was forced to take as a result of Mr. Dwyer's actions also caused his infant son to be dislodged from his car seat and become wedged in between the seat and car door.

The defendant related that this entire situation caused him to become angry, after which he went after the van and overtook it. With the intention of "scaring them as much as they scared me," the defendant related, he removed his shotgun from the back seat of the his car, picked a shell at random from a bag where he had them and chambered it in the shotgun. Mr. Hawks stated that he thought he was aiming the gun at least "twenty feet above and thirty feet behind" the van and does not understand how he came to put the round in the

-5-

van itself. He related that he had no idea there was anyone in the rear portion of the van and had no way of telling, given the lighting conditions and the type of van Mr. Dwyer was driving.

Mr. Hawks related that he is extremely remorseful for the consequences of his conduct, but realizes he will now have to "pay the price."

SOCIAL HISTORY:

(As provided by the defendant)

Address:   (Present) - Riverside County Jail

(Former) - 416 Roosevelt, Pomona, California  91767.

Family:  The defendant is 27 years of age, having been born on September 22, 1959. He is the youngest of five children born to the marriage of John E. Hawks, age 65, and Gloria L. Hawks, age 60, both of whom reside in the City of Pomona. It was with Mr. and Mrs. Hawks that the defendant resided prior to his arrest. The defendant is presently married to Roxanna Hawks, (nee Fleming), who presently resides in the City of West Covina. One child, Harold William Hawks (DOB: 8/11/84) has been born to the marriage. The child presently resides with his mother.

Education:  The defendant's formal education consists of him having graduated from Pomona High School in 1978. He has also taken vocational courses in plumbing, sheet metal layout, as well as in air conditioning and heating installation.

Employment and Income: At the time of his arrest, Mr. Hawks was employed as an Installation/Fabrication Foreman for California Air Control in Upland, California. Previous employment as a Trouble-Shooter for Servi-matic Solar Systems was indicated. Prior to incarceration, the defendant was earning $9.00 per hour for a forty-plus hour work week.

Military:  None.

Medicial/Psychological:   Mr. Hawks characterizes his present health as being

-6-

good. He suffers from no handicaps or ailments. He has not been treated, in the past, for any psychological or nervous disorders.

<u>Substance Abuse:</u> The defendant acknowledged consuming four to five six-packs of beer per week, prior to his arrest. He also acknowledged experimentation with marijuana usage in 1984. He disavowed usage of any other intoxicants or contraband substances.

<u>Religion/Interests:</u> The defendant voiced no particular religious preference, other than to state he is "a christian." His spare time interests include hunting, hiking, snow skiing, and trapshooting. In the future, he desires to continue with his education and training, specializing in mechanical drafting.

COLLATERAL INFORMATION:

Sources:   Christen Theirbach - Deputy District Attorney
           Law Offices of Jack Murphy, Esq.

When contacted, Mr. Theirbach stated that the testimony at trial concerning this case, closely paralleled that information set forth in the investigation reports completed by Corona law enforcement officials. He stated the only material variance was the fact that Mr. Michael Dwyer, while testifying for the people, admitted that, as he passed Mr. Hawks' vehicle, he tossed an empty aluminum can out the window of his van in the general direction of Mr. Hawks' vehicle. As to sentencing in this case, Mr. Theirbach stated, the defendant's criminal conduct consisted of a single act, resulting in multiple crimes being committed. Based thereon, it is his opinion, that multiple sentencing for the crimes of which Mr. Hawks was convicted is probably barred by application of Section 654 of the Penal Code.

During the interim period between the defendant's conviction and present sentencing hearing, this writer was contacted by a law clerk for the law offices of Jack Murphy. This writer's office address was provided for the purpose of interested parties submitting character/reference letters on behalf of the defendant. The undersigned was informed that Mr. Murphy would probably be

-7-

contacting the Probation Officer in order to make a few brief comments concerning this case. However, at the time of the dictation of this report (May 27, 1987) Mr. Murphy has remained unavailable for comment.

ADDITIONAL INFORMATION:

    This writer, while this case has been pending, has received character/reference letters, seventeen in number, from the defendant's friends, co-workers, and family members. In summary, they attest to the defendant's honesty, industriousness, dependability and Mr. Hawks' good character in general, through periods of long association with him.

PROBATION OFFICER'S STATEMENT:

    Because the defendant personally used a firearm during the commission of a murder, he is statutorily ineligible for probation (1203.26(a)(1)(i)). Hence, there is no alternative, but to order that Mr. Hawks be committed to State Prison for the term prescribed by law.

CREDIT FOR TIME SERVED:

| | |
|---|---|
| Local Time | 281 Days |
| PC 4019 Time | 140 Days |
| Total Time Credited | 421 Days |

| Date of Arrest | Date of Release |
|---|---|
| August 26, 1986 | June 2, 1987 |

/ / /

RECOMMENDATION:

    In the matter of Harold Harvey Hawks, CR-26084, it is respectfully recommended that the defendant be committed to State Prison for the term prescribed by law.

DATED this 28th day of May, 1987.

WS/la

Respectfully submitted,

THOMAS J. CALLANAN
Probation Officer

I have reviewed the above report.

*Norman E Brogdon*
NORMAN E. BROGDON
Supervising Probation Officer

*William Seager*
BY: WILLIAM SEAGER
Senior Probation Officer

I hereby certify that I have read and considered the Probation Officer's report.

_____
JUDGE OF THE SUPERIOR COURT