**EXHIBIT 6**

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 2004 CALENDAR

HAWKS, HAROLD                                                                            D-60489

I. **COMMITMENT FACTORS:**

A. **Life Crime:** Count 1, Murder 2nd, with Use of Firearm; PC 187/12022.5. Case number: Riverside CR26084; Sentence: 17 years to Life. MEPD: 11/28/97. Victim: Patricia Dwyer. Age: unknown.

**1. Summary of Crime:** Hawks shot Patricia Dwyer on August 22, 1986, utilizing a shotgun. (POR, page 3). According to the POR, pages 2 and 3, Patricia Dwyer and her family were driving on the freeway enroute to the hospital with their injured son. They were driving in the number one lane (fast lane). Hawks was also traveling the fast lane and drove up behind the Dwyer family van. Hawks then changed lanes to the number two lane and passed the Dwyer van and changed lanes back to the number one lane. Hawks then slowed down his vehicle causing the Dwyer van to decelerate also. Mr. Dwyer wishing to get his son to the hospital as quickly as possible, flicked his high beams on and off to get Hawks to move over into the number two lane. Hawks did not comply with the request and continued to slow down and additionally made an obscene gesture with his hand at Mr. Dwyer. When Mr. Dwyer attempted to pass Hawks by moving over to the number two lane, Hawks sped up and refused to allow the passing movement. Mr. Dwyer finally succeeded in overtaking Hawks' vehicle and then changed back into the fast lane. Hawks continued to follow the Dwyer van until they reached the area of the Corona city limits. When Hawks pulled up next to Mr. Dwyer and motioned for him to follow Hawks off the freeway. Mr. Dwyer did not acknowledge this request but continued on the course down Freeway 91. Almost immediately, the sound of a shotgun was heard and Mr. Dwyer could see the muzzle flash from the weapon emanating from Hawks' vehicle. At that point, the son, Mark Dwyer noticed that his mother had been wounded and was bleeding profusely. Mr. Dwyer immediately left the freeway, taking his wife to the Corona Community Hospital. At the hospital, Patricia Dwyer was pronounced dead on arrival, having sustained a gunshot wound to her chest. The projectile severed her aorta and exited her body striking Wendy Varga, a passenger in the Dwyer van, who was critically wounded in the throat. The corona Police Department began their investigation of the homicide and other crimes related to Hawks' act at the time of the incident. All of the victims/witnesses in the Dwyer van were interviewed and physical evidence was gathered. On August 26, 1986, the Corona Police Department received information from a San Bernardino County

COPY TO INMATE ON 1/03/04

Sheriff's Sergeant that his daughter-in-law had information concerning their investigation into this case. On that same date, telephonic contact was made with the female informant who informed the detective that she was the cousin of Harold Hawks. She stated that Hawks had stopped by her home on the evening of August 22, 1986. While at her home, Hawks told her of a confrontation he had on the freeway culminating with him firing a shot from his shotgun at a van before it passed down the freeway. Subsequent investigation resulted in Hawks being taken into custody on August 26, 1986. Hawk's shotgun was recovered from his parents' home in Pomona later that evening. After being Mirandized, Hawks told investigating police officers that he needed to talk to them. During questioning, Hawks admitted he had fired his shotgun in order to frighten the driver of the van in return for him nearly driving Hawks off the roadway. Hawks was then transferred from the Corona Police Department to the Riverside County Jail where he was booked on criminal charges.

2. **Prisoner's Version:** Hawks stated that on the night of August 22, 1986 he was scheduled to pick up his son from his in-laws' house at approximately 6:00 P.M. Upon arriving at the residence, no one was home. He waited until 7:00 P.M. when Tom Fleming, his father-in-law, arrived home. At 7:30 P.M., Shirley Fleming, his mother-in-law, arrived and stated that Roxanne, his wife, had taken their son to San Diego by train and would not be back until approximately 9:10 P.M Hawks stated he drank a few beers with Tom Fleming and then went to the train station to meet his wife. As Hawks waited for the train to arrive, he had two or more beers. When the train arrived late, he had an argument with his wife about picking up their son. They talked in the parking lot of the train station for about on half-hour and he then followed his wife back to her parent's house. At her parents' house they had another argument. Hawks then left, taking only his son. He planned to go to his parents' house in the Lake Arrowhead area for the weekend. Hawks stated that while driving on Freeway 91 in the number one lane, he was suddenly approached by a set of bright lights, which he thought were a Highway Patrol car. The lights continued to get closer and were extremely bright and he realized it was not a police car and the car stayed on his tail. Hawks said he flipped-off the driver of the vehicle and waived him around. It was then that he noticed that the vehicle was just a van and just as it passed the front of his car, the driver threw something metallic at the front of Hawks' car. Hawks stated that the van deliberately cut in front of him causing him to break and swerve to the right. At this time, Hawks was very scared and his son was screaming at the top of his lungs. Hawks stated he was mad and then reached into the back seat of his car for a clothes bag. From inside the bag he pulled out a shotgun and put it on his lap. He then grabbed a round from inside the bag and chambered it into the shotgun. The van was about one or two car lengths ahead when Hawks fired a shot above and behind the van to scare the person in the van, stating, "It was only a warning shot". Hawks states he had no intention of hitting anyone, nor did it appear to him that he had hit the van. The van continued along the freeway and

then Hawk exited the freeway. Hawks then went to a 24-hour gas station, purchased some gas and beer and got back on Freeway 91. He then took out the spent shell from his shotgun and threw it out of the car window onto the freeway between Corona and Riverside. Hawks than went to his cousin's house and stayed there for a couple of days. On Sunday morning, Hawks decided to go home to Pomona and that afternoon returned his son to his in-laws' house. Hawks then left his in-laws' house and went home. On Tuesday, Hawks went to work and when he returned home, he went to a friend's (Greg) house to help fix an air-conditioning unit. While at the house, the Pomona Police Department arrested him on the charge of murder.

    3.    **Aggravating/Mitigating Circumstances:**

        a.    **Aggravating Factors:**

          1. During the commission of the crime, Hawks had a clear opportunity to cease but instead continued.

          2. The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

          3. There were multiple victims in the instant offense.

        b.    **Mitigating Factors:** Hawks had no prior history of criminal behavior.

  B.    **Multiple Crime(s):** None.

    1.    **Summary of Crime:** N/A

    2.    **Prisoner's Version:** N/A

II.  **PRECONVICTION FACTORS:**

  A.    **Juvenile Record:** Hawks has no juvenile record.

  B.    **Adult Convictions:** Hawks has no adult record.

  C.    **Personal Factors:** Hawks graduated from Pomona High School in 1978. He had taken Vocational courses in Plumbing, Sheet Metal Layout, Air-conditioning and Heat Installation. Hawks had worked as a Foreman for the California Air Control Company until the time of his arrest. Prior employment consisted of working as a repairman for Servi-Matic Solar Systems.

III. **POSTCONVICTION FACTORS:**

    A. **Special Programming/Accommodations:** None.

    B. **Custody History:** Documents from the previous hearing have been considered and the information remains valid. During the period of time since the last hearing, Hawks has remained at CTF with MED A custody and housed with the general population. Hawks is assigned to the vocational print shop.

    C. **Therapy and Self-Help Activities:** Documents from the previous hearing have been considered and that information remains valid. Hawks completed a weekly lifers group per CDC 128C dated 8/5/04. Hawks has being actively attending Alcoholics Anonymous per CDC 128B dated 12/15/03 and 4/9/04. Hawks received a CDC 128B dated 6/8/04 for completing Dr. Gordon's Family Effectiveness Training/Harmony in the Home. Hawks has also received two laudatory 128B's dated 5/6/04 and 8/12/04 for his involvement in the CTF Arts in Corrections and one from Custody Staff.

    D. **Disciplinary History:** Hawks has remained disciplinary free throughout his incarceration.

    E. **Other:** Hawks appeared before BPT on 11/19/03, his parole was denied for 1 year with recommendations to remain disciplinary free, participate in self-help and order a new psych report.

IV. **FUTURE PLANS:**

    A. **Residence:** Hawks plans to reside with Dennis Hill, 416 Roosevelt Ave, Pomona, CA 91767; telephone (909) 622-7346. An alternative is Breck and Heidi Spencer, 28719 Palisades Drive, Lake Arrowhead, CA 92352; telephone: (909) 337-3447.

    B. **Employment:** Hawks plans to make his career as an installer with Capital Drywall in Los Angeles County. Hawks also plans to work with Spencer roofing, helping to expand the business while at the same time pursing small business enterprises on his own in computer repair and graphic arts.

    C. **Assessment:** In review of Hawk's parole plans, this counselor does not foresee any problems.

V. **USINS STATUS:** N/A

VI. **SUMMARY**:

A. Prior to release, Hawks should continue to maintain a disciplinary free record, continue to participate in AA programs and any available therapy.

B. This Board Report is based upon a one-hour interview with Hawks and an extensive review of the Central File and incidental contact with Inmate Hawks.

C. Hawks was afforded the opportunity to examine his Central File on 8/13/04 evidenced by CDC 128B dated 8/13/04. He examined his Central File on that date.

D. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

_____   10-26-04
R. Garcia (A)                Date
Correctional Counselor I


_____   10-29-04
F. Deguzman                  Date
Correctional Counselor II


_____   10-29-04
R. Pope                      Date
Facility Captain


_____ CDPR  11-3-04
D. S. Levorse                Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                           STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [ ] DOCUMENTATION HEARING
- [x] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

INSTRUCTIONS
  TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
  TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
  ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/1/03 to 8/4/04 (Present) | | | **PLACEMENT**: Remained housed at CTF with the general population. <br> **CUSTODY**: Remained Med A. <br> **VOCATIONAL TRAINING**: Hawks has been assigned to the Vocational Print Shop receiving satisfactory grades per CDC 128E dated 12/31/03 and 3/31/04. A CDC 128B dated 1/9/04 stating Hawks completed an extensive course in Spanish language (Espanol in 32 lessons) <br> **ACADEMICS**: None. <br> **WORK RECORD**: None noted this period. <br> **GROUP ACTIVITIES**: Received a CDAC 128B dated 12/15/03 and 4/9/04 for actively attending alcoholics anonymous. Hawks received a CDC 128B dated 6/8/04 for completing Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home. Hawks also received a CDC 128C dated 8/5/04 for completing a weekly lifer's group. <br> **PSYCH. TREATMENT**: Received a 128C dated 10/31/03 reflecting his participation in a weekly lifers group since 5/9/03. <br> **PRISON BEHAVIOR**: Has remained disciplinary free during his period of review throughout his incarceration. <br> **OTHER**: Hawks appeared before BPT on 11/19/03, his parole was denied for 1 year with recommendations to remain disciplinary free, participate in self-help and order a new psych report. |

CORRECTIONAL COUNSELOR'S SIGNATURE                              DATE 10-26-04

HAWKS                   D-60489              CTF                NOV 2004

BPT 1004 (REV 7/86)                     Page _1_