# EXHIBIT 8
# Part 1 of 2

MC-275

Name **Harold H. Hawks**

Address **P.O. Box-689, G-329L**

**Soledad, CA 93960-0689**

APR 2 4 2007.

P8

CDC or ID Number **D-60489**

# E042907

FILED

APR 24 2007

COURT OF APPEAL FOURTH DISTRICT

## California Court of Appeal

### Fourth Appellate District, Division Two

(Court)

| | |
|---|---|
| **Harold Harvey Hawks** | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No. **E042907** |
| **B. Curry, Warden CTF** | *(To be supplied by the Clerk of the Court)* |
| Respondent | **Riv.Sup.Ct. No.: RIC463199** |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- *Read the entire form before answering any questions.*

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

**ORIGINAL**

Page 1 of 10.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction      ☒ Parole

☐ A sentence      ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other (specify): _____

1. Your name: **Harold Harvey Hawks, D-60489**

2. Where are you incarcerated? **Correctional Training Facility, Soledad, California**

3. Why are you in custody? ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Second Degree Murder, with 2 year firearm enhancement.**

   b. Penal or other code sections: **California Penal Code §187**

   c. Name and location of sentencing or committing court: **Riverside County Superior Court.**

   d. Case number: **CR 26084**

   e. Date convicted or committed: **4 May 1987**

   f. Date sentenced: **28 June 1987**

   g. Length of sentence: **17 years-to-life.**

   h. When do you expect to be released? **Minimum Eligible Parole Date (MEPD) 28 November 1997.**

   i. Were you represented by counsel in the trial court? ☒ Yes.   ☐ No. If yes, state the attorney's name and address:

   **John J. Murphy, 22235 Mulholland Hwy., Woodland Hills, CA 91364**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

   PETITIONER, FILING IN THE PROPER STATE VENUE FOR JUDICIAL CONSIDERATION, HAS A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST IN PAROLE AND DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, THAT CAN NOT BE INFRINGED UPON BY AN UNCONSTITUTIONAL AND UNREVIEWABLE STATE COURT STANDARD OF LAW.

   a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

   See Ground 1 Attached.

   b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

   See Ground 1 Attached.

GROUND 1

PETITIONER, FILING IN THE PROPER STATE VENUE FOR
JUDICIAL CONSIDERATION, HAS A CONSTITUTIONALLY
PROTECTED LIBERTY INTEREST IN PAROLE AND DUE
PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH
AMENDMENTS OF THE U.S. CONSTITUTION, THAT CAN NOT
BE INFRINGED UPON BY AN UNCONSTITUTIONAL AND
UNREVIEWABLE STATE COURT STANDARD OF LAW.

a.    Supporting facts:

1.    Petitioner files petition for writ of habeas corpus in the
California Court of Appeal for the Fourth Appellate District, Division
Two, challenging a denial of parole by the California Board of Parole
Hearings (BPH, Board or Executive) on July 27, 2006, in violation of
Petitioner's due process rights protected by the Fifth and Fourteenth
Amendments to the United States Constitution.[1]  The Court of Appeal for
the Fourth Appellate District is the lawful venue for review of
Petitioner's petition for writ of habeas corpus challenging a Board
decision after a summary denial by the Superior Court of Riverside.
(See Exhibit Y and  In re Orlando Roberts (2005) 31 Cal.Rptr.3d 458,
472; California Rules of Court, Rule 60(e)(2).)[2]  Petitioner requests
an evidentiary hearing and relief from the violations of his due
process rights in the Court of Appeal for the Fourth Appellate
District.

2.    California Penal Code section 3041 (P.C. §3041) creates a
liberty interest in parole and a presumption that parole will be
granted at the initial parole hearing that is protected by due process

---

[1] The Board of Parole Hearings decision became final 120 days after the hearing on
November 27, 2006.  (See 15 CCR §2043.)  However, the transcript in Petitioner's
case designates October 25, 2006 as the final date.  (Exhibit A, p.154:24-26.)
[2] Petition for writ of habeas corpus was filed in the Superior Court of Riverside
County on 12-26-06.  Petition was denied on 03-02-07 with Petitioner not being
notified until 03-30-07.  (Exhibit Y.)

of law under the United States Constitution and recognized by state and federal case law.

3.    Petitioner's federally protected liberty interest in parole can not be infringed upon by an unconstitutionally vague and unreviewable "minimum necessary" standard for parole suitability determination, as set forth by the California Supreme Court.  (In re Dannenberg (2005) 34 Cal.4th 1061.)  The state court's ruling in Dannenberg was contrary to clearly established United States Supreme Court law in violation of Petitioner's federally protected liberty interest in parole and in violation of language that is unconstitutionally vague.

4.    Petitioner was denied parole for the sixth (6) consecutive time on July 27, 2006, for a period of 1 year (Exhibit A, July 27, 2006 Board of Parole Hearings Transcript, Parole Decision, pgs.152:4 and 154:23), with the Board's decision becoming final on October 25, 2006. (Exhibit A, p.154:24.)  As demonstrated herein and at Ground 2, there was no reasonable or reliable evidence to demonstrate that Petitioner was a current or unreasonable threat to the public to deny parole suitability after he has served 20 calendar years of a 17-to-life sentence as defined by state and federal law.

b.    **Supporting cases, rules or other authority:**

Petitioner was convicted of second degree murder in 1987 in the Riverside County Superior Court (Case No. CR 26084).  On July 27, 2006, Petitioner appeared before the Board for his fifth subsequent (sixth actual) parole hearing and was denied parole for one (1) year.  (See Exhibit A, pgs.152:4 and 154:23.)

The Board violated Petitioner's due process rights by failing to find him suitable for parole at the July 27, 2006 hearing, thus

1  depriving him of his legitimate liberty interest in parole protected
2  under the Fifth and Fourteenth Amendments.    It is now a well-
3  established principle that a constitutional protection attaches to an
4  inmate's interest in parole under P.C. §3041.  As the Ninth Circuit
5  Court of Appeals held in McQuillion v. Duncan (2002) 306 F.3d 895, at
6  p. 902, "California's parole scheme gives rise to a cognizable liberty
7  interest in release on parole.    The scheme 'creates a presumption that
8  parole will be granted' unless the statutorily defined determinations
9  were made."

10      The McQuillion ruling is based upon United States Supreme Court
11  case law specifically analyzing the intent and construction of the same
12  "...shall normally set a release date..." liberty interest language
13  expressed in P.C. §3041(a) and (b) (Greenholtz v Nebraska Penal Inmates
14  (1979) 442 U.S. 1, at 7, 11-12, 60 L.Ed.2d 668, 99 S.Ct. 2100; Board of
15  Pardons v. Allen (1987) 482 U.S. 368 at 376-378, 381, 96 L.Ed.2d 303,
16  107 S.Ct. 2415; and Perveler v. Estelle (9th Cir. 1992) 974 F.2d 1132),
17  and is further expanded upon by the Ninth Circuit's decision in Biggs
18  v. Terhune (2003) 334 F.3d 910, 913-914.  (See also Irons v. Carey (9th
19  Cir. 2007) __ F.3d __, 2007 DJDAR 3072, 3073.)  Furthermore, the
20  California Supreme Court's own confirmation of a statutorily defined
21  liberty interest in parole is apparent in the "presumption" and
22  "expectation" of release language found in In re Rosenkrantz (2002) 29
23  Cal.4th 616 at 654, 661, 665 and 683, which clearly mimics the language
24  of Allen, supra, at 376-378, 381.

25      The federally protected liberty interest ingrained in P.C. §3041
26  et seq. predates and over-rules the California Supreme Court's recent

27
28

Ground 1
Page 3

1  interpretation in In re Dannenberg (2005) 34 Cal.4th 1061,[3] which

2  twists and distorts the clear language and legislative intent of the

3  statute to come to the illogical and illegal reinterpretation that P.C.

4  §3041 et seq. provides only a "hope" of parole (Id. p. 1087), violating

5  Constitutional due process protections under the 5th and 14th

6  Amendments.[4]  Petitioner's liberty interest is a federally protected

7  due process right that can not be overturned by a state court.  In

8  addition, state statutory law (P.C. §3041 et seq.) is sustained by a 25

9  year body of state court decisions requiring parole release dates shall

10  normally be set in a uniform manner that may not be retroactively

11  overturned in an arbitrary manner to evade the federal requirements of

12  due process.  (Peltier v. Wright (9th Cir. 1994) 15 F.3d 860, 862;

13  Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399; United

14  States v. Walsh (9th Cir. 1985) 770 F.2d 1490, 1492; and Bouie v.

15  Columbia (1964) 378 U.S. 347, 354, 84 S.Ct. 1897, 12 L.Ed.2d 894.)

16  Hence, the Dannenberg decision is contrary to clearly established

17  United States Supreme Court law in violation of Petitioner's protected

18  liberty interest in parole.

19      Compliance with the legislative mandate of proportionality and

20

21  _____

22  [3] While the In re Dannenberg court was not faced with and did not address any issue
or dispute regarding federally protected due process liberty interest (see Sass v.
Califronia Board of Prison Terms (9th Cir. 2006) 461 F.3d 1123, 1128; and e.g.

23  Rosenkrantz v. Marshall (C.D. Cal 2006) 444 F.Supp.2d 1063, 1077-1080), the
overall effect of the Dannenberg interpretation and decision destroys the

24  practical application of the liberty interest embedded in the statutory mandate of
P.C. §3041(a).

25  [4] Even after the Dannenberg decision, California state courts continue to find that

26  P.C. §3041 et seq. creates a liberty interest in parole. (In re DeLuna (2005) 126
Cal.App.4th 585, 591; In re Lowe (2005) 130 Cal.App.4th 1405, 1421; In re Shaputis

27  (2005) 37 Cal.Rptr.3d 324, 335, depublished at 2006 DJDAR 6008 (May 17, 2006),
though not overturned, see accompanying Request/Motion for Judicial Notice; and In

28  re Elkins (2006) 50 Cal.Rptr.3d 503, 514.)  Grounds 2, 4 and 6, infra, present
further arguments regarding the Dannenberg decision.

1  uniformity ingrained within Penal Code §3041(a) also demands that the

2  Board weigh the gravity of Petitioner's offense against the gravity of

3  other offenses of the same class and take into account both the term to

4  which Petitioner was sentenced and the term established under the

5  Board's Matrix, 15 CCR §2403(c).  (In re Rosenkrantz (2002) Cal.App.4th

6  616, 683; In re Ramirez (2001) 94 Cal.App.4th 549, p.570).[5]  The very

7  language defined by Rosenkrantz and Dannenberg to determine suitability

8  based on P.C. §3041(b) commitment offense factors requires that the

9  Board examine like-offenses to determine if a crime is "more

10 aggravated," "particularly egregious" or "more than the minimum

11 necessary to convict" than other offenses of the same class.  These

12 factors can not be deduced in isolation;[6] thus, a P.C. 3041(a)

13 comparative proportionality analysis is integral and inseparable to the

14 process of determining parole suitability based on P.C. 3041(b)

15 commitment offense factors.

16     Also, failure to preserve proportionality, as described in

17 Ramirez, supra, at p.571, through repeated parole denials would destroy

18 the legislative intent of P.C. §3041 et seq. as mandated by the Uniform

19 Determinative Sentencing Act (UDSA).  This second aspect of

20 proportionality in the Ramirez decision was not overturned in

21 Dannenberg (2005) 34 Cal.4th 1061, pgs.1096 and 1100.  (See also In re

22 Scott (2004) 119 Cal.App.4th 871, 890-892.)  Petitioner respectfully

23 contends that the Dannenberg decision, particularly in its de-

24

25 [5] While this aspect of "comparative proportionality" in Ramirez, supra, at p.570,
   was rejected in Dannenberg, supra, at pp.1087 and 1100, comparative like-crimes
26 analysis remains a valid aspect under Rosenkrantz, supra, at p.683; furthermore,
   the Dannenberg court can not simply side-step the plain meaning of P.C. §3041(a)
27 without violating Petitioner's liberty interest and placing Petitioner in jeopardy
   of serving a disproportionate term as argued herein at Ground 4.
28 [6] Again, see Grounds 4 and 6, post, for further argument on the necessity of a P.C.
   §3041(a) comparative like-crimes analysis under the "minimum necessary" standard.

1  emphasizing and shelving of the mandatory liberty interest language

2  defined in P.C. §3041 subsection (a) (Id. at 1087 and 1100), violates

3  the clear meaning and intent of the language of P.C. §3041 et seq.,

4  unambiguous language which was intended by the state legislature to

5  preserve and protect all aspects of proportionality in sentencing under

6  the UDSA.  The California State Legislature would never have included

7  such language if it did not intend it to be applied to indeterminately

8  sentenced prisoners.

9       The Board has a duty to set terms absent a supported finding that

10  the particular offense was among the most "egregious" and "gravest" of

11  crimes. (In re Rosenkrantz, supra, 683.)  Under the Dannenberg

12  decision, this would mean crimes committed with more than the minimum

13  necessary to sustain a conviction, in this case, for second degree

14  murder. (Id. p. 1095.)  The Dannenberg "minimum necessary" standard is

15  unconstitutionally vague in that it destroys the concept of

16  proportionality in California murder statutes (e.g. P.C. §§190, 1168,

17  1170 and 3041 et seq.), as the minimum elements of the crime of murder

18  are simply that a person dies at the hands of another with the

19  perpetrator exhibiting the requisite intent to kill. "Any fact" in

20  addition to this could be viewed as more than minimally necessary to

21  convict. [7]  Hence, the Dannenberg minimum necessary standard is

22  unreviewable and unconstitutionally vague, in violation of clearly

23  established United States Supreme Court law. (See In re Dannenberg,

24  supra, dissent at pp.1103-1104.)  Yet, valid California Supreme Court

25  law and statutory mandates clearly hold that a panel making a parole

26  suitability decision consider that:

27  _____

28  [7] Indeed, as described in Justice Moreno's dissent to In re Dannenberg, supra, acts
not beyond the minimum necessary to sustain a conviction of second degree murder
would result in a manslaughter or acquittal of murder. (Id. p.1103-1104.)

> All violent crimes demonstrate the perpetrator's
> potential for posing a grave risk to public
> safety, yet parole is mandatory for felons serving
> determinate sentences. (Penal Code §3000,
> subd.(b)(1).) The legislature has clearly
> expressed its intent that when murderers – who are
> the majority of inmates serving indeterminate
> sentences – approach their minimum eligible parole
> date, the Board "shall normally set a parole
> release date." (Penal Code §3041, subd.(a).) The
> Board's authority to make an exception based on
> the gravity of a life term inmate's current or
> past offense should not operate so as to swallow
> the rule that parole is "normally" to be granted.
> Otherwise the Board's case by case rulings would
> destroy the proportionality contemplated by Penal
> Code section 3041, subdivision (a), and also by
> the murder statutes, which provide distinct terms
> of life without the possibility of parole, 25
> years to life, and 15 years to life for various
> kinds and degrees of murder. (Penal Code §190 et
> seq.) (In re Rosenkrantz (2002) 29 Cal.4th 616,
> 683.)

Dannenberg did not contravene this aspect of Rosenkrantz. (Id. at p. 1094.)[8] In line with Rosenkrantz, supra, at 654, 661 and 665, a liberty interest is inherent in P.C. §3041 et seq., and parole is the rule, not the exception. (In re Ernest Smith (2003) 114 Cal.App.4th 343, 351.) This duty applies at the initial hearing, and any subsequent hearing thereafter.

Even upon a finding that the crime is sufficiently egregious, the Board is not excused from setting a parole date indefinitely (Biggs v. Terhune (2003) 334 F.3d 910, at 917-918). Under Biggs, at some point, the Board's continued reliance on the unchanging facts of the commitment offense constitutes a violation of due process. (Biggs, supra, at 916-917; and Rosenkrantz v. Marshall (C.D. Cal 2006) 444 F.Supp.2d 1063, pp.1086-1088.) That point in time has now been defined

[8] Hence, Dannenberg (at pgs.1084, 1087, 1094-1095, 1098, 1100) endorsed and did not overrule Rosenkrantz. Implied overrulings are extremely disfavored. (Scheiding v. General Motors (2000) 22 Cal.4th 471, at 478.)

1    by the 9th Circuit as when a prisoner has "...served the minimum number
2    of years required by his sentence." (Irons v. Carey (9th Cir. 2007) __
3    F.3d __, 2007 DJDAR 3072, 3074.)  Petitioner's minimum number of years
4    required by his sentence is 17 years.

5        Petitioner, who has now served 20 calendar years, is a parole
6    eligible inmate and is entitled to the full statutory benefit of P.C.
7    §3041 et seq.,  The circumstances of Petitioner's criminal offense fall
8    squarely in the Matrix (15 CCR §2403(c) at Category III-B, for a term
9    of 18-19-20 years) and can not be deemed as amongst the gravest and
10   most egregious second degree murders where more than the minimum
11   necessary occurred to sustain a conviction of second degree murder.
12   (See Ground 2, infra.)  Petitioner has a liberty interest right to
13   receive good time credit earning.  (15 CCR §2414; P.C. §§2931(a) and
14   3041 et.seq.; and Superintendent v. Hill (1985) 472 U.S. 444, 453-455,
15   105 S.Ct 2768, 86 L.Ed.2d 356, citing Wolff v. McDonnell (1974) 418
16   U.S. 539, 94 S.Ct 2963, 41 L.Ed.2d 935 [holding due process requires
17   procedural protections before a prison inmate can be deprived of a
18   protected liberty interest in good time credits.].)  With Petitioner's
19   15 CCR §2410 good time credits of 79 months proactively applied to the
20   19 years, 11 months already served, he has served an adjusted term of
21   26 years, 6 months.

22       Nor is there any scintilla of evidence, post-conviction or
23   otherwise, that indicates Petitioner is currently an unreasonable
24   threat to public safety.  (See 15 CCR §2402(a); In re Ernest Smith
25   (2003) 114 Cal.App.4th 343; In re Scott (2004) 119 Cal.App.4th 871,
26   890-892; In re Scott II (2005) 34 Cal.Rptr.3d 905, 924-925 and 927; In
27   re Wen Lee (2006) 49 Cal.Rptr.3d 931, 936; and In re Elkins (2006) 50
28   Cal.Rptr.3d 503, 521.)  The Board violated Petitioner's federally

1 protected liberty interest and presumption of parole rights by failing

2 to find him suitable for parole based solely on offense circumstances

3 at his sixth (6) parole hearing on July 27, 2006, when Petitioner had

4 served 20 calendar years--3 years past the minimum number of years

5 required by his sentence of 17 years (<u>Irons v. Carey</u> (9th Cir. 2007) __

6 F.3d __, 2007 DJDAR 3072, p.3074); had served the maximum number of

7 calendar years proscribed by the 15 CCR §2403(c) III-B matrix of 20

8 years; and had served an adjusted term of 26 years, 6 months with good

9 time credits.    (P.C. §2931(a) and 15 CCR §2410.)

10     Further, the Superior Court of California for the County of

11 Riverside failed to protect Petitioner's due process rights when it

12 denied Petitioner's petition for writ of habeas corpus without pointing

13 to any lawful evidence upon which the Board would be permitted to

14 exercise its broad discretion and lawfully deny suitability.    (Exhibit

15 Y.)    As set fort herein at Grounds 2 and 4, there is no some evidence

16 to lawfully deny Petitioner parole suitability.

17 /  /  /

18 /  /  /

19 /  /  /

7. Ground 2 or Ground XXXXXX  *(if applicable)*:

THE BOARD DEPRIVED PETITIONER OF HIS LIBERTY INTEREST AND DUE PROCESS
RIGHTS BY REPEATEDLY DENYING HIM PAROLE BASED ON THE UNCHANGING FACTS OF
THE COMMITMENT OFFENSE AND IGNORING THE EVIDENCE OF HIS REHABILITATION
PROGRAMMING AND CONTINUED EXEMPLARY BEHAVIOR WHILE IN PRISON.

a. Supporting facts:
See Ground 2 Attached.

b. Supporting cases, rules, or other authority:
See Ground 2 Attached.

GROUND 2

THE BOARD DEPRIVED PETITIONER OF HIS LIBERTY
INTEREST AND DUE PROCESS RIGHTS BY REPEATEDLY
DENYING HIM PAROLE BASED ON THE UNCHANGING FACTS
OF THE COMMITMENT OFFENSE AND IGNORING THE
EVIDENCE OF HIS REHABILITATION PROGRAMMING AND
CONTINUED EXEMPLARY BEHAVIOR WHILE IN PRISON.

a.   Supporting facts:

1.   Petitioner appeared before the Board on July 27, 2006, for his sixth (6) parole hearing.  He was denied parole for one (1) year. (Exhibit A, pgs.152:4 and 154:23.)  Petitioner's MEPD was November 28, 1997.

2.   In 1987, Petitioner was convicted of second degree murder in Riverside County Superior Court (Case No. CR26084) for the shooting death of a passenger in a vehicle with which Petitioner had a freeway altercation in August 1986.  Petitioner was also convicted of assault with a deadly weapon against the driver of said vehicle and a second passenger who was struck by the same, single shot.  Petitioner was acquitted by jury trial of first degree murder and all specific intent attempted murder charges, with the assault charges being stayed pursuant to California Penal Code §654.  Petitioner was sentenced to 17 years to life.

3.   Prior to the commencement of the parole hearing, Petitioner's attorney, Steve Defilippis, objected extensively to the introduction of television media brought to the hearing by the Riverside District Attorney.[1]  (Exhibit A, pp.1-12.)  Specifically, Attorney Defilippis

---

[1] The July 27, 2006 Hearing Transcript does not indicate exactly which party invited television media to Petitioner's hearing, the Riverside District Attorney, the Corona Police Department or the victim's next-of-kin; however, all three of these entities work in close conjunction to oppose Petitioner's parole, with the District Attorney taking the leadership role.  Thus, the District Attorney, as

1  objected to the fact that no prior notice was made to Petitioner that
2  media would attend the hearing.  (Exhibit A, pp.1-8.)  This objection
3  to media presence was tied to prior ex parte communication between the
4  Board and Lieutenant Anderson, Corona Police Department, where the
5  Board had instructed Anderson on a means to oppose Petitioner's parole.
6  (See Exhibit M, Lt. Anderson's 2003 and 2005 opposition letters.)
7  Hence, the introduction of television media after 5 prior hearings and
8  20 years of incarceration was objected to as an attempt by the
9  Riverside District Attorney to exert prejudicial influence over the
10  Board to deny Petitioner parole.  (Exhibit A, pp.1-9.)  Attorney
11  Defilippis further objected that the Board, in its entirety, was
12  disqualified from making a fair and impartial decision in Petitioner's
13  case, due to past ex parte communication with Lt. Anderson.  (Exhibit
14  A, pp.8-11.)  The Board panel overruled these objections, stating that
15  the Department of Corrections and Rehabilitation (CDCR) and the Board
16  had cleared the media 1 day prior to the hearing, and both
17  commissioners felt that they could conduct the hearing without
18  prejudice.  (Exhibit A, pgs.4-7 and 11-12.)

19      4.  After the hearing commenced, further objections were made by
20  Attorney Defilippis as to the number of observers being allowed into
21  the hearing exceeding two without prior written approval (Exhibit A,
22  pp.24-25); inaccurate and misleading materials being introduced into
23  the hearing in the Riverside District Attorney's opposition package
24  aimed at retrying the case in front of the Board (Exhibit A, pp.25-28);
25  and on the Board's use of the Probation Officer's Report to describe
26  the circumstances of the crime due to prejudicial inconsistencies in
27
28

representative of the People of the State of California (P.C. §3041.7) at parole
hearings, is the party responsible for inviting or approving media presence.

Ground 2

Page 2

1  that report. (Exhibit A, pp.29-30.)   All of these objections were

2  overruled by the Board.   (Exhibit A, pgs.25:15-18, 28:3-13 and 30:6-8.)

3  The Board then read into the record accounts of the criminal offense

4  from the Probation Officers Report (Exhibit A, pp.30-37), the Court of

5  Appeals opinion (Exhibit A, pp.37-38) and the Correctional Counselor's

6  Report.   (Exhibit A, pp.38-43.   See also Exhibit F.)

7       5.   At the request of his attorney, Petitioner, who has spoken

8  with the Board extensively about the crime at four (4) of his five (5)

9  prior hearings, chose not to discuss the circumstances of the crime.

10  (Exhibit A, p.28:18-26.)   Petitioner admits and accepts responsibility

11  for his actions in the offense (Exhibit A, pgs.102:1-7, 139:15-17,

12  Exhibits B, C, F, G, H and I) and expressed his feelings of remorse for

13  the crime at the hearing.   (Exhibit A, pgs.52:10-24, 68:8-26, 95-97,

14  101-103, and closing statement at pp.139-142.)   Petitioner openly and

15  extensively discussed pre- and post-conviction factors with the Board.

16  (Exhibit A, pp.43-54 and 54-63.)

17       6.   The Board reviewed Petitioner's extensive laudatory

18  documentation, volunteer documentation, his self-help and psychological

19  group and one-on-one participation, reading some of the more recent

20  documentation into the record (Exhibit A, pp.54-63.) and verifying that

21  Petitioner has participated in approximately 19 self-help and therapy

22  programs.   (Exhibit A, pgs.67:3-15 and 107:8-11.)[2]   The Board partially

23

24  [2] Petitioner has participated in at least 16 obvious self-help and therapy
programs.  (See Exhibit B, Program Accomplishments List and Exhibit C.)
25  Apparently, Dr. Sexton in his 2005 Psychological Evaluation and Attorney
Defilippis include Petitioner's 3 college degrees in the total of self-help and
26  therapy programs, due to Petitioner's extensive studies in human behavior
(including psychology, sociology, history and humanities) which are of obvious
27  therapeutic importance.  (Exhibit E.)  Under Departmental Operations Manual,
section 504060.12, self-help and therapeutic value is also evident in Petitioner's
28  organized participation in occupational programs (4 completed vocations and
paralegal diplomas), art programs (hobby and Arts-in-Corrections), music

1  reviewed Petitioner's extensive work, educational and vocational

2  advances, acknowledging that Petitioner has completed a fourth

3  vocational trade in vocational print shop (Exhibit A, pp.61:4-27, 106-

4  107, 152:1-3 and Exhibits B and D). The Board also acknowledged that

5  Petitioner had completed the Blackstone paralegal course (Exhibit A,

6  pgs.61:15-18, 106-107, 151-152 and Exhibit D) equaling a fifth

7  vocational trade.  Finally, the Board was made aware of Petitioner's

8  extensive educational advances, receiving an Associate Degree (1992), a

9  Bachelor's Degree (1995) and a Masters Degree (1998).  (Exhibit A,

10  p.105:10-18.)  See attached Exhibit B for a complete record of

11  laudatory, self-help documentation; Exhibit C for all therapy,

12  participation; Exhibit D for all vocational documentation to date; and

13  Exhibit E for all educational documentation.

14      7.  The Board questioned Petitioner about his pre-offense

15  alcoholism and substance abuse (Exhibit A, pp.45-53), and Petitioner

16  elaborated extensively on his post-conviction sobriety throughout the

17  hearing, demonstrating deep insight into his alcoholism and his

18  dedication to life-long sobriety. (Exhibit A, pgs.45-53 57-58, 65-66,

19  80:8-18, 90-93, 96-96 and 99-105.)  The Board recognized that

20  Petitioner has continued his A.A. participation consistently since 1990

21  (Exhibit A, p.104:10-12) and particularly since his last hearing

22  (Exhibit A, pgs.57:14-21, 151:15-16, and Exhibit B), as well as

23  continued participation in psychological one-on-one therapy.  (Exhibit

24  A, pgs.51:1-20, 66-67 and Exhibit C.)  The Board recognized laudatory

25  documentation from Officers Ramos and Schramm that offered deep insight

26  into Petitioner's current readiness for parole.  (Exhibit A, pgs.60-62,

27

28  programming (Arts-in-Corrections) and recreational activities (such as Spanish
language learning), which would elevate Petitioner's actual number of self-help
programs to more than 27.  (Exhibits B, C, D and E.)

Ground 2
Page 4

1  67-68, 151:21-22 and Exhibit B.)   The Board noted that Petitioner has

2  been disciplinary free his entire incarceration.   (Exhibit A, pgs.55:1-

3  11, 150:12-21 and 151:2-6.)

4      8.  The Board recognized and read into the record Petitioner's

5  current Psychiatric Evaluation (Exhibit G) prepared by Doctor Sexton,

6  January 14, 2005, as being highly favorable and supportive of parole.

7  (Exhibit A, pgs.63-69, 150:21-24, 152:16 and 153:1-2.)   The Board

8  reiterated the five (5) specific questions that the previous panel

9  asked for in requesting a new psychological evaluation.   (Exhibit A,

10  p.64-69 and Exhibit G.)   First, regarding Petitioner's current mental

11  health, the Board noted that "...based on diagnostic impressions, there

12  is no psychiatric reason that [Petitioner] should not be paroled."

13  (Exhibit A, p.64:10-12.)   As to the violence potential in the free

14  community, the Board stated from the evaluation that "[d]ue to the

15  inmate's exemplary performance while incarcerated, [Petitioner's] lack

16  of mental illness and resolved substance abuse issues that [Petitioner

17  is] reviewed as having no greater violence potential than the average

18  non-offender population in the community, and [Petitioner is] viewed as

19  being below average for the typical parolee."   (Exhibit A, p.64:16-22.)

20  The Board further stated that "Doctor Sexton notes that all of the

21  clinicians have written very positive chronos regarding your

22  participation in one-on-one therapy, and that Doctor Howlin concluded

23  his August 2004 chrono by stating that in his opinion [Petitioner]

24  should have a very low risk of re-offending."   (Exhibit A, p.66:19-25,

25  and Exhibits C and G.)

26      9.  As to questions of drugs and alcohol relating to the

27  commitment offense and the Petitioner's ability to refrain from

28  use/abuse of alcohol if released, the Board paraphrased Doctor Sexton

Ground 2
Page 5

1  evaluation that "...alcohol abuse was a significant contributor to the
2  commitment offense.    However, since [Petitioner's] incarceration [he
3  has] remained substance free for 19 years and not due to institutional
4  remission, but rather individual commitment.    And that that commitment,
5  in the Doctor's opinion, will sustain you when you are released from
6  the institution.    The Doctor goes on to note that at present, there is
7  no alcohol dependence problem and that further treatment in AA would
8  not be recommended.'    [Petitioner has] indicated that [he] attend[s] AA
9  now mostly to help others or for social interaction, and that is a
10 benefit to society and the institution."    (Exhibit A, p.65:1-15 and
11 Exhibit G.)

12     10.   As to the extent Petitioner has explored his commitment
13 offense, the Board panel skimmed Doctor Sexton's evaluation stating:
14 "...the Doctor notes that as it's well known to the Board, [Petitioner]
15 has attended approximately 14 different self-help groups or programs.
16 And although they were not necessarily recommended by various
17 clinicians, [Petitioner] attended them... through [his] own volition."
18 (Exhibit A, p.66:8-14.)    Again, the Board recognized that through self-
19 help and various therapy sessions Petitioner would represent "...a very
20 low risk of re-offending."    (Exhibit A, p.66:10-26.).    Doctor Sexton's
21 actual 2005 report continues to include: "[w]ith the greater awareness
22 that inmate Hawks has obtained through the programs, he has written
23 apology letters to the victims and the victim's family.    He has
24 participated in an article which should be read in its entirety by the
25 Board to better understand this inmate's complete understanding of the
26 crime he committed, the pain it has caused other people, and how it has
27 motivated his personal growth."    (Exhibit G, 2005 Psy.Rpt., p.4; and
28 Exhibit A, pp.67-69.)

1    11.   Finally, the Board noted that Doctor Sexton addressed the

2    Board's request to know if any further therapy was necessary, with the

3    Panel recognizing that Petitioner has no alcohol dependence problem and

4    further treatment through AA would not be recommended.   (Exhibit A,

5    pp.66-67.)   Moreover, Doctor Sexton's actual report states: "[i]t

6    should be obvious from the lack of recommendations for further therapy

7    by all previous clinicians that the inmate's completing of 14 self-help

8    programs and one-on-one therapy with three different clinicians that no

9    further therapy programs while incarcerated are necessary."   (Exhibit

10   G, 2005 Psy. Eval., p.4, as well as the 2000, 1997 and 1990

11   Psychological Evaluations; and Exhibit C.)

12   12.   The Board acknowledged that it reviewed three (3) apology

13   letters written by Petitioner to the victim's family, Corona Police

14   Department and Citizens at Corona, via the Press Enterprise (Exhibit A,

15   pgs. 68:8-15, 96-97, 135-136 and Exhibit H), as well as a 2004 Concrete

16   Wave magazine article featuring Petitioner (Exhibit A, p.68:15-26 and

17   Exhibit I), which demonstrates remorse and Petitioner's deep

18   understanding of the cause and impact of the crime.   (See also Exhibit

19   B, Officer Schramm's and Officer Ramos' chronos; Exhibit G, 2005 Psy.

20   Eval., p.4, Psychological Evaluation; and Exhibit A, pp.67-69,

21   discussing all of these materials.)

22   13.   The Board discussed in depth and recognized Petitioner's

23   valid parole plans and extensive array of thirty-one (31) letters of

24   support to the Board (Exhibit A, pgs. 69-87, 89:1-25 and 93-94), with

25   solid job offers in two counties and residential offers throughout most

26   of Southern California.   (See Exhibit J, Parole Plans; and Exhibit K,

27   Support Letters to the Board.)   The Board was also made aware of

28   twenty-seven (27) other support letters sent directly to the District

1   Attorney.   (Exhibit A, pgs.83:7-13 and 120:10-16; and Exhibit L.)   The

2   Board affirmed Petitioner's parole plans in it decision stating: "Your

3   parole plans are appropriate."   (Exhibit A, p.150:24.)

4       14.   The Board also recognized and reviewed 5 letters and an

5   uncertified signature petition in opposition to parole from the

6   victim's family members, friends and former coworkers, as well as

7   opposition to parole from the Riverside District Attorney.   (Exhibit A,

8   pp.87-88.)

9       15.   For the record, Petitioner answered questions asked by the

10  District Attorney, regarding a 1986 police report and how long

11  Petitioner had exposure to firearms, both of which were subjects

12  reviewed by the jury at trial.   (Exhibit A, pp.97-99.)   The District

13  Attorney also inquired into Petitioner's AA participation past, present

14  and future (Exhibit A, pp.99-101) and asked if Petitioner accepted the

15  jury's verdict as fair (Exhibit A, pp.101-102), with Petitioner clearly

16  stating "...I do accept the jury's verdict in my case." (Exhibit A,

17  pgs.102:6-7 and 139:15-17.)

18      16.   Petitioner next answered questions from Attorney Defilippis,

19  clarifying Petitioner's deep sense of remorse and dedication to

20  personal change as a result of the crime; Petitioner's 20 years of

21  dedicated sobriety; participation in AA, anger management and other

22  self-help, therapy and volunteer programs; Petitioner's vocational and

23  educational advances; and Petitioner's participation in hobby and the

24  arts.   (Exhibit A, pp.102-109.)

25      17.   Closing statement was made by the District Attorney.

26  (Exhibit A, pp.109-121.)   The District Attorney opposed parole based on

27  the commitment offense stating: "We oppose parole for this man, not

28  only because he killed a woman who was an off-duty police officer....

1  We oppose parole because he killed a human being....   This human being

2  did not have any connection to the inmate and he killed her in a

3  senseless and completely random act." (Exhibit A, pp.109-110.)   The

4  District Attorney further stated "[a]nd the problem today is that we

5  don't know what his insight into the crime is.   We don't know what the

6  reasons are that led him to this point really were.   We have no

7  opportunity to know that." (Exhibit A, p.111:8-12 and see pp.118-119.)

8  The District Attorney next accused the Petitioner of lying about the

9  crime and then recharacterized the offense as an "intentional murder,"

10 in effect retrying the case as a first degree murder.   (Exhibit A,

11 pp.111-113.)   Even after Attorney Defilippis objected to the tactic,

12 the Board allowed the District Attorney to continue (Exhibit A, pp.113-

13 114), summarizing how the crime (via facts that had already been before

14 the jury and rejected) could not have been an "accident" and stating

15 "...this is an extremely dangerous, reckless crime, which exhibited a

16 callous disregard for human suffering...." (Exhibit A, pp.114-115.)

17 The District Attorney next argued multiple victims were attacked,

18 reading Wendy Varga's sentencing statement into the record (Exhibit A,

19 pp.115-118); argued for a pre-crime history of Petitioner's life being

20 "...chaotic and out of control" (Exhibit A, p.19:12-13; blaming

21 Petitioner for not seeking help for his alcoholism before the crime

22 occurred (Exhibit A, pp.119-120); and claiming that Petitioner did not

23 fully accept responsibility for the crime. (Exhibit A, pgs.120:1-10 and

24 121:16-22.)

25     18.   The District Attorney also violated P.C. §3041.7 by refusing

26 to acknowledge or read into the record any of the twenty-seven (27)

27 letters of support for Petitioner's parole sent directly to the

28 Riverside County District Attorney, dismissing Petitioner's supporters

1   as "...angry people....." (Exhibit A, p.120:10-16.)   Finally, the

2   District Attorney went on to remind the Board of the victims status in

3   the community as a police woman, before arguing that Petitioner's

4   psychological evaluation, which supports parole, is incorrect because

5   Petitioner had committed a murder, and "[t]he best predictor of future

6   behavior is past behavior." (Exhibit A, pp.120-121.)

7       19.   Attorney Defilippis' closing statement rebutted every aspect

8   of the District Attorney's claims (Exhibit A, p.122-139), exposing the

9   fact that the District Attorney had argued the exact same factors for

10  first degree murder that the trial prosecutor had argued 20 years

11  prior, for which the jury expressly acquitted Petitioner, finding

12  instead for an implied malice/unintentional second degree murder that

13  resulted from Petitioner firing a single "warning or scare shot" that

14  inadvertently struck and killed Patricia Dwyer and wounded Wendy Varga.

15  (Exhibit A, pp.122-123.)

16      20.   Attorney Defilippis also discussed various aspects of the

17  case that were before the jury that mitigated Petitioner's culpability,

18  as well as a post-conviction lawsuit by Wendy Varga where she

19  successfully sued the driver of the van that she was riding in for

20  putting her in danger by instigating the freeway altercation and

21  provoking Petitioner. (Exhibit A, p.124-126.)   Attorney Defilippis

22  reiterated that "...the acquittal of first degree murder and the

23  acquittals of attempted murder negates the issues of intent to kill.

24  It shows that anything that was charged with an intent to kill,

25  premeditation, deliberation, anything of that nature, there were

26  acquittals for." (Exhibit A, p.126:15-22.)   Attorney Defilippis

27  demonstrated that the crime was essentially a felony murder conviction

28  for firing a weapon into an occupied vehicle (a theory the prosecution

introduced in closing argument), which is how the jury came to a
finding of an implied malice second degree murder. (Exhibit A, pp.126-127.)[3]

21. Attorney Defilippis demonstrated that Petitioner immediately
acknowledged responsibility for the crime and has always admitted to
the underlying facts of the case. (Exhibit A, p.127:3-6.) As a
result, Petitioner immediately took steps to turn his life around in an
exemplary manner (Exhibit A, p.127:6-12), finding sobriety (Exhibit A,
pp.127-128); extensively participating in self-help programs (Exhibit
A, pp.128-129) and therapy (Exhibit A, pgs.129:1-16 and 137:13-22);
completing four (4) vocational trades (Exhibit A, pgs.129:16-23 and
133:18-21) and a paralegal diploma (Exhibit A, p.133:17-18);
participating extensively in college and university studies, earning
Associate, Bachelor and Masters Degrees (Exhibit A, p.133:1-16); and
volunteering his time to help others. (Exhibit A, p.133:22-27.)
Attorney Defilippis pointed to the indisputable fact(s) that Petitioner
has demonstrated an in-depth understanding of his crime and remorse for
his actions, as indicated in an article in Concrete Wave magazine
(Exhibit A, pgs.134:2-4, 135:12-17 and Exhibit I), apology letters sent
directly to the victim's next-of-kin, the Corona Police Department and
the Citizens of Corona (Exhibit A, pp.135-136 and Exhibit H), laudatory
documentation written by correctional officers Schramm and Ramos
(Exhibit A, pp.134-135 and Exhibit B) and reports by prison mental
health professionals that demonstrate Petitioner's significant insight
into the causative factors of his crime and his extensive and sincere
record of personal change and rehabilitation. (Exhibit A, pgs.131-132,

---

[3] As will be discussed more fully post, the prosecutor's original theory of murder at trial was based on transferred intent.

136-137 and Exhibits C and G.)

22. Finally, Attorney Defilippis explained that parole is for the guilty: "It's for the individual who's guilty of their offense and has done their time and shown themselves not to be an unreasonable risk of danger to society if paroled.... There's nothing that shows [Petitioner] is a current danger to society if he's released." (Exhibit A, p.130:3-27.)  Attorney Defilippis argued that the predictive value of the crime being an indicator of future violence 20 years after the fact is nil (Exhibit A, p.131:1-4), in light of the fact that Petitioner had done everything possible to correct the issues that led to the crime. (Exhibit A, pgs.125:3-9, 131:4-7 and 136-137.)  In closing, Attorney Defilippis stated: "There was justice on the prosecutor's side when there was a conviction and there was a sentence and [Petitioner] was sent to prison indeterminately, which meant·that he could spend up to his life in prison if he didn't do anything to change himself.  And what [Petitioner has] done is he's earned the right to have a parole date set consistently with the matrix." (Exhibit A; p.138:15-25.)

23. Petitioner began his closing statement by again clarifying that he accepted his conviction and has taken responsibility for the crime (Exhibit A, p.139:15-17), before expressing his deep remorse, sincere change and readiness for parole.  (Exhibit A, pp.139-142.)  Two (2) members of the victim's family gave heart felt testimony of the loss that they have suffered (Exhibit A, pp.142-148) and their desire for Petitioner to never be paroled.  (Exhibit A, p.145:1-6.)

24. The Board denied parole finding paramount that: "The prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from

prison.    We come to this conclusion based on the nature and
circumstances of the commitment offense.    The offense was carried out
in an especially callous manner.    There were multiple victims; one
injured and one killed in the same incident.    The offense was carried
out in a manner which demonstrates an exceptionally callous disregard
for human life.    And the motive for the crime is inexplicable in
relation to the offense.    These conclusions are drawn from the
Statement of Facts, wherein for a reason still best known to
[Petitioner], he became involved in what would be described today as a
road rage incident.    He was already angry when he chose to drive after
drinking.    Rather than disengaging from the incident, he chose to
retrieve a shotgun from a bag.    He loaded the shotgun with a slug,
pointed at the van and fired.    The slug pierced the side of the van,
killing Patricia Dwyer and seriously wounding Wendy Varga."    (Exhibit
A, pp.149-150.)

    25.    The Board noted that the Petitioner had no criminal history.
(Exhibit A, p.150:11-12.)    The Board found that Petitioner's
"...behavior while being in the institution has been exemplary.
[Petitioner has] no 128(a) counseling chronos and no serious 115's."
(Exhibit A, p.150:12-15.)    The Board commended Petitioner for his
institutional record, stating "...that is a record you should be truly
proud of." (Exhibit A, p.150:15-21.)    The Board recognized Petitioner's
January 2005 Psychological Report by Doctor Sexton 2005 to be
supportive of parole (Exhibit A, p.150:21-23) and further recognized
Petitioner's parole plans to be appropriate.    (Exhibit A, p.150:24.)
The Board also noted that the District Attorney from Riverside County
opposed parole.    (Exhibit A, pp.150-151.)

    26.    The Board reiterated many of Petitioner's accomplishments in

1  prison, primarily since the previous hearing, including the completion
2  of four (4) vocations; a diploma from Blackstone Paralegal; positive
3  work evaluations; numerous self-help programs accomplishments including
4  Healing the Angry Heart, Cage Your Rage and a 12 week Anger Management
5  class; continued participation in Alcoholics Anonymous; volunteer
6  participation in We Care, Father's Behind Bars, soccer field repairs
7  and Arts-in-Corrections; numerous laudatory chronos from officers and
8  staff; and participation in numerous one-on-one and group therapy
9  programs (Exhibit A, pp.151-152), although failing to include
10 Petitioner's extensive record of accomplishments, particularly in
11 learning Spanish and numerous college degrees.  (Exhibits B, and E.)
12 The Board denied parole for a period of one (1) year.  (Exhibit A,
13 p.152:4.)

14     27.  The Board concluded by recommending Petitioner remain
15 disciplinary free, continue available self-help programs and earn
16 positive chronos.  (Exhibit A, p.152:4-12.)  The Board also ordered
17 "...a new psychological evaluation for the next hearing, as this
18 current psychological [evaluation] has been used in two prior hearings,
19 although it is favorable." (Exhibit A, p.152:13-16.)  When asked by
20 Attorney Defilippis if there was something the panel wanted clarified
21 in a new psychological evaluation, reminding the Board of Doctor
22 Sexton's explicit statement that further psychological evaluations
23 would be redundant (See Exhibit G, 2005 Psy. Eval., p.3), the Board
24 made no meaningful comments or recommendations other than they hoped a
25 new report might show "...additional growth..." and the new
26 psychological evaluation will be considered "current" by the next
27 panel.  (Exhibit A, pp.152-153.)

28     28.  The Offense and Victim Factors for Petitioner's offense fall

1  within the 15 CCR §2403(c) III-B Matrix category, requiring a term of
2  18-19-20 years. At the time of the hearing, Petitioner had been in
3  custody for over 19 years, 11 months. When his post-conviction (15 CCR
4  §2410) credits of 79 months are added, his time served equals 26 years,
5  6 months. Petitioner is already serving a disproportionate term for
6  the most aggravated classification of 20 years in the III-B Matrix
7  category. Because Petitioner has served a term greater in length than
8  the "uniform term" for the gravity of his offense, the gravity of his
9  criminal offense no longer supports a Penal Code §3041(b) finding
10 requiring a longer period of incarceration.

11     29. The Board's factual determinations regarding Petitioner's
12 crime are contrary to clearly established Unites States Supreme Court
13 law in that the Board used findings not made by the court of conviction
14 to deny parole suitability in violation of due process of law and the
15 right to a jury trial. Petitioner's hearing was conducted in a _pro_
16 _forma_, sham manner and with bias against Petitioner. There was "no
17 evidence" that Petitioner represents a current and/or unreasonable risk
18 to public safety or that his commitment offense was particularly
19 egregious or more than the minimum necessary to convict for second
20 degree murder to justify continued incarceration. To the contrary,
21 after 20 years of "exemplary" prison conduct and rehabilitation, the
22 immutable factors of Petitioner's commitment offense (including
23 opposition to parole) are nil indicators of future violence. All
24 reliable information before the Board clearly demonstrated that
25 Petitioner was suitable for release on parole. Petitioner's federally
26 protected due process liberty interest in parole, which is clearly
27 established in United States Supreme Court precedent, was violated at
28 the July 27, 2006 hearing.

Ground 2
Page 15

1

2  b.   Supporting cases, rules or other authority:

3      For the sixth time Petitioner appeared before the Board for

4  parole consideration and was denied parole based on the unchanging

5  factors of his commitment offense.   The July 27, 2006 hearing is devoid

6  of evidence that Petitioner's crime was "particularly egregious" or

7  more than the "minimum necessary" to sustain a conviction of 2nd degree

8  murder, and no post-conviction evidence exists to find that Petitioner

9  is a current and/or unreasonable threat to public safety and therefore

10  unsuitable for parole.   The Board's refusal to set a parole date is a

11  denial of adequate procedural protection and is in direct conflict with

12  the legislative intent of P.C. §3041, which creates and protects

13  Petitioner's liberty interest and presumes that he will be found

14  suitable at his first parole hearing.

15  A.   The Offense of August 22, 1986 and the Jury's Findings.

16      Examining the commitment offense, Petitioner stands convicted of

17  second degree murder.   As will now be demonstrated, the circumstances

18  of the crime indicate the bare minimum to sustain a conviction of

19  second degree murder.   Like any unlawful killing, the crime is most

20  serious, but when compared to other second degree murders, it is not

21  "especially heinous" within the meaning of 15 CCR §2402(c)(1).

22  Petitioner did not intend to kill his victim, and while his actions

23  were reckless and irresponsible, they were not intentionally deadly.

24      The crime arose out of a freeway altercation where Petitioner was

25  cut off, run off the road and had objects thrown at his car by the

26  driver of another vehicle, the van in which the victim was a backseat

27  passenger.   Unfortunately, Petitioner had been arguing with his

28  estranged wife, was intoxicated and over-reacted to the driver's

1  conduct, clearly failing to handle the situation properly.   He reached

2  behind his seat to where the shotgun he was to use the next day for

3  skeet shooting was located, intending to fire a warning shot to

4  frighten the other driver.   However, rather than grabbing a round of

5  skeet load, he unintentionally removed a round containing a slug, and

6  instead of tiny pellets that would have bounced harmlessly off the van,

7  the round penetrated the back wall of the vehicle, struck and killed

8  the victim, exiting her body and wounding another backseat passenger.

9         The evidence was clear that the victims could not be seen by

10  Petitioner.   To Petitioner's knowledge, the driver was the only

11  occupant of that vehicle.[4]   The evidence was equally clear that

12  Petitioner did not intend to kill anyone by his actions, and while

13  profoundly irresponsible, he was not acting with murderous intent.

14  This fact was confirmed at trial by the jury who acquitted Petitioner

15  of all of the alternative charges that had included the element of

16  intent to kill (i.e. first degree murder and attempted murder).

17         The facts of this crime clearly do not amount to "some evidence"[5]

18  that the criminal act was "particularly egregious" or more than the

19  "minimum necessary" to sustain a second degree murder conviction under

20  the standards espoused in In re Rosenkrantz, 29 Cal.App.4th 616, at 683

21  and In re Dannenberg (2005), 34 Cal.4th 1061, 1094-1095.   Petitioner

22  was expressly acquitted of all specific intent to commit murder

23

24  [4] These facts are confirmed by the District Attorney's original theory of murder at
    trial based on "transferred intent," where at trial the prosecutor claimed that
25  Petitioner was attempting to shoot the driver of the van but inadvertently struck
    two passengers with a single shot.
26  [5] As required by current state law, Petitioner argues Grounds 1 through 6, infra,
    utilizing the "some evidence" standard.   However, in Ground 6, Petitioner raises
27  the argument that some evidence is the incorrect standard of proof for the Board's
    suitability determination, as the "preponderance of evidence" is the lawfully
28  correct standard of proof for Board hearings, as defined by statutory and
    regulatory law.

1  charges, and he was found guilty by jury trial of second degree murder

2  based on the theory of implied malice under the felony murder rule for

3  shooting into an occupied vehicle,[6] with the crime occurring as a

4  result of significant stress built up over time due to the turmoil of

5  his failed marriage.   (See In re Scott (2004) 119 Cal.App.4th 871,

6  generally at p. 894; In re Wen Lee (2006) 49 Cal.Rptr.3d 931, at p.939

7  [discussing long-term stress buildup as a mitigating factor] and at

8  p.940 [where the killing of an unintended victim does not constitute an

9  act beyond the minimum necessary to convict for second degree murder];

10  and In re Weider (2006) 52 Cal.Rptr.3d 147, 159-161.)   The facts of

11  Petitioner's crime establish that he acted irrationally and

12  spontaneously, making a horrible mistake with extremely tragic

13  consequences, but he certainly was not acting with the intent to kill,

14  let alone with premeditation and deliberation.

15  **B.   Implications of the Dannenberg Decision.**

16      While the California State Supreme Court has recently interpreted

17  the parole statute in a manner that undermines the standards previously

18  established to provide like-term for like-crime proportionality in P.C.

19  §190(a), P.C. §3041 et seq. and In re Ramirez (2001) 94 Cal.App.4th

20  549, at 570, Petitioner contends that In re Dannenberg supra,

21  unlawfully destroys the plain meaning and intent of the parole scheme,

22  which is to provide proportionate/like-terms for like-crimes, under the

---

24  [6] In the closing arguments of Petitioner's jury trial, the prosecution abandoned
    the transferred intent theory of murder and bootstrapped a new charge (P.C. §246)

25  and theory of murder based on the felony murder rule, even though Petitioner was
    never charged with P.C. §246 and the elements of that crime were never presented

26  to the jury.   As such, Petitioner's case was prosecuted under both theories of
    murder.   Yet, even under the prosecution's original theory of murder for first

27  degree murder based on transferred intent, Petitioner's crime can not be regarded
    by the Board or a reviewing court as particularly egregious or beyond the minimum

28  necessary to convict for the second degree murder of an unintended victim.   (See
    In re Wen Lee, supra, at 940.)

1  Uniform Determinative Sentencing Act (UDSA).  P.C. §3041 et seq. was
2  specifically provided by the Legislature to govern the manner in which
3  term-to-life offences under the UDSA were administered.  The language
4  that the length of terms are to be proportionately rendered is crystal
5  clear in the plain meaning of the statute, and the Board and
6  Legislature have adopted the matrices, 15 CCR §§2280 et seq. and 2403
7  et seq. to provide a determinate sentencing scheme of like-terms for
8  like-crimes based on offense circumstances.

9      The State Supreme Court's reinterpretation of P.C. §3041 et seq.
10  is vague, ambiguous and unreviewable, running counter to nearly 3
11  decades of established state and federal law, and is in violation of
12  due process of law under the State and U.S. Constitutions.[7]  Even under
13  the Dannenberg standard where a crime can be considered particularly
14  egregious if elements more than the "minimum necessary" occurred in the
15  offense circumstances to sustain a term-to-life conviction,
16  proportionality based on life crimes remains an issue.  (Id, pp.1094
17  and 1100.)[8]

18      In any case and under all lawful standards, Petitioner contends
19  that he is unequivocally suitable for parole as argued herein and
20  throughout this petition.  The Board's factual determinations regarding
21  Petitioner's crime factors are contrary to clearly established United
22  States Supreme Court law.

23  **C.   Due Process of Law Requires Three Levels of Review.**

24      The determination of Petitioner's parole suitability is protected

25

---

26  [7] See Ground 1, infra, for further argument concerning In re Dannenberg, supra, in
     relation to Petitioner's liberty interest and the unreviewable aspects of the
27  "minimum necessary standard" in conflict with preexisting California statutes;
     state and federal case law; and in violation of state and federal due process of
28  law.  See also Ground 6 for extensive arguments against Dannenberg.
     [8] See Grounds 4 and 5, infra, arguing due process issues of proportionality.

1  by procedural safeguards that rise beyond the Dannenberg decision,

2  requiring a 3 level analysis in order to ensure due process of law.    At

3  the first level of review, before considering the rudimentary

4  sufficiency of the Board's findings, the analysis must focus on the

5  question of whether the commitment offense can even lawfully be relied

6  on to any degree in finding Petitioner unsuitable for parole.    To the

7  extent that the Board in its decision (or the DA at the hearing)

8  utilized terminology or elements of first degree murder or second

9  degree murder with express malice to make the crime "particularly

10  egregious," their decision violates the Apprendi-Blakely-Cunningham[9]

11  principles established by the U.S. Supreme Court.    There the Court

12  announced rules that preclude the use of findings to take the case out

13  of the ordinary sentencing range, here the 15 CCR §2403(c) Matrix,

14  unless those findings were alleged in the information and either found

15  true by the jury or were admitted by the defendant as part of his plea.

16  The use of findings by the Board not made in the court of conviction

17  violate the right to a jury trial.

18      In California, the Board, acting as an arm of the sentencing

19  court, serves a quasijudicial function equivalent to that of a

20  sentencing judge in a determinate term case and is, thereby, bound by

21  the same rules under Apprendi-Blakely-Cunningham.    (See Hornung v.

22  Superior Court (2000) 81 Cal.App.4th 1098, 1099; Sellars v. Procunier

23  (9th Cir. 1981) 641 F.2d 1295, 1304; and Obrimski v. Maass (9th Cir.

24  1990) 915 F.2d 418.)    Thus, when the Board, as they did here, makes

25  "findings of fact" that the crime was committed in an "...especially

26  callous manner"  (Exhibit A, p.149:19-20), involving a "...an

27

28  [9] Apprendi v. New Jersey (2000) 530 U.S. 466; Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403; and Cunningham v. California (2007) __U.S.__, 127 S.Ct. 856.

exceptionally callous disregard for human life" (Exhibit A, p.149:22-24), "[t]here were multiple victims; one was injured and one killed in the same incident" (Exhibit A, p.149:21-22), "[a]nd the motive for the crime is inexplicable in relation to the offense" (Exhibit A, p.149:25-26), the rules of P.C. §3041 and Apprendi-Blakely-Cunningham are violated since the result is to remove the case from the requirement in P.C. §3041 that the Board "shall normally" set a uniform and proportional parole release date consistent with the matrix. While Dannenberg, supra, gives the Board the discretion to do that in appropriate cases, it is not a "blank check" to do so in the absence of findings by the jury on factual issues relied upon to justify the departure. Such a practice by the Board is clearly subterfuge to evade its duty and effect an illegal policy.

Here, as will shortly be discussed in depth, an even stronger case is presented, as it is not just an absence of findings on those issues by the jury, but the jury explicitly rejected every charge having express malice (intent to kill) as an element of the commitment offense. As these findings by the Board are being used to take the case outside the normal sentence range, the Apprendi-Blakely-Cunningham rules require that they be submitted to the trier of fact at the time of conviction. Here, the jury's actual findings negate the existence of intent to kill, and therefore preclude the Board from reaching the decision it did.

An Apprendi-Blakely-Cunningham analysis is not a "some evidence" evaluation. It is a legal issue that precludes the Board from making the findings that it relies on to conclude that the crime justifies the refusal to set a parole release date. The result of a finding in favor of Petitioner on this issue is that the Board loses jurisdiction to

1  continue to rely on the facts of the commitment offense as the basis

2  for precluding parole.    (See, e.g., <u>Brown v. Poole</u> (9th Cir. 2003) 337

3  F.3d 1155.)

4      The second level of review is under the analysis noted by the

5  Ninth Circuit in <u>Biggs v. Terhune</u>, (2003) 334 F.3d 910, at 916-917.

6  There the court discussed the limits on using the immutable and

7  unchanging facts of the crime to deny parole in the face of evidence

8  that the inmate has achieved rehabilitation.

> [While] the [California] parole board's sole reliance on
> the gravity of the offense can initially be justified as
> fulfilling the requirements set forth by state law...
> over time should [Petitioner] continue to demonstrate
> exemplary behavior and evidence of rehabilitation,
> denying him a parole date simply because of the nature
> of [his] offense... would raise serious questions
> involving his liberty interest in parole.... [¶] A
> continued reliance on the circumstances of his offense…
> runs contrary to the rehabilitative goals espoused by
> the prison system and could result in a due process
> violation."    (<u>Id.</u> at pp. 916-917.)

16  The Ninth Circuit was clear that, at some point, the crime can not any

17  longer be used to deny parole suitability without violating federal due

18  process.    The Ninth Circuit has now explicitly defined the rule of

19  <u>Biggs</u> where the minimum number of years of the sentence is the limit

20  for the use of crime factors beyond the minimum necessary to convict to

21  deny parole suitability.    (<u>Irons v. Carey</u> (9th Cir. 2007) __ F.3d __,

22  2007 DJDAR 3072, pp.3073-3074.)    This point has been in contention in

23  the courts since first addressed in <u>In re Ramirez</u> (2001), 94

24  Cal.App.4th 549, at 571, when the court noted that reliance on the

25  crime after 7 hearings, 17 years in prison and 9 years after the

26  inmate's minimum term was arbitrary.    This aspect of <u>In re Ramirez</u> was

27  not disapproved by the California Supreme Court in <u>In re Dannenberg</u>,

28  <u>supra</u>, at p.1100.    (See also <u>Biggs v. Terhune</u>, <u>supra</u>, at 917; <u>Martin v.</u>

Ground 2
Page 22

1   Marshall, (N.D. Cal. 2006) 431 F.Supp.2d 1039, 1046-1048; Rosenkrantz

2   v. Marshall (C.D. Cal 2006) 444 F.Supp.2d 1063, 1084-1085; Sanchez v.

3   Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062; In re Scott II (2005)

4   34 Cal.Rptr.3d 905, 920; In re Wen Lee, supra, at pp.937-940; and In re

5   Elkins (2006) 50 Cal.Rptr.3d 503, at pp.518-523.)   Hence, Irons v.

6   Carey, supra, has now established a clear and concise bright line rule

7   as to when the use of particularly egregious crime factors can no

8   longer be used to deny parole, and that point arrives when a prisoner

9   has "...served the minimum number of years required by his sentence."

10  (Id. P.3074.)

11      Here, Petitioner has been in custody 20 years; is 3 years beyond

12  the Irons v. Carey, supra, bright line rule; is beyond his MEPD by more

13  than 8 and one-half years; has served an adjusted term of good time

14  credits of 26 years, 6 months; and the only reason that he has not had

15  more than 6 parole hearings is that the Board improperly used multiple

16  year denials.   The evidence of Petitioner's rehabilitation and

17  behavior, as noted extensively by the Board, is "...exemplary... [and]

18  a record to be truly proud of..." and "...remarkable..." (Exhibit A,

19  pgs.150:12-17, 151-152 and 55:1-11), and absolutely no contrary

20  evidence was submitted at the hearing.   In fact, not only do the CDCR

21  Staff Psychologists establish Petitioner as a low violence potential,

22  prison staff, including multiple Correctional Officers (one with 8

23  years as a parole agent) have graciously written chronos documenting

24  Petitioner's suitability for parole, stating that he would be an

25  excellent candidate for parole.   (See Exhibit A, pgs.60-61, 150:21-23,

26  151:21-22 and Exhibits B and G.)

27      Furthermore, the Board panels at each hearing have given

28  directives for Petitioner to follow in order to achieve suitability

1    (Exhibit N), and Petitioner has fully complied with and exceeded those

2    directives after each of his 5 prior parole hearings.    If the crime was

3    to forever stay an impediment to parole, compliance with these

4    directives would be an idle act, serving no purpose, and one would have

5    to wonder why the Board would be mandating them upon Petitioner.    The

6    fact that the directives are utilized is an implied admission that, if

7    complied with, the crime will no longer bar the setting of a parole

8    date.[10]

9         The third level of review is a "some evidence" review under In re

10    Dannenberg, supra, and In re Rosenkrantz, supra, which requires that

11    the crime exhibit some evidence beyond the minimum elements necessary

12    for a conviction of second degree murder.    The requirements of due

13    process are met if some evidence supports the Board's decision,

14    establishing that the inmate presents an unreasonable danger if

15    released.    (See Biggs v. Terhune, supra, at 915; McQuillion v. Duncan

16    306 F.3d 895, at 904; Jancek v. Oregon Board of Parole (9th Cir. 1987)

17    833 F.2d 1389; Superintendent v. Hill (1985) 472 U.S. 445, 456.)    A

18    some evidence finding that an inmate represents an "unreasonable

19    danger" must be based on a factually supported belief that the inmate

20    will commit a violent act and may not be based on whim, caprice or

21    rumor (In re Powell (1988) 45 Cal.3d 894; In re Morrall (2002) 102

22    Cal.App.4th 280), and such evidence must be based on some indicia of

23    reliability.    (Biggs, supra, at p.915; McQuillion, supra, at p.904; and

24    Rosenkrantz v. Marshall, supra, pp.1083-1084.)[11]

25    _____

26    [10] See Ground 3, herein, for arguments on an implied contract created by the
      Board's recommendations and Petitioner's achievement of those goals.

27    [11] "Some evidence," however, does not mean literally "any" evidence.    If it did,
      the protection afforded by due process would be meaningless.    See Gerald L.

28    Newman, the Constitutional Requirement of "Some Evidence," 25 San Diego L.Rev.
      631, 663-664 (1988) (noting that "[e]vidence that the respondent was alive at the
      time in question is usually relevant to any charge against her.    The [due process]

                                        Ground 2
                                        Page 24

1      Penal Code §3041 requires that the factors relied upon, and

2 supported by some evidence, must be factors that indicate a legitimate

3 concern that the prisoner represents a "current threat" to public

4 safety.   (See In re Ernest Smith (2003) 114 Cal.App.4th

5 343, at pp. 365-373; In re Scott (2004) 119 Cal.App.4th 871, 890-892;

6 and In re Dannenberg, supra, at 1096.)   Most importantly, California

7 law requires that "[t]he test is not whether some evidence supports the

8 reasons the [Board] cites for denying parole, but whether some evidence

9 indicates a parolee's release unreasonably endangers public safety."

10 (In re Wen Lee, supra, at 936, emphasis in original.   See also In re

11 Elkins, supra, at 521 [discussing that the parole authority must not

12 focus on circumstances that may be aggravating in the abstract; rather,

13 it must focus on fact(s) indicating whether or not the release would

14 pose "...an unreasonable risk of danger to society."].)   "[T]he

15 overreaching consideration in the suitability determination is whether

16 the inmate is currently a threat to public safety."   (In re Weider

17 (2006) 52 Cal.Rptr.3d 147, 160-161.)   Some evidence of a particular

18 factor found by the Board does not necessarily equate to some evidence

19 that the parolee's release poses an unreasonable risk to public safety.

20 (In re Wen Lee, supra, at pp.936-937 and n.3.)

21      Moreover, the court in In re Ramirez (2001), 94 Cal.App.4th 549,

22 established a standard that more is required than just a some evidence

23 review to ensure that all aspects of the panel process are complied

24 with; consequently, P.C. §3041 includes the mandate of the State

25 Legislature that prison terms be set proportionately, and thus the

26 courts must consider whether the punishment has become

27

28 protection of the 'some evidence' requirement demands more than that — less than
legal 'sufficiency' of evidence, but more than a trivial charade."   See
Rosenkrantz v. Marshall (C.D. Cal 2006) 444 F.Supp.2d 1063, pp.1083-1084.

1  disproportionate, particularly where a prisoner has served more than

2  his appropriate term under the matrix.   (Ramirez, supra, at 570-571,

3  and 15 CCR §2403(c).)   Again, this aspect of Ramirez was not overturned

4  by In re Dannenberg, supra, at p.1100.

5       Under In re Dannenberg, supra, there is no "some evidence" in

6  Petitioner's commitment offense factors that justifies a denial of

7  parole.   Since the facts of Petitioner's second degree murder

8  conviction bears no evidence beyond the minimum necessary to establish

9  the elements, as a matter of law, the crime cannot be "particularly

10 egregious" so as to allow the Board to defer setting a parole date

11 after six (6) hearings and 20 years in prison.   In fact, the jury's

12 findings rejecting the "intent to kill" based offenses are sufficient

13 to preclude the use of the crime as evidence of unsuitability.   The

14 facts of the Petitioner's crime certainly do not contain evidence that

15 went beyond the minimum necessary to establish the elements for an

16 "implied malice," unintentional second degree murder.   (In re Wen Lee,

17 supra, at 940.)   The evidence was easily susceptible to manslaughter

18 interpretation, on the theory of provocation, but just went too far, as

19 the provocation was not adequate to negate implied malice, irrespective

20 of the lack of intent to kill.   Thus, the circumstances of the crime

21 demonstrate nothing beyond the bare elements of an implied malice

22 second degree murder.   Certainly, there was no evidence to support a

23 finding that includes elements of first degree murder, such as

24 premeditation and deliberation were present.

25      Nor was there any pre- or post-conviction evidence that would

26 preclude the Board from setting a parole date at the July 27, 2006

27 hearing.   As will be further seen, Petitioner prevails under all three

28 levels of analysis   (Apprendi-Blakely-Cunningham, supra; Biggs v.

1  Terhune, supra, Irons v. Carey, supra; and In re Dannenberg, supra.)

2  The Board's denial in Petitioner's case constitutes a denial of all

3  these procedural protections as it is in direct conflict with the

4  Board's own rules set forth in 15 CCR §2400 et seq., the sole purpose

5  of which are to facilitate the determination of parole suitability

6  under P.C. §3041.   There is no evidence in the July 27, 2006 hearing

7  record to support the Board's denial of parole based on Petitioner

8  being a current or unreasonable risk to society.

9  **D.  The Board's Findings of Unsuitability Do Not Amount to Some Evidence and Violate Due Process of Law.**

10

11  In violation of clearly established law, and consistent with the

12  commonly utilized script of Denial Form BPT 1000a, the Board found that

13  Petitioner was unsuitable for parole under 15 CCR §2402(c)(1)[12]

14  "...based on the nature and circumstances of the commitment offense"

15  and §2402(c)(1)(D) that "...the offense was carried out in an

16  especially callous manner."  (Exhibit A, p.149:12-20.)   "There were

17  multiple victims; one was injured, one was killed in the same incident"

18  (Exhibit A, p.149:21-22), proving unsuitability under 15 CCR

19  §2402(c)(1)(A).   The Board again found that the crime could support a

20  denial under 15 CCR §2402(c)(1)(D) when it stated that "[t]he offense

21  was carried out in a manner which demonstrates an exceptionally callous

22

23  _____

[12] A finding of any factor under 15 CCR §2402(c)(1)(A-E) means that the Board has
24  determined "[t]he prisoner committed the offense in an especially heinous,
atrocious, or cruel manner."  The Board derived this regulation from the language
25  found in P.C. §190.2(a)(14): "the murder was especially heinous, atrocious, or
cruel, manifesting exceptional depravity."  This is a special circumstance
26  allegation prescribed by the Legislature to justify imposition of a sentence of
death or life without the possibility of parole.  The use of such factors to find
27  Petitioner unsuitable for parole violates due process of law because Petitioner's
offense was not in a special circumstance category.  Moreover, casting
28  Petitioner's criminal conduct (an implied malice unintentional second degree
murder) as a special circumstance offense is arbitrary and capricious.

1  disregard for human life."  (Exhibit A, p.149:22-24.)  Finally, the

2  Board ruled that "...the motive for the crime was inexplicable in

3  relation to the offense," to find unsuitability under 15 CCR

4  §2402(c)(1)(E).  (Exhibit A, p.149:25-26.)

5    The term "especially" connotes a heightened level beyond what is

6  normally present in a finding of actual or implied malice.  While

7  Petitioner's commitment offense is certainly tragic, in order for the

8  Board to rely upon it as the sole (or even primary) reason for denying

9  parole, it must be clear from the facts that the crime is "especially

10  heinous, atrocious or cruel" in a way that sets it apart from the vast

11  majority of other second degree murders as amongst the "gravest" of

12  those offenses.  (15 CCR §2402(c)(1); see In re Ramirez, supra, at p.

13  570, Rosenkrantz, supra, at p. 683, and In re Dannenberg, supra, at pp.

14  1094-1095.)  Petitioner's offense (a conviction based on "implied

15  malice") simply can not be said to be dramatically more "callous" than

16  most other murders, and certainly not of a caliber equivalent to the

17  higher-end first degree murders, which include premeditated and

18  deliberated torture killings.  In fact, Petitioner's crime factors

19  share many of the attributes of traditional "heat of passion"

20  manslaughter, but without enough provocation to fully negate a finding

21  of implied malice.

22    As compared with other second degree murders, which by definition

23  include intentional killings, the crime is not "particularly

24  egregious," and certainly no more than the minimum necessary to sustain

25  a conviction of second degree murder occurred in the base offense,

26  which was confirmed by jury verdict as previously discussed herein.

27  The Board's findings attempt to impress a level of malicious intent

28  upon Petitioner's crime factors **beyond** what was found by the jury,

Ground 2
Page 28

1  thereby violating Apprendi-Blakely-Cunningham, supra.   Therefore, a
2  finding that the crime prevented the Board from setting a parole date
3  at six (6) separate hearings over a nine (9) year period (eight and
4  one-half years after Petitioner's MEPD) is legally unsupportable.
5  Penal Code §3041 requires the Board to "normally" set a parole date,
6  and that mandate applies to Petitioner.   (See In re Rosenkrantz, supra,
7  at p.683; In re Ernest Smith, supra, at p.351; In re Weider, supra, at
8  pp.160-161; and Biggs v. Terhune, supra, at p.916.)

9      As argued herein, there is no evidence that Petitioner's offense
10 was heinous, atrocious or cruel that would indicate Petitioner to be a
11 current or unreasonable risk to society and thereby unsuitable for
12 parole.

13     The Board's finding of multiple victims, 15 CCR §2402(c)(1)(A),
14 is also insufficient to support a finding of unsuitability.   Though two
15 persons were struck by the single slug, there is no evidence to support
16 a finding that multiple victims were intentionally and independently
17 attacked or killed.   In fact, the Board clearly recognized "...one was
18 injured, one killed in the same incident." (Exhibit A, p.149:21-22.)
19 As previously summarized, only one shot was fired, and the second
20 victim was actually struck by the same slug after it exited the body of
21 the first victim.   Petitioner did not intend to shoot anyone.   (See In
22 re Wen Lee, supra, at 940 [where killing an unintended or accidental
23 victim with 5 shots fired and multiple victims involved does not
24 constitute an act beyond the minimum necessary for second degree
25 murder]; and In re Weider, supra, at p.161 [holding the fact of
26 multiple victims being inadvertent or a happenstance occurrence of 5
27 shots being fired in a bar, killing 1 and injuring 2 victims, can not
28 support an unsuitability finding of multiple victims.].)   Petitioner

1  fired a single round from the gun as a "warning" shot.    (See Martin v.

2  Marshall, supra, at p.1040 [where crime factors involve multiple shots

3  fired striking 3 people, killing 2, are not particularly egregious] and

4  pp.1046-1048 [where crime factors can not continuously be used to deny

5  parole without violating due process.].)    While there is no excuse for

6  the resulting tragedy, Petitioner did not intentionally attack any

7  individuals.    Rather, it was his reckless conduct that resulted in the

8  death and injury.

9      In Petitioner's case, the trial court stayed the two assault with

10 a deadly weapon charges under California P.C. §645, rightfully

11 acknowledging that a "single act" resulted in multiple consequences.

12 Perpetually denying Petitioner parole over six (6) consecutive hearings

13 based on a finding of multiple victims being attacked negates the

14 legislative intent of P.C. §654 and Petitioner's due process rights.

15 While the Board may aggravate setting Petitioner's base term under 15

16 CCR §2404(a)(13) for multiple victims, to do so would be improper at

17 this point because Petitioner has already served an aggravated term in

18 prison beyond what is prescribed by the Matrix for his crime

19 circumstances.    (15 CCR §2403(c), III-B.)

20     Moreover, there is no evidence to reliably demonstrate that

21 multiple victims in Petitioner's case indicates that he is a current or

22 unreasonable threat to public safety.    (See e.g. In re Wen Lee, supra,

23 at pp.936-941; and In re Weider, supra, at p.161.)

24     If Petitioner's commitment offense, an unintended killing, can be

25 found to demonstrate "...an exceptionally callous disregard for human

26 life" (Exhibit A, p.149:23-24) to deny parole under 15 CCR

27 §2402(c)(1)(D), it is impossible to imagine a second degree murder that

28 would not.    Second degree murder is always callous and cruel, but the

1  facts of Petitioner's case do not indicate that this case is

2  "especially" callous and cruel in a way that would distinguish it from

3  other murder cases as being "particularly egregious." (See In re Scott

4  (2004) 119 Cal.App.4th 871, 891-892; In re Ernest Smith, (2003) 114

5  Cal.App.4th 343, 376; In re Ramirez, supra, 94 Cal.App.4th at 570; In

6  re Van Houten (2004) 116 Cal.App.4th 339, 351; In re Rosenkrantz,

7  supra, at 683; In re Dannenberg, supra, pp. 1094-1095; In re Scott II

8  (2005) 34 Cal.Rptr.3d 905, 920; In re Shaputis[13] (2005) 37 Cal.Rptr.3d

9  324, at 331-333; In re Wen Lee, supra, at pp.937-941; In re Elkins,

10  supra, at pp.521-523; and In re Weider, supra, at pp.159-161.)

11  An "exceptionally callous disregard for human life" (Exhibit A,

12  p.149:23-24) means that the offense must have been committed in a more

13  aggravated or violent manner than ordinarily shown in the commission of

14  second degree murder, such as when death results from beating, burning

15  or strangulation. (In re Scott (2004) 119 Cal.App.4th 871, at 891-

16  892.)[14]  Here, Petitioner shot the victim one time, unknowingly,

17

18  [13] While In re Shaputis (2005) 37 Cal.Rptr.3d 324 was depublished by the California
Supreme Court at 2006 DJDAR 6008 (May 17, 2006), the appellate court decision was
19  not overturned; therefore, the theory of law for the findings in In re Shaputis
were not overruled. As lawfully submitted through the accompanying Request/Motion
20  for Judicial Notice (at Exhibits A and B) filed simultaneous to this petition,
Petitioner asks this court to take judicial notice of In re Shaputis due to its
21  relevance to the Biggs line of reasoning and other important aspects of term-to-
life parole law. Further, the federal district court has recently cited and
22  verified Shaputis, post-depublication by the California Supreme Court. (See
Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F.Supp.2d 1063, pgs.1078 and 1084.)
23  Hereinafter, In re Shaputis is cited normally in all grounds, without reference to
the accompanying Request/Motion for Judicial Notice.
24  [14] See In re Scott, supra, at p.892: "Other examples of aggravated conduct
25  reflecting an 'exceptionally callous disregard for human suffering' are set forth
in Board regulations relating to the matrix used to set base terms for life
26  prisoners (§2282, subd. (b))[Id. n.11]; namely 'torture,' as where the '[v]ictim was
subjected to the prolonged infliction of physical pain through the use of non
27  deadly force prior to the act resulting in death,' and 'severe trauma,' as where
'[d]eath resulted from severe trauma inflicted with deadly intensity; e.g.,
28  beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds
inflicted with a weapon not resulting in immediate death or actions calculated to

1  causing death instantaneously.  As such, there is no evidence that the

2  victim suffered within the meaning of 15 CCR 2402(c)(1)(D) in a more

3  aggravated or violent manner than shown in other second degree murders.

4  (e.g. In re Shaputis, supra, at pp.331-332 and 332, n.10 [where death

5  was caused instantaneously by a single gunshot was not particularly

6  egregious]; In re Ernest Smith, supra, at p.367 [where 3 shots fired

7  point blank into the victim's head was not particularly egregious]; In

8  re Morrall (2002) 102 Cal.App.4th 280, 285-286 [where 7 shots were

9  fired into the victim point-blank with one shot resulting from a

10  contact wound to the neck was particular egregious];[15] In re

11  Rosenkrantz, supra, at pgs.628-629, 670-672 and 678-679 [where 10 shots

12  were fired into the victim at close range, including 3 to the head,

13  after lying in wait, was particularly egregious to justify Governor's

14  reversal];[16] Martin v. Marshall, supra, at pgs.1040 and 1046-1048

15  [where more than 7 shots, killing two people and injuring one, was

16  insufficient to justify continued parole denials]; In re Wen Lee,

17  supra, at 940 [where, after firing a total of 5 shots at the intended

18  victim wounding him, a stray bullet struck and killed an unintended

19  victim and is not more than the minimum necessary to convict for second

---

induce terror in the victim.'"  Id. n.11 at p.892: "Under the Board regulations,
base terms for life prisoners are not calculated until after an inmate is deemed
suitable for release.  (§2282, subd. (a).)  The regulations therefore contemplate
that an inmate may be deemed suitable for release even though his offense
demonstrated 'exceptionally callous disregard for human suffering.' (§2402, subd.
(c)(1)(D)."  See also the 15 CCR §§2282(b) and 2403(b-c) matrices categories C and
D, describing circumstances of severe trauma and torture.

[15] Norman G. Morrall was released on parole on March 5, 2005 when Governor
Schwarzenegger declined to review his 2004 grant of parole from the Board of
Prison Terms; hence, his crime factors are no longer particularly egregious to
deny parole.

[16] As discussed more fully post, Rosenkrantz has been released by state and federal
court orders, and these same "particularly egregious" crime factors well beyond
the minimum necessary to convict for second degree murder could no longer be used
to deny parole after 21 years in prison.  (See Ground 4.)

1  degree murder or deny parole based on the crime]; and In re Weider,

2  supra, at 15801 [where firing 5 shots in a crowded bar, killing the

3  intended victim and inadvertently wounding 2 other patrons, does not

4  indicate a callous disregard for human suffering.].)

5       Further, second degree murder by definition ordinarily involves

6  an intentional killing, the taking of a life with malice aforethought.

7  The facts of Petitioner's crime do not show a callous disregard for

8  human life beyond that necessary to give rise to a showing of "implied

9  malice" necessary for the crime of second degree murder.  Considering

10 Petitioner's offense factors, "...the [Board] cannot rely on the bare

11 conviction for second degree murder to deny parole under the

12 exceptionally callous or cruel factor."  (In re Shaputis, supra, at

13 p.333.)  Under a Dannenberg analysis, no more than the minimum

14 necessary to convict Petitioner of second degree murder occurred in the

15 Petitioner's crime; hence, the Board violated Petitioner's due process

16 rights by failing to find him suitable, based solely on the commitment

17 offense, after six (6) parole hearings.

18      Thus, the Board's finding of a callous disregard for human

19 suffering is not reliably or rationally supported by the evidence of

20 Petitioner's commitment offense and can not indicate Petitioner to be a

21 current or unreasonable threat to the public.

22      The motive for this crime of anger ("road rage" as defined by the

23 Board at Exhibit A, pp.149-150) is hardly inexplicable in relation to

24 the offense and can not support an unsuitability finding under 15 CCR

25 §2402(c)(1)(E), inexplicable or very trivial motive.  While the crime

26 is not justifiable, justification or excuse is not a requirement to be

27 found suitable, as the absence of justification or excuse is the very

28 element of the convicted offense.  (See In re Scott (2004) 119

1  Cal.App.4th 871, at 892-893.   Also see <u>Rosenkrantz v. Marshall</u>, <u>supra</u>,

2  at 1082.)   The motive for the crime is explainable, just not excusable,

3  by virtue of Petitioner's enraged and overwhelmed state.   Stating that

4  the motive for the death was trivial implies that the killing was

5  dispassionate.   This is an improper characterization of Petitioner's

6  offense because the trial court did not find a dispassionate and

7  calculated intent to kill; and in fact, the jury expressly acquitted

8  Petitioner of all crimes that included the element of express intent to

9  kill.   (Apprendi-Blakely-Cunningham, <u>supra</u>; and <u>In re Scott</u> (2004) 119

10 Cal App.4th at pp.889-890; <u>In re Shaputis</u>, <u>supra</u>, at p.333; and <u>In re</u>

11 <u>Weider</u>, <u>supra</u>, at pp.159-160 [where being angry or distraught negates

12 the Board's ability to find a crime dispassionate or calculated.].)

13 After an altercation on the freeway with the driver of the van,

14 Petitioner was scared, enraged and angry and his judgment was impaired

15 with emotion and alcohol, and these factors led to a tragic but

16 unintended death.   (See Exhibit A, pp.122-127 Attorney Defilippis'

17 detailed crime analysis and evidence of provocation; pp.38-38 Court of

18 Appeal summary of the crime; and pp.39-43 for the Correctional

19 Counselor's reporting of the crime.)

20     The case of <u>In re Scott</u> (2004) 119 Cal.App.4th 871 also makes it

21 clear that fear and anger are common place motives for murder.   (<u>Id</u>.

22 892-894.)   It should, further, be noted that when an offense is so

23 serious that it results in death, any motive would be trivial.   If the

24 motive justified or excused the killing, it would not be a crime.

25 Petitioner need not negate his guilt of the crime before being paroled.

26 Parole is for the guilty—not the innocent.

27     The Board's trivial or inexplicable motive finding of

28 Petitioner's offense based on anger/road rage does <u>not</u> provide evidence

Ground 2
Page 34

1  that reliably or rationally supports a finding of unsuitability or

2  indicate that Petitioner is currently or unreasonably a threat to

3  public safety.

4      Finally, Petitioner has openly discussed the crime and his

5  motivation for firing a scare/warning shot at four (4) prior parole

6  hearings; testified to the crime at trial; and openly admitted to

7  police his reason for firing the fatal "scare" shot during

8  interrogation.   Moreover, Petitioner has openly discussed the crime

9  with numerous staff psychologists, correctional counselors and other

10  correctional staff.   (See Exhibits B, F and G.)   The Board read

11  Petitioner's version of the crime from the Counselor's Report.

12  (Exhibit A, pp.39-43 and Exhibit F.)  Finally, Attorney Defilippis

13  extensively described the trial court and jury findings, evidence of

14  provocation from the court record and Wendy Varga's civil suit, as well

15  as Petitioner's motivation for firing a shot.   (Exhibit A, p.122-127.)

16  All of this information was before the Board at the hearing.[17]

17      For the Board to then turn around and state in its decision that

18  its "...conclusions are drawn from the Statement of the Facts, wherein

19  for **a reason still best known to** [Petitioner], he became involved in

20  what would be described today as a road rage incident" (Exhibit A,

21  pp.149-150, emphasis added) can only be interpreted as a due process

22  violation where the Board is either holding it against Petitioner for

23  not discussing the crime at the July 27, 2006 hearing, in violation of

24

25

26  [17] See Exhibit A, pp.18-19 where the Board states it reviewed Petitioner's central
    file and prior transcripts; pgs.19:6-7 and 21:18-21 where the Board states that it
27  accepts the Court's findings to be true and correct; and pp.25-27 where the Board
    allowed police reports to be introduced into the record, including Petitioner's
28  original police report where he fully cooperated with police and gave a detailed
    description of the crime.

Ground 2
Page 35

1   P.C. §5011(b),[18] or the Board purposefully ignored all the evidence of

2   motive before it in order to render a _pro forma_ finding of

3   unsuitability based on an inexplicable or trivial motive.    Further

4   aspects of the sham nature of Petitioner's July 27, 2006 hearing will

5   be discussed fully _post_.

6       As such, the Board could rely on _no_ evidence that Petitioner's

7   decision not to discuss the commitment offense at the sixth (6) parole

8   hearing indicated him to be a current or unreasonable risk to the

9   public.

10      None of the other factors tending to show unsuitability in 15 CCR

11  §2402(c) apply, as Petitioner has (2) no previous record of violence;[19]

12  (3) Petitioner has no history of tumultuous relations with others that

13  would indicate an unstable social history; (4) no record of sadistic

14  offenses; (5) no history of psychological problems; and (6) his

15  institutional behavior has been exemplary.

16  **E.   Factors of Suitability Undeniably Demonstrate Actual Rehabilitation**

17  **which Mandates Petitioner's Suitability and Release on Parole.**

18      Petitioner is overwhelmingly suitable for parole under every

19  factor that demonstrates suitability for parole under 15 CCR §2402(d)(1

20  through 9) as follows:

21      1) Petitioner has no criminal history at all, juvenile or adult,

22         other than the commitment offense.    (Exhibit A, pgs.49-50, 53-

23         59 and 150:11-12.)

24

---

25  [18] See Exhibit A, p.21:17-18 where the Board declared that Petitioner need not
    admit or discuss the crime to be found suitable.  Moreover, under P.C. §5011(b),
26  Petitioner is not required to accept the Board's reinterpretation of the crime or
    the District Attorney's version of the crime to be true (particularly one that is
27  inconsistent with the jury's verdict) in order to be found suitable for parole.
    [19] See _In re Scott II_ (2005) 34 Cal.Rptr.3d 905 where the fact that Petitioner
28  "...lacks any significant history of violent crime ([15 CCR] 2402(d)(6) tends to
    show him suitable for release on parole." (_Id_. At 926.)

2) Petitioner's central file contains well over 100 letters of support (such as those in Exhibits K and L), including offers of housing and employment, recounting strong and enduring friendships, trust, respect and support for the Petitioner. These letters are a testament to Petitioner's stable social history and are further reflected in numerous laudatory chronos from his central file written by institutional staff, teachers and supervisors. (See Exhibit B.) With the exception of Petitioner's failed marriage which created significant stress at the time of the offense, Petitioner has experienced a life devoid of tumultuous relationships both inside and out of prison.

3) Petitioner's psychological evaluations have noted that he expresses genuine empathy for the victims of his crime and shows a full understanding of his responsibility in the underlying offense. (Exhibit G.) Petitioner's file is replete with evidence that he takes full responsibility for this tragic event and a sincere and genuine remorse. Examples of Petitioner's awareness and remorse can easily be reviewed in Exhibit A, pgs.52:10-24, 68:8-26, 95-97, 101-103 and 139-142. (See also Exhibit H for apology letters and Exhibit I for a recent magazine article about Petitioner. Also see In re Wen Lee, supra, at pp.940-941 [acceptance of responsibility and remorse indicates suitability for parole.]; In re Elkins, supra, at pp.516-518; and Sanchez v. Kane, supra, at 1062 [remorse is a mutable crime factor, over time, that indicates parole suitability.].)

4) It is well documented that Petitioner's crime was committed

Ground 2
Page 37

during a time of significant stress in his life that had built

up over many months due to the dissolution of his marriage.

Unskilled in how to cope or deal with this high stress level

and his unrecognized alcoholism, Petitioner was unable to

handle the antagonism and provocation of the driver of the van

in a healthy manner.  On the evening of the offense, these

stress inducing life factors combined with the situational

stresses of the moment and contributed to the tragic events.

These facts must be contributed towards his rehabilitation and

parole suitability.  (See In re Minnis (1972) 7 Cal.3d 639; In

re Strum (1973) 11 Cal.3d 258; In re Rosenkrantz, supra, 682;

In re Scott (2004) 119 Cal.App.4th 871, 894;  In re Wen Lee,

supra, at 939; In re Weider, supra, at p.161; and Rosenkrantz

v. Marshall, supra, at 1082.  See also Sass v. California Board

of Prison Terms (9th Cir. 2006) 461 F.3d 1123, pgs.1132, 1134-

1141, dissenting opinion regarding alcoholism and

rehabilitation.)

5) Battered Women Syndrome does not apply.

6) Petitioner has no criminal history.  The fact that Petitioner

   lacks any history of violent crime (i.e. a total absence of a

   significant history of criminal violence) must weigh heavily in

   Petitioner's favor that he is suitable for release on parole.

   (In re Scott II (2005) 34 Cal.Rptr.3d 905, 926.)

7) Petitioner is now 47 years old.  He has spent nearly half his

   life incarcerated with no disciplinary problems.  (Exhibit A,

   pgs.55:1-11 and 150;12-15.)  This lack of violence coupled with

   his current high level of maturity makes recidivism highly

   unlikely.  (Rosenkrantz v. Marshall, supra, pp.1085-1086,

1    n.18.)

2    8) As recognized by the Board, Petitioner has numerous marketable

3    skills (4 vocational trades, paralegal diploma and 3 college

4    degrees), realistic parole plans and extensive community

5    support to facilitate a rapid and successful reintegration into

6    society.  (Exhibits D, E, J, K and L.)

7    9) Petitioner's institutional behavior has been "...exemplary..."

8    (Exhibit A, p.150:12-21), and Petitioner has remained

9    disciplinary free for his entire incarceration.  (Exhibit A,

10    pgs.55:1-11 and 150;12-15.)  Petitioner has earned AA, BGS and

11    MA Degrees (Exhibit E); completed four (4) vocational trades

12    and a paralegal diploma (Exhibit D); participated in numerous

13    programs of self-help, anger management, group and one-on-one

14    therapy (Exhibits B and C); and has been repeatedly commended

15    for laudatory behavior.  (Exhibit B.)  Petitioner's

16    institutional behavior indicates the type of "enhanced ability

17    to function within the law upon release" contemplated in this

18    section and confirmed by his counselor and psychological

19    reports.  (See Exhibits F and G.)  (See Martin v. Marshall,

20    supra, at 1047; and Rosenkrantz v. Marshall, supra, pp.1086-

21    1087, citing Greenholtz, supra, at p.15 ["the behavior of an

22    inmate during confinement is critical in the sense that it

23    reflects the degree to which the inmate is prepared to adjust

24    to parole release."].)

25    No evidence reliably or rationally demonstrates Petitioner to be

26    a current or unreasonable threat to public safety.  (15 CCR §2402(a);

27    In re Ernest Smith, supra, at 365-373; In re Scott, supra, 119

28    Cal.App.4the at 890-892; In re Dannenberg, supra, at 1096; In re Scott

Ground 2
Page 39

1  II, supra, 34 Cal.Rptr.3d at 920; In re Wen Lee, supra, at 936; In re

2  Elkins, supra, at 521; and In re Weider, supra, at pp.159-161.)  The

3  Board has consistently abused its authority and misinterpreted the law,

4  ignoring the relevant facts of Petitioner's case.  Despite the

5  overwhelming evidence of Petitioner's suitability, the Board

6  continuously fails to treat his exemplary programming and psychological

7  factors as supportive of a grant of parole.  (See Ramirez, supra at

8  571-572; Rosenkrantz, supra at 682; In re Scott II, supra, 34

9  Cal.Rptr.3d at 920; In re Wen Lee, supra, at 939-941; In re Elkins,

10 supra, at 518-523; and In re Weider, supra, at pp.158-162; Biggs,

11 supra, at pp. 916-917; Irons v. Carey (9th Cir. 2007) ___ F.3d ___, 2007

12 DJDAR 3072, p.3074; Rosenkrantz v. Marshall, supra, pp.1086-1087; and

13 Sanchez v. Kane, supra, at 1062.)  The Board ignores the positive

14 evidence and finds him unsuitable for parole based solely on the facts

15 of the commitment offense in clear violation of his due process rights.

16 **F.    The Board's Indifference to "Actual Evidence" that Petitioner Is**
        **Not a Current or Unreasonable Risk to Public Safety Demonstrates a**
17      **Pro Forma, Sham Parole Hearing.**

18      Synonymous to Petitioner's July 27, 2006 hearing, "[t]he Board's

19 readiness to make a finding so at odds with the record supports

20 [Petitioner's] claim that his parole hearing was a sham."  (In re

21 Ramirez, supra at 571.)  Nothing in the record or the reasons for the

22 Board's decision indicates that Petitioner is an unreasonable risk to

23 public safety.  This is a glaring violation of the standard set in

24 Biggs v. Terhune, supra, at pp. 916-917.  To the contrary, the evidence

25 before the Board was that Petitioner is housed at a low-security, Level

26 II, institution, and his counselor's report makes no indication that he

27 is a threat to the institution or the public.  (Exhibit F.)  In fact,

28 all correctional experts declare Petitioner to be ready for parole.

1  Correctional Officer Schramm, with 8 years experience as a Parole

2  Agent, wrote "...Inmate Hawks is an excellent candidate for parole who...

3  demonstrates a strong promise for a successful and productive return to

4  society." (See Exhibit A, pp.67-68 and Exhibit B.) Correctional

5  Officer Ramos, who has known Petitioner for more than 14 years stated

6  "...it is my steadfast and informed opinion that Inmate Hawks is a well-

7  adjusted, model prisoner who is ready for parole." (Exhibit B.) The

8  Board recognized that "...both of those chronos are very positive in

9  that they strongly recommend that you be granted parole." (Exhibit A,

10 pgs.61:1-4 and 151:21-22.)

11      As a result of long-term one-on-one and group therapy that is

12 replete in Petitioner's file, Doctor Howlin wrote in 2004 that "Inmate

13 Hawks has demonstrated excellent insight, and seems to hold the

14 significant gains that he has made since being incarcerated. He should

15 have a very low risk of re-offending." (See Exhibit A, pgs.66:19-25

16 and 129:1-23 and Exhibit C.) The Board verified that Petitioner had

17 continued one-on-one therapy with Doctor Howlin over the previous 23

18 months to voluntarily "...gain deeper personal insight." (Exhibit A,

19 p.56:1-12.) Doctor Howlin's 2006 chrono goes on to read "[p]artly

20 because of his therapy, and motivation for personal growth issues,

21 [Petitioner] should have greater insight into subtle personality

22 factors, which should help him in many areas of his life, both in

23 prison, and if paroled." (Exhibit C.) Furthermore, reviewing Doctor

24 Sexton's 2005 psychological evaluation, the Board acknowledged

25 Petitioner's violence potential to be "...no greater violence potential

26 than the average non-offender in the community, and [Petitioner is]

27 viewed as being below average for the typical parolee." (Exhibit A,

28 p.64:16-23 and Exhibit G.)

1    As recognized by the Board, all four of Petitioner's

2 psychological evaluations (none of which recommend further therapy)

3 have been supportive of parole, as is all documentation relating to

4 Petitioner's therapy participation.  (See generally Exhibit A, pp.66-

5 67, Exhibits C and G.)  Yet, the Board disregarded the psychological

6 evidence and simply came to the **capricious** conclusion that Petitioner

7 was still an unreasonable threat to society  (Exhibit A, p.147:11-17)

8 and thus unsuitable for parole in violation of clearly established law.

9 (See Ramirez, supra, at pp. 571-572; In re Scott (2004) 119 Cal.App.4th

10 871, at 898; In re Scott II (2005) 34 Cal.Rptr.3d 905 at pgs. 920, 924-

11 925, 927; Biggs v. Terhune, supra, at p. 916; Irons v. Carey (9th Cir.

12 2007) __ F.3d __, 2007 DJDAR 3072, p.3074; Martin v. Marshall, supra,

13 at pp.1044-1048; and Rosenkrantz v. Marshall, supra, pp.1086-1087.)

14    Moreover, the Board's neglect and indifference to the extent of

15 Petitioner's therapy and rehabilitation programming, past and present,

16 is reflected in the Board's request for another psychological

17 evaluation.  (Exhibit A, p.152:13-16.)  The Board could state no

18 meaningful rationale for a new evaluation.  (Exhibit A, pp.152-153.)

19 Petitioner's current psychological evaluation was only 18 months old at

20 the time of the hearing, and it will be a mere 30 months old at the

21 time of the 2007 hearing.[20]  Specifically, the evaluation explicitly

22 states that "...there is no psychiatric reason why [Petitioner] should

23 not be paroled" (Exhibit A, p.64:10-12 and Exhibit G, 2005 Psy. Eval.,

24 p.1) and "...further psychological reports would be redundant and of

25

---

26 [20] See Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049, at 1053 where the Board
relied on 3 and 5 year old psychological evaluations to find Sanchez suitable for
27 parole, as did the Central District Court in overturning the Governor's reversal
of parole.  Henceforth, an 18 month or 30 month old psychological evaluation can
28 not be lawfully deemed as "old" for the purpose of determining parole suitability
in Petitioner's case.

Ground 2
Page 42

1   little clinical value."   (Exhibit A, p.152:24-26 and Exhibit G, 2005

2   Psy. Eval., p.2.)   All four (4) of Petitioner's psychological

3   evaluations and other therapy documentation (Exhibits B, C and G)

4   demonstrate actual rehabilitation and must support a finding of parole

5   suitability. (See In re Rosenkrantz, supra, p. 682; In re Ernest

6   Smith, supra, pp.370-372; In re Scott (2004) 119 Cal.App.4the 871,

7   p.898; Biggs v. Terhune, supra, pp.916-917; Irons v. Carey (9th Cir.

8   2007) __ F.3d __, 2007 DJDAR 3072, p.3074 [specifically dealing with

9   therapy]; and Rosenkrantz v. Marshall, supra, pp.1084-1087.)

10      Finally, the Board's recommendations for Petitioner to remain

11   disciplinary free, continue self-help and earn positive chronos

12   (Exhibit A, p.152:4-12) are vague and meaningless after 20 exemplary

13   years of extensive rehabilitation programming. (See Exhibits B, C, D,

14   E, F and G.)[21] These arbitrary actions by the Board clearly point to

15   the sham nature of the hearing. (Ramirez, supra, at pgs.568-569 and

16   571-572.)

17   **G.   The Board's Indifference to All Lawful Objections Made by Attorney**

18        **Defilippis Points to the Pro Forma, Sham Nature of the Parole**
        **Hearing.**

19      In fact, any attempt by Attorney Defilippis through objections to

20   steer Petitioner's hearing towards a fair and impartial proceeding were

21   outright rejected by the Board. Objections were made to the Board

22   allowing the District Attorney to introduce police reports, photographs

23   and other materials into the hearing in an obvious effort to retry the

24

25

26   [21] What all these recommendations amount to is for Petitioner to continue doing
what he has already done for two decades. This is exactly the same recommendation

27   that the previous panel in 2005 made. (See Exhibit N.) There are already over
100 positive chronos in Petitioner's C-File (Exhibit B); Petitioner has availed

28   himself to every self-help and therapy program available to him (Exhibits B, C and
G); and Petitioner's record of volunteerism, vocation and education is extensive
and exhaustive. (Exhibits B, D and E.)

facts of the case. (Exhibit A, pgs.25-27 and 39.)    Attorney Defilippis

explained that much of the materials were inflammatory, inaccurate and

misleading: "These are materials that would not have been utilized at

trial and are materials that should not be considered by the Board

here." (Exhibit A, p.27:11-14.)    Attorney Defilippis also objected to

the use of the Probation Officer's Report being utilized by the Board,

which was "...prepared by reference to police reports.    And as I've

indicated previously, much of what was said in the police reports

turned out to be factually inaccurate at trial. (Exhibit A, p.29:11-22.

See also Paine v. Baker (4th Cir. 1979) 595 F.2d 197, 202 [if erroneous

information in a prisoner's file is used to deny parole, the prisoner's

liberty interest is at stake, and the Due Process Clause is called into

play.].)    Furthermore, any information introduced at trial had already

been weighed by the jury and was part of the jury's verdict of second

degree murder based on implied malice.    The Board must consider only

reliable and relevant information.    (15 CCR §2402(b).)

Yet, the Board overruled these objections (Exhibit A, pgs.28:3-13

and 29-30), reading the Probation Officer's Report into the record

(Exhibit A, pp.30-37); and as if on cue, the District Attorney retried

the facts of the case in her closing statement based on these materials

(Exhibit A, pgs.109-113 and 114-121.    Of course, Attorney Defilippis'

objections to this tactic were overruled. (Exhibit A, p.113-114.)    At

the onset of the hearing, the Board clearly stated that it was not

going to retry the case (Exhibit A, p.19:6-8) and accepted the trial

court's findings to be true and correct.    (Exhibit A, p.21:18-20.)    If

the Board is not going to follow its own rules and findings and allow

the District Attorney to retry the facts of the case in closing

statement based on unreliable information and in a manner inconsistent

1   with the trial court's findings, then it is a strong indication that

2   Petitioner's hearing was a <u>pro forma</u> sham, designed as a ruse to the

3   fulfillment of Petitioner's due process rights.

4        Even more troubling is the "dog and pony show" manner in which

5   the Board allowed the hearing to be manipulated by the District

6   Attorney in the presence of media.  First, the Board allowed seven (7)

7   observers (press and otherwise) into the hearing room directly and

8   through video conferencing, bringing to a total of fifteen (15) persons

9   in the District Attorney's entourage.  Attorney Defilippis objected to

10  more than two (2) observers being present without any prior notice that

11  the Board was allowing seven observers into the hearing, in violation

12  of 15 CCR §2029.1.  (Exhibit A, pgs.1-2 and 24-25.)  Even after

13  Attorney Defilipis clarified the fact that the Board's legal counsel

14  had recently verified that two observers was the limit (Exhibit A,

15  p.25:10-14), the Board overruled the objection. (Exhibit A, p.25:15-

16  18.)

17       Nor was there any prior notice or evidence of written approval to

18  Petitioner of television media appearing at the hearing, which Attorney

19  Defilippis also objected to. (Exhibit A, pp.1-6.)  While the Board's

20  regulations make no provision of notice of media coverage to

21  Petitioner, the Board's rules clearly state that requests for coverage

22  shall be made no later than three (3) working days before the hearing.

23  (15 CCR §2032(b)(2).)  Here, the Board Stated that "[t]he press did get

24  clearance from our CDCR and actually we were just notified of this

25  yesterday." (Exhibit A, p.5:5-7 and p.5:18-21.)  Petitioner's due

26  process and liberty interest rights imply the requirement that he

27  should have a right to know in advance of any extraordinary

28  circumstances that might impact or prejudice his hearing, such as an

1  inordinately high number of observers in attendance, press included.
2  (See 15 CCR §§2032(b)(6)(A) and §§2032(b)(7)(C).)   Certainly, the
3  sudden introduction of television media in attendance at the hearing
4  after 20 years and five prior hearings is a circumstance that
5  Petitioner should have the right to know of in advance (see Exhibit A,
6  p.4:15-23); yet, the Board overruled Attorney Defilippis' objections.
7  (Exhibit A, pp.11-12.)

8      While these aforementioned objections might appear to be minor
9  violations and omissions by the Board, there is a far more sinister
10  effect and motive underlying the Board's actions.   Simply put, the
11  Board gave the District Attorney free reign to set up an environment in
12  the hearing room where opposition to parole could and did exert
13  prejudicial influence over the Board.   As will now be demonstrated, the
14  Board has a long history in Petitioner's case of prejudicial ex parte
15  communication with persons opposing Petitioner's parole, to which the
16  introduction of television media at the hearing is the latest twist.

17  **H.   A Prejudicial Hearing Environment and History of Illegal Ex Parte
       Communication Indicate Bias against Petitioner and Further Reveal
18     the Pro Forma, Sham Nature of the Parole Hearing.**

19      The fact that Petitioner's hearings have become pro forma "sham"
20  events is concisely exposed by Lieutenant Michael D. Anderson's two
21  opposition letters written in 2003 and 2005 (Exhibit M) and the
22  reasoning for the introduction of the television media at the hearing
23  by Senior Deputy District Attorney Linda Dunn at the 2006 hearing.   In
24  pre-hearing objections, Attorney Defilippis discussed these letters in
25  depth with the Board panel (Exhibit A, pgs.1-4 and 8-11.), which denied
26  any personal contact with Lt. Michael D. Anderson in overruling the
27  objections.   (Exhibit A, pgs.6-8 and 11-12.)   While the July 27, 2006
28  Board panel claimed no ex parte communication had occurred for the

1   current hearing, there is little doubt that the opposition efforts

2   inspired by Lt. Anderson and nurtured by the Board (discussed more

3   fully <u>post</u>) continue with the District Attorney's introduction of

4   television media at the 2006 hearing.    As concisely stated by Attorney

5   Defilippis:

6           There appears to be clear[] attempts to influence
            the Board in this matter, to put pressure on the
7           Board, political pressure, as a result of the
            status of the victim in this case.    And I believe
8           that what's going on at this point is that there's
            an attempt to get the press involved, so that
9           further pressure is put on the Board not to parole
            Petitioner. (Exhibit A, pp.3-4.)
10

11      Petitioner's crime is not a high-profile case, such as one that

12  would have required change of trial venue, as determined by the

13  California Court of Appeal, Fourth Appellate District, on direct appeal

14  to Petitioner's conviction.    The television media has never been

15  invited to any of Petitioner's prior five hearings.

16      Knowing that the Board has no lawful reason to deny parole based

17  on the crime, pre- or post-convictions factors, the District Attorney

18  upped the political/emotional ante by inviting the television press

19  with the aim of exerting political influence over the Board to deny

20  parole in an election year.[22]    In no way could a Board panel be seen to

21  appear "soft on crime" in an election year by granting a parole date on

22  television, especially for a prisoner who killed an off-duty police

23  woman.

24      The Deputy District Attorney stated "[w]e oppose parole for this

25  man not only because he killed a woman who was an off-duty police

26  officer.    Let's make it very clear.    We oppose his parole because he

27

28  ――――――――――――――――――――――
    [22] This political tactic is closely aligned to an Executive Branch no parole
    policy, as discussed in depth at Ground 5, <u>ante</u>.

    Ground 2
    Page 47

1  killed a human being...."  (Exhibit A, pp.109-110.)   If this statement
2  was true, Petitioner's hearing would be treated the same as any other
3  prisoner convicted of murder in Riverside County.   It is less than
4  curious, then, that simultaneous to Petitioner's July 27, 2006 parole
5  hearing, James Erbes (C-60318) was attending his parole hearing for
6  second degree murder in the room adjacent to Petitioner.   Prisoner
7  Erbes' murder victim was a human being from Riverside County, but the
8  television media was not invited to his hearing and never has been.
9  The same can be said of numerous other prisoners convicted in Riverside
10  County of second degree murder, such as James K. Haverstock (D-60488)
11  and Pete Adame (C-01612).   The District Attorney consciously and
12  purposely chose to "publicize" Petitioner's hearing "not only" because
13  the murder victim was a "human being."   To be "very clear," the
14  television media was explicitly invited because the victim was an off-
15  duty police woman.   Moreover, the Board, despite Attorney Defilippis'
16  objections, agreed to televise the hearing in what can only be deduced
17  as collusion with the Riverside District Attorney and the Corona Police
18  Department and their on-going efforts in opposition of Petitioner's
19  parole.

20       Actual evidence that the Board has a history of ex parte
21  communication with the Corona Police Department, which works in close
22  conjunction with the Riverside District Attorney's Office, is
23  undeniable in Petitioner's case.   The evidence that Lt. Anderson has
24  had contact with the Board outside hearings is irrefutable by his own
25  admission.   In the process of rallying members of the Corona Police
26  Department to write opposition letters for Petitioner's 2003 hearing,
27  Anderson declared: "We have been successful in stopping his release in
28  recent years.   However, we have been told by the board that Hawks is

1    doing everything right and may be paroled in the near future.... [¶]

2    We have been told that these letters in past years have been the only

3    thing that has kept him in custody." (Exhibit M.)

4        In his 2005 opposition letter, Anderson writes: "Last year I

5    attended the proceedings and could not believe at the end of the

6    hearing the family and I were told Hawks would probably be paroled

7    soon." (Exhibit M.)  Lieutenant Anderson was not in attendance at the

8    previous hearing on November 19, 2003; thus, his communication,

9    indicated in his 2005 letter, with the Board had taken place "outside"

10   Board hearings and violates Petitioner's due process rights.

11       Anderson's written statements represent a clear indication that

12   the Board has had ex parte communication with Anderson, instructing him

13   on a method (opposition letters) to ensure an unsuitability finding.[23]

14   Further, while the Board simply dismissed the notion that the victim

15   being a prominent off-duty police woman would have any bearing on their

16   decision (Exhibit A, pp.6-8), the fact of the matter is that the Board

17   has been in ex parte communication with Anderson leaving the taint of

18   bias upon Petitioner's continued parole denials.[24]  Such ex parte

19

20   [23] Since 2002, opposition to parole has increased significantly.  There were 3
     opposition letters in 1997, 1 opposition letter in 2000, 2 opposition letters in
21   2002, 29 opposition letters in 2003 and 33 opposition letters in 2005.  The
     opposition letters generated by Anderson continue to state the same theme that
22   Petitioner has never shown any respect or remorse to the victim's family,
     completely ignoring the evidence of Petitioner's remorse, even after Petitioner
23   sent letters of apology (by request of victim's family) to the victim's family and
     to the Chief of Police of Corona  (See Exhibit H for actual letters and further
24   documentation that the apology letters were received by all parties prior to the
     2005 hearing).  At the 2006 parole hearing, only 5 opposition letters were
25   received and a 17 page signature petition, in which more than half of the
     signatures are illegible; however, television media was invited into the hearing
26   by the Riverside District Attorney.  At the courts request Petitioner will provide
     the court with all materials of support and opposition written since the offense
27   in 1986.  (See Attorney Defilippis' discussion, Exhibit A, pp.2-4.)
     [24] Further evidence that Petitioner is being biasly denied parole is apparent in
28   Ground 4, infra, where Petitioner is repeatedly denied parole when the Board is
     setting release dates for numerous other prisoners with specific and general like-
     crimes to that of Petitioner.

1   communication represents an appearance of bias against Petitioner by

2   the Board, in violation of due process.    (Gibson v. Berryhill (1973)

3   411 U.S. 564, 36 L.Ed.2d 488, 93 S.Ct. 1689 and Exxon Corp. v. Heinze

4   (9th Cir. 1994) 32 F.3d 1399.)    The Board's authority rests on an

5   unbiased panel as due process requires that a prisoner be afforded an

6   impartial panel at all hearings.    (Morrissey v. Brewer (1972) 408 U.S.

7   471, at 486-489, 33 L.Ed.2d 484, 92 S.Ct. 2539; Withrow v. Larkin

8   (1975) 421 U.S. 35 at 47, 43 L.Ed.2d 712, 95 S.Ct. 1456; Schweiker v.

9   McClure (1982) 456 U.S. 188, at 195, 72 L.Ed.2d 1, 102 S.Ct. 1665;

10  O'Bremski v. Maass (9th Cir. 1990) 915 F.2d 418, at 422; and Martin v.

11  Marshall, supra, at 1049.    See also 15 CCR §2250.)

12      The District Attorney's tactic of "loading" the hearing room with

13  "observers" (television and other media) to exert prejudicial pressure

14  on the hearing panel and the Board's acceptance of such tactics reeks

15  of the same taint of bias as the undeniable history of illegal ex parte

16  communication.    Fully knowing the history of ex parte communication

17  with opponents of Petitioner's parole and recognizing the District

18  Attorney's introduction of television media for what it was (a

19  political ploy to exert pressure on the Board to deny parole), Attorney

20  Defilippis rightfully objected to the Board in its entirety as being a

21  fair and impartial body capable of rendering an unbiased and fair

22  decision in Petitioner's case (Exhibit A, pp.9-11), further stating

23  that only a court or other independent body could now make a fair

24  decision regarding Petitioner's parole. (Exhibit A, p.11:9-15.)    Again,

25  the Board overruled these objections.    (Exhibit A, pp.11-12.)

26      An unbiased Board panel would not be influenced by or permit such

27  tactics from the Riverside District Attorney and Corona Police.    An

28  opinion (from law enforcement agencies, the district attorney, victim's

1  next of kin or the public at large) is not some evidence in and of

2  itself.  Although the Board is required to note public opposition to a

3  prisoner's release (<u>In re Dannenberg</u>, <u>supra</u>, at p.1070 and P.C. §§3042

4  and 3043), public opposition is not a factor upon which the Board may

5  rely upon to deny parole as defined in 15 CCR §2402 et seq..  A Board

6  decision cannot be supported by District Attorney, victim next of kin

7  or other persons or letters of opposition, as those individuals were

8  unsworn; did not provide "evidence" of unsuitability; and public

9  pressure or sentiment cannot be the independent basis for the denial of

10  parole.  (<u>In re Powell</u> (1988) 45 Cal.3d 894, 902; <u>In re Fain</u> (1983) 139

11  Cal.App.3d 295, 310; and <u>O'Bremski v. Maass</u> (9th Cir. 1990) 905 F.2d

12  281, 285-286.)

13     In re Weider, <u>supra</u>, at pp.161-162, specifically addressed the

14  issue of opposition.  The <u>Weider</u> court noted that the Board is bound to

15  consider opposition to parole under P.C. §§3042 and 3043; however, the

16  court concluded that "...the opposition cannot add weight where there

17  is no evidence of unsuitability to place in the balance." (<u>Id</u>, at

18  p.161.)  As argued herein and as found in <u>Weider</u>, because the record

19  provided <u>no</u> evidence of unsuitability at Petitioner's July 27, 2006

20  parole hearing, opposition by the District attorney and victim's next-

21  of-kin provide no weight to the finding of unsuitability.  (<u>Id</u>. at

22  pp.161-162.)  Permission from the district attorney or victim's next-

23  of-kin is not a prerequisite to the Board granting parole.

24  Additionally, reliance on law enforcement agencies opposition to parole

25  based on static crime factors after two decades of exemplary behavior

26  in prison would be arbitrary and biased in Petitioner's case.  (See

27  <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, pgs.1080 n.14 and 1082.)

28     Finally, the impact of the crime represents an unchanging

1 offense characteristic (Biggs, supra, at 916-917; Irons v. Carey (9th

2 Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3074-3075; and Weider, supra

3 at 15801), particularly considering the victim's next-of-kin will

4 "...never..." want Petitioner to be paroled.  (Exhibit A, p.145:1-6.)

5 No evidence was presented by opposition parties that reliably indicates

6 Petitioner currently being an unreasonable risk to public safety.  (In

7 re Wen Lee, supra, at pp.536-537; In re Elkins, supra, pp.520-521; In

8 re Weider, supra, at pp.161-162.)  Thus, Petitioner's hearing and

9 denial of parole for the sixth (6) time over a nine and one-half year

10 period could only be seen as pro forma in nature and a sham as

11 expressed in Ramirez, supra, at 571, in violation of Petitioner's due

12 process rights.

13 I.  The District Attorney's Withholding of Evidence in Support of
     Parole Blatantly Demonstrates an Illegal Tactic to Exert
14   Prejudicial Influence Over the Board, in Violation of Petitioner's
     Due Process Rights.
15

16      It must further be noted that the Deputy District Attorney

17 completely ignored and withheld from the Board twenty-seven (27)

18 letters of support of Petitioner's parole sent directly and

19 specifically to the District Attorney's office (Exhibit L).[25]  The

20 District Attorney summarily rejected these letters with the statement

21 that "...there's some angry supporters of [Petitioner], and they have

22 alleged this office - - our office, the District Attorney's office does

23 not care about their position.  We respect their positions, of course."

24 (Exhibit A, p.120:12-16.)  Not once did the District Attorney address

25 the merits or content of these letters as supportive of release on

26

27 [25] These twenty-seven (27) letters to the District Attorney (which differ in
    sentiment, composition and content) found in Exhibit L are not to be confused with
28  the thirty-one 31 letters of support sent to the Board of Parole Hearings in
    support of parole found in Exhibit K.

1    parole.    The District Attorney's failure and aversion to fairly
2    represent these twenty-seven letters of support represents a mockery of
3    and bias against Petitioner's base of social support for parole.

4         Unlike letters in opposition, however, these twenty-seven
5    letters demonstrate "actual evidence" of parole suitability from the
6    community (e.g. providing job and housing offers and sentiments from
7    people in the community who have long-standing relationships with
8    Petitioner).    Petitioner has a due process right to have these letters
9    before the Board under P.C. §3043.5 the Condit-Nolan Public
10   Participation in Parole Act of 1984.    The citizens who wrote these
11   twenty-seven letters of support have a right to have their public
12   representative at parole hearings fairly and fully present their
13   sentiments to the Board, and the District Attorney has a "duty" to
14   present these letters as well as their content and sentiments of
15   support of parole directly to the Board under P.C. §3041.7.    The
16   District Attorney neither represented the sentiments of these letters
17   nor presented them to the Board for evaluation.    Simply paying lip-
18   service to these letters (as the Deputy District Attorney clearly did
19   to suit her political needs) violates Petitioners' due process rights
20   by denying the Board relevant information in support of parole from the
21   public.    The Board can not perform its "public input" and "public
22   safety" obligations if it is purposely denied all relevant information
23   from the District Attorney.    (Dannanberg, supra, at pp.1084-1085.)

24        Indeed, the District Attorney's tactic of withholding the
25   sentiment and content of these letters of support for parole from the
26   Board is yet another tactic by which the District Attorney exerted
27   prejudicial influence over the Board to deny parole in violation of
28   Petitioner's due process rights.

J.  **Reliance on Unchanging Offense Factors to Deny Parole Violates Petitioner's Due Process and Liberty Interest Rights, Resulting in a Disproportionate Term of Incarceration.**

The only permissible reason for denying parole under P.C. §3041 is that a prisoner poses a "current" and "unreasonable risk of danger to society."  No such evidence exists here.  The evidence of Petitioner's actual rehabilitation is beyond dispute.  In making such a finding, the Board must determine that there is an unusually high risk of violence to the public if the prisoner is paroled.  No such finding was made here, and no such finding could be made, in light of the evidence before the Board.  Certainly, the facts do not show a present risk of any danger, let alone an unreasonable or current risk. Petitioner's significantly below average violence potential, coupled with his exceptional progress over 20 years of disciplinary free behavior in self-help, therapy, vocational and education programs is compelling evidence of his suitability.

Nothing in Petitioner's post-conviction record or the circumstances of the offense supports the Board's finding of unsuitability, and the Board's repeated reliance on the unchanging facts of the crime at the July 27, 2006 hearing violated Petitioner's due process rights.  (Irons v. Carey (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3074-3075; Biggs v. Terhune, supra, at pp.916-917; Martin v. Marshall, supra, at 1046-1048; Rosenkrantz v. Marshall, supra, pp.1086-1087; Sanchez v. Kane, supra, p.1062; Apprendi-Blakely-Cunningham, supra; In re Rosenkrantz, supra; In re Dannenberg, supra; and In re Scott II (2005) 34 Cal.Rptr.3d 905, at 920.)  The characteristics of Petitioner's offense clearly do not exceed the court defined thresholds for "particularly egregious" crimes with elements in aggravation beyond the minimum necessary to sustain a conviction for

1   second degree murder.  (e.g. In re Rosenkrantz, supra, at 683;[26] In re

2   Mark Smith (2003) 109 Cal.App.4th 489, 504, 506; In re Ernest Smith,

3   supra, at 351, 367; In re Scott (2004) 119 Cal.App.4th 871, at 890; In

4   re Dannenberg, supra; In re Shaputis, supra, at 331-333; In re Wen Lee,

5   supra, at pp.937-941; In re Elkins, supra, at pp.520-523; In re Weider,

6   supra, at pp.15800-15802; Martin v. Marshall, supra, at 1040 and 1046-

7   1048; Irons v. Carey (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072,

8   pp.3073-3075.)  Certainly, the characteristics of Petitioner's offense

9   do not meet or exceed the first degree murder circumstances of

10  McQuillion, supra, 306 F.3d 895; and, without doubt the characteristics

11  of Petitioner's offense fall well below the threshold defining

12  "particularly egregious" crimes when elements of "special

13  circumstances" are present found in In re Leslie Van Houten (2004) 116

14  Cal.App.4th 339, 352-353.  Even in cases where the circumstances of the

15

16  [26] Petitioner requests that this Court take judicial notice that Robert Rosenkrantz

17  was released on August 4, 2006 after denials on appeal by the Attorney General to the California Court of Appeal, Division Two (July 31, 2006, No.B192676), and

18  petition for review to the California Supreme Court (August 3, 2006, No. S145504) regarding Judge Wesley's Los Angeles County Superior Court order for release, In

19  re Rosenkrantz VI (June 26, 2006, No. BH003529).  (See Exhibits C, D and E to Request/Motion for Judicial Notice filed concurrent with this petition.)  Further,

20  the U.S. Central District Court simultaneously ordered Rosenkrantz released within 30 days on August 1, 2006.  (See Rosenkrantz v. Marshall, supra, pgs.1087, 1088

21  and n.20.)  Rosenkrantz served 21 years in prison on a second degree murder

22  conviction for a crime that has been characterized by the California Supreme Court as a "particularly egregious" murder beyond the "minimum necessary" to sustain a

23  conviction for second degree murder.  In fact, The California Supreme Court upheld Governor Davis' decision to revoke Rosenkrantz' parole date because his crime

24  exhibited characteristics of first degree murder (i.e. premeditation, deliberation and laying in wait), despite the jury's acquittal of first degree murder at trial.

25  (In re Rosenkrantz (2002) 29 Cal.App.4th 616, pgs.628-629, 670-672 and 678-679.) For the State Supreme Court to now effectuate Rosenkrantz' release by denying

26  Petition for Review sets an upper limit on how long a prisoner convicted of a "particularly egregious" second degree murder should serve in prison before his

27  sentence becomes grossly disproportionate.  (See Ground 4, herein, for further argument on this issue.)  This court must now take into consideration that

28  Petitioner has been incarcerated 20 calendar years with crime factors that fall within the 15 CCR §2403(c) B-III which are far less egregious than that committed by Robert Rosenkrantz.

offense rise beyond the minimum necessary to convict, those factors can not be utilized to deny parole beyond the minimum number of years required by the sentence without violating due process. (Irons v. Carey (9th Cir. 2007) ___ F.3d ___, 2007 DJDAR 3072, pp.3073-3075.) As will be further demonstrated herein at Ground 4, the characteristics of Petitioner's offense fall well below the minimum necessary threshold for a conviction of second degree murder when compared to other like-crimes of second degree murder, specifically and generally, where the Board has made affirmative suitability findings and/or has been demonstrated by state and federal case law.

Petitioner has now served 20 calendar years on a sentence of 17 years to life. As such, he has served 3 years beyond the bright line rule established in Irons v. Carey, supra, at p.3074. Petitioner has appeared before the Board six (6) times, being denied solely on unchanging offense characteristics at the last 4 hearings. (Exhibit N.) Petitioner therefore notes for this court's consideration that his gravity based uniform term for the victim and offense factors of his crime is a P.C. §3041 et seq. and 15 CCR §2403(c) Matrix Category III-B term of 18-19-20 years. Petitioner has a right to receive good time credit under statutory and U.S. Supreme Court law. (P.C. §2931(a); Superintendent v. Hill, supra, 472 U.S. at pp.453-455. citing Wolff v. MacDonald, supra.) When Petitioner's 15 CCR §2410 post-conviction credits of 79 months are added to the most aggravated 15 CCR 2403(c) III-B matrix term of 20 years, Petitioner has already served a disproportionate term of 26 years, 6 months and is still in custody.

K.   The Predictive Value of Petitioner's Offense Holds No Weight Of Unsuitability After Petitioner Has Served Twenty Exemplary Years In Prison Demonstrating Extensive Evidence of Actual Rehabilitation.

1    Petitioner further submits that since he is serving a 15 CCR

2   §2403(c) term in excess of that uniformly established for the III-B

3   victim and offense factors of his crime and is 3 years beyond the

4   bright line rule established in Irons v. Carey, supra, p.3074, his

5   criminal conduct can no longer be considered as more aggravated and/or

6   more serious than necessary to support his term of imprisonment, and

7   therefore, his crime can no longer be considered by the Board to be

8   particularly egregious or beyond the minimum necessary to convict.

9    There is no evidence that Petitioner's offense holds any

10  predictive value in determining his current threat to public safety.

11  After 20 years of disciplinary free rehabilitation, the ability to

12  predict Petitioner's future dangerousness based simply on unchanging

13  offense circumstances is nil.   (Irons v. Carey (9th Cir. 2007) __ F.3d

14  __, 2007 DJDAR 3072, pp.3073-3075 [defining the minimum number of years

15  on the sentence as the cut off point for the use of offense characters

16  representing some evidence to deny parole]; Biggs v. Terhune, supra, at

17  916-917; Rosenkrantz v. Marshall, supra, pp.1084-1085;[27] Sanchez v.

18  Kane, supra, at p.1062; In re Scott II (2005) 34 Cal.Rptr.3d 905, at

19  p.920; In re Shaputis, supra, at 335; In re Wen Lee, supra, at pp.939-

20  941; and In re Elkins, supra, at pp.518-523.)[28]   All post-conviction

21

22  [27] Among other cases, citing Johnson v. Finn (E.D. Cal.) 2006 WL 195159, p.8, n.3:
    "Obviously, the seriousness of the crime had predictive value for the
23  dangerousness of petitioner's release for the first, second, perhaps third
    suitability hearing.  But as the years go by, this factor loses its predictrive
24  value in light of the growing experience to the contrary  (assuming petitioner's
    record in prison is exemplary)."
25  [28] The Elkins court, at pp.521-523, extensively analyzed Elkins' first degree
    murder crime factors in accordance with the second degree murder cases of In re
26  Scott II, supra; In re Rosenkrantz, supra; Rosenkrantz v. Marshall, supra; Martin
    v. Marshall, supra; and Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936,
27  concluding that after 26 years of exemplary prison conduct and eleven parole
    hearings the crime can not be used to indicate a threat of future violence or
28  indicate a current threat to public safety.  Petitioner's prison record is every
    bit as exemplary and his crime factors are far less egregious than Elkins or any

1  evidence points clearly to Petitioner's readiness for a successful

2  parole.   "The rote repetition year after year in the face of

3  overwhelming evidence to the contrary that an inmate is considered too

4  dangerous for parole because he committed a callous crime does not

5  satisfy the mandates of California law."   (In re Liber R. Andrade

6  (2006) 46 Cal.Rptr.3d 317, concurring and dissenting opinion at p.330,

7  citing In re Minnis (1972) 7 Cal.3d 639, at 647.)   Petitioner's

8  continued incarceration clearly violates the requirement that parole

9  shall normally be granted.   (In re Ramirez, supra at 570; In re

10  Rosenkrantz (2002) 29 Cal.App.4th 616, 683; Penal Code §3041(a); and In

11  re Seabock 140 Cal.App.3d 29, 38 [P.C. 3041(a) is the primary

12  legislative command]; McQuillion v. Duncan, supra; Biggs v. Terhune,

13  supra; Greenholtz, supra, and Board of Pardon v. Allen, supra,

14  [defining the mandatory nature of the "shall normally" language in

15  establishing a prisoner's liberty interest.].)

16      While the commitment offense (now more than 20 years in the past)

17  may have indicated Petitioner's present dangerousness for a period of

18  time to fulfill the "some evidence" requirement for parole denial, this

19  is no longer true.   (Schware v. Board of Bar Examiners for the State of

20  New Mexico (1957) 353 U.S. 323 [holding reliance on remote events that

21  are outdated in light of changed circumstances is arbitrary and

22  capricious.].)   There is no evidence that Petitioner now is a current

23  or unreasonable threat to the community.   As defined by state and

24  federal case law, the Board can no longer continuously rely on the

25  crime as the basis for denying parole.   (Irons v. Carey (9th Cir. 2007)

26

27  of the aforementioned cases.  As such, individualized consideration,
    proportionality in sentencing and due process of law require that Petitioner serve
28  a shorter term in accordance with the statutes for various degrees of murder and
    the Board's 15 CCR §2403(c) matrix for second degree murder.

Ground 2
Page 58

1  ___ F.3d ___, 2007 DJDAR 3072, pp.3073-3075; <u>Biggs v. Terhune</u>, <u>supra</u>,

2  pp.916-917; <u>Martin v. Marshall</u>, <u>supra</u>, pp.1046-1048; <u>Rosenkrantz v.</u>

3  <u>Marshall</u>, <u>supra</u>, pp.1084-1085; <u>Sanchez v. Kane</u>, <u>supra</u>, p.1062; <u>In re</u>

4  <u>Scott II</u>, <u>supra</u>, p.920; <u>In re Shaputis</u>, <u>supra</u>, p.335; <u>In re Wen Lee</u>,

5  <u>supra</u>, pp.939-941; <u>In re Elkins</u>, <u>supra</u>, pp.518-523; and <u>In re Weider</u>,

6  <u>supra</u>, pp.158-162.)

7      The dramatic nature of the change undergone by Petitioner over

8  the past 20 years has distanced him from the crime, not just

9  temporally, but in the sense of him no longer being the person who

10  committed the offense and no longer subject to the issues that led to

11  the commission of the crime.  Petitioner has so effectively dealt with

12  every underlying issue that led him to commit the offense that the fact

13  of its commission no longer has any meaning in assessing his current

14  dangerousness.  As demonstrated <u>ante</u>, every mental health care and

15  correctional official in evidence have found Petitioner to be a low

16  risk to the public as a result of his extensive and genuine

17  rehabilitative accomplishments.

18      Thus, the <u>Irons v. Carey</u> bright line rule must now be applied in

19  Petitioner's case to stop the continued abuses of discretion by the

20  Board.  The Board can no longer ignore the amount of time a prisoner

21  has served when determining suitability.  (<u>Irons v. Carey</u>, <u>supra</u>,

22  pp.3074-3075.)  The Board knew that Petitioner had already served an

23  excessive twenty calendar year term of incarceration.  Yet, the Board

24  blindly relied on the stale facts of the commitment offense to deny

25  parole.  At no time during the hearing did the Board refer to the 15

26  CCR §2403(c) second degree murder matrix and determine that

27  Petitioner's crime factors require a category III-B term of 18-19-20

28  years or consider Petitioner's excessive 26 year, 6 month term served

1  with good time.  These glaring omissions by the Board to even consider

2  using its own guidelines to determine suitability based on time served

3  are violations of Petitioner's due process rights and strong

4  indications that the July 27, 2006 hearing was a pro forma sham.

5      The findings used by the Board at the July 27, 2006 parole

6  hearing are devoid of evidence that Petitioner is a current or

7  unreasonable risk to public safety, according to the standards

8  established in Ramirez, Rosenkrantz (2002), Dannenberg, Scott II, Wen

9  Lee, Elkins, Weider, Irons v. Carey, Biggs, Martin v. Marshall,

10  Rosenkrantz v. Marshall, Sanchez v. Kane and Apprendi-Blakely-

11  Cunningham, supra.  The Board acted arbitrarily and capriciously in

12  finding Petitioner unsuitable for parole.  Continuing to deny

13  Petitioner parole based on the commitment offense (an offense clearly

14  within the 15 CCR §2403(c) Matrix at Category III-B) deprives him of

15  his federally protected liberty interest and 14th Amendment

16  Constitutional right to due process of law.  (See McQuillion v. Duncan,

17  supra, at p.902; Biggs v. Terhune, supra, at pp.914-915; Irons v. Carey

18  (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3073-3075;

19  Apprendi-Blakely-Cunningham, supra; and also see Little v. Hadden

20  (1980) 504 F.Supp 558, at 562 ["It is simply irrational for the

21  seriousness of the offense to be first used to determine the

22  appropriate guideline period [(i.e. Matrix)] and then to be used again

23  as the stated reason for confining a prisoner beyond that guideline,"

24  citing Branch v. Nelson (1979) 472 F. Supp. 569, 574 and Lupo v. Norton

25  (1974) 371 F.Supp. 156, 163.].)

26  / / /

27  / / /

28  / / /

Ground 2
Page 60

7. ~~Ground Two~~ Ground __3__ (if applicable):

THE BOARD'S DENIAL IS A VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS AS
A BREACH OF CONTRACTUAL OBLIGATIONS AND REQUIRES REMEDY AS A CONTRACT
IMPLIED-IN-LAW.

a. Supporting facts:
See Ground 3 Attached.

b. Supporting cases, rules, or other authority:
See Ground 3 Attached.