# EXHIBIT 8
# Part 2 of 2

GROUND 3

> THE BOARD'S DENIAL IS A VIOLATION OF PETITIONER'S
> DUE PROCESS RIGHTS AS A BREACH OF CONTRACTUAL
> OBLIGATIONS AND REQUIRES REMEDY AS A CONTRACT
> IMPLIED-IN-LAW.

a.    Supporting facts:

1. Petitioner has been denied parole at six (6) consecutive parole hearings.  At each hearing, the Board set specific terms and recommendations for Petitioner to comply with in order to become suitable for parole.  (See Exhibit N, 2005, 2003, 2002, 2000 and 1997 Board denials and recommendations.)  At every hearing, Petitioner has met and exceeded those terms and recommendations.

2. Evidence that Petitioner fulfilled and exceeded his obligation to the Board's previous recommendations and terms at the July 27, 2006 hearing was recognized by the Board panel (Exhibit A, pgs.54-63, 69-97, 150:12-21 and 151-152; regarding Psychological Evaluation pgs.63-69 and 150:21-23).  Specifically, Petitioner remained disciplinary free, participated in self-help and therapy, upgraded vocationally and sought out educational opportunities as defined by previous Board panels. (See Exhibit A, pp.150-152, and Exhibits B through G.)

3. Despite the fact that Petitioner had fulfilled all expectations and recommendations, psychological and otherwise, that previous and the current Board panel have made, the Board arbitrarily ordered a new psychological evaluation (Exhibit A, p.152:13-16) but could not make or detail any meaningful reasons for the new report. (Exhibit A, pp.152-153.)  As for program recomendations, the Board requested Petitioner to remain disciplinary free, continue self-help and earn positive chronos. (Exhibit A, p.152:4-12.)

4.  In Brown v. Poole (9th Cir. 2003) 337 F.3d 1155, the court

1    extended due process to prisoners recognizing that their liberty
2    interest is further supported by certain contractual obligations.    Even
3    though Petitioner was convicted by jury trial, the contractual
4    obligations made by the Board at previous hearings still apply.
5        5.    The Board's acknowledgement of Petitioner fulfilling all
6    recommendations (yet resorting to the commitment offense to deny parole
7    after six (6) hearings) has created an ambiguous situation where
8    Petitioner is unsure as to what he can do to become suitable for
9    parole.    The Board has, thus, become unjustly enriched by
10   inappropriately and repeatedly utilizing the trump card of the
11   commitment offense to deny parole.    The remedy provided by an implied-
12   in-law contract must now be applied to Petitioner's parole
13   consideration.
14       6.    Based on his reliance upon the terms and recommendations set by
15   previous Board panels (Exhibit N), Petitioner has taken on numerous
16   tasks requested by the Board to fulfill his part of the agreement with
17   the government to honor his liberty interest.    When Petitioner was
18   denied parole on July 27, 2006, he did not receive his due
19   consideration to the contractual terms set by the previous Board
20   panels, thus violating his liberty interest and presumption of
21   suitability rights required by due process of law embedded in the Fifth
22   and Fourteenth Amendments.
23
24   b.    Supporting cases, rules or other authority:
25       Although Petitioner was convicted by jury trial, the Ninth
26   Circuit provided a broader understanding of the due process provided to
27   prisoners recognizing that their liberty interest is further supported
28   by certain contractual obligations.    (See Brown v. Poole (2003) 337

1  F.3d 1155.)   In <u>Brown v. Poole</u>, the Ninth Circuit considered the
2  implications of a plea agreement upon a prisoner's liberty interest.
3  The court has long recognized a kind of "conditional liberty" interest
4  in parole.  (<u>Morrisey v. Brewer</u> (1972) 408 U.S. 471.)   In <u>Brown v.</u>
5  <u>Poole</u>, <u>supra</u>, the court employed contract rules to guide its discussion
6  of the prisoner's conditional right to be released after a spotless
7  prison record for the full term arranged in her plea agreement, noting
8  specifically that "Brown's due process rights conferred by the federal
9  constitution allowed her to enforce the terms of the plea agreement."
10 (<u>Id</u>. at 1159, citing <u>Santobello v. New York</u> (1971) 404 U.S. 257, 262;
11 see also <u>United States v. Hallman</u> (9th Cir. 1973) 472 F. 2d 168, 169.)
12 Here, Petitioner has similar contractual rights which, although not
13 promised upon a plea bargain, "are of equal dignity" arising due to
14 Petitioner fulfilling the terms and requirements imposed by each of the
15 successive Board panels in 1997, 2000, 2002, 2003 and 2005 to ensure
16 that he would be found suitable for parole.  (Exhibit N.)

17       "Contractual agreements do not become less enforceable for their
18 being conditional" (<u>Brown v. Poole</u>, <u>supra</u>, at p. 1160-1161); thus, the
19 Ninth Circuit held that Brown upheld her part of the bargain in
20 reliance upon the agreement.  The government, therefore, was obligated
21 to follow through with its part of the agreement.  The court found that
22 Brown had served her full sentence and was no longer properly under the
23 Board's authority.  In conclusion, the court held that the Board's
24 authority "cannot trump the constitutional considerations that the
25 Board's discretion may apply only to those who are legitimately
26 imprisoned."  (<u>Id</u>., p. 1162.)

27       In the present case, the Board's recommendations over
28 Petitioner's five previous hearings requires the remedy imposed by an

implied-in-law (or quasi) contract.

> **Implied-in-law Contract.** An obligation imposed by law because of the conduct of the parties, or some special relationship between them, or because one of them would otherwise be unjustly enriched.[1] An implied-in-law contract is not actually a contract, but instead a remedy that allows the plaintiff to recover a benefit conferred on the defendant. (<u>Black's Law Dictionary</u>, 2nd Pocket Edition, West Group, St. Paul, MN, 2001.  p.141.)[2]

The conduct of the Board making recommendations and the Petitioner fulfilling them meets the requirement of an implied-in-law contract. And, a special relationship clearly exists between the parties, as it is the Board's duty to fairly determine Petitioner's parole suitability and guide his prison conduct by making realistic program recommendations that will lead to a finding of suitability.[3]  Finally, an implied-in-law contract must now be applied to Petitioner's parole determination, as the Board has now become unjustly enriched by being able to simply ignore Petitioner's fulfillment of all program recommendations and resort to the commitment offense to deny parole.[4] This has led to an ambiguous situation where Petitioner has no idea what he can do to become suitable for parole.

---

[1] Unjust enrichment is defined by <u>Black's Law Dictionary</u>, <u>supra</u>, in pertinent part, as "[t]he retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected." (<u>Id</u>., p.737.)

[2] A quasi contract is defined exactly the same as an implied-in-law contract by <u>Black's Law Dictionary</u>, <u>supra</u>, at p.141.)

[3] In California, the only reason that the Board can use to deny parole is that a prisoner is an "unreasonable risk of threat to the public safety." Therefore, any and all recommendations or requirements made by the Board must be based on the pretext that those recommendations or requirements will, if achieved, make the prisoner suitable due to a reduction of risk.

[4] Otherwise, the Board's admission that Petitioner has fulfilled all recommendations but is still unsuitable based on the commitment offense means, in effect, that there is "nothing" Petitioner can ever do to become suitable for parole, thus illegally converting his sentence to life without the possibility of parole.

1    In California, "[a]ll contracts, whether public of private, are

2  to be interpreted by the same rules."   (California Civil Code §1635.

3  See also Buckley v. Terhune (9th Cir. 2006) 441 F.3d 688, at 694-700

4  [applying Cal. Civ. Code §§1635, 1644, 1649 and 1654 to a plea

5  agreement/contract resulting in specific performance by the Board.].)

6  The plain language of the Board's program recommendations at each of

7  Petitioner's hearings formed in Petitioner's mind an "objective

8  reasonable expectation" that if he fulfilled the Board's

9  recommendations he would be found suitable and released on parole.

10 (e.g., see Cal. Civ. Code §§1638, 1644 and 1649.   Also see Bank of the

11 West v. Superior Court (1992) 2 Cal.4th 1254, 1265; Badie v. Bank of

12 America (1998) 67 Cal.App.4th 779, 802 n.9.)   Petitioner's clear and

13 unambiguous expectation was that sincere recommendations had been

14 formed that would be honored by a subsequent Board panel.   Petitioner's

15 expectation was that fulfillment of the Board's recommendations would

16 overcome the Board's reliance on the unchanging nature of the

17 commitment offense and result in a parole date.[5]   In good faith,

18 Petitioner can think of no other reason why the Board would make

19 program recommendations.

20   As applied to the present case, it is clear that Petitioner was

21 entitled to a presumption of parole based upon his recognized liberty

22 interest.   Further, Petitioner had an expectation/interest in the grant

23 of parole that was created in each previous parole hearing with the

24 recommendations of the Board panels and his subsequent reliance on

25

26 [5] Petitioner's offense characteristics are static and can never change.   The only
   thing that can change is the Petitioner through participation in positive prison
27 conduct and rehabilitation programming.   Hence, the "only reasonably objective
   way" Petitioner can overcome the static nature of the offense is to comply with
28 (or exceed, as in the present case) the Board's program recommendations.   Rarely,
   if ever, will a Board panel find a prisoner suitable for parole that has not
   achieved all previous Board panel(s) program recommendations.

Ground 3

Page 5

1  those recommendations.  (Exhibit N.)  The Board at the 2006 hearing
2  fully recognized and acknowledged that Petitioner had fulfilled all
3  previous Board panels recommendations with his extensive positive
4  programming accomplishments in education (3 college degrees), four (4)
5  vocations, a paralegal diploma, extensive volunteerism, completion of
6  some nineteen (19) self-help therapy programs and by remaining
7  disciplinary free.  (Exhibit A, pgs.55-63, 65:13-19, 66-69, 90-95, 102-
8  109, 127-135, 137-138, 150-152 and Exhibits B through G.)  However,
9  after "commending" Petitioner (Exhibit A, pgs.55:1-11 and 150:11-21)
10  and recognizing that Petitioner has "truly kept busy" (Exhibit A,
11  p.152:4), the Board failed to fulfill its obligation (defined by prior
12  Board panels) to set a parole date and ambiguously recommended:
13  "...continue [to] remain disciplinary free... continue as available in
14  your self-help programs... continue to earn positive chronos and this
15  panel will also request a new psychological evaluation...." (Exhibit A,
16  p.152:4-14.)  Clearly, the Board did not give sufficient weight to the
17  fact that Petitioner has already remained disciplinary free for twenty
18  years (Exhibit A, pgs.55:1-11 and 152:1-6); has availed himself to some
19  19 self-help and therapy programs (Exhibit A, p.67:11-15, and Exhibits
20  B through G); has over 100 positive and laudatory chronos in his file
21  (Exhibits B and C); and Petitioner's current psychological evaluation
22  states that any further psychological evaluations would be meaningless
23  and redundant based on all of Petitioner's previous psychological
24  evaluations.   (Exhibit A, pgs.60:10-12, 152:22-26 and Exhibit G, p.1.)
25  The Board stated that the crime was the reason for denying parole
26  (Exhibit A, pp.149-150) despite the fact that Petitioner had done
27  everything possible to become suitable as previously recommended by the
28  Board.   (Exhibit B through G and Exhibit N.)

1    By resorting to the commitment offense to deny parole, though

2  summarizing that he had fulfilled all previous Board recommendations

3  (Exhibit A, pp.149-152), Petitioner is left in an uncertain, ambiguous

4  and capricious situation as to how to attain parole suitability.   The

5  Board has become unjustly enriched by simply relying on the trump card

6  of the commitment offense for the past six (6) hearings over a period

7  of nine (9) years--a tactic that is entirely inappropriate in the

8  present case of second degree murder based on implied malice.   (See

9  Ground 2, ante.)   An implied-in-law contract must now be imposed upon

10  the Board's recommendations to enforce a remedy that will remove all

11  ambiguity.[6]

12    Much like the plea bargain in Brown v. Poole, the recommendations

13  presented by the Board in Petitioner's parole hearings were offers by

14  the Executive Branch of government that if he met the contingencies

15  they set, he would be found suitable for parole.   In Brown v. Poole,

16  the court recognized that "Brown agreed that she would garner the

17  benefit of early release only if she provided the considerations of a

18  spotless record..."  (Id., at pp. 1160-1161.)   Likewise, following each

19  hearing, Petitioner properly concluded that by following the Board's

20  recommendations he would be rewarded with parole.

21    Petitioner's consideration, time and time again, has been

22  exhibited by his reliance upon the terms and recommendations of the

23  Board and his actions in fulfilling them.   The Board has a duty to make

24  all recommendations "sufficiently clear" to inform Petitioner what

25  conduct will result in a grant of parole.   (U.S. v. Guagliardo (9th

26  Cir. 2002) 278 F.3d 868, 872, citing Grayned v. City of Rockford (1972)

27

28  [6] "In cases of uncertainty not removed by the proceedings rules, the language of a
contract should be interpreted most strongly against the party who caused the
uncertainty."  (Cal. Civil Code §1654.)

1  408 U.S. 104, 108-109.   See also Greenholtz, supra, at p.15.)   If the

2  Board's recommendations are not acknowledged as sincere offers,

3  providing legitimate goals for achieving a status of parole

4  suitability, then they are mere "hoops," designed to support an

5  elaborate ruse and a further affront to the due process rights of all

6  prisoners who rely upon them.   Petitioner consistently and sincerely

7  relied upon the Board's recommendations, successfully fulfilling each

8  recommendation of the five (5) Board panel prior to the July 27, 2006

9  hearing.   Petitioner's fulfillment is affirmed through his

10 accomplishments and gains, which the Board duly noted throughout his

11 twenty years of incarceration.   (Exhibit A, pgs.54-69, 89-96, 102-109,

12 125-138, 150-152 and attached at Exhibits B, C, D, E, F and G.)

13 Moreover, Petitioner's outstanding performance and behavior in prison

14 is a significant factor indicating parole suitability.   (Rosenkrantz v.

15 Marshall, supra, at 1086; and Greenholtz, supra, 442 U.S. at 15.)

16    Indeed, the Board is capitulating to the fact that the Petitioner

17 has met and/or exceeded all prior obligations and recommendations in

18 its decision and is denying parole solely on the crime.   (Exhibit A,

19 pp.149-150.)   If the crime was to forever stay an impediment to parole,

20 compliance with the Board's recommendations year after year are and

21 have been an idle act serving no lawful or meaningful purpose and are

22 contrary to the Prisoner's, the Board's and the prison system's goal(s)

23 of rehabilitation in violation of due process of law.   (See In re

24 Ramirez, supra, at 571; Biggs v. Terhune, supra, at 916-917; and Irons

25 v. Carey (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3073-3075.)

26    Based on the law articulated above, Petitioner is no longer

27 lawfully under the Board's authority as he has served his full sentence

28 as part of his compliance with the government (via consecutive parole

1  hearing panels) as supported by the statutory laws of the state and the

2  constitutional requirements of both state and federal governments.

3  /  /  /

4  /  /  /

5  /  /  /

7. ~~Grounds~~ Ground __4__ *(if applicable):*

A COMPARISON TO THE BOARD'S PAROLE AFFIRMATIVE SUITABILITY DECISIONS AND CASE LAW IN LIKE-CRIMES TO THAT OF PETITIONER'S SECOND DEGREE MURDER REVEALS A COMPLETELY ARBITRARY AND CAPRICIOUS FAILURE TO FIND PETITIONER SUITABLE FOR PAROLE IN VIOLATION OF DUE PROCESS OF LAW.

a. Supporting facts:
See Ground 4 Attached.

b. Supporting cases, rules, or other authority:
See Ground 4 Attached.

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS          Page 6 of 10.

GROUND 4

## A COMPARISON TO THE BOARD'S PAROLE AFFIRMATIVE SUITABILITY DECISIONS AND CASE LAW IN LIKE-CRIMES TO THAT OF PETITIONER'S SECOND DEGREE MURDER REVEALS A COMPLETELY ARBITRARY AND CAPRICIOUS FAILURE TO FIND PETITIONER SUITABLE FOR PAROLE IN VIOLATION OF DUE PROCESS OF LAW.

a.    Supporting facts:

1.  In denying parole to Petitioner at the July 27, 2006 hearing, the Board violated his protected liberty interest and due process rights by failing to compare his criminal offense characteristics to those of other like-crimes of second degree murder where the Board has made affirmative suitability findings.

2.  In the Board's decision, it failed it's duty to consult the matrix for second degree murder, 15 CCR §2403(c), and determine exactly how much time Petitioner should do in prison for his criminal offense characteristics.  Petitioner's prescribed term for his offense characteristics is at 15 CCR §2403(c), category III-B, 18-19-20 years.

3.  "Specifically," the Board failed to find Petitioner suitable for parole for a second degree murder which involved firing a weapon from a vehicle into another vehicle (or at a person on the street) when it has previously done so in the second degree murder cases of, though not limited to, Mike Watkins (C-59172), Ramon Ochoa (YA-64189), Javier Flores (C-44235), Lewis Battee (D-16811), Patrick Peralo (D-06447), Gary Sarmiento (D-20964), Jimmie Thompson (D-21162), Jose Jauregui (D-89794), Kenneth Pearson (D-46781), Brian Warth (H-93389), Michael Clark (D-96016), Carlton Hillmon (D-22145), Fernando Sanchez (E-15328), Curtis Thomas (C-96014), Robert McGruder (CDCR No. Unknown), Robert

1   Urieta (D-61987), Fernando Ortiz (CDCR Unknown), Emilia Ceniceros (CDCR

2   Unknown); the first degree murder cases of Fermin Zamora (B-83998),

3   Artemio Esquivel (C-08411), Hector Beltran (CDCR No. Unknown); and the

4   attempted murder cases of Frank Gallego (E-52064), Aaron Casillas (H-

5   56837), William Morataya (E-11882), Fernando Sanchez (CDCR No.

6   Unknown), Miguel Gonzalez (CDCR Unknown), Jose Paramo (CDCR Unknown),

7   Juan Ramirez (CDCR Unknown).[1]

8       4.  Each of these twenty-eight (28) "specific like-crimes"

9   demonstrate crime factors more egregious than Petitioner's, and each of

10  these prisoners has a less favorable prison record than Petitioner.

11  (See Exhibit O, Specific Like-Crimes Report.)

12      5.  "Generally," compared to all second degree murders where the

13  Board has made an affirmative finding of suitability as indicated by

14  the Executive Report on Parole Review Decisions 2005, Petitioner's case

15  factors and institutional record demonstrate that the Board has acted

16  arbitrarily and capriciously in failing to find Petitioner suitable for

17  parole and set his release date.  (See Exhibit P for the Governor's

18  Reports Life Term Parole Consideration Summary 2005 for Second Degree

19  Murder; Exhibit Q for the Governor's Reports Life Term Parole

20  Consideration Summary 2004 for Second Degree Murder; Exhibit R for the

21  Governor's Reports Life Term Parole Consideration Summary 2003 for

22  Second Degree Murder; and Exhibit S for the Governor's Reports Life

23  Term Parole Consideration Summary 2002 for Second Degree Murders.)

24      6.  Due process of law mandates that Petitioner's term of

25  imprisonment be set proportionately as compared to other offenders with

26  like-crimes as prescribed by P.C. §3041(a).  (See also In re

27

28
_____

[1] Lewis Battee was released on parole on 7/28/04; Jose Jauregui was paroled on
8/10/04; and Fermin Zamora was released 8/10/04.

Ground 4
Page 2

1  <u>Rosenkrantz</u>, <u>supra</u>, at 683, and. <u>In re Ramirez</u> 94 Cal.App.4th 549.)

2  Respectfully, the State Supreme Court erred when it ruled that there

3  was no reasonable expectation that parole will be granted when the time

4  served is similar to the punishment for similar crimes.  (<u>In re</u>

5  <u>Dannenberg</u>, <u>supra</u>, at 1083-1084.)  The terminology for making a P.C.

6  §3041(b) offense-based suitability determination defined by

7  <u>Rosenkrantz</u>, <u>supra,</u> and <u>Dannenberg</u>, <u>supra</u>, necessitates a like-crimes

8  analysis of second degree murder cases to determine if Petitioner's

9  offense is "particularly egregious," "more aggravated" or "more than

10  the minimum necessary to convict" than other second degree murders.  As

11  will be demonstrated, numerous California courts (state and federal)

12  have resorted to the method of like-crime analysis to determine parole

13  suitability.

14    7.  The Board must follow the legislative mandate of P.C. §3041(a)

15  and conduct a like-crimes analysis at each and every parole hearing in

16  order to ensure proportionality in sentencing and protect Petitioner

17  from serving a disproportionate (and eventually a grossly

18  disproportionate) term which would violate his federally protected due

19  process liberty interest.

20    8.  In Petitioner's case, it is particularly necessary that the

21  Board provide a like-crimes analysis in light of the fact that the

22  Board has failed to determine how long a sentence Petitioner should

23  serve after six (6) parole hearings.[2]    Further, an appearance of bias

24

25  [2] At Petitioner's 2005 parole hearing, the Board violated Petitioner's liberty
    interest and due process rights embedded in P.C. §3041 when it stated that **it did**
26  **not know** how much time Petitioner should spend in prison for his criminal
    culpability.  (March 2, 2005 Hearing Transcript, p.108:4-7 and Exhibit N.)
27  Specifically the 2005 panel asked Petitioner during the hearing: "How much time do
    you think is enough...."  (<u>Id</u>., p.71:5-11.)  Petitioner directed the Board to
28  consult the 15 CCR §2403(c) matrix to make that determination.  (<u>Id</u>., p.71:8-11.)
    In its 2005 decision, the panel declared: "And I suppose one of the biggest,

Ground 4

Page 3

1  exists where twenty-eight (28) other prisoners with specific like-

2  crimes have received Board grants but Petitioner has not.

3

4  **b.    Supporting cases, rules or other authority:**

5      The Board violated Petitioner's liberty interest and due process

6  rights embedded in P.C. §3041 when it failed to use the 15 CCR §2403(c)

7  matrix to make a determination of the appropriate amount of time

8  Petitioner should serve in prison for his offense characteristics.  The

9  Board's neglect to utilize it's own rules to even consider how much

10  time Petitioner should serve in prison is a due process violation when

11  the Board has set terms for like-crimes of second degree murder

12  (specifically and generally) and/or crimes more egregious than

13  Petitioner's on numerous occasions.  (Exhibits N, O, P and Q.)

14  Petitioner's offense characteristics fall squarely in the matrix at

15  category III-B, 15 CCR §2403(c), requiring a base term of 18-19-20

16  years.

17      Petitioner, therefore, presents to this honorable court evidence

18  from specific and general like-crimes analyses of second degree murder,

19  derived from Executive Reports on Parole Review Decisions (1991-2005)

20  and case law (state and federal), to demonstrate that the Board has

21  acted arbitrarily and capriciously in violation of due process of law

22  by failing to find Petitioner suitable for parole after a perfect 20

23  year prison conduct record and six (6) parole consideration hearings.

24  **A.    Evidence Derived from a Specific Like-Crimes Analysis of Vehicle
Shooting Related Murders Demonstrates that Petitioner is**

25

26  hardest questions to answer is the question I asked you.  How much time is enough.
I don't know either."  (Id., p.108:4-7 and Exhibit N.)  The lawful answer to the

27  question of how much time Petitioner should do is prescribed at 15 CCR §2403(c),
category III-B, 18-19-20 years, which the 2006 panel also failed to address or

28  consider.  (See decision pages for Petitioner's 1997, 2000, 2002, 2003 and 2005
hearings at Exhibit N.)

**Consistently and Unlawfully Denied Parole.**

Petitioner is being denied due process of law by being denied parole when twenty-eight (28) other prisoners with "specific like-crimes" to that of Petitioner have been given parole dates. Specifically similar cases where parole dates were granted for inmates who committed like-crimes, though not limited to, for second degree murder are Mike Watkins (C-59172), Ramon Ochoa (YA-64189), Javier Flores (C-44235), Lewis Battee (D-16811), Patrick Peralo (D-06447), Gary Sarmiento (D-20964), Jimmie Thompson (D-21162), Jose Jauregui (D-89794), Kenneth Pearson (D-46781), Brian Warth (H-93389), Michael Clark (D-96016), Carlton Hillmon (D-22145), Fernando Sanchez (E-15328) Curtis Thomas (C-96014), Robert McGruder (CDCR No. Unknown), Robert Urieta (D-61987), Fernando Ortiz (CDCR Unknown), Emilia Ceniceros (CDCR Unknown); the first degree murder cases of Fermin Zamora (B-83998), Artemio Esquivel (C-08411), Hector Beltran (CDCR No. Unknown); and the attempted murder cases of Frank Gallego (E-52064), Aaron Casillas (H-56837), William Morataya (E-11882), Fernando Sanchez (CDCR No. Unknown), Miguel Gonzalez (CDCR Unknown), Jose Paramo (CDCR Unknown), Juan Ramirez (CDCR Unknown). Information on these parole board grants was derived from the Executive Report on Parole Review Decisions 1991-2005. (See Exhibit O for specific like-crimes summary and the most recent Executive Reports for each of these twenty-eight (28) prisoners, with the exception of Mike Watkins, whose date was rescinded by Board action in or around 1995.)

Petitioner's institutional programming meets or exceeds that of each of these twenty-eight prisoners, yet he has not received a parole date. The criminal offense characteristics of each of these twenty-eight cases also demonstrates a more deliberate intent to commit murder than Petitioner's case factors, though again Petitioner has not been

1  found suitable.  Such a determination violates Petitioner's due process

2  liberty interest rights under P.C. §3041(a) to receive a proportional

3  term for his specific offense factor(s) of vehicle shooting related

4  murder.

5  **B.   Evidence Derived from General Like-Crimes Analyses of Second Degree Murder Reveals that Petitioner is Routinely Passed Over for Parole in Violation of His Due Process Rights.**

7       Again utilizing Board parole grant information provided through

8  the Executive Report on Parole Review Decisions 1991-2005, a comparison

9  of the Board's decisions, "generally," in the like-crimes of second

10 degree murder reveals that Petitioner is regularly and routinely passed

11 over for parole, whereas the Board has granted suitability in many

12 hundreds of second degree murder cases where the prisoners have

13 extensive criminal histories, serious disciplinary records, minimal

14 institutional programming and more egregious offense characteristics

15 than Petitioner.  The Governor's Reports Life Term Parole Consideration

16 Summary, 2005 for Second Degree Murder is attached herein at Exhibit P

17 and provides a representative sample of 120 recent Board grants for

18 second degree murder (the most current sample available at the time of

19 Petitioner's 2006 hearing) (hereinafter "sample group").  While the

20 2005 summary sample group provided in Exhibit P demonstrates a current

21 and economic example for the purpose of this legal argument,

22 Petitioner, at the court's request, will provide full and complete

23 copies of all Executive Report on Parole Review Decisions (1991-2005).

24      Of the 120 prisoners[3] found suitable in the 2005 sample group, 107

25 prisoners had quantifiable data available from Executive Reports 1991-

26 2005, including 95 men (88.8%) and 12 women (11.2%).  The average time

27

28 _____

[3] See Exhibit P, Table of Case Factors, pp.1-3 for a detailed tabulation and explanation of all data utilized herein.

Ground 4

Page 6

incarcerated was 21.1 years.   Ninety-one (91) prisoners (85.1%) committed intentional second degree murders with "express malice" and/or the killing occurred during an aggravated act (such as a kidnap, robbery or multiple gunshots/stab-wounds were inflicted).   Thirty (30) of the prisoner's crimes involved multiple victims being attacked or killed (28%).   Gang affiliation was associated with 28 of the crimes (26.2%), and 72 prisoners (67.3%) had prior arrests/convictions.   An extensive drug/alcohol history was indicated in 83 crimes (77.6%). Four (4) prisoners in the sample group had "specific like-crimes" of second degree murder (Robert Urieta, Emilia Ceniceros, Fernando Ortiz and Brian Warth) to that of Petitioner's crime (3.3%).   Three (3) other prisoners (2.5%) had specific like-crimes characteristics to that of Petitioner though were convicted of attempted murder: Miguel Gonzalez, Jose Paramo and Juan Ramirez

In terms of prison conduct, 73 prisoners (68.2%) had violations of serious disciplinary misconduct resulting in CDCR 115s, including 66 prisoners having more than one serious disciplinary report (61.7%), and 23 of the 73 prisoner's disciplinary reports included acts of violence against staff and/or inmates (21.5%).   Fifty (50) prisoners (46.7%) had extensive numbers of serious and/or minor disciplinary reports, ranging from 3 to 28 reports.   Minor disciplinary reports were indicated for seventy-two (72) prisoners (67.3%), inclusive and exclusive of the 73 prisoners with serious disciplinary reports.[4]

An analysis of the "general like-crimes" of second degree murder and the pre- and post-conviction behavior of the 107 quantifiable prisoners in the 2005 sample group reveals that Petitioner should have

---

[4] See Exhibit P, Table of Case Factors, pp.3-4, for a complete breakdown of prisoners with extensive disciplinary records.

Ground 4

Page 7

1   been found suitable for parole.  Petitioner's criminal conduct simply
2   can not be said to be more egregious than that of the majority of the
3   cases in the sample group.  While the majority of the sample group
4   (85.1%) committed intentional and/or aggravated acts of second degree
5   murder (acts involving "express malice"), Petitioner's criminal
6   culpability rests on an unintentional second degree murder based on
7   "implied malice" decided by jury verdict and certified by the court.
8   (See Ground 2, infra.)  Multiple victims had been a factor in 28% of '
9   the sample cases, and thus should not have precluded Petitioner (who
10  committed one act with multiple consequences) from being found suitable
11  for parole.  Like 77.6% of the sample group, Petitioner has a
12  drug/alcohol history involved with the commitment offense
13  (traditionally a mitigating factor).

14      Petitioner at his July 27, 2006 hearing had served 19 years, 11
15  months actual time in custody (with a 15 CCR §2410 adjusted sentence of
16  26 years, 6 months), which was one (1) year and two (2) months under
17  the average time served for the "general like-crimes" sample group of
18  21.1 years (actual time).  However, of the four (4) "specific like-
19  crimes" of second degree murder in the sample group, Petitioner had
20  served slightly more actual time than Robert Urieta (18 years),
21  significantly more time than Emilia Ceniceros (13 years) and Brian
22  Warth (12 Years), though less actual time than Fernando Ortiz (25
23  years).[5]  More importantly, all of these crimes involved "express
24  malice," intentional killings with all of the crimes being gang
25  related; whereas, Petitioner's culpability rests upon "implied malice"
26  for an unintentional killing, which he did not know had occurred until
27
28
─────────────────────────────────────────
[5] Keeping in mind that the Board's decisions were rendered up to 150 days before
the Governor's decision on review.

1  his arrest four days after the fact.

2      Furthermore, Petitioner has no gang affiliations (as opposed to

3  26.2% of the sample group) nor prior arrests/convictions (as opposed to

4  67.3% of the sample group). Petitioner has had no serious or minor

5  disciplinary infractions, in contrast to 68.2% for the sample group.

6  The Governor (generally focusing on the negative aspects of the cases)

7  rescinded/revoked the parole grant in 94 of 120 in the sample group for

8  second degree murders (a 78.3% denial rate). Of the positive aspects

9  mentioned in the sample group, few of the cases compare with

10 Petitioner's extensive post-conviction accomplishments in education

11 (AA, BGS and MA Degrees), vocation (4 completed trades), paralegal

12 diploma, self-help/therapy (numerous self-help groups, including 16

13 years AA participation, one-on-one and group therapy) and volunteerism,

14 to name only the prominent. Petitioner has been disciplinary free his

15 entire 20 years of imprisonment (Exhibit A, pp.55:1-11 and 150:11-21),

16 and his behavior has consistently been described by the Board as

17 "exemplary." (Exhibit A, p.150:12-14 and Exhibit N.) Petitioner's

18 positive programming accomplishments are easily recognizable in the

19 July 27, 2006 Board panel's recognition of those accomplishments

20 (Exhibit A, pgs.54-69, 90-97, 102-109, 127-139 and 150-152) and herein

21 at Exhibits B, C, D, E, F and G.

22     Yet, the Board has consistently granted parole release dates to

23 prisoners convicted of second degree murder whose offense

24 characteristics are comparable to or more egregious than Petitioner's.

25 Table 1 demonstrates second degree murder offense characteristics with

26 findings of suitability by the Board of Parole Hearings and effective

27 grants sent to the Governor(s) for review for 2002, 2003, 2004 and 2005

28 (See Exhibits S, R, Q and P for summary reports).

TABLE 1:   Crime Factors for Suitable Second Degree Murders 2002-2005.

| Offense and Post-Conviction Factors | Year | | | |
|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 |
| Total Parole Grants Made Effective | 120<br>107<br>Quantifiable* | 146<br>125<br>Quantifiable* | 85 | 73 |
| Males | 95<br>(88.8%) | 103<br>(82.4%) | 73<br>(86%) | 64<br>(81%) |
| Females | 12<br>(11.2%) | 22<br>(17.6%) | 12<br>(14%) | 15<br>(19%) |
| Average Years Served | 21.1 | 20.1 | 19.5 | 18.8 |
| Express Malice and/or Aggravated Crime Factors | 91<br>(85.1%) | 84<br>(67.2%) | 65<br>(76.5%) | 66<br>(83.5%) |
| Crimes Involving Multiple Victims | 30<br>(28%) | 32<br>(25.6%) | 23<br>(19.6%) | 13<br>(16.5%) |
| Alcohol and/or Substance Abuse History | 83<br>(77.6%) | 92<br>(73.6%) | 64<br>(75.3%) | 54<br>(68.4%) |
| Prior Arrests and/or Convictions | 72<br>(67.3%) | 74<br>(59.2%) | 42<br>(49.4%) | 41<br>(51.9%) |
| Gang Related Offense and/or Gang Affiliation | 28<br>(26.2%) | 24<br>(14.2%) | 16<br>(18.8%) | 13<br>(16.6%) |
| Serious Disciplinary Reports | 73<br>(68.2%) | 59<br>(47.2%) | 28<br>(32.9%) | 23<br>(29.1%) |
| Prisoners with Extensive Disciplinary Records | 50<br>(46.7%) | 37<br>(29.6%) | 19<br>(22.4%) | 9<br>(11.4%) |
| Prisoners with Like-Crimes to Petitioner's** | 7<br>(5.8%) | 9<br>(7.2%) | 8<br>(9.4%) | 5<br>(6.3%) |

Source:  Executive Reports on Parole Review Decisions 2002-2005.  See Exhibits P, Q, R, and S Governor's Reports Life-Term Parole Consideration Summary for Second Degree Murder 2005, 2004, 2003 and 2002.
* Of the 120 parole grants made effective by the Board, only 107 were quantifiable for the purpose of these statistics; hence the totals and percentages in this table for 2005 are calculated only from quantifiable grants.  See Exhibit, pp.1-4, Table of Case Factors for a full explanation.
** Includes Life-Crimes of 2nd Degree, 1st Degree and Attempted Murder.  See Exhibits P, Q, R and S.

        Most importantly, Table 1 represents a historical example that

Board panels over the past 4 years know exactly how much time a

prisoner (such as Petitioner) should serve for the general offense

characteristics of second degree murder.   Further, the Board has set

1  parole dates for twenty-eight prisoners with specific like-crimes

2  characteristics to those of Petitioner between 1997 and 2005.  (See

3  Exhibit O.)   The Board's utter disregard of the regulatory guidelines

4  of the 15 CCR §2403(c) matrix and the statutory mandate of P.C.

5  §3041(a) to set like-terms for like-crimes must be scrutinized as the

6  appearance of bias against parole for Petitioner in connection with the

7  illegal ex parte communication, District Attorney inspired media

8  attention and opposition/public outcry argued infra at Ground 2.

9       In the foregoing like-crimes analysis (statistically,

10  qualitatively and quantitatively), there simply is no rhyme, reason or

11  evidence as to why Petitioner has been repeatedly denied parole.  The

12  Board's actions in denying Petitioner parole suitability for the sixth

13  (6) time at the July 27, 2006 hearing were arbitrary, capricious and

14  devoid of any evidence that demonstrates Petitioner's crime factors to

15  be "particularly egregious" or "more than the minimum necessary to

16  convict" compared to other like-crimes (generally and specifically),

17  nor did any pre- or post-conviction evidence exist that demonstrated

18  Petitioner to be a current threat to public safety, particularly in

19  comparison to other prisoners already found suitable for parole in the

20  2005 sample group with like-crimes to that of Petitioner, generally or

21  specifically.   (See Exhibits O, P, Q, R and S.)

22       Petitioner's due process rights have been violated when making

23  general and specific comparisons of terms for second degree murder

24  previously set by the Board.  While in fact each of the 107

25  quantifiable cases sampled of second degree murder from the 2005

26  Executive Report should have been granted parole under the liberty

27  interest embodied in P.C. §3041 (even though there is "some evidence"

28  in nearly every one of these cases to deny parole), Petitioner contends

1   that he, comparatively, should not have been denied parole.

2   C.   The Liberty Interest Language Defined in P.C. §3041(a) is Protected
         under the U.S. Constitution, and Despite the Rulings in

3        Rosenkrantz and Dannenberg, State and Federal Courts Rely on
         Inter-Case/Like-Crimes Analyses to Determine Board Related Case

4        Law.

5        Of obvious and immediate concern to the California State

6   Legislature when enacting the Uniform Determinative Sentencing Act

7   (UDSA) and P.C. §3041 was the mandate to guard against indeterminately

8   sentenced prisoners serving disproportionate terms of imprisonment, as

9   clearly provided for with the "shall normally" formula and "like-terms

10  for like-crimes" language in P.C. §3041(a).   (See In re Stanworth

11  (1982) 33 Cal.3d 176, 182 [regarding uniform terms for like-crimes

12  mandated by the UDSA]; In re Seabock (1983) 140 Cal.App.3d 29, 38 [P.C.

13  §3041(a) is the "primary command"]; In re Ramirez, supra, 570-571; and

14  In re Rosenkrantz, supra, 655, 657, 658, 660, 683.   See also Biggs v.

15  Terhune, supra, at 916-917 [continued reliance on the commitment

16  offense to deny parole is a federal due process violation]; and Irons

17  v. Warden (9th Cir. 2007) ___ F.3d ___, 2007 DJDAR 3072, p.3074 [defining

18  the minimum number of years of the sentence as the bright line rule for

19  use of crime factors beyond the minimum necessary to convict to deny

20  parole and reiterating Biggs, supra, at p.917.].)   Based on the clear

21  and concise language of P.C. §3041(a) and the consistent history of

22  state and federal courts relying on that language, Petitioner

23  respectfully submits that In re Dannenberg, supra, at 1083-1084,

24  misinterprets and neglects the statutory force of the subsection (a)

25  requirement for comparative "like-terms for like-crimes" analysis in

26  violation of Petitioner's federally protected due process liberty

27  interest.

28       In Dannenberg, supra, the California Supreme Court held that the

1  Board need not engage in a comparative like-terms for like-crimes
2  analysis under P.C. §3041(a) if public safety concerns warrant a denial
3  of parole under P.C. §3041(b).   (Id. pgs.1082-1094.)   However, the very
4  language defined by In re Rosenkrantz, supra, and In re Dannenberg,
5  supra, require an analysis of like-crimes in order to determine if
6  Petitioner's crime circumstances are more aggravated than other
7  murders.   Hence, in order to determine if Petitioner's offense was
8  "particularly egregious" or "more than the minimum necessary" to
9  sustain a conviction of second degree murder under P.C. 3041(b), the
10  Board must compare Petitioner's crime to other second degree murders.
11  Without comparing Petitioner's offense to other like-crimes as mandated
12  by P.C. 3041(a), there can be no base-line as to what is "particularly
13  egregious" or "more than the minimum necessary" for a given offense.
14  These court defined factors can not be deduced in isolation.

15       Indeed, in cutting through the tangled web of parole related
16  jurisprudence, California courts have exercised exactly this kind of
17  like-crimes analysis in ruling on parole suitability, pre- and post-
18  Dannenberg.   (e.g. In re Ramirez, supra, generally at pp.570-571; In re
19  Rosenkrantz, supra, at 678-679 [comparing Rosenkrantz's second degree
20  murder crime factors to the elements of first degree murder];[6] In re

21

22  [6] Robert Rosenkrantz was released on parole on August 4, 2006 by order of Los
    Angeles County Superior Court Justice Judge Wesley.  (See Notice/Motion for
23  Judicial Notice filed with this petition at Exhibits C, D and E.) Rosenkrantz was
    also ordered released within 30 days by the U.S. Central District Court on August
24  1, 2006.  (See Rosenkrantz v. Marshall, supra, p.1087 and n.20.)  Rosenkrantz
    served less than 21 years for a premeditated second degree murder where 10 shots
25  were fired into the victim at close range (including 3 to the head) after lying in
    wait.  Rosenkrantz' case and crime was a premiere case published by the California
26  Supreme Court in 2002 as a "particularly egregious" second degree murder with
    elements beyond the "minimum necessary" to sustain a second degree murder
27  conviction that the Governor/Board could justifiably utilize to deny parole beyond
    the initial parole hearing.  (In re Rosenkrantz (2002) 29 Cal.4th 616, at p.683.)
28  It appears now that the State Supreme Court has determined that a 21 calendar year
    limit is a proportional term to serve for an aggravated second degree murder.

1   Leslie Van Houten (2004) 116 Cal.App.4th 339, 358-360 [comparing Van
2   Houten's crime factors to Rosenkrantz, supra] and 363-365 [comparing
3   crime factors to Biggs, supra, and In re Ramirez, supra]; In re Scott
4   (2004) 119 Cal.App.4th 871, 891-892, 893 ["trivial motive" especially
5   requires crime comparison]; In re Scott II (2005) 34 Cal.Rptr.3d 905,
6   922-923 [comparing Scott's crime factors to In re Rosenkrantz, supra,
7   In re Dannenberg, supra, In re Lowe (2005) 130 Cal.App.4th 1405 and In
8   re DeLuna (2005) 126 Cal.App.4th 585]; and In re Shaputis, supra, at
9   332 [relying significantly on comparison to In re Ernest Smith, supra];
10  In re Liber R. Andrade (2006) 46 Cal.Rptr.3d 317, concurring and
11  dissenting opinion at p.329 n.3 [comparing Andrade's crime factors to
12  In re Rosenkrantz, supra, In re Dannenberg, supra, In re Van Houten,
13  supra, In re DeLuna, supra, and In re Lowe, supra]; In re Dannenberg,
14  supra, dissent at pp.1102-1103 n.2 and 1106-1109 [discussing inter-case
15  comparisons]; In re Wen Lee (2006) 49 Cal.Rptr.3d 931, at pp.937-939
16  [comparing Lee's crime to In re Rosenkrantz, supra, In re Dannenberg,
17  supra, In re McClendon (2003) 113 Cal.App.4th 315, In re Burns (2006)
18  136 Cal.App.4th 1318, In re Van Houten, supra, In re DeLuna, supra, In
19  re Lowe, supra, In re Morrall (2002) 102 Cal.App.4th 280, and In re
20  Ernest Smith, supra];[7]  In re Elkins (2006) 50 Cal.Rptr.3d 503, at
21  pp.521-523 [comparing Elkins' first degree murder to the second degree
22  murder cases of In re Rosenkrantz, supra, Rosenkrantz v. Marshall,
23  supra, Martin v. Marshall, supra, and Irons v. Warden (E.D. Cal. 2005)
24  358 F.Supp.2d 936, concluding that the immutable factors of Elkins'
25

26  Petitioner's term of incarceration, as described herein and at Ground 2, is
    unlawfully disproportionate in comparison to Rosenkrantz' term and crime factors,
27  yet Petitioner who committed an unintentional, implied malice second degree murder
    remains incarcerated in excess of 20 years at the time of this filing.
28  [7] Wen Lee was released on parole on or about October 24, 2006. Lee's case factors
    are similar to Petitioner's and have been discussed extensively herein at Ground
    2.

1  offense over time do not indicate a "current threat" to public safety
2  after more than two decades of "exemplary" prison conduct]; and In re
3  Weider (2006) 52 Cal.Rptr.3d 147, at pp.160-161 [comparing Weider's
4  crime factors to In re Rozenkrantz, supra, In re Lowe, supra, and In re
5  DeLuna, supra.].)

6      Recently, federal courts have also begun to rely on like-crime
7  case analysis in resolving complex term-to-life parole decisions.
8  (e.g. Martin v. Marshall (2006) 431 F.Supp.2d 1038, 1047-1048
9  [comparing Martin's crime and post-conviction factors to Biggs, supra,
10 and Irons v. Warden, supra.];[8] Sass v. California Board of Prison Terms
11 (9th Cir. 2006) 461 F.3d 1123, pgs.1135 and 1137-1138, dissenting
12 opinion [comparing Sass' crime to 15 CCR §2282 factors, In re Van
13 Houten, supra, and In re Ernest Smith, supra.]; and Irons v. Carey (9th
14 Cir. 2007) __ F.3d __, 2007 DJDAR 3072, p.3074 [comparing Irons' case
15 factors with Dannenberg, supra, Biggs, supra, and Sass, supra, in
16 defining the minimum number of years of the sentence as the limit for
17 use of particularly egregious crime factors to deny parole.].)

18     In fact, a proportionate "upper limit" and term of incarceration
19 for a "particularly egregious" second degree murder with crime factors
20 beyond the "minimum necessary" elements was recognized and defined in
21 In re Rosenkrantz, supra, by Justice Moreno in his concurring opinion:

22

23 [8] Eulogio Martin was released on parole on August 4, 2006, as a result of the cited
24 case and another order by Northern District Court Judge Patel on July 21, 2006.
   Martin's case factors involve a drug related murder, where Martin fired 7 shots
   into his intended victim then continued firing into a crowd at a restaurant
25 killing a second person and injuring a third. In prison, he received 20 serious
   disciplinaries and was stabbed on 3 different occasions for failing to pay loan-
26 sharks. (Martin v. Marshall, supra, at 1040.) Martin served 26 years in prison
   for his extremely aggravated offense and post-conviction factors. By comparison,
27 Petitioner's case factors and exemplary post-conviction record should result in a
   shorter term in accordance with the 15 CCR §2403(c) C-III matrix of 18-19-20
28 years. At the time of this filing, Petitioner has already served in excess of 20
   calendar years and is still in custody.

> ...there will come a point, which already may have
> arrived, when petitioner would have become
> eligible for parole if he had been convicted of
> first degree murder.  Once petitioner reaches that
> point, it is appropriate to consider whether his
> offense would still be considered especially
> egregious for a <u>first degree</u> murder in order to
> promote the parole statute's goal of
> proportionality between the length of sentence and
> the seriousness of the offense.  (See <u>In re
> Ramirez</u> (2001) 94 Cal.App.4th 549, 570-571, 114
> Cal.Rptr.2d 381 [in conducting parole
> proportionality analysis, the court considers the
> gravity of the offense in relation to the time in
> prison already served].)  Under this circumstance,
> the justification for denying his parole would
> become less clear, even under the deferential
> 'some evidence' standard.  Thus, future denials of
> petitioner's parole may warrant judicial
> reappraisal."  (<u>In re Rosenkrantz</u>, <u>supra</u>, at
> p.690.)

Undeniably, Justice Moreno's rationale was adopted by Judge David S. Wesley in his order releasing Robert Rosenkrantz:

> "Petitioner has now served in excess of the
> maximum term for both second and first degree
> murder....  Petitioner has reached the point in
> which the denial of parole can no longer be
> justified on the commitment offense."
> (See Request/Motion for Judicial Notice, Exhibit
> C, p.3:17-23.)

Further, Justice Moreno's proportionality rationale was adopted in the U.S. Central District Court's decision ordering release in <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, at pp.1087-1078 and n.20, and is incorporated into the decision at p.1070, n.5.

The recent <u>Rosenkrantz</u> decisions resulting in release bear directly on the proportionality of Petitioner's term of incarceration. The California Supreme Court set a "top-end term" of just under 21 years for an aggravated second degree murder, in denying the Attorney General's petition for review and effectuating Rosenkrantz' release on parole.  (See Request/Motion for Judicial Notice, Exhibit E.)

1  Petitioner's crime factors pale in comparison to Rosenkrantz'.

2  Petitioner (who has served an exemplary 20 years of incarceration and

3  appeared before the Board 6 times) is long past the point where the

4  commitment offense (an implied malice/unintentional second degree

5  murder) can be relied upon to deny parole.  (See Irons v. Carey (9th

6  Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3074-3075.)   Yet, in

7  Petitioner's case a parole date and term have never been set or

8  determined by the Board.  This failure by the Board to ever consider

9  Petitioner's 15 CCR §2403(c) B-III matrix term of 18-19-20 years can

10  only be seen as arbitrary and capricious in violation of due process in

11  light of the recent Rosenkrantz decisions, as well as the 9th Circuit's

12  holding in Irons v. Carey, supra, at pp.3074-3075.

13  D.   **Failure to Conduct a Like-Crimes Analysis at Every Parole Hearing
          Violates Petitioner's Federally Protected Liberty Interest Due
14        Process Rights by Endangering Petitioner of Serving an Unlawful
          and Disproportionate Prison Sentence.**

15       Due process of law requires that Petitioner receive

16  individualized consideration in evaluation for parole suitability (In

17  re Rosenkrantz, supra, at 658, 677, 682, 684; In re Ramirez, supra, at

18  565-566, 568; and In re Minnis, (1972) 7 Cal.3d 639, 647); but, as part

19  of that individualized consideration, Petitioner's crime factors and

20  post-conviction behavior must be compared with other like-crime

21  offenders (whose terms have been set and/or completed) to ensure that

22  he is not serving a disproportionate term.

23       In Petitioner's case, it is particularly necessary that the Board

24  conduct a like-crimes analysis, since after six (6) parole hearings the

25  Board has failed to grant parole suitability and determine Petitioner's

26  appropriate term of incarceration.[9]   Petitioner has demonstrated,

27

28  _____

[9] Keeping in mind that the Board admitted that "...it did not know..." how much
time Petitioner should serve for his offense characteristics and refused to

1  herein, that his crime factors and prison conduct (in comparison to

2  other like-crime offenders "specifically" for vehicle shooting related

3  murders and "generally" to all second degree murderers found suitable

4  in 2005) should qualify him to be part of the group of prisoners

5  currently being found suitable for parole and released. Continued

6  denials without like-crimes analyses will result (if not already) in

7  Petitioner's sentence becoming disproportionate.

8      The requirements for like-crimes analysis mandated by P.C.

9  §3041(a) are integral and inseparable to Petitioner's liberty interest

10  and protected by federal due process of law. (See Ground 1, ante.)

11  While the Board's discretion is great,[10] it is not so vast that it can

12  simply sweep aside and ignore the mandate of P.C. §3041 subsection (a),

13  relying only on the public safety exclusion of subsection (b). Due

14  process of law protects the mandate of subsection (a) that requires the

15  Board, at each and every hearing, to conduct a comparative like-crimes

16  analysis to guard against Petitioner's term becoming disproportionate,

17  lest repeated denials based on the commitment offense without the

18  benefit of comparative like-crimes analyses will result in Petitioner's

19  sentence becoming disproportionate and, eventually, grossly

20  disproportionate, thereby violating state and federal protections

21  against cruel and unusual punishment. (People v. Wingo (1975) 14

22

23  ────────────────────────────────────────

    consult the 15 CCR §2403(c) matrix for second degree murder at Petitioner's March
24  2, 2005 fourth subsequent (fifth) parole hearing. (See March 2, 2005 hearing
    transcript, p.71:5-11 and Exhibit N for the 2005 hearing decision p.108:4-7.)
25  [10] Indeed, the Adult Authority under the Indeterminate Sentencing Law (ISL) had
    broad, almost absolute discretion; however, under the UDSA term-to-life
26  indeterminate sentencing scheme mandated by P.C. §3041 et seq., the Board's
    discretion is more carefully and explicitly restricted. (e.g. See In re
27  Dannenberg, supra, pgs.1077-1078, 1080, 1083, 1088-1091 [historically discussing
    the problems of indeterminate sentencing and proportionality in sentencing under
28  the ISL and the Legislative purpose of the UDSA]. See also In re Stanworth,
    supra, pp.182-185.)

                                Ground 4
                                Page 18

1  Cal.3d 169, 175-180; In re Rodriguez (1975) 14 Cal.3d 639, 646-656; In

2  re Ramirez, supra, at 570-571; and Lockyer v. Andrade (2003) 538 U.S.

3  63, at 72-73, 123 S.Ct. 1166; 144 L.Ed.2d 144 [citing numerous U.S.

4  Supreme Court authority].)[11]

5      Regarding the danger of sentences becoming grossly

6  disproportionate, the Dannenberg Court realized that "...we

7  acknowledge, section 3041, subsection (b) can not authorize such an

8  inmate's retention, even for reasons of public safety, beyond this

9  constitutional maximum period of confinement." (Id., at 1096.)   Hence,

10  the Board has a duty to protect Petitioner from serving a

11  disproportionate and/or grossly disproportionate term.   A

12  constitutionally valid UDSA indeterminate sentence can only be

13  determined by a like-crimes analysis as triggered by P.C. §3041(a) and

---

[11] In fact, many prisoners who have committed the most heinous crimes in California
history and been sentenced to death for first degree murders and other atrocious
offenses (who later had their sentences altered to life without the possibility of
parole), have served less time than Petitioner: William Archie Fain (14 years, 8
months) People v. Fain (1969) 70 Cal.2d 588; Dennis Stanworth (17 Years) People v.
Stanworth (1969) 70 Cal.2d 820; Darryl Kemp (19 years) People v. Kemp (1961) 55
Cal.2d 458; Walter Hines (14 years) People v. Hines (1965) 61 Cal.2d 164; Robert
Nye (13 years) People v. Nye (1965) 63 Cal.2d 166; Robert Massie (13 years) People
v. Massie (1967) 66 Cal.2d 899; Jerry Goodridge (13 years) People v. Goodridge
(1969) 70 Cal.2d 824; Dennis McGautha (14 years) People v. McGautha (1969) 70
Cal.2d 770; William McClellan (21 years) People v. McClellan (1969) 71 Cal.2d 793;
Warren Sailing (9 years) People v. Sailing (1972) 7 Cal.3d 844; and Milton Earl (9
years) People v. Earl (1973) 29 Cal.3d 894.   (See CDC Data Analysis Unit and ABC
News Documentary, "Life After Death Row.")   Thus, it would appear grossly
disproportionate that Petitioner (who has now served 20 calendar years for an
implied malice/unintentional second degree murder) should serve a longer term of
incarceration based on offense characteristics and threat to public safety than
someone whose offense carried a penalty of death or life without parole.   Whatever
may be said of Petitioner's crime, it is not as heinous, atrocious or cruel as any
death penalty offense.   Most importantly, there is no difference between the
criteria and standards utilized for determining parole suitability under the UDSA
and ISL.  (In re Seabock (1983) 140 Cal.App.3d 29, at 41.)     Repeated parole
denials in Petitioner's case clearly demonstrate a violation of due process and
the principles of proportionality.

1  guided by the regulatory provisions of 15 CCR §2402 et seq.[12] at <u>each</u>

2  <u>and every</u> parole hearing to guarantee uniformity in sentencing in

3  compliance with Petitioner's federally protected liberty interest right

4  to parole.[13]

5  **E.    Specific, General and Case Law Like-Crimes Analyses Reveal that the**
       **Board Has Violated Petitioner's Due Process Rights By Failing to**
6      **Find Him Suitable for Parole.**

7        Penal Code §3041(a) and (b), further enlightened by <u>In re</u>

8  <u>Ramirez</u>, 94 Cal.App.4th 549, establishes in state law a common sense

9  approach.   Absent facts that make the offense "particularly egregious,"

10  it is simply irrational to use the circumstances of the crime to hold a

11  prisoner beyond the term prescribed by the Matrix in 15 CCR §2403(c).

12  This approach is logical, since it is the circumstances of the offense

13  that went into the making of the Matrix in the first place.   (See

14  <u>Little v. Hadden</u> (D.Colo. 1980) 540 F.Supp. 558, at p.562.   See also

15  <u>Briggs v. U.S. Parole Commission</u> (8th Cir. 1984) 736 F.2d 446, 450;

16  <u>Myrick v. Gunnell</u> (D.Conn. 1983) 563 F.Supp. 51, 54;   <u>Allen v. Hadden</u>

17  (D.Colo. 1982) 546 F.Supp. 586, 596;   <u>Baker v. McCall</u> (S.D.N.Y. 1981)

18  543 F.Supp. 498, 500, affirmed without opinion (2nd Cir. 1982) 697 F.2d

19

20  [12] Public safety concerns mandated by P.C. §3041(b) are extensively addressed by
     the Board panel when assessing the regulatory criteria of 15 CCR §2402 et seq. in
21   the determination of parole suitability.  If there is evidence that a prisoner
     remains a threat to public safety (i.e an indication that the prisoner will commit
22   a violent crime, as argued herein at Grounds 1 and 2), the Board can deny
     suitability up <u>until</u> the point that the prisoner's term of imprisonment becomes
23   grossly disproportionate in comparison to other like-crimes.  Then, the Board <u>must</u>
     release even a dangerous offender in order to avoid offending the Eighth Amendment
24   to the United States Constitution.  (e.g. <u>In re Rodriguez</u> (1975) 14 Cal.3d 639,
     646-656; <u>In re Dannenberg, supra</u>, 1096; and <u>Lockyer v. Andrade</u> (2003) 538 U.S. 63,
25   at 72-73, 123 S.Ct. 1166, 144 L.Ed.2d 144.)
     [13] While the <u>Dannenberg, supra</u>, at 1096-1097, states that this duty is diminished
26   under the UDSA, that reasoning is flawed (as well as circular) due to the fact
     that Petitioner is now being exposed to the exact same excessive punishment and
27   disparity in sentencing that led to due process violations under the ISL resulting
     in sentences becoming grossly disproportionate and the imposition of court
28   mandated term-setting.  (<u>In re Rodriguez, supra</u>, 14 Cal.3d 639, 646-656.)

1   287; and <u>Branch v. Nelson</u> (D.Conn. 1979) 472 F.Supp. 569, 574.)

2        The Board's treatment of Petitioner ignores this common sense

3   approach (as previously argued in Ground 2, <u>infra</u>.) and in comparison

4   with other like-crimes, specifically and generally, where the Board has

5   granted parole suitability.   In fairly characterizing Petitioner's

6   offense under state law with other second degree murders, it simply can

7   not be said that Petitioner's case involves the type of especially

8   callous disregard beyond that necessary in any conviction for second

9   degree murder; in fact, Petitioner's offense characteristics

10  demonstrate the bare minimum necessary elements to sustain a second

11  degree murder conviction.   (See <u>In re Dannenberg</u> (2005) 34 Cal.4th

12  1061, 1094-1095; <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, at p. 683; <u>In</u>

13  <u>re Ramirez</u>, (2002) 94 Cal.4th 549, 570-571; <u>In re Mark Smith</u> (2003) 109

14  Cal.App.4th 489, 504, 506; <u>In re Ernest Smith</u> (2003) 114 Cal.App.4th

15  343, 367; <u>In re Scott</u> (2004) 119 Cal.App.4th 871, 891-892; <u>In re Van</u>

16  <u>Houten</u> (2004) 116 Cal.App.4th 339, 363-366; <u>In re Scott II</u> (2005) 34

17  Cal.Rptr.3d 905, 922-923; <u>In re Shaputis</u> (2005) 37 Cal.Rptr.3d 324,

18  331-332; <u>In re Wen Lee</u>, <u>supra</u>, at pp.936-941; <u>In re Elkins</u>, <u>supra</u>, at

19  pp.518-523; and <u>In re Weider</u>, <u>supra</u>, at pp.158-162.)   As demonstrated

20  by the various like-crimes analyses herein and Ground 2 <u>ante</u>,

21  Petitioner's crime factors certainly do not justify characterizing his

22  offense as being more egregious than an "intentional second degree

23  murder," for which the Board has granted numerous cases of suitability.

24       According to federal law, Petitioner's crime characteristics

25  (which lawfully do not rise beyond the minimum necessary to convict)

26  and model prisoner program record would have required a determination

27  of parole suitability at his initial hearing.   (<u>Irons v. Carey</u>, <u>supra</u>,

28  pp.3073-3075 [defining the minimum number of years of the sentence as

1 the limit for the use of crime factors beyond the minimum necessary to
2 convict to deny parole suitability]; <u>Biggs v. Terhune</u> 334 F.3d, at 916-
3 917; <u>Martin v. Marshall</u> (2006) 431 F.Supp.2d 1038, 1044-1048;
4 <u>Rosenkrantz v. Marshall</u> (C.D. Cal 2006) 444 F.Supp.2d 1063, pp.1086-
5 1087; and <u>Sanchez v. Kane</u>, (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062
6 [where Governor's reversal based on immutable crime factors, a "gang
7 killing," after 15 years of rehabilitation programming and 4 prior
8 parole hearings violated due process of law.].)   Furthermore, the
9 Board's failure to find Petitioner suitable in comparison to other
10 like-crimes over six (6) hearings and twenty (20) calendar years in
11 prison (thereby making his term disproportionate within the meaning of
12 <u>Ramirez</u>, <u>supra</u>, at pgs.570 and 571) arbitrarily and capriciously
13 violated Petitioner's P.C. §3041 due process rights.   If not already,
14 Petitioner's term now runs the risk of becoming grossly
15 disproportionate.
16 / / /
17 / / /
18 / / /
19
20
21
22
23
24
25
26
27
28

7. ~~EXAMXXX~~ Ground ___5___ (if applicable):

THE BOARD'S IMPROPER DENIAL OF PAROLE TO PETITIONER IS BASED UPON A MORE
INVASIVE, UNLAWFUL POLITICAL POLICY SUPPORTED BY THE EXECUTIVE BRANCH,
AS DEMONSTRATED BY A SIXTEEN YEAR RECORD OF THE BOARD'S FAILURE TO
NORMALLY GRANT PAROLE IN VIOLATION OF DUE PROCESS OF LAW UNDER THE FIFTH
AND FOURTEENTH AMENDMENTS.

a. Supporting facts:
See Ground 5 Attached.

b. Supporting cases, rules, or other authority:
See Ground 5 Attached.

GROUND 5

THE BOARD'S IMPROPER DENIAL OF PAROLE TO
PETITIONER IS BASED UPON A MORE INVASIVE, UNLAWFUL
POLITICAL POLICY SUPPORTED BY THE EXECUTIVE
BRANCH, AS DEMONSTRATED BY A SIXTEEN YEAR RECORD
OF THE BOARD'S FAILURE TO NORMALLY GRANT PAROLE IN
VIOLATION OF DUE PROCESS OF LAW UNDER THE FIFTH
AND FOURTEENTH AMENDMENTS.

a.    Supporting facts:

1.   The Board "normally" denies parole to approximately 98 percent
of appearing inmates in violation of statutory code (P.C. §3041 et
seq.) statistically demonstrating a bias against parole.   (See Exhibit
T.)

2.   The Board's sixteen (16) year record of systematically failing
to normally grant parole as required by the California Parole Scheme
violated Petitioner's right to Due Process under the United States
Constitution's 5th and 14th Amendments, depriving him of his federally
protected liberty interest.   (See Exhibit T.)

3.   In April 1999, then Governor Gray Davis stated that he was
adamant that all murderers, even with second degree convictions or
extenuating circumstances, should serve at least life in prison.   (See
Exhibit U.)

4.   Ex-Governor Davis also made it publicly clear that he expected
all his political appointees to carry out his political agenda, not
necessarily the law: "They are there to reflect the sentiments that I
expressed in the campaign."  (Exhibit U.)  Davis' statement applied
directly to Board Commissioners who have quasi-judicial powers under
the Executive Branch, and Davis readily expected that "... judges'
decisions should reflect his policies.  And if that weren't enough, he
said those who could not do that should resign."  (Exhibit U.)  Indeed,
Federal District Courts for California have recently found that both

1  former Governors Wilson and Davis practiced an unlawful blanket no

2  parole policy. (See <u>Martin v. Marshall</u> (N.D. Cal. 2006) 431 F.Supp.2d

3  1038, 1048-1049; and <u>Martin v. Marshall</u> (N.D. Cal. 2006) 448 F.Supp.2d

4  1143, 1144-1145.)

5      5. The make-up of the Board is primarily of persons of law

6  enforcement, anti-crime, victim's rights and correctional backgrounds

7  who will act in a political manner prescribed by the governor. The

8  composition of the Board is in violation of P.C. §5075 (See Exhibit V

9  for biographies of the Board Commissioners at the time of Petitioner's

10  July 27, 2006 hearing). Furthermore, the Board tends to act

11  arbitrarily and capriciously by granting parole to prisoners who have

12  some deficiency in their prison record and/or offense characteristics

13  that can later be utilized by the Board and/or Governor to revoke or

14  rescind the grant of parole suitability, all the while passing over

15  more suitable candidates such as Petitioner. (See Exhibits P, Q, R and

16  S for summaries of the 2005, 2004, 2003 and 2002 Executive Reports on

17  Parole Review Decisions as representative samples. Also see Exhibit O

18  for a specific like-crimes comparison.)

19      6. At the July 27, 2006 hearing, the Board Commissioners were

20  acting in a manner consistent with Ex-Governor Davis' invasive and

21  unlawful political policy. Although his record is slightly better,

22  current Governor Schwarzenegger reviews approximately the same number

23  of parole grants as his predecessor (indicating that the Board is

24  maintaining the status quo in normally denying parole grants) and

25  "normally blocked" 2 of 3 parole suitability findings in 2004, thereby

26  continuing to statistically demonstrate a bias against parole. (See

27  Exhibit W, pgs.8-13 and 19-22 for articles, data on parole grants and

28  Governor Schwarzenegger's policies; and Exhibit X, SB-1522, p.6.) In

1 2005, Governor Schwarzenegger continued blocking parole at an increased

2 ratio of 7 out of 9 grants, reversing or referring en banc

3 approximately 144 of the 179 effective grants (82.4%), with an overall

4 parole denial rate of 98.8 percent.   (See Exhibits P, T and W, pp.1-3.

5 See also Executive Report on Parole Review Decisions 2005.)   As

6 indicated by various newspaper articles and reports, Governor

7 Schwarzenegger cut back on parole grants and releases in the first two

8 quarters of 2005 due to political pressure from television ads and

9 protests by Crime Victims United.   (See Exhibit W, pp.4-6.)   As of

10 August 2006 (a gubernatorial election year), the Governor significantly

11 reduced parole releases, reversing or referring en banc 98 of 111

12 effective parole grants, a ratio of 9 out of 10 parole grants blocked.

13 (Exhibit W, pgs.1 and 17.)   These statistics and articles indicate that

14 parole releases for indeterminate sentenced prisoners are politically

15 controlled/inspired, in violation of due process of law.   (Exhibit W.)

16    7.  Petitioner's incarceration has become disproportionate as a

17 result of the Executive Branch's violation of his due process rights,

18 requiring this court's intervention.   Petitioner was denied parole in

19 violation of his liberty interest, presumption of parole suitability

20 and due process rights statutorily embedded in P.C. §3041 et seq. and

21 protected by the 5th and 14th Amendments and federal case law.   (See

22 McQuillion v. Duncan (2002) 306 F.3d 895; Biggs v. Terhune (2003) 334

23 F.3d 910.)

24

25 b.   Supporting cases, rules or other authority:

26    Release on parole is the "rule" not the "exception" under the

27 P.C. §3041 parole scheme.   (See In re Ernest Smith (2004) 114

28 Cal.App.4th 343, 351 and In re Rosenkrantz (2002) 29 Cal.4th 616, 683.)

1  Consequently, the Board must (as a matter of routine) "normally" grant

2  parole to prisoners appearing before their panels for parole

3  consideration.    Should they consistently do otherwise, those appearing

4  inmates would be deprived of their owed due process.[1]

5  **A.    Historical, Statistical And Political Data Confirm An Executive**

   **Branch No Parole Policy In Violation Of Petitioner's Due Process**

6  **Rights.**

7      Random outcomes occurring as a "rule" (i.e. as the norm or

8  normally) are those happening with average frequency.    When the

9  possibility of random outcomes produced under identical conditions

10 (such as those resulting from parole consideration hearings) are

11 restricted to one of two possible choices (in this case either a grant

12 or denial of parole), results occurring with a mathematically average

13 probability are those which occur in no less than 50 percent of the

14 possible outcomes.[2]    Statistically, results reflecting the "norm" are

15

16 [1]  (See In re Seabock, 140 Cal.App.3d 29, 38, holding, "The legislature's primary
   command to the Board is that it 'shall set a parole release date.'"  See In re
17 Rosenkrantz, 29 Cal.4th 616, at p. 683, citing In re Ramirez, 94 Cal.App.4th 549,
   569-570, holding, "The Legislature has clearly expressed its intent that when
18 murderers... approach their minimum eligible parole date, the Board 'shall
   normally set a parole release date.'  (Pen. Code §3041, subd. (a).)  The Board's
19 authority to make an exception based on the gravity of life term inmate's current
   or past offense should not operate so as to swallow the rule that parole is
20 normally to be granted."  See In re Ernest Smith, 114 Cal.App.4th 343, holding
   "Under [California Penal Code] section 3041, subdivision (a), release on parole is
21 the rule, rather than the exception...."  See Biggs v. Terhune (9th Cir.) 334 F.3d
   910, 915, holding, "Section 3041 of the California Penal Code creates in every
22 inmate a cognizable liberty interest in parole... protected by the procedural
   safeguards of the [United States Constitution's] Due Process Clause."  Therefore,
23 should the Board ignore that parole scheme's Penal Code §3041(a) requirement that
   granting parole is the "rule," i.e. the norm (see Webster's Dictionary), and
24 proceed to apply their Penal Code §3041(b) discretionary authority such that
   parole becomes the "exception," that Board action would violate an appearing
25 inmate's due process rights and deprive him of his federally protected liberty
   interest.
26 [2]  Under California's Penal Code §3041 parole scheme only 50% or less of the
   offenses considered by the Board can be found "particularly egregious,"
27 "especially grave" or "more than the minimum necessary to convict" and used to
   support a parole denial decision, else parole will not be the rule.  Thus, the In
28 re Ramirez, supra at p.570, requirement is mandated by due process that a Board

1  those occurring within one standard deviation of the mean (the average)

2  in a normal distribution (the part of the normal bell curve displaying

3  approximately 68 percent of the results).

4      Should historical data show that the Board routinely denied

5  parole over an extended period to significantly more than 50 percent of

6  appearing inmates, that data would demonstrate a violation of the

7  Legislative policy, the controlling tenet on which the P.C. §3041

8  parole scheme rests—a requirement that parole grants and releases be

9  the rule (the norm), not the exception.

TABLE 2: Parole Hearings vs. Grants 1990-2004 (Exhibits T and W).

| Year | Number of Hearings | Parole Grants Made Effective | Percentage |
|------|--------------------|------------------------------|------------|
| 1990 | 1,226 | 45 | 3.67 |
| 1991 | 1,726 | 54 | 3.13 |
| 1992 | 1,739 | 16 | 0.92 |
| 1993 | 1,614 | 14 | 0.87 |
| 1994 | 1,863 | 9 | 0.48 |
| 1995 | 2,123 | 5 | 0.24 |
| 1996 | 2,273 | 8 | 0.35 |
| 1997 | 2,260 | 19 | 0.84 |
| 1998 | 2,170 | 18 | 0.93 |
| 1999 | 1,936 | 13 | 0.67 |
| 2000 | 2,175 | 26 | 1.20 |
| 2001 | 3,638 | 57 | 1.57 |
| 2002 | 4,826 | 140 | 2.90 |
| 2003 | 4,498 | 158 | 3.51 |
| 2004 | 4,550 | 199 | 4.37 |
| 2005 | 4,953 | 179 | 3.61 |
| Totals: | 43,570 | 960 | 2.20 |

As demonstrated by Table 2 between 1990 and 2005, the record

shows that the California Parole Board held 43,570 parole consideration

hearings.  During that sixteen year period, the Board granted parole

---

panel compare the gravity of the offense(s) being considered against other similar
crimes to determine if the crime under consideration is "particularly egregious"
and supportive of a Penal Code §3041(b) "exception" to the rule that parole
normally be granted at approximately fifty percent of Board hearings.

1  960 times (or at 2.20 percent of those hearings), including only five

2  years during which the Board granted parole to more than 3 percent of

3  appearing inmates (3.55% in 1990, 3.13% in 1991, 3.51% in 2003, 4.37%

4  in 2004 and 3.61% in 2005) and eight years in which less than 1 percent

5  of appearing inmates were granted parole, with a 1995 low of .24

6  percent.[3]  (See Exhibits T and W, p.1.)

7       Thus, a sixteen year record exists, showing a significant

8  variance between the approximately 50 percent rate of occurrence that

9  is required to demonstrate that parole grants/releases are the rule

10  (the norm) and the 2.20 percent rate of parole grants, demonstrating

11  the Board's failure to procedurally process parole applications.

12  (Exhibit T.)[4]  Further, from January to August 2006, statistics

13  indicate of the 111 Board grants reviewed by the Governor, he reversed

14  or referred en banc 98 grants (an 88.3 percent denial rate), an

15  approximate ratio of 9 out of 10 grants blocked.  (Exhibit W, p.1.)

16  These statistics demonstrate that the trend to grant parole

17  significantly below 50% of the time continues for the first 2 quarters

18  of 2006.

19       Petitioner, denied parole 6 times from February 27, 1997 to

20  July 27, 2006 under a politically inspired and controlled parole

21  system, did not receive a fair hearing as commanded by the state's

22  federally protected parole scheme, violating his rights under the Due

23

24  [3]  During a 15 year period (from 1990-2004) approximately 243 inmates convicted of
    murder (95 first degree and 148 second degree) were actually released on parole,
25  compared to the approximately 825 inmates serving terms for first degree murder
    and 1,825 inmates serving terms for second degree murder released during a
26  comparable 15 year period from 1974-1983.  (Exhibit T.)
    [4]  The Board's actual rate of parole releases for actual murders in 2005 was
27  approximately .63 percent, or 31 murderer releases out of 4,953 total parole
    hearings. The Board held en banc hearings for 23 non-murder offenses referred by
28  the Governor.  (Exhibits P, T and W.  See also Executive Report on Parole Review
    Decisions 2005.)

1  Process Clause of the United States Constitution and depriving him of
2  his liberty interest in parole.

3      Reflected in the statistical showing that the Board historically
4  acts to deny parole (Table 2 and Exhibits T and W), the Board's
5  decision in Petitioner's case was the result of a politically inspired,
6  categorical rejection of parole for virtually all inmates with term-to-
7  life sentences.  The evidence has become overwhelming that the Board
8  has adopted the Governors' unlawful policy that denies all term-to-life
9  prisoners a fair hearing by failing to afford prisoners the presumption
10 of parole suitability required under P.C. §3041 (see McQuillion, supra,
11 at 901-902 and Biggs v. Terhune, supra, at 915), and by ignoring the
12 mandate of P.C. §3041(a) that "parole shall normally be granted."
13 Under this policy, persons convicted of parole eligible murders are
14 unable to get paroled in the manner required by law.  Ex-Governor Gray
15 Davis' political policy and bias against parole for term-to-life
16 prisoners is well established.  (See Exhibit U.)

17     Governor Davis has never denied nor disavowed his stated
18 political policy.  Of the 17,073 hearings during his time in office
19 from 1999 to 2003, only 394 prisoners were found to be suitable by the
20 Board (approximately 2.3%).  (See Exhibit U and Table 2)  Governor
21 Davis' record on parole rescissions demonstrates that he "normally
22 blocked" parole of the 394 prisoners found suitable by the Board
23 approximately 98.2% of the time, allowing only 8 prisoners to be
24 released.  (See Exhibits T, U, and W, p.11 Daily News article.)  Davis
25 typically only allowed parole for term-to-life prisoners whom he felt
26 were wrongfully convicted of murder, such as Battered Women Syndrome
27 victims.

28     The fact that only a select few prisoners were granted parole

1  under Governor Davis clearly indicates that the Board and Governor have

2  not been applying the statutory presumption of parole suitability and

3  have failed to follow the mandate of P.C. §3041 that parole "shall

4  normally be granted."   The California Supreme Court recognized a "no

5  parole" policy could exist (In re Rosenkrantz, 29 Cal.4th 616, at

6  p.684), though the Court held that Rosenkrantz failed to present

7  sufficient evidence to prove a blanket "no parole" policy by the

8  Executive Branch. (Id. pp.684-686.)   However, the Northern and Eastern

9  District Courts of California have since recognized that a blanket no

10 parole policy by the Executive Branch did exist under Governors Wilson

11 and Davis.   "[A] recent decision from the [U.S.] District Court [E.D.

12 Cal.] concluded that Governors Wilson and Davis operated under a

13 blanket no-parole policy for inmates serving sentences for murder."

14 (See Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1048-1049;

15 and Martin v. Marshall (N.D. Cal. 2006) 448 F.Supp.2d 1143, 1144-1145.)

16     The Board members are political appointments of the governor and

17 are/were expected to carry out Governor Davis' unlawful political

18 policy to "normally deny" parole in violation of P.C. § 3041.   The

19 composition of the Board, which has not changed significantly under

20 Governor Schwarzenegger (See Exhibit V), fails to comply with the

21 diversity mandated by P.C. §5075 and has the appearance of reflecting a

22 group of commissioners willing to comply with the governor(s) unlawful

23 policy.   (See Exhibit V for biographical information on

24 Commissioners.)[5]   In furtherance of the Governor's policy under the

25 _____

26 [5] The make-up of the Board Commissioners is predominantly that of ex-law
   enforcement, anti-crime, victims' rights and correctional backgrounds.  Police
27 Officers are normally excluded from juries, yet the majority of the Board is made-
   up of persons of law enforcement backgrounds.  This is particularly troubling in
28 Petitioner's case where the victim was an off-duty police woman; hence, Board
   Commissioners may harbor an unspoken sympathy for the victim and bias against
   parole for Petitioner.  As argued in Grounds 2 and 4, infra, the appearance of

1   Davis Administration and carrying on into the current administration,
2   the Board Commissioners (who depend on the graces of the governor for
3   their $100,000 per year income) have developed and maintained a policy
4   that illegally denied Petitioner his constitutional right to due
5   process and right to be free of arbitrary decision making.    (See
6   Ramirez, supra, 94 Cal.App.4th 549.  See also Exhibits T and W where
7   statistically the Board continues to normally deny parole under
8   Governor Schwarzenegger and herein at Table 2.)[6]

9        The appearance of bias and an illegal policy also exists where
10  the Board regularly skips over parole suitable prisoners, such as
11  Petitioner, while randomly selecting and finding suitable for parole
12  prisoners that have some deficiency in their prison record, criminal
13  history or crime characteristics that can be interpreted as being
14  particularly egregious.   (See Exhibit P, summary of 2005 Executive
15  Report and tabulation pages for a representative sample of second
16  degree murderers.)   For example, of the 107 quantifiable second degree
17  murderers found suitable by the Board in 2005, 85.1% committed express
18  malice murders or murders with aggravating circumstances; 67.3% had
19  prior arrests; 28% had multiple victims; 26.2% had gang affiliated
20  offense characteristics; and 68.2% had serious disciplinary reports
21  while incarcerated.   (Exhibit P.)   All of these characteristics are
22  commonly utilized by the Governor and/or Board to revoke/rescind parole
23  grants.   Indeed, 144 of 179 effective grants total for 2005 (82.4%)
24  were reversed or referred en banc.   (Exhibits P, T and W, p.1.)   Those

25  _____

26  bias exists in Petitioner's case where ex parte communication has occurred between
    the Board and Corona Police, and the Riverside District Attorney has been allowed
27  to exert prejudicial influence over the Board panel.
    [6] For instance, in June and July of 2006, Commissioner Davis conducted 83 parole
28  hearings, finding all but 1 prisoner unsuitable, a 98.8% denial rate. (Exhibit W,
    p.2.)  Petitioner was one of the 82 prisoners in that time frame found unsuitable
    by Commissioner Davis.

                                    Ground 5
                                    Page 9

1   less favorable candidates provide the Board and/or governor the means
2   to revoke/rescind parole at a later date, a tactic that Davis used 98.2
3   percent of the time (Exhibits T and U) and Schwarzenegger continues to
4   do with increasing frequency, as demonstrated by his blocking parole
5   grants at ratios of 2 out of 3 in 2004; 7 out of 9 in 2006; and 9 out
6   of 10 through the first two quarters of 2006.  (See Exhibits P, Q and
7   T; Exhibit W, pp.1-13; Exhibit X, SB-1522, p.6.)  This illegal policy
8   "pads" the Board's grant statistics making it "appear" that it provides
9   meaningful consideration.

10      In reality, this policy is an affront to due process in an
11  attempt to justify arbitrary and capricious decision making in pro
12  forma hearings, rather than the fairly reasoned consideration of
13  factors set forth in 15 CCR §2400 et seq., to which Petitioner and all
14  term-to-life prisoners have a constitutional right to receive.  In
15  comparison to the bulk of cases disclosed in the Governor's Reports
16  Life-Term Parole Consideration Summary 2005 for Second Degree Murder
17  (Exhibit P), Petitioner's rights were undeniably violated by the
18  Board's illegal policies when he was arbitrarily and capriciously
19  denied parole at the July 27, 2006 hearing.  (See Grounds 2 and 4,
20  infra.)

21      The Board continues to act exactly the same as described herein
22  under Governor Schwarzenegger.  The Board continues to ignore the
23  mandate that parole "shall normally" be granted and denied parole
24  approximately 96.4 percent of the time in 2005 (Exhibits T and W, pp.1-
25  3), statistically demonstrating a continued bias against parole.
26  Governor Schwarzenegger, whose stated policy is to "let the Board do
27  its job" and only rescind grants when he feels that the Board has made
28  an error (Exhibit W, pp.10-11), regularly reversed or referred en banc

1   2 out of 3 grants (146 of 225) in 2004.  (See Exhibits Q, T and  W,
2   pgs.1, 8-9 and 12-13.)   Nor is Governor Schwarzenegger's parole
3   practice and policy immune from political attacks by victims rights
4   groups, as indicated by the Crime Victims United efforts in the first
5   two quarters of 2005.  (Exhibit W, pgs.4-6 and 15-22.)   In fact,
6   Governor Schwarzenegger's frequency of blocking parole grants in 2005
7   increased to a ratio of 7 out of 9, reversing or referring en banc 144
8   of 179 parole grants.  (Exhibits P, T and W; pgs.1 and 15-22.)   And, in
9   the first half of 2006, the Governor has reversed or referred en banc
10  98 of 111 parole grants, a parole blocking ratio of 9 out of 10.
11  (Exhibit W, pgs.1, 15-22 and chart at p. 17.)

12      Governor Schwarzenegger's stated policy and his actions
13  demonstrate that the Board is deficient in doing its job of fairly
14  granting parole to suitable prisoners, such as Petitioner, because of
15  its illegal and biased policies against parole, and/or the Governor is
16  demonstrating a political bias against parole.  Either way, the result
17  is that parole suitability and release for term-to-life prisoners is
18  increasingly and "normally" denied and blocked, with the exception of a
19  slim few prisoners.  (See Exhibits T, W and X.)

20      While a plethora of other examples could be cited to demonstrate
21  that the Board and Governor(s) have adopted and applied an illegal bias
22  and policies against parole,[7] sufficient evidence exists here to
23  demonstrate that the Executive Branch (past and present) maintains an
24  illegal policy that denied Petitioner his freedom.  Petitioner has a
25  liberty interest and due process rights which require an impartial

26

27  [7]  Further evidence exists in the 1999 Joint Committee of the Legislature
    hearings, Senate Bill 1497 (2002), Senate Bill 1522 (2004), Albert Leddy's
28  declaration and OAL Determination #27, just to name a few.  See Exhibit X for the
    latter 3. (See Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1048-1049.)

1  hearing panel free of political agendas and actual bias against parole

2  (<u>Morrissey v. Brewer</u> (1972) 408 U.S. 471, at 486-489, 33 L.Ed.2d 484,

3  92 S.Ct. 2539; <u>Withrow v. Larkin</u> (1975) 421 U.S. 35, 43 L.Ed.2d 712, 95

4  S.Ct. 1456; <u>Schweiker v. McClure</u> (1982) 456, U.S. 188, at 195, 72

5  L.Ed.2d 1, 102 S.Ct. 1665; and <u>O'Bremski v. Maass</u> (9th Cir. 1990) 915

6  F.2d 418, at 422; 15 CCR §2250; and/or the appearance of bias <u>Gibson v.</u>

7  <u>Berryhill</u> (1973) 411 U.S. 564, 36 L.Ed.2d 488, 93 S.Ct. 1689 and <u>Exxon</u>

8  <u>Corp. v. Heinze</u> (9th Cir. 1994) 32 F.3d 1399). [8]

9         It is understandable that there is a reluctance to find that the

10  Board and the Governor are discharging their duties in an unlawful and

11  unconstitutional manner.  While the Board and Governor would like to

12  pretend that the problem does not exist and avoid the fallout that such

13  a finding would entail, it is important to consider that the Board and

14  Governor(s) created the problem.  Neither the Petitioner, nor the

15  Legislature, nor the courts have created this problem.  The courts have

16  a constitutional obligation to ensure compliance with Petitioner's

17  right to due process of law.  (<u>In re Liber R. Andrade</u> (2006) 46

18  Cal.Rptr.3d 317, 330.)

19  **B.    The Executive Branch's "No Parole" Policy, In Its Application, Is
    A Violation Of Due Process Of Law That Has Resulted In Petitioner**
20  **Serving A Disproportionate Term Of Incarceration.**

21         The Executive Branch has abdicated its statutory duty to

22  "normally" set parole dates.  It is legally irrelevant why they have

23  failed to set parole dates, as it is simply the case that they have

24

---

25  [8] An appearance of political bias also specifically exists as described in Ground
    2, <u>infra</u>, where the Board has been in <u>ex parte</u> contact with the Corona Police
26  Department and the Board instructed Detective Anderson on a method to ensure
    parole denials through increasing opposition to parole.  Further, the Board
27  allowed the District Attorney to exert political influence upon the panel at the
    July 27, 2006 hearing.  Thus, Petitioner's liberty interest would be particularly
28  at peril under a system of parole that allows political influence to guide the
    determination of parole suitability.

Ground 5
Page 12

1  failed to comply with the Legislative mandate. "Under Governors Wilson
2  and Davis, the state 'disregarded regulations ensuring fair suitability
3. hearings and instead operated under a sub rosa policy that all murders
4  be found unsuitable for parole.'" (Martin v. Marshall (N.D. Cal. 2006)
5  431 F.Supp.2d 1038, 1048-1049; and Martin v. Marshall (N.D. Cal. 2006)
6  448 F.Supp.2d 1143, 1144-1145.) As previously argued, evidence
7  demonstrates that Governor Schwarzenegger has continued the sub rosa
8  pattern set by Governors Wilson and Davis, albeit allowing slightly
9  more parole releases. (Exhibits T and W.) In support of this
10 evidence, it has been statistically demonstrated, infra, that the Board
11 has granted parole in only 2.20 percent of the hearings between 1990
12 and 2005, thus statistically proving that in fact, a "No Parole Policy"
13 exists. (Exhibit T and Table 2 herein.)

14     The basic infirmity with the Board's actions is that it
15 frustrates the mandate of the Legislature in P.C. §3041 that parole is
16 normally to be granted. By refusing to grant parole to more than 98
17 percent of term-to-life inmates, the Board is effectively amending the
18 penal statutes to make parole eligible sentences into parole ineligible
19 sentences and eliminating the concept of parole as envisioned by the
20 Legislature when they enacted P.C. §3041. Whether this is viewed as a
21 "No Parole" policy; an invasion of the legislative function by the
22 Executive Branch (i.e. a violation of the separation of powers
23 doctrine); a federal due process violation based on improperly
24 excluding inmates from the presumption of suitability as articulated in
25 McQuillion, supra at 902; or simply a statutory violation of P.C.
26 §3041, the action and its result are unlawful. The court in Ramirez
27 determined that a discriminatory application would be unlawful,
28 stating: "Nor could the Board routinely deny parole for a certain class

1    of prisoners under a blanket policy of the kind condemned in <u>Minnis</u>,

2    and shield itself with a case-by-case invocation of the "some evidence

3    standard." (<u>Ramirez, supra</u>, at 564.)

4         Further, the legislative intent did not envision that P.C. §3041

5    would be applied to prisoners in such a manner as to exclude them from

6    the benefits of its provisions. This fact is borne out by the

7    Legislature's attempt to modify the statute through Senate Bill 1522

8    (2004) and compel the executive branch to follow the intent of the

9    statute as it was originally conceived. (See Exhibit X.) The language

10   of P.C. §3041 is not itself defective. It is the application of the

11   statute that is constitutionally infirm. Assuming a broad and

12   unfettered level of discretion not apparent in the statute, the current

13   and former Governors and the Board have failed to administer the

14   statute in a Constitutional manner.

15        The California Supreme Court's decision in <u>In re Dannenberg</u>

16   (2005) 34 Cal.4th 1061[9] defines an unreviewable standard (i.e. the

17   "minimum necessary" standard) that further frustrates the legislative

18   intent and violates due process in that the court's interpretation

19   blocks aspects of proportionality statutorily prescribed by P.C.

20   §3041(a), as previously defined in numerous state and federal cases

21   over 25 years that specifically prohibit the Board on a case-by-case

22   basis from ignoring, overriding or destroying the proportionality

23   assigned to a term-to-life prisoner's offense as designated by his

24   distinct term of imprisonment.[10] As defined by P.C. §3041(a) and

25

26   [9] See Grounds 1, 2 and 4 for further arguments regarding <u>In re Dannenberg</u>.

27   [10] See Grounds 1, 2 and 4 for a detailed arguments concerning <u>In re Dannenberg</u>,
     <u>supra</u>, in relation to Petitioner's liberty interest and the unreviewable aspects
     of the "minimum necessary standard" in conflict with preexisting California

28   statutes; state and federal case law; and in violation of state and federal due
     process of law.

1  sustained by 25 years of state and federal court rulings, California's

2  parole scheme requires that parole release dates shall normally be set

3  in a manner that ensures uniformity of terms for crimes of similar

4  gravity, while making no provisions allowing prisoners to serve greater

5  than uniform terms, when the prisoner has an "exemplary" prison record.

6  (Exhibit A, pgs.55:1-11 and 150:12-21.)   (See In re Ramirez, supra, 94

7  Cal.App.4th at 570-571; Rosenkrantz, supra, 21 Cal.4th at p. 683; Biggs

8  v. Terhune, supra, at pp. 916-917; In re Stanworth (1982) 33 Cal.3d

9  176, at p. 182 [noting the significant changes to the Board's authority

10  following implementation of the UDSA version of P.C. §3041 et seq.,

11  including the need to set uniform terms for offenses of similar

12  gravity]; In re Seabock (1983) 140 Cal.App.3d 29, at 38 [holding, "the

13  legislature's primary command to the Board is that it 'shall set a

14  parole release date'"]; and Oxborrow v. Eikenberry (9th Cir. 1989) 877

15  F.2d 1395, 1399 [holding, "an unforeseeable, [even if] legitimate,

16  construction of state law by the courts may not be retroactively

17  applied to a defendant 'if a judicial construction of a criminal

18  statute is unexpected and indefensible by reference to the law which

19  had been expressed prior to the [actions] at issue,' it must not be

20  given retroactive effect"], citing United States v. Walsh (9th Cir.

21  1985) 770 F.2d 1490, 1492, quoting Bouie v. Columbia (1964) 378 U.S.

22  347, 354, 84 S.Ct. 1897, 12 L.Ed.2d 894.)

23      Constructed by the Board of Parole Hearings and adopted by the

24  legislature, the 15 CCR §2403 Uniform Term Matrixes tightly

25  circumscribe the authority of the Board to set dates proportionately

26  for like-crimes by providing three sentencing choices within each

27  matrix range, which are defined by crime and victim factors.  It would

28  be logically absurd and violate the legislative intent of P.C. §3041 et

1    seq. to set uniform terms for like-crimes and violate due process if
2    the Board was allowed to use offense characteristics to deny parole
3    long after the uniform term established by regulation (15 CCR §2403)
4    had passed.   (See <u>Little v. Hadden</u> (D.Colo. 1980) 504 F.Supp. 558, 564.
5    See also <u>Briggs v. U.S. Parole Commission</u> (8th Cir. 1984) 736 F.2d 446,
6    450; <u>Myrick v. Gunnell</u> (D.Conn. 1983) 563 F.Supp. 51, 54; <u>Allen v.</u>
7    <u>Hadden</u> (D.Colo. 1982) 546 F.Supp. 586, 596; <u>Baker v. McCall</u> (S.D.N.Y.
8    1981) 543 F.Supp. 498, 500, affirmed without opinion (2nd Cir. 1982)
9    697 F.2d 287; and <u>Branch v. Nelson</u> (D.Conn. 1979) 472 F.Supp. 569,
10   574.)

11   The California Court of Appeal in <u>Ramirez</u>, <u>supra</u>, 94 Cal.App.4th
12   564, at 570-571, and the California Supreme Court in <u>Rosenkrantz</u>,
13   <u>supra</u>, 29 Cal.4th 616, at 683, have spoken directly to the legislative
14   intent of P.C. §3041 holding that parole is normally to be granted even
15   for any term-to-life offense, and only the most "egregious" crimes as
16   compared with other similar offenses fall within the section 3041(b)
17   exception to granting parole at the initial hearing.   (See <u>Dannenberg</u>,
18   <u>supra</u>, 34 Cal.4th 1061, at 1094 ["...our conclusion does not contravene
19   <u>Rosenkrantz</u>..."].)   It simply can not be the case that approximately 98
20   percent of all offenses that come before the Board exhibit factors that
21   make the offenses "particularly egregious" compared to other term-to-
22   life crimes, or that approximately 98 parcent of all offenses before
23   the Board have characteristics that fall "outside" the matrix (15 CCR
24   2400, et seq.), an administrative regulation/tool specifically designed
25   to gauge and set terms for crimes of murder.   Thus, in regard to the
26   validity of P.C. §3041, the statute itself is valid.   It is the
27   Executive Branch's administration of the statute that is
28   unconstitutional.   (<u>In re Rodriguez</u>) (1975) 14 Cal.3d 639.)

1   Under California law, a court has a duty to construe a statute
2   according to legislative intent so as to effectuate its purposes.
3   (Woods v. Superior Court (1981) 28 Cal.3d 668, 679; Morris v. Williams
4   (1967) 67 Cal.2d 733, 737.)   The express purpose is to ensure that
5   prisoners serve similar terms for similar crimes in compliance with the
6   notions of proportionality and uniformity (P.C. §3041).   The
7   Legislature never intended to classify prisoners differently, thereby
8   excluding an entire group of prisoners from the benefits derived from
9   the statute.

10   Clearly, the Board may not promulgate or apply regulations that
11   alter, omit or interpret statutes in a manner inconsistent with the
12   clear legislative intent.   (Terhune v. Superior Court (1998) 65
13   Cal.App.4th 864, 872-873; Cal. Government Code §11342.2.)   However, by
14   failing to normally grant parole (even if they allow parole in the
15   modicum of cases, which is exactly what the Board and Governor are now
16   doing), they are failing to comply with and administer the statute in a
17   manner consistent with legislative intent.   The result is that the
18   legislative intended benefits of P.C. §3041 are denied to the prisoners
19   entitled to them.   Whether termed a "No Parole" policy; a statutory
20   violation; an infringement of the Legislative power by the Executive
21   Branch; or a failure of the Executive Branch to administer the
22   Determinate Sentencing Law statutory scheme in violation of due process
23   of law for term-to-life prisoners, the effect is the same.   Prisoners
24   deserving of parole and entitled to release under the statutes and
25   regulations are remaining incarcerated beyond their appropriate terms.
26   Petitioner deserves parole, yet he remains wrongfully incarcerated and
27   is entitled to relief.

28   In Petitioner's case, just as in Ramirez, the Board panels since

1  1997 have merely paid "lip service" to the applicable law and rules,

2  reciting a number of stock reasons for denial of parole in a <u>post hoc</u>

3  rationalization of decisions already made, failing to actually consider

4  the evidence before them in making a decision.   P.C. §3041(a) directs

5  the Board to establish criteria ensuring that terms will be set in a

6  manner providing uniformity for offenders committing the same offense

7  under similar circumstances.   Petitioner has been denied this statutory

8  mandate resulting in a disproportionate term of imprisonment.

9        There are two issues of proportionality presented herein.[11]   The

10  first issue involves consideration of what the Board must look at when

11  determining the question of suitability, starting at the initial parole

12  consideration hearing where the inmate is presumed to be suitable under

13  the doctrine of <u>McQuillion</u>, <u>supra</u> at 901-902.   The second issue is the

14  determination first addressed in <u>Ramirez</u>, <u>supra</u> at 571, when the court

15  noted that even if the finding regarding the offense is supported by

16  "some evidence," continued reliance on the crime after years in custody

17  and over the course of multiple parole hearings becomes arbitrary.

18  This rule has since been stated by the Ninth Circuit in <u>Biggs v.</u>

19  <u>Terhune</u>, <u>supra</u>, at 916-917, and further clarified in <u>Irons v. Carey</u>

20  (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072, pp.3074-3075, where the

21  Court defined a bright line rule as the minimum number of years of the

22  sentence as the limit for the use of crime factors beyond the minimum

23  necessary to convict to deny parole suitability.   (See also <u>Rosenkrantz</u>

24  <u>v. Marshall</u> (C.D. Cal. 2006) 444 F.Supp.2d 1063, pp.1080-1088; <u>Martin</u>

25  <u>v. Marshall</u> (N.D. Cal. 2006) 431 F.Supp.2d 1038, pp.1046-1048; and <u>In</u>

26  _____

27  [11] See Ground 4, <u>ante</u>, for a specific and general like-terms for like like-crimes
    arguments based on affirmative suitability findings and case law; evidence

28  regarding Petitioner's comparative suitability at the time of the July 27, 2006
    hearing; and proportionality arguments regarding the Board's duty to conduct a
    like-crimes case analysis at every hearing.

1  re Dannenberg, supra, 34 Cal.4th 1061, at p. 1100, leaving open this

2  aspect of Ramirez, supra, at 571.)

3      On the first issue, the California Supreme Court has itself

4  acknowledged the importance of proportionality to suitability

5  determination when it stated that denying parole for anything but a

6  "particularly egregious" offense "...would destroy the proportionality

7  contemplated by Penal Code §3041...." (In re Rosenkrantz, supra, 29

8  Cal.4th at 683.)  The Board must use the matrix term to provide

9  uniformity for offenders committing similar offenses under similar

10 circumstances at the initial hearing, unless evidence indicates that

11 the prisoner poses an especially unreasonable risk of danger if

12 released.  (P.C. §3041 and 15 CCR §2400 et seq.)  P.C. §3041(b) does

13 not say that suitability is first determined, and then proportionality

14 is only addressed if the inmate is found suitable.  The plain meaning

15 of the statute is clear: "The Board shall set a release date unless it

16 determines that the gravity of the current convicted offenses... is

17 such that the consideration of public safety requires a more lengthy

18 period of incarceration... and that a parole date, therefore, cannot be

19 fixed at this meeting." (P.C. §3041(b).)  The provision is explicitly

20 referring back to the "meeting" described in P.C. §3041(a) where at the

21 initial "meeting" the Board "shall normally set a parole release date."

22 (See also In re Seabock (1983) 140 Cal.App.3d 29, 38, holding that

23 "[t]he Legislature's primary command to the Board is that it 'shall

24 normally set a parole release date.'")

25      The McQuillion court has made it abundantly clear that, as a

26 matter of federal due process, the language of P.C. §3041 gives rise to

27 the presumption of parole suitability.  (McQuillion, supra at 901-902.)

28 If the Board is to normally set a parole release date, then they are to

1 normally consider the issue of proportionality.  The two requirements
2 are integral to due process under the statute.[12]

3    The Board is presumptively aware that 15 CCR §2403(c) requires
4 that Petitioner's term be set no greater than 20 years against which
5 the post-commitment credits of four (4) months for each twelve (12)
6 months are applied under 15 CCR §2410.  Petitioner has now served 20
7 calendar years with an adjusted sentence for good time credits of 26
8 years, 6 months and still has no release date.  The Board's failure to
9 grant Petitioner a parole date has resulted in a situation where he is
10 serving a grossly disproportionate sentence for no valid reason.[13]
11 This has resulted in a denial of due process rights, since the
12 Petitioner remains in prison for no other reason than it is the policy
13 of the Executive Branch to deny parole to virtually any convicted
14 murderer.

15    With respect to the second proportionality issue, the Ninth
16 Circuit in Biggs v. Terhune, stated that the Board's "...continued
17 reliance on an unchanging factor, the circumstances of the offense and
18 conduct prior to imprisonment, runs contrary to the rehabilitative
19 goals espoused by the prison system and could result in a due process
20 violation."  (Biggs, supra, at 917; Irons v. Carey, supra, at 3073-3075
21 [reiterating the Biggs doctrine as law of the Circuit at p.3074];

22

23

[12] Also see Grounds 1 and 4, ante, where the Board can not pick and choose between
24 the mandatory language of P.C. §3041.  All of the liberty interest language of
   P.C. §3041 et seq. is protected by the Due Process Clause, and all protected
25 language must be given equal weight when interpreting and applying the statute.
   [13] See Grounds 2 and 4 for examples of how much time Petitioner should serve in
26 comparison to other second degree murderers, through state and federal case law
   comparisons and comparisons based on Governors Reports on Parole Review Decisions
27 (1991-2005).  Petitioner, having now served 20 calendar years with no reduction
   for good time credits, is now serving a proportionately excessive term according
28 to these case comparisons and in violation of the 15 CCR §2403(c) matrix category
   C-III of 18-19-20 years.

1  <u>Martin V. Marshall</u> (N.D. Cal. 2006) 431 F.Supp.2d 1038, pp.1046-1048:
2  and <u>Rosenkrantz v. Marshall</u> (C.D. Cal. 2006) 444 F.Supp.2d 1063,
3  pp.1080-1088.)   The <u>Biggs</u> court went on to say that when an inmate
4  demonstrates continued exemplary conduct, "...denying him a parole date
5  simply because of the nature of [the inmate's] offense and prior
6  conduct would raise serious questions involving his liberty interest in
7  parole."   (<u>Id</u>. At p.917.)

8      This aspect of proportionality was first addressed in <u>Ramirez</u>,
9  <u>supra</u>, and expressly adopted by the California Supreme Court in
10 <u>Rosenkrantz</u> (2002), 24 Cal.4th at pp. 655, 657, 658, 660 and 683.  The
11 <u>Ramirez</u> court stated that even when "some evidence" exists to support a
12 parole denial (in turn allowing a habeas writ to be denied on that
13 basis), a second level analysis is done to determine if the continued
14 reliance on the static facts of the crime or priors has become
15 arbitrary due to the length of time served.  This is precisely what the
16 <u>Biggs</u> court affirmed.  (<u>Biggs</u>, <u>supra</u>, at 917.)  This analysis requires
17 a court to look at the length of time served beyond the MEPD and in
18 relation to the uniform matrix terms, 15 CCR §2403(c), in order to
19 determine if the sentence "has become" disproportionate to the
20 prisoner's level of culpability.  (See <u>Irons v. Carey</u>, <u>supra</u>, at 3074-
21 3075. [defining the bright line rule.].)

22     The <u>Rosenkrantz</u> (2002) decision expressly adopted the <u>Ramirez</u>
23 Court's recognition that there must be proportionality in terms set for
24 the various term-to-life offenses, and the intent of proportionality is
25 demonstrated by the Legislature's different minimum terms (e.g. 7-to-
26 life, 15-to-life and 25-to-life).  (<u>Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at
27 683.)  Rosenkrantz has now been released from custody by both state and

28

1   federal decisions based on these same principles.[14]   Therefore, there
2   must come a time when Petitioner's term must be viewed as excessive in
3   relation to the punishment that applies to similar offenses.   The Biggs
4   decision takes this issue a step further, highlighting the unfairness
5   of repeatedly denying parole on the unchanging nature of the offense
6   while the Petitioner has done everything possible to change his life in
7   a positive fashion and shown, convincingly, actual rehabilitation.
8   (Irons v. Carey, supra, at pp.3074-3075.)

9       Six Board panels have refused to even set a parole date for
10  Petitioner, the last four (4) based solely on the commitment offense
11  (Exhibit N), despite the fact that no post-conviction conduct shows
12  Petitioner to be a threat or danger to society.   Simply stated,
13  Petitioner's offense does not present any unique or complicated factors
14  that would make it necessary for the Board to defer setting a date.
15  The Board has already had the opportunity to see how Petitioner
16  performs in custody, watching him program in an exemplary manner for 20
17  years.   All the correctional experts agree that Petitioner would be a
18  very low risk if released.   (Exhibits B, C, F and G.)   Nothing is going
19  to change before Petitioner's next subsequent hearing, tentatively
20  scheduled for 2007.

21      Each of the Board panels have expressly relied on the commitment
22  offense to establish unsuitability, despite a perfect, "exemplary"
23  prison record.   (Exhibit A, pgs.55:1-11 and 150:12-21.)   The Board's
24  explanation that it needs more time to evaluate Petitioner after 20
25  years of completely positive programming is simply a hollow excuse to
26  avoid setting a parole date as required by P.C. §3041.   Hence, the

27

28  [14] See Rosenkrants v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1080-1088; In
re Rosenkrantz VI (2006) Superior Court order at accompanying Notice/Motion for
Judicial Notice, Exhibits C, D and E; and infra at Grounds 2 and 4.

1  refusal to set a parole date at the July 27, 2006, hearing is erroneous

2  as a matter of law; as a result, Petitioner's sentence has become

3  disproportionate to his crime.

4      In sum, a 16 year statistical body of evidence revealing a bias

5  against parole for murderers exists to demonstrate that the

6  Board/Executive Branch has abused its discretion by failing or refusing

7  to act in accordance to its own guidelines and statutory law.  At the

8  July 27, '2006 hearing, the Board's failure to follow the law and its

9  continued application of an arbitrary and irrational standard in

10 Petitioner's parole hearing process has violated his due process rights

11 and rendered his sentence disproportionate in violation of the law and

12 the intent of the legislature.  Given the unwillingness of the Board

13 and the Governor to correct this situation, the only remedy is by way

14 of writ of habeas corpus.

15 /  /  /

16 /  /  /

17 /  /  /

18

19

20

21

22

23

24

25

26

27

28

7. ~~Supporting~~ Ground __6__ *(if applicable):*

APPLYING THE SOME EVIDENCE STANDARD OF REVIEW TO THE BOARD'S DECISION
IS AN UNREASONABLE APPLICATION OF STATE AND FEDERAL LAW IN VIOLATION OF
PETITIONER'S DUE PROCESS RIGHTS.

a. Supporting facts:
See Ground 6 Attached.

b. Supporting cases, rules, or other authority:
See Ground 6 Attached.

GROUND 6

**APPLYING THE SOME EVIDENCE STANDARD OF REVIEW TO THE BOARD'S DECISION IS AN UNREASONABLE APPLICATION OF STATE AND FEDERAL LAW IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS.**

a.   Supporting facts:

1.   On July 27, 2006 Petitioner appeared before the Board for his sixth (6) parole consideration hearing and was denied parole suitability by the Board panel which alleged "some evidence"[1] to deny parole in its decision.   The some evidence standard was first adopted by the California Supreme Court in the case of In re Powell (1988) 45 Cal.3d 894, 902-904, and the standard has since been refined and modified by state court decision(s) as it applies to judicial review and Board of Parole Hearings.[2]   (See In re Ramirez (2001) 94 Cal.App.4th 549, 564; In re Rosenkrantz (2002) 29 Cal.4th 616, 658, 665 [adopting "any modicum of evidence"] 677, 678 and 683; and In re Dannenberg (2005) 34 Cal.4th 1061, 1095 [minimum necessary].)   While it logically follows that the Board, in making a parole suitability determination, must find at least "some evidence" to deny parole, there

---

[1] While Petitioner has argued in Grounds 1 through 5, ante, challenge(s) to his denial of parole under the some evidence standard as required by law, Petitioner now argues that the some evidence standard is itself inadequate and unlawful for the purpose of parole suitability determination.   Petitioner herein asserts that the preponderance of evidence standard is the lawful standard of proof.

[2] Although the some evidence standard is the court-imposed standard for judicial review of parole hearings, the some evidence standard is also the standard of proof utilized by the Board "during" parole suitability hearings.   While the Board's administrative "guidelines" for determining parole suitability are set forth under 15 CCR § 2402 et seq., those "guidelines" can not be imposed unless there is "some evidence" (or any modicum of evidence) to find that a "guideline" applies to unsuitability.  (e.g. In order to apply 15 CCR 2402(c)(1)(A) to a finding of unsuitability, there must be "some evidence" that, in fact, multiple victims were attacked or killed.)   Hence, when the Board denied parole to Petitioner, herein, its decision was based on some modicum of evidence that the Petitioner remained a threat to public safety, and the Board set forth its reasons for denial in the decision based on the guidelines provided by 15 CCR §2402 et seq., as defined and argued in depth at Ground 2, infra.

1   is no evidence or indication that the Board applies any standard of

2   proof other than some evidence.

3       2.  The some evidence standard is not defined by Legislative

4   enactment.  While no California statutory code or regulatory provision

5   prescribes the standard of proof in parole consideration hearings, a

6   "preponderance of the evidence" is widely utilized by the California

7   Department of Corrections and Rehabilitation (CDCR) and the Board of

8   Parole Hearings in disciplinary, rescission (particularly when based on

9   disciplinary violations) and other hearing determinations that involve

10  the delay, possible and/or actual loss of liberty.  It is also clear

11  that California Evidence Code §§115 and 605 provide that if a standard

12  of proof is not provided, the default standard is a preponderance of

13  the evidence.  The California Evidence Code is defined by the state

14  legislature; thus, a preponderance of the evidence standard is the

15  lawful standard of proof to be used in parole suitability hearings.

16      3.  Some evidence, as a standard of proof, is lawfully inadequate

17  for determining Petitioner's (as a term-to-life prisoner) parole

18  suitability, which is a vested liberty interest right (P.C. §3041 et

19  seq.) protected by due process of law under the U.S. Constitution.

20  (See <u>Greenholtz v Nebraska Penal Inmates</u> (1979) 442 U.S. 1, 60 L.Ed.2d

21  668, 99 S.Ct. 2100; <u>Board of Pardons v. Allen</u> (1987) 482 U.S. 368 at

22  381, 96 L.Ed.2d 303, 107 S.Ct. 2415; <u>Perveler v. Estelle</u> (9th Cir.

23  1992) 974 F.2d 1132); <u>McQuillion v. Duncan</u> (2002) 306 F.3d 895, at

24  p.902; <u>Biggs v. Terhune</u> (2003) 334 F.3d 910; and <u>Irons v. Carey</u> (9th

25  Cir. 2007) __ F.3d __, 2007 DJDAR 3072, p.3073.  Also see <u>In re Wen</u>

26  <u>Lee</u>, 49 Cal.Rptr.3d 931, 936; and <u>In re Elkins</u>, 50 Cal.Rptr.3d 503,

27  520-521 [both cases defining that "some evidence" must reliably

28  demonstrate a parolee's release unreasonably endangers public

1  safety.].)

2       4.   Because the Board relied on the some evidence standard in

3  determining Petitioner's parole suitability, instead of a preponderance

4  of the evidence standard, Petitioner's July 27, 2006 parole suitability

5  hearing was in violation of California statutory code, due process of

6  law under the State and Federal Constitutions and is contrary to

7  clearly established United States Supreme Court law.

8  **b.    Supporting cases, rules or other authority:**

9       No California statutory code or regulatory provision prescribes

10  the standard of proof in parole consideration hearings.   The judicial

11  standard of review for a decision by the Board of Prison Terms denying

12  parole to a prisoner is the some evidence standard, which has been

13  further defined by court rulings to apply in parole consideration

14  hearings.   (In re Dannenberg (2005) 34 Cal.4th 1061, 1095 [more than

15  the minimum necessary to convict];[3] In re Rosenkrantz (2002) 29 Cal.4th

16  616, 658, 664, 665 [any modicum of evidence], 683; In re Ramirez (2001)

17  94 Cal.App.4th 549, 564; In re Powell (1988) 45 Cal.3d 894, 902-904;

18  Biggs v. Terhune, supra, at 915-916; McQuillion v. Duncan, supra, at

19  904-905; and Jancsek v. Oregon Board of Parole (9th Cir. 1987) 833 F.2d

20  1389.)   There is no indication that the Board applies any other

21  standard of proof than some evidence when making parole suitability

22  determinations.   It should be recognized, however, that several courts

23  are struggling to determine exactly how this standard is to be applied.

24  One thing is for certain, even if a mere some evidence standard is to

25  apply, that standard is only a vehicle for the court's review of the

26

27  [3] The Dannenberg "more than the minimum necessary to convict" formulation is not a
    statutory or regulatory factor for determining unsuitability.  Rosenkrantz, supra,
28  stands for the parole decision being based on "specified factors" and
    "individualized consideration." (Id., pgs.658 and 677.)

1  Board's decision, not a standard of proof for the Board itself to

2  apply.  (See Hamdi v. Rumsfeld (2004) 542 U.S. 507, at 537, 159 L.Ed.2d

3  578, 124 S.Ct. 2633, at 2651.)

4       The findings to support that initial decision by the Board to

5  deny parole, however, must be that proof in the record which indicates

6  that Petitioner poses a "current and unreasonable" danger to the

7  public.  (P.C.§3041.)   That finding must have some indicia of

8  reliability and can not be based on such flimsy evidence as to render

9  it whim, caprice or rumor.  (See In re Ramirez, supra, at 564; In re

10 Powell, supra, at 902; In re Scott II (2005) 133 Cal App.4th at 594-

11 595; Biggs v. Terhune, supra, at 913-915; and Jancsek v. Oregon Board

12 of Parole (9th Cir. 1987) 833 F.2d 1389, 1390.)   As defined in In re

13 Rosenkrantz, supra, "[a]s long as the [Board's] decision reflects due

14 consideration of the specified factors... in accordance with applicable

15 legal standards, the Court's review is limited to ascertaining whether

16 there is some evidence in the record that supports the [Board's]

17 decision."  (Id. At 677.  See also p.658 [where the court defines

18 "specified factors" as being defined by statute and regulation.].)

19 However, "[t]he test is not whether some evidence supports the reasons

20 the [Board] cites for denying parole, but whether some evidence

21 indicates a parolee's release unreasonably endangers public safety."

22 (In re Wen Lee, supra, at 936.  See also In re Elkins, supra, at 520-

23 521; and Ground 2, herein, discussing the requirements of some

24 evidence.)

25      Furthermore, Petitioner contends that the Dannenberg "more than

26 minimally necessary to convict" formulation is not a statutory or

27 regulatory factor of unsuitability.  A holding that the Board merely

28 needs to point to some evidence beyond what is minimally necessary to

1    convict fails to satisfy the required evidentiary standard for

2    determining parole suitability in California.    To the contrary, as set

3    forth herein, the Board's decision must be made under a preponderance

4    of the evidence standard.

5         Prior to the 1980s, there was no standard known as the some

6    evidence standard.    The some evidence standard relied upon by the

7    courts in parole matters over the past two decades evolved from the

8    United States Supreme Court case <u>Superintendent, Massachusetts</u>

9    <u>Correctional Institution at Warpole v. Hill</u> (1985) 472 U.S. 445, 86

10   L.Ed.2d 356, 105 S.Ct. 2768.    That case involved the standard of proof

11   required to support a finding of guilt in a prison disciplinary

12   proceeding, and a subsequent court's review of that decision.[4]    The

13   Supreme Court held that because no standard of proof was dictated by

14   the prison authority's regulations in Massachusetts, the U.S.

15   Constitution's guarantee of due process only required that the court

16   reviewing the decision find some evidence be present to support the

17   hearing officer's determinations.    Hence, the some evidence standard

18   was born into case law.

19

20   [4] Prison disciplinary proceedings, such at those in <u>Superintendent v. Hill</u>, often
     involve "exigent circumstances" that require swift action based on minimal or

21   insubstantial evidence in the interest of prison operations and security.
     Petitioner's denial of parole suitability, however, is a "liberty interest" issue

22   involving the determination of release on parole which is a statutorily defined
     (P.C. §3041 et seq.) and federally protected due process right. (<u>Greenholtz v</u>

23   <u>Nebraska Penal Inmates</u> (1979) 442 U.S. 1, 60 L.Ed.2d 668, 99 S.Ct. 2100; <u>Board of</u>
     <u>Pardons v. Allen</u> (1987) 482 U.S. 368 at 381, 96 L.Ed.2d 303, 107 S.Ct. 2415;

24   <u>Perveler v. Estelle</u> (9th Cir. 1992) 974 F.2d 1132); <u>McQuillion v. Duncan</u> (2002)
     306 F.3d 895, at p. 902; <u>Biggs v. Terhune</u> (2003) 334 F.3d 910; and <u>Irons v. Carey</u>

25   (9th Cir. 2007) __ F.3d __, 2007 DJDAR 3072, p.3073.) At the time that the <u>Powell</u>
     court adopted the some evidence standard, term-to-life prisoners' vested liberty

26   interest right protected by federal law was not recognized as it is now (<u>Id.</u> 903),
     under the aforementioned case law.  Furthermore, Petitioner's "liberty interest in

27   parole" issue should not be confused with internal "prison administrative
     segregation liberty interest" issues described in <u>Sandin v. Connor</u> (1995) 515 U.S.

28   472.

Ground 6
Page 5

1        Subsequent courts (<u>McQuillion</u>, <u>supra</u>, <u>In re Rosenkrantz</u>, <u>supra</u>,

2    <u>In re Dannenberg</u>, <u>supra</u>, <u>In re Ramirez</u>, <u>supra</u>, <u>In re Powell</u>, <u>supra</u>, and

3    the progeny following those cases) have applied the <u>Hill</u> "some

4    evidence" standard to the standard of proof required by the

5    Constitution in upholding Board of Prison Terms findings denying parole

6    suitability in California.  This has been based on a presumption by the

7    courts that there is no higher standard required by the Board's

8    regulations or statutory prescription.  This presumption is flawed.

9    Applying the some evidence standard as a standard of proof for parole

10   suitability determinations is contrary to clearly established United

11   States Supreme Court law, in violation of Petitioner's protected

12   liberty interest in parole and due process of law.

13       Unlike the circumstances in <u>Hill</u>, the California Department of

14   Corrections and Rehabilitation does provide a standard of proof greater

15   than some evidence for a finding of guilt in disciplinary matters.

16   California legislative and corrections lawmakers have determined that a

17   prisoner's liberty is important enough that before any prisoner's

18   freedom can be delayed due to loss of credits imposed upon a finding of

19   guilt in a disciplinary hearing, the finding of guilt must be supported

20   by a preponderance of the evidence.  (See 15 CCR §3320(1) [...guilt

21   shall be based upon determination by the official(s) conducting the

22   disciplinary hearing that a preponderance of the evidence...].)  The

23   Department of Corrections and Rehabilitation requires a preponderance

24   of evidence standard of proof in any disciplinary finding of guilt that

25   would result in the loss of liberty.  That refers to everyone within

26   the CDCR's jurisdiction, including those inmates already released on

27   parole.  CDCR reiterated the importance of the preponderance standard

28   when it promulgated its rules on findings of guilt and imposition of

1  credit loss on offenders for illegal substance violations.  (See 15 CCR

2  §3290(g) and (h) [Testing of controlled substances.].)

3      These examples distinguish the standard of proof that should be

4  recognized in California from the standard recognized by the United

5  States Supreme Court in Superintendent v. Hill, supra.  While the state

6  in Hill had no standard of proof defined to authorize the imposition of

7  loss of credits (thus extending a prisoner's period of incarceration),

8  the State of California does--it imposes a requirement of a

9  preponderance of evidence standard of proof to be found by any finder

10  of fact before any denial of liberty can be imposed upon an offender

11  for disciplinary violations.

12      In the pertinent California Penal Code sections (§§190, 1168 and

13  3041 et seq.) and Board of Prison Terms Regulations (15 CCR Div. 2),

14  there is no specific standard of proof defined for the purpose of the

15  parole consideration hearing process.  There is, however, sufficient

16  evidence in 15 CCR Divisions 2 and 3[5] and the California Evidence Code

17  §§115 and 605 to impose a preponderance of evidence standard of proof

18  in parole consideration hearings, which would thereby exclude the

19  presumption of a "minimum" some evidence standard required by the

20  Constitution as described in Superintendent v. Hill, supra, or imposed

21  by the California courts. (e.g. In re Dannenberg (2005) 34 Cal.4th

22  1061, 1095; In re Rosenkrantz (2002) 29 Cal.4th 616, 658, 665, 683; In

23  re Ramirez (2001) 94 Cal.App.4th 549, 564; In re Powell (1988) 45

24  Cal.3d 894, 902-904; Biggs v. Terhune, supra, at 915-916; McQuillion v.

25  Duncan, supra, at 904-905; and Jancsek v. Oregon Board of Parole (9th

26

27  _____

28  [5] The latter having been discussed ante in terms of disciplinary and credit loss
    standards (15 CCR §§3020(1); 3290(g) and (h); and post at 3000 defining good
    cause.

1   Cir. 1987) 833 F.2d 1389)[6]

2       For instance, in the process to which the Board must adhere

3   before extending an offender's incarceration by way of postponement or

4   rescission of release, the Board has provided strict guidelines.[7]  15

5   CCR §2450 provides very clearly that "good cause" is the burden of

6   proof at rescission hearings.  "Good cause" is a specific, legally and

7   regulatory defined standard.  (See 15 CCR §2000(b)(5).)  The Department

8   of Corrections and Rehabilitation's rules and regulations mirror that

9   recognition of what is required to substantiate good cause at 15 CCR

10  §3000: "Good cause means a finding based upon a preponderance of the

11  evidence that there is a factual basis and good reason for the decision

12  made."  The Board's rules defined in 15 CCR §2451 provide that delay or

13  rescission of release can be imposed by the Board if the inmate is

14  found guilty of certain disciplinary actions. As shown above, any

15  finding of guilt in any disciplinary hearing in California requires

16

17

18

19  [6] Indeed, against the backdrop of cases defining "some evidence" as the standard
    for Board decisions and court review (and in accord with the arguments to follow),
20  there are a number of other cases that point to a "good cause" standard of proof
    and review based on a preponderance of the evidence, including In re Caswell
21  (2001) 92 Cal.App.4th 1017, 1024; In re Powell (1988) 45 Cal.3d 894, 901; In re
    Clutchette (1974) 39 Cal.App.3d 561, 565; In re Monzo (1973) 33 Cal.App.3d 144,
22  147; In re Brown (1967) 67 Cal.2d 339, 342; and In re McClain (1960) 55 Cal.2d 78,
    87.  See also 15 CCR §§2450 and 2000(b)(49).
23  [7] Coincidently, the Board's own regulations under 15 CCR §2450 et seq. for
24  conducting a rescission hearing are at odds with the some evidence standard
    required for judicial review established in Powell, supra, and its progeny of
25  rescission related case law.  In fact, since the Board's regulations were clear on
    the standard of proof (good cause/preponderance of the evidence) as described
26  herein, the court's In re Powell, supra, decision, unlawfully imposed a lesser
    standard of proof upon the Board in the rescission hearing process.  The Powell
27  court specifically adopted the some evidence standard to the process of rescission
    hearings (Id. at 902-904.)  It makes no sense (lawful or otherwise) that the
28  Board's regulations require a greater standard of proof than what the court
    demands for the rescission process and judicial review.

1  support by a preponderance of the evidence.[8]

2      While the aforementioned regulations point to a requirement of

3  the preponderance of evidence standard for the purpose of parole

4  consideration hearings under Hill, California statutory law is

5  undeniably clear.  California Evidence Code §115 provides that if a

6  standard of proof is not provided, the default standard is a

7  preponderance of the evidence.  Moreover, because P.C. §3041 et seq.

8  creates a liberty interest and presumption of release on parole as

9  defined under Greenholtz, Allen, and McQuillion, the existence of this

10  "presumption of parole" is critical in mandating a preponderance of the

11  evidence under California Evidence Code §605 as a standard of proof in

12  Board hearings.[9]  Clearly established U.S. Supreme Court authority

13  requires that when a state adopts certain procedures for a hearing (as

14  California has under P.C. §3041 et seq., 15 CCR Division Two and

15  Evidence Code §115 and 605), any person involved in that process is

16  entitled to the benefit of those procedures.  (Evitts v. Lucey (1985)

17  469 U.S. 387, 393; and see also Griffin v. Illinois (1956) 351 U.S. 12,

18  20.)  Therefore, because neither the California Penal Code nor the

19  California Code of Regulations (15 CCR Div. 2) prescribes a standard of

20  proof for parole consideration hearings for indeterminate term

21  offenders, the correct statutory standard of proof applicable is a

22  preponderance of the evidence under the California Civil Code, §§115

23

24  [8] Furthermore, to deprive a parolee of his/her liberty interest outright, 15 CCR
    §2600 requires "probable cause" to place a parole hold on a parolee pending a
25  parole revocation hearing.
    [9] California Evidence Code §605 provides: "A presumption affecting the burden of
26  proof is a presumption established to implement some public policy other than to
    facilitate the determination of the particular action in which the presumption is
27  applied, such as the policy in favor of establishment of a parent and child
    relationship, the validity of marriage, the stability of titles to property, or
28  the security of those who entrust themselves or their property to the
    administration of others."  (Emphasis added.)

1  and 605.

2      As argued herein, the some evidence standard is lawfully

3  inadequate for determining Petitioner's parole suitability.

4  Petitioner's liberty interest right is created by state statutory

5  mandate (P.C. §3041 et seq.) and federally protected by due process of

6  law under the United States Constitution and clearly established

7  federal case law, including United States Supreme Court precedent.

8  (See Greenholtz v Nebraska Penal Inmates (1979) 442 U.S. 1, 60 L.Ed.2d

9  668, 99 S.Ct. 2100; Board of Pardons v. Allen (1987) 482 U.S. 368 at

10 381, 96 L.Ed.2d 303, 107 S.Ct. 2415; Perveler v. Estelle (9th Cir.

11 1992) 974 F.2d 1132); McQuillion v. Duncan (2002) 306 F.3d 895, at p.

12 902; Biggs v. Terhune (2003) 334 F.3d 910; and Irons v. Carey (9th Cir.

13 2007) __ F.3d __, 2007 DJDAR 3072, pp.3073-3075.)  Petitioner's

14 protected liberty interest in parole requires, at minimum, that a

15 preponderance of the evidence standard of proof be required by the

16 Board of Prison Terms in making parole suitability determinations.[10]

17     Based on individualized consideration as argued in all Grounds

18 herein, there was no "preponderance of the evidence" that clearly

19 demonstrated by regulation or statute that Petitioner was unsuitable

20 for parole at the July 27, 2006 parole hearing.  As such, Petitioner's

21 continued incarceration is unlawful and in violation of due process of

22 law under the Fifth and Fourteenth Amendments to the United States

23 Constitution.

24 /  /  /

25

26

[10] In fact, in a state where prisoners facing a parole authority also have a
27 Constitutionally protected liberty interest in parole, the Supreme Court of
Minnesota recently came to this exact conclusion in Carillo v. Fabian (2005) 710
28 NW 2d 763, 777 and at 775 citing Hamdi v. Rumsfeld, supra, 542 U.S. 507, at 537,
159 L.Ed.2d 578, 124 S.Ct. 2633, at 2651; and Superintendent v. Hill, supra.

Ground 6
Page 10

**PRAYER FOR RELIEF**

Wherefore, Petitioner requests that this court:

1. Issue a writ of habeas corpus or order to show cause to the Director of the Department of Corrections and Rehabilitation and/or the Board of Parole Hearings to inquire into the legality of Petitioner's incarceration;

2. Order the immediate release of Petitioner, or alternatively, order the Board to hold a new parole hearing within forty-five (45) days, and, if no new information is presented that establishes that Petitioner poses a present threat of future violence, find Petitioner suitable for parole and set a release date;

3. Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing issue an order directing the Board to act as set forth in paragraph 2, above;

4. Order further parole hearings to be timely held and to proceed in a manner that comports with due process as specified by applicable statute and regulation;

5. After the proper setting of a parole release date, apply all post-term custody time defined by the 15 CCR §2403(c) matrix as "surplus time served" towards Petitioner's maximum parole period, and if five (5) years following the uniform term have passed, grant a discharge free and clear of parole (<u>Martin V. Marshall</u> (N.D. Cal. 2006) 448 F.Supp.2d 1143, 1145); and

6. Grant such other and further relief as justice may require.

Dated: 16 APRIL 2007  Respectfully Submitted,

Harold H. Hawks
In Pro Per

/   /   /

8. Did you appeal from the conviction, sentence, or commitment?  [XX] Yes.  [ ] No.  If yes, give the following information:

  a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
    **California Court of Appeal, Fourth Appellate District, Division Two.**

  b. Result: **Denied.**      c. Date of decision: **1098**

  d. Case number or citation of opinion, if known:  **Eoo4478**

  e. Issues raised:  (1)  **Change of Venue,**

    (2)  **Inadmissible Evidence,**

    (3)  **Insufficient Evidence,**    (4)  **Shackling.**

  f. Were you represented by counsel on appeal?  [XX] Yes.  [ ] No.  If yes, state the attorney's name and address, if known:

    **Marvin L. Part, 6255 Sunset Blvd., #602, Hollywood, CA 90028.**

9. Did you seek review in the California Supreme Court?  [ ] Yes.  [XX] No.  If yes, give the following information:

  a. Result: _____  b. Date of decision: _____

  c. Case number or citation of opinion, if known: _____

  d. Issues raised:  (1) _____

    (2) _____

    (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
  **N/A**

11. Administrative Review:

  a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    **Board of Parole Hearings appeals (form 1040) and all appeals procedures were repealed as of May 1, 2004. (See 15 CCR Div. 2, Article 6, Appeals §§ 2050 through 2057.) No administrative appeal exists; thus, the only legal remedy is by way of petition for writ of habeas corpus as herein filed.**

  b. Did you seek the highest level of administrative review available?  [XX] Yes.  [ ] No.
    *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?   [XX] Yes. If yes, continue with number 13.   [ ] No. If no, skip to number 15.

13. a. (1) Name of court: Superior Court of California for the County of Riverside.

   (2) Nature of proceeding (for example, "habeas corpus petition"): Petition for Writ of Habeas Corpus.

   (3) Issues raised: (a) Same as the 6 Grounds raised herein.

      (b) _____

   (4) Result (Attach order or explain why unavailable): Denied (See Exhibit Y).

   (5) Date of decision: 03-02-07     Case Number RIC463199

   b. (1) Name of court: N/A

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   _____

   _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
   There have been no delays.

   _____

16. Are you presently represented by counsel?   [XX] Yes.   [ ] No. If yes, state the attorney's name and address, if known:
   Counsel is not retained for the purpose of this petition.  Steve Defilippis,
   625 N. First St., San Jose, CA 95112  (408) 292-0441

17. Do you have any petition, appeal, or other matter pending in any court?   [XX] Yes.   [ ] No. If yes, explain:
   Petition(s) for writ of habeas corpus in the Cal. Supreme Court challing 2005 parole hear-
   ing and the 9th Circuit challenging 2000, 2002 and 2003 parole denials.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   N/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 16 APRIL 2007                    ▶ _Uriahil U. Urick_
                                           (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS          Page 10 of 10.

## PROOF OF SERVICE BY MAIL
### (C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                    ) SS.  Harold Harvey Hawks v. B. Curry, Warden CTF
COUNTY OF MONTEREY )

I, _____Harold H. Hawks_____, am a resident of the State of California, County of Monterey. I am over the age of 18 years and I am a party to the within action. My business/residence address is the Correctional Training Facility, P.O. Box 689, Soledad, CA 93960-0689.

On ___16  APRIL___, 2007, I served the following:

Petition for Writ of Habeas Corpus; Exhibits Volume I (A through N) and Volume II (O thourgh Y); and Request/Motion for Judicial Notice.

_____ on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States Mail in the institution's United States Mailbox at the Correctional Training Facility, Soledad, California , addressed as follows:

California Court of Appeal
Fourth Appellate District, Division 2
3389 Twelfth Street
Riverside, CA 92501

Attorney General of California
Office of the Attorney General
P.O. Box-85266
San Diego, CA 92186-5266

There is a regular service by the United States Postal Service between the place of mailing and the places so addressed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___16TH___ day of ___APRIL___, 2007, at Soledad, California.

/S/ _____
Harold H. Hawks